### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

LEVINE, DAVID ANDREW
LEVINE, MONICA LARSON,

      Debtors.

_____

THOMAS H. FLUHARTY, Trustee of the
Bankruptcy Estate of David Levine and Monica
Levine,

      Plaintiff,

MARTIN P. SHEEHAN, Trustee of the
Bankruptcy Estate of Geostellar, Inc.,

      Co-Plaintiff,
v.

PHILADELPHIA INDEMNITY INSURANCE
COMPANY and DAVID A. LEVINE,

      Defendants.

Bankruptcy Case No.: 3:19-bk-01048

Adversary Proceeding No. 3:21-ap-00019

## PHILADELPHIA INDEMNITY INSURANCE COMPANY'S PRELIMINARY RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR A BRIEFING SCHEDULE

Philadelphia Indemnity Insurance Company ("PIIC") provides this preliminary response to

request that this Court allow for briefing of issues asserted in a Motion for Preliminary Injunction

filed by co-Plaintiffs Thomas Fluharty, Trustee of the Bankruptcy Estate of David Levine and

Monica Levine (the "Levine Trustee") and Martin P. Sheehan, Trustee of the Bankruptcy Estate of

Geostellar, Inc. (the "Geostellar Trustee") (collectively, "Plaintiffs") in regard to the subject of an

Adversary Complaint Plaintiffs filed to commence this case on August 13, 2021.  The Adversary

Complaint concerns issues in regard to insurance coverage for Defendant David A Levine, under Private Company Protection Plus Policy No. PHSD1249816 (the "Policy") issued by PIIC to Geostellar, Inc. which was in effect for a Policy Period of May 31, 2017 to May 31, 2018.  A true and correct copy of the Policy with an Extended Reporting Period Endorsement, which has been numbered in the bottom right corner consecutively for ease of reference, is attached to the Exhibit 1, the Declaration of Dirk E. Ehlers ("Ehlers Dec."), as Exhibit 1.1, and is referenced herein as "Ex. 1.1".  Mr. Levine is an "Individual Insured" under the Policy for which PIIC has agreed to provide a defense to Mr. Levine in the Lawsuit captioned *Sheehan v. Levine*, Bankruptcy Case No. 3:19-ap-00024 (the "Geostellar Lawsuit"), which is also pending in this Court.

Plaintiffs have scheduled a preliminary injunction hearing in this case on an *ex parte* basis without conferring with Defendants, upon a motion that is demonstrably inadequate.  The matters presented in Plaintiffs' Adversary Complaint and Motion for Preliminary Injunction involve complex issues which, if appropriately to be considered by this Court, should be the subject of briefing to provide the Court's due consideration of a proper record of fact and full disposition of law.  Neither of the Defendants have been afforded any opportunity to assert their respective responsive positions either in response to the Adversary Complaint or in briefing of the Motion for Preliminary Injunction, and as a result, neither a factual record nor an adequate discussion of applicable law have been provided to this Court.

While copies of the filed Adversary Complaint and Motion for Preliminary Injunction were provided by email to counsel who have represented the Defendants in regard to other matters on August 13, 2021, no indication of a request by Plaintiffs for a preliminary injunction hearing was provided to such counsel, who learned of the hearing request by happenstance on August 17, 2021, just two days prior to the scheduled hearing.  (Ehlers Dec., Ex. 1, ¶¶ 10-11, and Ex. 1.2, email

communication providing notice of lawsuit).  Notice of the hearing was instead provided, according

to the record by first class U.S. Mail delivery initiated on Sunday, April 15, 2021.  (Dckt. No. 8,

Certificate of Notice).  George Stewart, who has appeared as defense counsel for David Levine in

Geostellar Lawsuit, was provided notice of August 19, 2021 hearing in this case in an email from

Courtroom Deputy Lisa McNeil at 1:25 p.m. on August 18, 2021, which Mr. Stewart forwarded to

counsel who has represented PIIC in connection with its interests in the Geostellar Lawsuit (as to

which PIIC is not a party).  (Ehlers Dec., Ex. 1, ¶ 12 and Ex. 1.3, email from George Stewart to

Debra Varner, providing notice from Ms. McNeil).

Defendant PIIC respectfully requests that this Court deny Plaintiffs' improper and

unsupported request for a preliminary injunction, and further allow Defendants an opportunity to

file their responses to the Adversary Complaint and to provide a briefing schedule in regard to any

proper dispositive motion that may subsequently be filed in regard to the issues for which the

preliminary injunction is now improperly sought.  In support of this request, PIIC addresses in this

filing:  (1) why a preliminary injunction would be improper; (2) substantive issues as to which

Plaintiffs are wrong, as examples of why the disposition of these matters should take place only

after Defendants are provided an opportunity to provide a full record of facts and law to the Court

for its consideration; and (3) issues in regard to standing, which also should be briefed before this

proceeding can move forward (which should be the subject of Defendants' responses to the

Adversary Complaint).

## I.    Plaintiffs' Preliminary Injunction Request is Improper

## A.    Mandatory Injunctions are Disfavored

Plaintiffs here improperly seek a mandatory injunction to change the status quo, rather than

to preserve it.  The primary function of a preliminary injunction is to maintain or restore the status

3

quo.  *See Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (explaining that "a preliminary injunction preserves the status quo pending a final trial on the merits[.]").  Accordingly, any preliminary injunction must "be tailored to restrain no more than what is reasonably required to accomplish its ends."  *Consolidation Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971).  Plaintiffs seek a mandatory injunction because they seek to take control of a directors & officers liability insurance Policy issued for the benefit of Mr. Levine as an "Individual Insured," and thereby to confer a benefit to the Levine Trustee (the propriety of which is also not established, as discussed below).  Moreover, Plaintiffs seek to force PIIC to engage in settlement negotiations before its Insured's liability has been determined.

The law disfavors mandatory injunctions.  *See*, *e.g.*, *Vollette v. Watson*, Civil Action No. 2:12cv231, 2012 U.S. Dist. LEXIS 103322 (E.D. Va. July 24, 2012) ("… Plaintiffs have the burden to demonstrate that a preliminary injunction should issue in this case.  Furthermore, because Injunction Plaintiffs seek a mandatory injunction that would alter the status quo during the pendency of the litigation, the Court's inquiry is even more searching than in a typical case, and entry of the requested mandatory injunction is "disfavored" by governing law."); *Sun Microsystems, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litig.)*, 333 F.3d 517 (4th Cir. 2003)  ("Our application of this exacting standard of review is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature.")

**B.     A Preliminary Injunction Requires the Court's Consideration of Facts**

Court must evaluate facts when deciding preliminary injunction and enter an injunction only when the facts support the movant's claims of harm and interest.  It is a general principle that a court on a motion for a preliminary injunction must see evidence in support of movant's claims.

"When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party." *Queen Virgin Remy, Co. v. Thomason*, No. 1:15-CV-1638-SCJ, 2015 U.S. Dist. LEXIS 186411, 2015 WL 11422300, at *2 (N.D. Ga. June 10, 2015), *modified*, No. 1:15-CV-1638-SCJ, 2015 U.S. Dist. LEXIS 185667, 2015 WL 11455760 (N.D. Ga. Oct. 21, 2015) (citing *Imaging Business Machines, LLC. v. BancTec, Inc*., 459 F.3d 1186, 1192 (11th Cir. 2006)). If the evidence is contested, however, the court "'must assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications.'" *Weaver v. Henderso*n, 984 F.2d 11, 14 (1st Cir. 1993) (quoting *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co*., 864 F.2d 927, 929 (1st Cir. 1988)).

Here there is no evidentiary record. Plaintiffs produce no affidavits in support of their motion and the verification of their Adversary Complaint is inadequate. The Adversary Complaint lacks proper verification because it fails the standards required for an affidavit in support of summary judgment.

Plaintiff's title their Adversary Complaint a "Verified Complaint," but the pleading lacks proper verification. The verification states only: "the facts and allegations therein contained are true except so far as they are therein stated to be on information . . . ." (Verification, Dckt No. 1-1.) Such language is insufficient because it does not state the affiant's competence to make that statement, nor does it provide sufficient verification. For example, in *Tillery v. Borden*, Civil Action No. CBD-07-1092, 2010 U.S. Dist. LEXIS 92501 (D. Md. Sep. 3, 2010) a court presented with a similarly inadequate verification commented as follows:

> In large measure, a verified complaint is intended to provide the same evidentiary foundations as an affidavit. A properly verified complaint can provide a sufficient basis to oppose a motion for summary judgment. Pursuant to Fed. R. Civ. P. 56(e) an affidavit must "set out facts that would be admissible in evidence, and show that

the affiant is competent to testify on the matters stated." Assuming the Court were to give credence to the original verified Complaint, the verification is inadequate in that it merely states that the information set forth therein is believed to be "true and correct to the best of our knowledge, information and belief." Such an affidavit, or verification, is inadequate to withstand a motion for summary judgment. Information "believed" to be "true and correct" is not "admissible in evidence."

*Id*. at *7-8.

Accordingly, the verification of the Adversary Complaint is deficient on its face and the Court has no adequate factual record to establish Plaintiffs' right to injunctive relief.

**C.      Plaintiff Do Not Establish Irreparable Harm**

Plaintiffs assert only that allowing Mr. Levine to continue to assert a right to consent to a settlement will then change which party will receive money—this is merely a money damage issue and not an irreparable harm that is sufficient to require mandatory injunctive relief.

The Supreme Court's "frequently reiterated standard requires [a plaintiff] seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. NRDC, Inc*., 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) (internal emphasis omitted). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough." *Roe v. United States DOD*, 947 F.3d 207, 228 (4th Cir. 2020) (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)) (internal quotation marks and alteration omitted). Plaintiffs have not established irreparable injury at this point for two reasons. First, their only argument is that the Policy issued by PIIC insuring Mr. Levine will erode if funds are expended for Mr. Levine's defense. At worst, that means if the current state of affairs continues, money will be paid to lawyers in Defense Costs under the Policy instead of to the Geostellar Estate in settlement. However, the party seeking to control the right to consent under the Policy is the trustee for the personal bankruptcy estate for Mr. Levine and his wife in their Chapter 7 bankruptcy, rather than the Geostellar Trustee, and the value of their personal

bankruptcy estate will remain unchanged by the outcome.  In regard to the Geostellar Estate, it is already the case that some creditors will not be paid the entirety of debts owed, but moreover, the Geostellar Trustee does not have standing to assert Mr. Levine's rights under the Policy.

**D.**      **The Geostellar Trustee Has Not Provided Facts as to Standing for Injunctive Relief**

First, to establish standing at this stage of the case, a plaintiff is "not entitled to rest on . . . mere allegations" of standing "but must set forth by affidavit or other evidence specific facts" demonstrating the elements of standing.  *Beck*, 848 F.3d at 270 (quoting *Lujan*, 504 U.S. at 561). For purposes of deciding the application, the court must take such evidence as true and draw all reasonable inferences therefrom in a light most favorable to the plaintiff.  See *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 213 (4th Cir. 2020); *Pye v. United States*, 269 F.3d 459, 467 (4th Cir. 2001) (citing *Lujan*, 504 U.S. at 561).  The plaintiff must establish standing for each claim it seeks to press and for each form of relief it seeks.  *See Md. Shall Issue*, 971 F.3d at 209.

Plaintiff has stated only that the Geostellar Trustee has filed a claim against Mr. Levine in the Geostellar bankruptcy.  However, filing a claim against an Insured under the Policy does not establish standing.  West Virginia is not a direct-action state, and a claimant that has brought a claim against an insured under a liability policy under West Virginia law may not bring an action against an insurance company until it obtains a judgment against the insured.  The Geostellar Trustee, as a mere claimant against Levine, has no right to bring a direct action against PIIC.

The West Virginia Supreme Court of Appeals held in *Robinson*  v. *Cabell Huntington Hosp., Inc.*, 201 W.Va. 455, 460, 498 S.E.2d 27 (1997), that an injured party suing an insured tortfeasor has no standing to bring a direct action against the defendant's insurance company, with two narrow exceptions.  *Robinson v. Cabell Huntington Hosp., Inc.*, 201 W.Va. 455, 460,  498 S.E.2d 27 (1997), quoting *Mazon v. Camden Fire Ins. Ass'n*, 182 W.Va. 532, 533, 389 S.E.2d 743 (1990).  Those

exceptions are:  (1) where the insured fails to pay a judgment entered in a personal injury action (see *Broy v. Inland Mut. Ins. Co.*, 160 W.Va. 138, 233 S.E.2d 131 (1977)), and (2) "where the defendant's insurer has denied coverage" (see *Christian v. Sizemore*, 181 W.Va. 628, 383 S.E.2d 810 (1989)).  *Robinson*, *supra*, 201 W.Va. at 460.[1]  The court in *Robinson* expressly held that such claimants are not "third-party beneficiar[ies]" of the insurance contract.  *Id.*

The first exception obviously is not relevant here – as there is no unpaid judgment on behalf of Geostellar against Levine.  Moreover, there has been no "denial of coverage."  In *Christian v. Sizemore*, 181 W.Va. 628 (1989), the court held, in Syllabus Point 3, that "[a]n injured plaintiff may bring a declaratory judgment action against the defendant's insurance carrier to determine if there is policy coverage before obtaining a judgment against the defendant in the personal injury action where the defendant's insurer has *denied* coverage."  (Emphasis added.)  In *Christian*, the plaintiff brought an action for injuries she suffered in an automobile accident.  The defendants' insurance carrier denied coverage on the ground that the policy had lapsed before the accident occurred.  *Id.* at 629.  Under these circumstances, the court found that a declaratory judgment count against the insurance company could properly be joined with the action against the policyholders. The court acknowledged the principle that, in general, an action against a defendant's insurance carrier should not be joined in an action against the insured, so as to avoid the prejudice inherent in the possible mention of insurance coverage at trial.  *Id.* at 630.  However, because in the case before it the insurance carrier had *denied* any obligation to pay a judgment against the defendant, the court found it appropriate to seek early resolution of the coverage dispute:

---

[1]      *Robinson* identified a third exception, involving third party bad faith claims.  However, such claims were eliminated with the enactment of W.Va. Code § 33-11-4a in 2005, such that the third exception identified in *Robinson* no longer exists.  *Whittaker, LLC v. Nationwide Mut. Ins. Co.*, No. CIV. A. 2:07-963, 2008 WL 2063548, at *3 (S.D.W.Va. May 13, 2008).

> Declaratory judgment … provides a prompt means of resolving policy coverage disputes so that the parties may know in advance of the personal injury trial whether coverage exists.  This facilitates the possibility of settlements and avoids potential future litigation as to whether the insurer was acting improperly in denying coverage.  Moreover, as this case demonstrates, the use of declaratory judgment protects the plaintiff from an insured who has no independent assets and is not concerned about insurance coverage.

*Id.* at 632.

These concerns are not present here.  The *Christian* court noted that where "the coverage question" is separable from the issues in the underlying action, "it should ordinarily be decided first."  *Id.* at 632-633.

Post *Christian*, the West Virginia Supreme Court of Appeals in *Anderson v. Robinson*, 186 W. Va. 92, 411 S.E.2d 35 (1991), permitted the plaintiff to proceed in a direct action against the tortfeasor's insurer to satisfy a judgment, which had already been obtained, where the bankruptcy court modified the automatic stay in order for the plaintiff's lawsuit to proceed to the extent of available insurance coverage.  The critical factor however in *Anderson* was that a judgment had already been obtained.  In rendering its ruling, the Court noted it was only in certain circumstances that an injured plaintiff may proceed against the tortfeasor's insurer.  In this case, not only has a judgment not yet been obtained, but the Geostellar Trustee's operative complaint is the subject of a pending motion to amend, as to which the date for objections expires on August 25, 2021.  (*Sheehan v. Levine*, 3:19-ap-00024, Dckt. 57-58).

Plaintiffs rely heavily upon a ruling by the 10th Circuit in *Olah v. Baird (In re Baird)*, 567 F.3d 1207 (10th Cir. 2009), in which the court ruled that Utah law allowed the claimants, alleged victims of a tort by the debtor, to pursue an action against the insurer for their "loss," which was deemed to have been fixed as to the claimants at the time of the alleged tort, under Utah law.  However, Utah law does not apply in this case.  Under West Virginia law, an insured "loss," and with it the claimants' right to a direct action, has not been determined by a judgment establishing

the liability of Levine.  The Geostellar Trustee has no standing to assert a claim under against PIIC, because the liability of PIIC's Insured, David Levine, has not been established.

### E.      The Levine Trustee Has Not Established Standing

Plaintiffs assert that Mr. Levine's right of consent to settlement under the Policy as an Individual Insured should be deemed to have been transferred to the Levine Trustee because the rights of Mr. Levine under the Policy have been transferred to the Levine Trustee in connection with Mr. Levine's personal bankruptcy.  Plaintiffs also rely upon the 10th Circuit ruling applying Utah law in *Olah v. Baird (In re Baird)*, 567 F.3d 1207 (10th Cir. 2009), for this proposition. However, the nature and scope of the insurance coverage under the Policy in this case are materially different from the coverage for the debtor in *Olah* that was found to have been assigned to the trustee in that case.  The same result does not follow in this case.

In *Olah* a malpractice liability insurance purchase by a doctor was deemed to have been assigned to the trustee of his personal bankruptcy estate, and because the doctor's rights under the malpractice liability insurance policy were assigned to the trustee, the trustee was deemed thereby also to have also acquired the doctor's right to consent to a settlement with the claimants who were seeking to establish the personal liability of the doctor for loss covered by his malpractice liability insurance policy.  However, this case does not involve coverage for Mr. Levine's liability under an insurance policy that he purchased, for himself, for his own personal liability, that by virtue of such a qualities would automatically be deemed part of his personal assets transferred to a trustee upon his declaration of bankruptcy.  The Policy in this case was purchased by Geostellar, not only for Mr. Levine, but also for Geostellar and a host of other "Individual Insureds" as defined therein. (Ehlers Dec., Ex. 1, ¶¶ 3-4 and Ex. 1.1, p. 49).  None of those individuals, either Mr. Levine or anyone else, obtained coverage under the Policy for his or her personal liability.  To the contrary,

the insurance provides coverage for Individual Insureds only for their conduct as such.  (Ehlers Dec., Ex. 1, ¶¶ 3-8 and Ex. 1.1, pp. 42, 44-45, 49 and 64).

Mr. Levine's coverage under the Policy, confined to his conduct and liability as an Individual Insured, does not create a pool of funds for his personal creditors, and its availability or lack of availability will have no impact upon the assets that are a part of his personal estate. Therefore the finding in *Olah* by the 10th Circuit that the trustee in a personal bankruptcy had been assigned the doctor's personal malpractice policy, which had been purchased by the debtor himself, only for himself and only for his own personal liability, is not a finding that directors & officers liability policies, not allowing coverage for personal liability of directors or officers – are transferred to a personal bankruptcy estate of any one director or officer insured thereunder along with a corporate entity.  The proceeds of a directors and officers liability policy will never be used to reduce the liability of an insured director or officer for the personal debts that are impacted by a personal bankruptcy, and Plaintiffs have provided no example of such a policy being assigned to an individual's personal bankruptcy estate.

The very nature of the directors and officers liability coverage provided to Mr. Levine is to protect him, as well as a many others, for incurring liability as directors or officers of Geostellar, the corporation that obtained the coverage for such directors and officers to ensure that any potential loss they might incur as the result of their service in such capacities would remain separate from their personal finances.  This in turn provides an incentive for qualified individuals to serve as directors and officers, free from risk that the significant risks of work on behalf of the companies that they serve will impact their personal liability.  Courts routinely recognize that the benefits provided to directors and officers by directors & officers liability insurance coverage cannot be

stripped from them by a bankruptcy trustee – because the contract is written provides a secure and

independent resource to them to rely upon:

> D&O policies are obtained for the protection of individual directors and officers. Indemnification coverage does not change this fundamental purpose. There is an important distinction between the individual liability and the reimbursement portions of a D&O policy. The liability portion of the policy provides coverage directly to officers and directors, insuring the individuals from personal loss for claims that are not indemnified by the corporation. Unlike an ordinary liability insurance policy, in which a corporate purchaser obtains primary protection from lawsuits, a corporation does not enjoy direct coverage under a D&O policy. It is insured indirectly for its indemnification obligations. In essence and at its core, a D&O policy remains a safeguard of officer and director interests and not a vehicle for corporate protection.

*Ochs v. Lipson (In re First Central Financial Corp.)*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999). This

is why, as PIIC had provided in its motion in the Geostellar bankruptcy proceeding, the Geostellar

Trustee – even though Geostellar is itself an Insured under the Policy – has no right to preclude Mr.

Levine from obtaining the benefit of his coverage in a lawsuit against him as a director or officer

for his defense. See *In re Geostellar, Inc.*, 3:18-BK-0045, Dckt No. 159.

The hierarchy of rights created by directors and officers liability coverage is clear: directors

and officers insured thereunder are given the ability to defend themselves from claims against them

for their alleged conduct as directors and officers, which is confined to their capacities as such. The

company that purchased the policy, which also insures the company itself for liability, is placed

second by the order of payments – a circumstance irrelevant in this case because the company,

Geostellar, is not facing any liability for which the policy is required. Because the Policy that

Geostellar purchased from PIIC is an eroding policy – by which the defense of the Insureds directors

and officers reduces the limit of liability, the Policy is less expensive than a non-eroding policy,

which would maintain a separate source of funds for defense versus liability. This means that the

contract that was purchased by Geostellar to protect Mr. Levine as a director and officer of

Geostellar, first and foremost is available to enable him to defend against liability, and then for the liability that may be incurred. The limit being a significant amount of funds, either $3 million or $1 million, depending upon the Insuring Agreement that would apply, is impacted by its use for the defense of Mr. Levine, but it is not eliminated. Creditors who ultimately stand to recover in a lawsuit against Mr. Levine for alleged conduct as a director or officer of Geostellar may, *if* they establish liability, then be entitled to a recovery for such liability from the balance available under the Policy.

Purchasers of an eroding Policy – or their successors such as the Geostellar Trustee – cannot rewrite the insurance contract, either to eliminate the priority of payment to allow for the directors to obtain their defense, or to give creditors a right to recover any amount of the limit of liability without first actually establishing liability of an Insured under the Policy. If Geostellar had wanted to purchase a policy providing for the defense of its directors and officers on top of the limit of liability available to satisfy a judgement, Geostellar could have done so, but it would have then needed to pay a higher premium for such a product. The Geostellar Trustee, and Geostellar's creditors, may not like that Mr. Levine has access to the limit of liability for his defense, but that is the contract that was purchased – a contract that incentivizes a claimant to take into consideration that protracted litigation will eliminate the source of funds available to satisfy a judgment.

Where do the Levine Trustee and Mr. Levine's personal bankruptcy estate sit in this group of potential beneficiaries of the Policy? Nowhere. Mr. Levine's personal liability is not a risk insured under the directors and officers liability policy purchased by Geostellar for (1) the defense of Mr. Levine, and (2) for liability he may incur for conduct in his capacity as a director or officer, if – and only if – that liability is ever actually established, which certainly has not happened. The Policy in this case has not been assigned to the Levine Trustee, because it is not and never will be

the personal property of Mr. Levine, and will never be used to satisfy any of his personal debts. The *Olah* case, involving a malpractice policy for the debtor's personal liability, has no bearing on the proper result in this case, because the *Olah* case involved a policy solely purchased to provide payment for the debtor's personal liability. Because it was an assignment of the policy in *Olah* to the debtor's personal bankruptcy trustee that was deemed to likewise transfer the right of the policy holder to consent to the settlement to the trustee, the Levine Trustee is misplaced in relying upon *Olah* in this case to assert he has now acquired that right.

**F.   Additional Significant Issues**

There are two additional significant issues that are not addressed by Plaintiffs in their Motion for a Preliminary Injunction that are also significant and should properly be the subject of a response to the complaint and proper briefing before any disposition is rendered by the Court as to the issues in this case. First, consideration of the applicability of a provision for consent to a settlement under a liability policy is not a core proceeding. See *Roman Catholic Diocese of Rockville Ctr. v. Arrowood Indemnity Co.*, 2021 U.S. Dist. LEXIS 94233 *18-20 (S.D.N.Y. May 17, 2021) (In determining that a determination of a coverage issue would not be a core proceeding, the court noted in regard to exercise of a right to consent for a settlement: "Adding another party to the negotiating table during settlement discussions does not require the estate to make any payments at all, let alone payments that are prerequisites to insurance coverage. Accordingly, the consent-to-settlement provisions do not render the claims against Arrowood core.").

Second, in regard to a determination of any coverage issues, Plaintiffs are subject to an arbitration provision in the Policy. Part 6, COMMON POLICY CONDITIONS, Section XIV., ACTION AGAINST THE UNDERWRITER; ARBITRATION, provides:

XIV.   ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.   No person or entity shall have any right under this Policy to join the Underwriter as a party to any action against the Insured to determine the Insured's liability, nor shall the Underwriter be impleaded by the Insured or their legal representatives. Bankruptcy or insolvency of the Insured or their successors in interest shall not relieve the Underwriter of its obligations hereunder.

B.   Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any Insured and the Underwriter, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such Insured, one arbitrator selected by the Underwriter and a third independent arbitrator selected by the first two arbitrators.

Ehlers Dec., ¶ and Ex. 1.1, p. 59.

## CONCLUSION

For these foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is improper and inadequate, and should be denied.  The case should proceed with Defendants' filing of a response to the Adversary Complaint, after which the myriad of issues that require due consideration of applicable common law and a record of admissible facts should be addressed through briefing by the parties to this case.

Dated this 19th day of August, 2021.

Defendant, PHILADELPHIA
INDEMNITY INSURANCE COMPANY
By Counsel:

*/s/ Debra Tedeschi Varner*

Debra Tedeschi Varner (WV State Bar #6501)

Varner & Van Volkenburg PLLC
360 Washington Avenue
Clarksburg, WV 26301
Telephone: (304) 918-2840
Facsimile: (304) 566-1161

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

IN RE:

DAVID ANDREW LEVINE                          Bankruptcy Case No. 3:19-BK-01048
and MONICA LARSON LEVINE,                     Chapter 7

        Debtors.

THOMAS FLUHARTY,
Trustee of the Bankruptcy Estate of
David Levine and Monica Levine,
- and -
MARTIN P. SHEEHAN,
Trustee of the Bankruptcy Estate of
Geostellar, Inc.,

        Plaintiffs,

v.                                            Adv. Proc. No. 3:21-AP-00019
                                             Judge: Becker McKay Wyckoff Mignault
PHILADELPHIA INDEMNITY
INSURANCE COMPANY,
and DAVID A. LEVINE,

        Defendants.

## CERTIFICATE OF SERVICE

Service of the foregoing ***PHILADELPHIA INDEMNITY INSURANCE COMPANY'S PRELIMINARY RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR A BRIEFING SCHEDULE*** was had upon the parties, as set forth below, by electronic notification via the Court's CM/ECF system, and/or by mailing a true copy hereof, by United States Mail, postage prepaid, this 19th day of August, 2021:

Thomas H. Fluharty, Esquire
thfdebtatty@aol.com
wv12@ecfcbis.com
*Plaintiff*

David Andrew Levine
2426 Steamboat Run Road
Shepherdstown, WV 25443-4115
*Defendant*

Martin P. Sheehan, Trustee
sheehanparalegal@wvdsl.net
sheehanassistant@wvdsl.net
sheehanbankruptcy@wvdsl.com
wv05@ecfcbis.com
*Plaintiff*

Patrick S. Cassidy, Esquire
pcassidy@walslaw.com
kch@walslaw.com
Timothy F. Cogan, Esquire
tfc@walslaw.com
smh@walslaw.com
***Counsel for Plaintiff, Martin P. Sheehan***

               /s/ *Debra Tedeschi Varner*

16

EXHIBIT 1

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:                                          :

LEVINE, DAVID ANDREW                            :
LEVINE, MONICA LARSON                           : Bankruptcy Case No.: 3:19-bk-01048

     Debtors.                                 :

_____         :

THOMAS H. FLUHARTY, Trustee of the              :
Bankruptcy Estate of David Levine and Monica    :
Levine,                                         :

     Plaintiff,                               :

MARTIN P. SHEEHAN, Trustee of the               : Adversary Proceeding No. 3:21-ap-00019
Bankruptcy Estate of Geostellar, Inc.           :

     Co-Plaintiff,                            :

v.                                              :

PHILADELPHIA INDEMNITY INSURANCE                :
COMPANY and DAVID A. LEVINE,                    :

     Defendants.                              :

_____

## <u>DECLARATION OF DIRK E. EHLERS</u>

I, Dirk E. Ehlers, declare as follows:

I make this Declaration pursuant to 28 U.S.C. §1746 and state as follows:

1.     I am over the age of twenty-one (21) years and a citizen and resident of the State of

Illinois.  I am competent to make this Declaration and I have personal knowledge of the matters set

forth herein, and if called as a witness to testify I could and would testify competently to those

matters.  I make this Declaration in support of the motion of Philadelphia Indemnity Insurance

Company ("PIIC") entitled "Philadelphia Indemnity Insurance Company's Preliminary Response

to Motion for Preliminary Injunction and Request for a Briefing Schedule."

## **The Policy**

2.      Exhibit 1.1 to this Declaration is a true and correct copy of Private Company Protection Plus Policy No. PHSD1249816 (the "Policy") issued by PIIC to Debtor, Geostellar, Inc. for a Policy Period of May 31, 2017 to May 31, 2018, including an additional Extended Reporting Period Endorsement, as to which consecutive page numbers 1 through 76 have been added in the lower right corner for ease of reference.

3.      The Policy defines "Insured" under Part 4., COMMON POLICY DEFINITIONS, Section H. to mean "the Private Company and Individual Insured." Ex. 1.1, p. 49.

4.      The Policy defines "Individual Insured" under Part 4., COMMON POLICY DEFINITIONS, Section G. to mean, in pertinent part: "any individual who has been, now is or shall become a director, officer, governor, trustee, Employee, volunteer, management committee member, or member of the Board of Managers of the Private Company . . . ." Ex. 1.1, p. 49.

5.      Subject to the other terms and conditions of the Policy, the under Part 1, the DIRECTORS AND OFFICERS LIABILITY INSURANCE, Section I., INSURING AGREEMENTS, Subsections A., B. and C., the Policy provides as follows:

A.      INDIVIDUAL LIABILITY COVERAGE

> The Underwriter shall pay on behalf of the Individual Insured, Loss from Claims made against the Individual Insureds during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&O Wrongful Acts, except to the extent the Private Company has indemnified the Individual Insureds for such Loss.

B.      PRIVATE COMPANY INDEMNITY COVERAGE

> The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against Individual Insureds, during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act.

C.      PRIVATE COMPANY LIABILITY COVERAGE

2

> The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against the Private Company during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act.

Ex. 1.1, p. 42.

6.      Under Part 1, DIRECTORS AND OFFICERS LIABILITY INSURANCE, Section II., DEFINITIONS, Subsection A., as amended by CORPORATE ADVANTAGE PRO-PAK COVERAGE, PI-PRD-74 (05/06), the Policy defines "D&O Wrongful Act" as follows:

> A.      D&O Wrongful Act means any actual or alleged:
>
> 1.      act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured in his/her capacity as an Individual Insured; or
>
> 2.      act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the Private Company; or
>
> 3.      act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured arising out of serving in his/her capacity as a director, officer, governor or trustee of an Outside Entity if such service is at the written request of the Private Company.

Ex. 1.1, pp. 42, 64.

7.      Under Part 2, EMPLOYMENT PRACTICE LIABILITY INSURANCE, Section I., INSURING AGREEMENT, the Policy provides as follows:

> The Underwriter shall pay on behalf of the Insured, Loss from Claims made against the Insured during the Policy Period (or, if applicable, the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for an Employment Practice Act.

Ex. 1.1, p. 44.

8.      Under Part 2, EMPLOYMENT PRACTICE LIABILITY INSURANCE, Section II., DEFINITIONS, the Policy provides as follows:

> A.      Employment Practice Act means any actual or alleged:
>
> 1. wrongful dismissal, discharge or termination of employment;
> 2. breach of a written or oral employment contract or implied employment

3

contract;
3. employment related misrepresentation;
4. wrongful failure to promote;
5. violation of employment discrimination laws (including harassment);
6. wrongful deprivation of a career opportunity;
7. employment related wrongful discipline;
8. negligent employee evaluation;
9. employment related invasion of privacy;
10. employment related defamation (including libel and slander);
11. sexual or workplace harassment of any kind;
12. constructive discharge of employment;
13. employment related Retaliation;
14. employment related humiliation;
15. wrongful demotion;
16. negligent reassignment;
17. violation of any federal, state or local civil rights laws;

and committed or attempted by an Individual Insured in his/her capacity as an Individual Insured or by the Private Company.

Solely with respect to any Claim brought by or on behalf of any Third Party, Employment Practice Act means any actual or alleged wrongful failure to employ, discrimination, sexual harassment or violation of such Third Party's civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an Individual Insured in his/her capacity as an Individual Insured or by the Private Company.

Ex. 1.1, pp. 44-45.

9.      Under Part 6, COMMON POLICY CONDITIONS, Section XIV., the Policy

provides:

XIV.    ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.      No person or entity shall have any right under this Policy to join the Underwriter as a party to any action against the Insured to determine the Insured's liability, nor shall the Underwriter be impleaded by the Insured or their legal representatives. Bankruptcy or insolvency of the Insured or their successors in interest shall not relieve the Underwriter of its obligations hereunder.

B.      Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any Insured and the Underwriter, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such Insured, one arbitrator selected by the Underwriter and a third independent arbitrator selected by the first two arbitrators.

Ex. 1.1, p. 59.

### The Emails

10.     I was first advised of a hearing for the Motion for Preliminary Injunction filed in the captioned proceeding by George Stewart on August 17, 2021, after Mr. Stewart advised he had learned of the hearing on August 17, 2021.

11.     Attached as Exhibit 1.2 is a true and correct copy of an email communication dated August 13, 2021 from Molly Sovich, legal assistant to Martin P. Sheehan, to me and other recipients stated therein, providing copies of the filed captioned Adversary Complaint, Verification, Exhibit (the Policy issued by PIIC), Motion for Preliminary Injunction, Memo in Support of Motion for Preliminary Injunction and Certificate of Service.

12.     Attached as Exhibit 1.3 is a true and correct copy of an August 18, 2021 email from George Stewart to Debra Varner, providing a copy of the email from Courtroom Deputy Lisa McNeil to Mr. Stewart, issued at 1:25 p.m. on August 18, 2021, providing notice of the August 19, 2021 hearing in this case.

I declare under penalty of perjury under the laws of the United States of America and the State of Illinois that the foregoing is true and correct.

Dated this the 19th day of August 2021.

_____
**Dirk E. Ehlers**

# Exhibit 1.1

# Private Company Protection Plus
# Policy No. PHSD1249816

# POLICY CHANGE DOCUMENT

**POLICY NO.:** PHSD1249816

| Philadelphia Indemnity Insurance Company | 952 | MAURY DONNELLY & PARR, INC. |
|---|---|---|

NAMED INSURED     Geostellar, Inc.

MAILING ADDRESS     2426 Steamboat Run Rd
Shepherdstown, WV 25443-4115

POLICY PERIOD:     FROM   05/31/2017    TO   05/31/2018      at
12:01 A.M. Standard Time at your mailing address shown above.

CHANGE EFFECTIVE   05/31/2018              CHANGE # 2         REVISION # 2

DESCRIPTION

In consideration of the premium reflected, the policy is amended as indicated below:

12 Month Extended Reporting Period Endorsement is added.  Premium for endorsement is fully earned.

Path ID 11739555

Total Annual
Additional/Return Premium $              15,801.43
ADDITIONAL

Total Prorate
Additional/Return Premium $              15,801.43
ADDITIONAL

COUNTERSIGNED

(Date)

BY

(Authorized Representative)

05/29/2018
Issue Date

PI-PRD-17 (04/02)

## <u>THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.</u>

## EXTENDED REPORTING PERIOD

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Pursuant to PART 6 COMMON POLICY CONDITIONS, section VIII., and in return for additional premium of $ 14,842.00 , it is agreed and understood that an Extension Period is granted, effective 05/31/2018, and:

☒ Expiring on 05/31/2019

☐ with no expiration.

All other terms of the policy are unchanged.

2

## POLICY CHANGE DOCUMENT

**POLICY NO.:** PHSD1249816

| Philadelphia Indemnity Insurance Company | 952 | MAURY DONNELLY & PARR, INC. |
|---|---|---|

NAMED INSURED    Geostellar, Inc.

MAILING ADDRESS    2426 Steamboat Run Rd
Shepherdstown, WV 25443-4115

POLICY PERIOD:    FROM   05/31/2017    TO   05/31/2018    at
12:01 A.M. Standard Time at your mailing address shown above.

CHANGE EFFECTIVE   01/22/2018    CHANGE # 1    REVISION # 1

DESCRIPTION

In consideration of the premium reflected, the policy is amended as indicated below:

The mailing address is amended to read:

2426 Steamboat Run Rd
Shepherdstown, WV 25443

Path ID 11389091

Total Annual
Additional/Return Premium $         0.00
NO CHANGE

Total Prorate
Additional/Return Premium $         0.00
NO CHANGE

COUNTERSIGNED                          BY

(Date)                          (Authorized Representative)

01/23/2018
Issue Date



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

A Member of the Tokio Marine Group

## Philadelphia Indemnity Insurance Company
# COMMON POLICY DECLARATIONS

**Policy Number:** PHSD1249816

**Named Insured and Mailing Address:**
Geostellar, Inc.
2426 Steamboat Run Rd
Shepherdstown, WV 25443-4115

**Producer:** 952
MAURY DONNELLY & PARR, INC.
24 Commerce Street
BALTIMORE, MD 21202

(410)685-4625
at 12:01 A.M. Standard Time at your mailing
address shown above.

**Policy Period From:** 05/31/2017  **To:** 05/31/2018

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | 29,847.26 |
| Crime Protection Plus | 1,754.60 |
| **Total** | **$ 31,601.86** |
| Total Includes Fees and Surcharges (See Schedule Attached) | 172.86 |

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (06/14)

Secretary

President and CEO

4

Change Date: 01/22/2018                                                PI-PRD-1 (09/02)



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

## Philadelphia Indemnity Insurance Company

Policy Number:  PHSD1249816

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND R REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FO DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item     1.        Private Company Name and Address:
                   Geostellar, Inc.
                   2426 Steamboat Run Rd
                   Shepherdstown, WV 25443-4115


                   Internet Address: www.  geostellar.com

Item     2.        Policy Period:         From:  05/31/2017        To:  05/31/2018
                                          (12:01 A.M. local time at the address shown in Item 1.)


Item     3.        Limits of Liability:
         (A)       Part 1, D&O Liability:          $          3,000,000 each Policy Period.
         (B)       Part 2, Employment Practices:   $          1,000,000 each Policy Period.
         (C)       Part 3, Fiduciary Liability:    $          1,000,000 each Policy Period.
         (D)       Aggregate, All Parts:           $          5,000,000 each Policy Period.


Item     4.        Retention:
         (A)       Part 1, D&O Liability:       $       50,000  for each Claim under Insuring Agreement B & C.
                   Private Offering: $          50,000  for each Claim under Insuring Agreement B & C.
         (B)       Part 2, Employment Practices:  $       25,000  for each Claim.
         (C)       Part 3, Fiduciary Liability:   $            0  for each Claim.


Item     5.        Prior and Pending Date: Part 1    05/16/2013    Part 2    05/06/2013  Part 3    05/16/2013


Item     6.        Premium:      Part 1 $  23,270.00     Part 2 $  5,709.00      Part 3 $    705.00

                                          *Total Premium*:  $    29,847.26


Item     7.        Endorsements:  SEE SCHEDULE

5

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

Authorized Representative                    Countersignature                    Countersignature Date

Change Date: 01/22/2018

PI-CRP-01 (06/05)



A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

## *CRIME PROTECTION PLUS DECLARATIONS*

Policy Number:  PHSD1249816

In return for the payment of the premium, and subject to all the terms of this Policy, we agree with you to provide the insurance stated in this Policy.

DECLARATIONS

ITEM

1. Named Insured:  Geostellar, Inc.
     2426 Steamboat Run Rd
2. Mailing Address:  Shepherdstown, WV 25443-4115

3. Policy Period**:** from  05/31/2017  to  05/31/2018
     (12:01 A.M. Standard Time at Your Mailing Address)

4. Coverages, Limits of Insurance and Deductibles**:**

☐  Loss Sustained Option   ☒  Discovery Option
     (If no box is checked, the Loss Sustained Option shall apply)

Insuring Agreements, Limit of Insurance and Deductible Amounts shown below are subject to all of the terms of this policy that apply.

| Insuring Agreements Forming Part of This Policy | Limit of Insurance | Deductible Amount |
|---|---|---|
| A1. EMPLOYEE THEFT AND CLIENT COVERAGE | $        1,000,000 | $        10,000 |
| A2. ERISA FIDELITY | $        1,000,000 | $        NIL |
| B.  FORGERY OR ALTERATION, including Credit, Debit, or Charge Card Extension ($25,000 limit) | $ | $ |
| C.  INSIDE THE PREMISES | $ | $ |
| D.  OUTSIDE THE PREMISES | $ | $ |
| E.  MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY | $ | $ |
| F.  COMPUTER FRAUD AND FUNDS TRANSFER FRAUD | $ | $ |

5. Form Numbers of Endorsements Forming Part of This Policy When Issued: SEE SCHEDULE
6. Cancellation of Prior Insurance**:**  By acceptance of this Policy, you give us notice canceling prior policies or bonds numbered: _____
     _____ the cancellations to be effective at the time this policy becomes effective.

This Policy has been signed by the Company's President and Secretary.

Includes copyright material of the Insurance Services Office Inc., used with its permission.

7



**PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, PA 19004

### RENEWAL APPLICATION FOR:

**PRIVATE COMPANY PROTECTION PLUS
DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE**

**NOTICE: THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE UNDERWRITER PURSUANT TO THE TERMS HEREIN. THIS POLICY PROVIDES A LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS THAT SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS. FURTHER NOTE THAT DEFENSE COSTS PAID SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

#### Instructions

- Whenever used in this Application the term **Applicant** shall mean the Named Corporation and its wholly-owned/controlled Subsidiaries and their respective Directors, Officers, Trustees or Governors.
- The **Applicant** is required to complete Application Sections 1 and 5.
- The **Applicant** should complete the other applicable Section(s) for which coverage is desired. (See chart below)

| Check Coverage Desired | Application Section | Requested Limit | Requested Retention | Requested Effective Date |
|---|---|---|---|---|
| General Information | 1 | N/A | N/A | N/A |
| ✓ Directors & Officers | 2 | $3,000,000 | $50,000 | 5/26/2017 |
| ✓ Employment Practices | 3 | $1,000,000 | $25,000 | 5/26/2017 |
| ✓ Fiduciary Liability | 4 | $1,000,000 | $0 | 5/26/2017 |
| General Summary | 5 | N/A | N/A | N/A |

#### SECTION 1 – GENERAL INFORMATION

1. Name of **Applicant**: Geostellar, Inc.

2. Change in Address: ✓ None or _____

3. Change in website address: ✓ None or www. _____

4. Have there been any changes in the **Applicant's** operations?: ☐ Yes ✓ No **If yes, please provide details.**

5. The Officer of the **Applicant** designated to receive any and all notices from the Underwriter or their authorized representative concerning this insurance is:  Name: David Levine

#### Section 2 - DIRECTORS & OFFICERS INFORMATION
(Complete this section **only** if Directors & Officers Liability coverage is desired.)

6. **Ownership Information:**

a) Number of common shares outstanding: 5,104,892           If LLC, number of membership shares: _____

PI-PRD-Renewal App (06/11)

© 2011 Philadelphia Insurance Companies

8

**Directors & Officers information cont'd**

b) Number of common shareholders: 46 _____   Number of active members: _____

c) Total number of shares owned directly or beneficially by Directors & Officers or Board of Managers: Attached _____

d) Does any shareholder(s) or group of affiliated shareholders (including an employee stock ownership plan) own more than five (5)% of the voting shares directly or beneficially? ☑ Yes ☐ No  **If yes, please provide details.**

See attached cap table
_____

e) Are there any changes in ownership from the prior year? ☑ Yes ☐ No **If yes, please provide details**.

See attached cap table
_____

7. Provide a list of all direct and indirect subsidiaries.

Name: NONE _____   Type of Business: _____

Percent Owned by the **Applicant**: _____ %   Date Created / Acquired: _____

Name: _____   Type of Business: _____

Percent Owned by the **Applicant**: _____ %   Date Created / Acquired: _____

Name: _____   Type of Business: _____

Percent Owned by the **Applicant**: _____ %   Date Created / Acquired: _____

**If additional space is needed, please attach a separate page or use the additional information page provided at the end of the application.**

8. In the next twelve (12) months, does the **Applicant** anticipate being involved in any of the following:
   **If yes, provide details by attachment.**

| | |
|---|---|
| Merger, acquisition or consolidation with another entity? | ☐ Yes ☑ No |
| Sales, distribution or divestiture of any assets other than in the ordinary course of business? | ☐ Yes ☑ No |
| Changes in the board of directors or senior management (other than death or retirement)? | ☐ Yes ☑ No |
| Change in the **Applicant's** independent auditors? | ☐ Yes ☑ No |

9. **Offering of Securities Information**

a) Within the next twelve (12) months is the **Applicant** contemplating any private offering of debt or equity of securities? ☑ Yes ☐ No **If yes, please attach the offering memorandum or prospectus describing the essential terms of each transaction, including the effective date, the professionals used, the amount of the offering and the current status of each such transaction.**

10. **Financial Information**

a) Within the next twelve (12) months, is the **Applicant** contemplating any bankruptcy, reorganization or arrangement with creditors under federal or state law? ☐ Yes ☑ No

b) Is the **Applicant** in violation of any of its debts or loan convenants? ☐ Yes ☑ No

c) In the past twelve (12) months, did an Independent CPA render a "going concern" opinion? ☑ Yes ☐ No

PI-PRD-Renewal App (06/11)

© 2011 Philadelphia Insurance Companies

9

**Note: If the Applicant answered yes to 10 (a), (b), or (c) please attach details including the most recent financial audit, review or compilation with the auditors notes.**

11. **Outside Directorship**

Does the **Applicant** direct or request any individual to serve as director, officer, governor or trustee of any other entity? ☐ Yes ☑ No  **If yes, please complete questions a – g below.**

a) Name of individual director, officer, governor or trustee: _____ Position held: _____
b) Name of outside entity: _____
c) Nature of entity's business: _____
d) Percentage of ownership by **Applicant**: _____ %  Domestic or Foreign: _____
e) Does the outside entity provide indemnification to its Directors and Officers? ☐ Yes ☐ No
f) Complete the following information regarding the Directors and Officers Liability Insurance carried by the outside entity: Insurer: _____ Limit of Liability _____ Policy Period: _____
g) Has the outside entity or its Directors and Officers been involved in any Directors and Officers Liability litigation? ☐ Yes ☐ No

<u>**Section 3 - EMPLOYMENT PRACTICES INFORMATION**</u>
(Complete this section **only** if Employment Practices Liability coverage is desired.)

12. Please provide the following employee count information:

| U.S. based employees: | Currently | One Year Ago | Two Years Ago |
|---|---|---|---|
| Total Full Time: | 30 | 29 | 15 |
| Total Part Time: | 0 | 0 | 0 |
| Volunteers: | 0 | 0 | 0 |
| Temporary: | 0 | 0 | 0 |
| Leased: | 0 | 0 | 0 |
| Total Non U.S. based employees: | 0 | 0 | 0 |
| **TOTAL SUM OF ABOVE:** | 30 | 29 | 15 |

Number of employees per the following states:

| | Currently | One Year Ago | Two Years Ago |
|---|---|---|---|
| CA: | 3 | 2 | 2 |
| FL: | 0 | 0 | 0 |
| NJ: | 0 | 0 | 0 |
| NY: | 0 | 0 | 0 |
| TX: | 0 | 0 | 0 |

13. Total number of current employees with annual compensation greater than $100,000: _____ 9 _____

14. How many employees have been terminated or demoted in the past twelve (12) months?

Voluntary: 7 _____   Involuntary: 9 _____   Laid Off: 6 _____

15. Is any reduction of employees or change of status anticipated or being contemplated in the next year?
☐ Yes ☑ No  **If yes, number estimated**: _____

16. Does the **Applicant** anticipate any plant, facility, branch, office, or department closing, consolidation, reorganization or layoff in the next twelve (12) months? ☐ Yes ☑ No **If yes, provide details.**

17. Does the **Applicant** have a human resources department? ☑ Yes ☐ No  **If no, describe how this function is handled.**

PI-PRD-Renewal App (06/11)

**Employment Practices Liability (continued)**

18. **Human Resource Policies and Procedures**

Has the **Applicant** implemented any new employment policies or procedures over the past twelve (12) months?
☐ Yes  ☑ No  **If yes, please provide details**.

---

### Section 4 - FIDUCIARY LIABILITY COVERAGE
(Complete this section **only** if Fiduciary Liability coverage is desired.)

19. List all plans for which coverage is requested (use attachment if necessary):

| Plan Name | Year Established | Assets / Contributions | Type* | Participants | Administrator |
|---|---|---|---|---|---|
| Example: | | | | | |
| The ABC Manufacturing Corp 401K Plan | 2000 | $1,000,000 | 3 | 75 | self |
| a) Geostellar, Inc. Employee Plan | 2014 | 121,587.51 | 2 | 2 | PEO-TriNet |
| b) | | | | | |
| c) | | | | | |
| d) | | | | | |

* **1** = Employee Welfare Benefit Plan (as defined by ERISA), **2** = Defined Contribution Plan (as defined by ERISA), **3** = Defined Benefit Plan (as defined by ERISA), **4** = Other. **If "Type" is an ESOP a Fiduciary Liability - ESOP Supplement must be completed.**

**If additional space is needed, please attach a separate page or use the additional information page provided at the end of the application.**

20. Have there been any changes to any plan listed above? ☐ Yes ☑ No **If yes, provide details by attachment.**

21. Has any plan requested or contemplated filing a request for termination? ☐ Yes ☑ No **If yes, provide details by attachment.**

22. Has any plan been spun-off (sold), transferred or terminated? ☐ Yes ☑ No **If yes, provide details by attachment.**

**Please attach the most recent tax form 5500 for each plan listed above.**

---

### SECTION 5 - GENERAL SUMMARY
(The Applicant must complete this section.)

23. Please provide details on the following insurance coverage currently in place:

| COVERAGES | Insurance Company | Limit of Liability | Deductible | Policy Effective Dates |
|---|---|---|---|---|
| General Liability | Hartford | $ 2,000,000 | $ 500 | 4/12/2017 - 4/11/2018 |
| Professional Liability | | $ | $ | |

24. Has the **Applicant** been the subject or involved in any litigation in the past twelve (12) months? ☐ Yes ☑ No **If yes, provide details by attachment.**

25. In the next twelve (12) months, does the **Applicant** anticipate any substantial change or reorganization of operations? ☐ Yes ☑ No **If yes, provide details by attachment.**

PI-PRD-Renewal App (06/11)

© 2011 Philadelphia Insurance Companies

11

**Material Change**

If there is any material change to the answers of this Applications questions prior to the policy inception date, the Applicant must notify the Underwriter in writing. Any outstanding quotation may be modified or withdrawn.

## FRAUD NOTICE STATEMENTS

**NOTICE TO APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF ALASKA APPLICANTS:** "A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE AN INSURANCE COMPANY FILES A CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION MAY BE PROSECUTED UNDER STATE LAW."

**RESIDENTS OF ARKANSAS APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**RESIDENTS OF ARIZONA APPLICANTS:** "FOR YOUR PROTECTION ARIZONA LAW REQUIRES THE FOLLOWING STATEMENT TO APPEAR ON THIS FORM. ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF COLORADO APPLICANTS:** "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES."

**RESIDENTS OF DISTRICT OF COLUMBIA APPLICANTS:** "WARNING:  IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON.  PENALTIES INCLUDE IMPRISONMENT AND/OR FINES.  IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

**RESIDENTS OF FLORIDA RESIDENTS APPLICANTS:** "ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE."

**RESIDENTS OF KANSAS APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO, OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF KENTUCKY APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY "MATERIALLY" FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME."

**RESIDENTS OF LOUISIANA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**RESIDENTS OF MAINE APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

© 2011 Philadelphia Insurance Companies

**RESIDENTS OF MARYLAND APPLICANTS:**  "ANY PERSON WHO KNOWINGLY AND WILLFULLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY AND WILLFULLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**RESIDENTS OF MINNESOTA APPLICANTS:**  "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST ANY INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**RESIDENTS OF NEW JERSEY APPLICANTS:**  "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF NEW MEXICO APPLICANTS:**  "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES."

**RESIDENTS OF NEW YORK APPLICANTS:**  "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

**RESIDENTS OF OHIO APPLICANTS:**  "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST ANY INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**RESIDENTS OF OKLAHOMA APPLICANTS:**  "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY."

**RESIDENTS OF OREGON APPLICANTS:**  "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD AN INSURER:  (1) BY SUBMITTING AN APPLICATION, OR (2) BY FILING A CLAIM CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT, MAY BE VIOLATING STATE LAW."

**RESIDENTS OF PENNSYLVANIA APPLICANTS:**  "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF TENNESSEE APPLICANTS:**  "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

**RESIDENTS OF TEXAS APPLICANTS:**  IF A LIFE, HEALTH AND ACCIDENT INSURER PROVIDES A CLAIM FORM FOR A PERSON TO USE TO MAKE A CLAIM, THAT FORM MUST CONTAIN THE FOLLOWING STATEMENT OR A SUBSTANTIALLY SIMILAR STATEMENT: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR THE PAYMENT OF A LOSS IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN STATE PRISON."

**RESIDENTS OF VERMONT APPLICANTS:**  "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE STATEMENT IN AN APPLICTION FOR INSURANCE MAY BE GUILTY OF A CRIMINAL OFFENSE AND SUBJECT TO PENALTIES UNDER STATE LAW."

**RESIDENTS OF VIRGINIA APPLICANTS:**  "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

**RESIDENTS OF WASHINGTON APPLICANTS:**  "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSES OF DEFRAUDING THE COMPANY.  PENALTIES INCLUDE IMPRISONMENT, FINES, AND DENIAL OF INSURANCE BENEFITS."

© 2011 Philadelphia Insurance Companies

13

**RESIDENTS OF WEST VIRGINIA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

Mike Rhodes
_____
Name (Please Print/Type)

CFO
_____
Title **(MUST BE SIGNED BY THE PRESIDENT, CHAIRMAN OR CEO)**

_____
Signature

5/26/2017
_____
Date

The above signed warrants that he/she is authorized and has the power to complete and execute this Application, including the Warranty Statement on behalf of the **Applicant** and their respective Directors, Officers or other insured persons.

**Produced By: (Section to be completed by Producer/Broker)**

_____
Producer

_____
Agency

_____
Producer License Number

_____
Agency Taxpayer ID or SS Number

_____
Address (Street, City, State, Zip)

As part of this Application, please submit the following documents:

a) **Applicant's latest fiscal year end financial statement (CPA prepared) and latest interim financial statement**
b) List of the **Applicant's** current Directors & Officers
c) Copies of the most recently filed Form(s) 5500 (and attachments) for all ERISA plans for which coverage requested (If Fiduciary Liability coverage is being requested)

## ADDITIONAL INFORMATION

This page may be used to provide additional information to any question on this application. Please identify the question number to which you are referring.

Signature

5/26/2017
Date

PI-PRD-Renewal App (06/11)

Page 8 of 8
© 2011 Philadelphia Insurance Companies



A Member of the Tokio Marine Group

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900 • Fax 610.617.7940 • PHLY.com

06/07/2017

Geostellar, Inc.
224 W King St
Martinsburg, WV 25401-3212

**Re: PHSD1249816**

Dear Valued Customer:

Thank you very much for choosing Philadelphia Indemnity Insurance Company for your insurance needs.  Our first class customer service, national presence and A++ (Superior) A. M. Best financial strength rating have made us the selection by over 550,000 policyholders nationwide.  I realize you have a choice in insurance companies and truly appreciate your business.

I wish you much success this year and look forward to building a mutually beneficial business partnership which will prosper for years to come.  Welcome to PHLY and please visit PHLY.com to learn more about our Company!

Sincerely,

Robert D. O'Leary Jr.
President & CEO
Philadelphia Insurance Companies

RDO/sm

16

- Receive Invoices Electronically
- Pay Your Bills Online
- Set Up Recurring Payments
- Available 24/7
- Safe and Secure
- NO FEE!
- Environmentally Friendly

# Enroll Today!

## Pay Your Bill Online

To pay your bills online you will need a User ID and Password to access our website. If you don't have a User ID please create one by visiting **https://www.PHLY.com/myphly/newuser.aspx**.

If you have a User ID, please login and click on *"Online Bill Pay"* and enter the necessary information to pay your bills.
Philadelphia Insurance Companies accepts electronic checks (a debit from your checking or savings account) as a method of payment. Please allow 2 to 3 business days for your payment to post to your account. This service is offered free of charge. Please note that credit card payments cannot be made online.

## Recurring Payment

Customers that receive their bill directly (and not from their agent) can sign up for recurring payment via automatic withdrawals from a checking, savings, or money market account for direct bill policies.

If you do not already have an account on **PHLY.com** you will need to create one by visiting **https://www.PHLY.com/myphly/newuser.aspx**. Once logged in please refer to "*Links for You*" and click the *"Recurring Payment Instructions"* to learn how to enroll.  You can also click the *"Online Bill Pay"* tab on the left hand side to enroll in Recurring Payment.

### How to Create an Account on PHLY.com

1. Go to **https://www.PHLY.com/myphly/newuser.aspx**
2. Select the applicable BUTTON (insured or producer).
3. Complete the information on the page:
   - You will CREATE your own USER NAME and PASSWORD.
   - The password must be at least 7 characters and contain one number, one lower case letter, and one capital letter.
4. Click CONTINUE when done.
5. On the next page, complete the PASSWORD RESET QUESTION. If you ever forget your password, we will ask you this security question and you will enter the answer you have selected.
6. Once you have received the page that states: "CONTINUE TO MY PHLY," then you have successfully created the account.



PHILADELPHIA
INSURANCE COMPANIES

A Member of the Tokio Marine Group

Focus on the Things that Matter, We'll Handle the Risk!®





# PHILADELPHIA
## INSURANCE COMPANIES
*A Member of the Tokio Marine Group*

# Making Things Easier for You!

## PHLY CUSTOMER SERVICE

### Did you know…
- The Loss Assistance Hotline provides Management & Professional Liability policyholders with two FREE HOURS of legal consultation with knowledgeable attorneys on any matter that could potentially result in a claim under a PHLY policy
- You can review billing and payment history online
  *For example: Payment verifications go to MyPHLY on PHLY.com*
- You can pull up and print your invoices and policy documents online
- You can update your profile online
  *For example: Billing address or contact information changes*
- We offer live help within seconds: No complicated phone systems
- 94.4% of our policyholders would refer us to prospective customers*
- We provide 48 hour turnaround time on small business quotes and policy issuance in less than 10 days
- We provide interest free installments for accounts that generate at least $2,000 in premium

### Frequently Asked Questions
*How can I get information about my insurance?*
There are 5 different ways to contact Customer Service
- Customer Service 877.438.7459
- Customer Service Fax 866.847.4046
- Customer Service E-mail: custserv@phly.com
- Customer Service online chat
- PHLY.com – "Contact Us"

*When can I contact Customer Service?*
Customer Service is available Monday - Friday from 8:30 a.m. - 8:00 p.m. EST

*What forms of payment does PHLY accept?*
PHLY accepts 3 forms of payment:
- Check sent to the lock box
- Check by phone payments through our IVR (877.438.7459 – Option 1), website, or contact center representatives
- Credit card payments through our live contact center representatives (Visa, MasterCard, and American Express)

### Claims
- Average policyholder first party automobile losses settled in 10 days or less
- Same or next business day acknowledgements of newly reported and opened claims
- Claims representation nationally with Commercial Liability Claims Examiner Niche expertise
- 24/7 claims service. Staff efficiencies with paperless and industry leading systems
- Staff of Subrogation and Recovery Examiners exclusively dedicated to recovery efforts for policyholder paid losses
- Experienced, consistent staff and department structure

### Risk Management Services
- National network of in-house risk management professionals providing direct support to policyholders
- Product specific web-based risk management solutions through PHLY.com
- Interactive Driver Training online courses and examination at no additional charge
- Regular e-flyer communications on relevant risk management issues
- Strategic partnerships with best-in-class vendors for discounted MVR checks, abuse training, GPS, and many more

### Automatically included on most accounts
PHLY Bell Endorsement - Includes $50,000 limits each for Business Travel Accident Benefit, Donation Assurance, Emergency Real Estate Consulting Fee, Identity Theft Expense, Image Restoration and Counseling, Key Individual Replacement Expenses, Kidnap Expense, Terrorism Travel Reimbursement, Workplace Violence Counseling. $25,000 limits for each Conference Cancellation, Fundraising Event Blackout, Political Unrest ($5,000 per employee), Temporary Meeting Space Reimbursement, and $1,500 Travel Delay Reimbursement.

### Honors, Awards, and Ratings
- America's Top 150 Workplaces
- Best Places to Work in Insurance (4th consecutive year)
- Stevie Awards
- ACE Awards
- Top Workplaces in Philadelphia
- Ward's Top 50 (13th consecutive year)
- National Underwriter Top 100 Insurance Groups (Tokio Marine) #29
- National Underwriter Top 100 Insurance Companies #41

## *A Passion for Service!*

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Coverage(s) described may not be available in all states and are subject to Underwriting and certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. © 2014 Philadelphia Consolidated Holding Corp., All Rights Reserved.
*All statistics contained herein were generated via an internal company survey of active policy holders.







Ed. 101514



# Risk Management Services

## PHLY RISK MANAGEMENT SERVICES

Welcome to PHLY Risk Management Services Services, PHLY is familiar with the unique Risk Management Services programming needs of you organization and has achieved superior results in this area. We are committed to delivering quality and timely loss prevention services and risk control products to your organization. Customer satisfaction through the delivery of these professional products to achieve measurable risk improvement results is our goal. We know the fulfillment of our Risk Management Services commitment is not complete until we deliver upon our promises.

**OUR MISSION:** We welcome the opportunity to demonstrate how we can tailor a risk management program suitable to our customer's needs. We are committed to providing our customers with improved communications, quicker implementation of loss control servicing initiatives, and specific benchmarking goals that help us quantify the true value of our services.

**OUR MOTTO:** "Innovative Services Producing Optimum Results:" This mantra reflects our commitment to utilize innovative products and solutions to help our customers achieve measurable results. Customer satisfaction through the delivery of these quality professional products is our goal. We know the fulfillment of our Risk Management Services commitment is not complete until we deliver upon our promises.

In order to gain full access to these resources and others, please take a moment to register on our website. If you already have an id to PHLY.com, please login to access Risk Management Services resources.

Risk Management Resources
- IntelliCorp Records, Inc.
- Accountants Resources
- WEMED Loss Assistance Hotline
- in2vate: Web-enabled EPLI (employment practices liability insurance) Risk Management Services

Proprietary Risk Management Services
- PHLY Risk Management Services E-flyers
- Responding to Risk Management Services Recommendations

Contact
- For more information please contact: Customer Service

# 800.873.4552

IMPORTANT NOTICE - The information and suggestions presented by Philadelphia Indemnity Insurance Company in this e-brochure is for your consideration in your loss prevention efforts. They are not intended to be complete or definitive in identifying all hazards associated with your business, preventing workplace accidents, or complying with any safety related, or other, laws or regulations. You are encouraged to alter them to fit the specific hazards of your business and to have your legal counsel review all of your plans and company policies.

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Consolidated Holding Corp., All Rights Reserved.







One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

# Philadelphia Indemnity Insurance Company

# Commercial
# Lines
# Policy

THIS POLICY CONSISTS OF:

– DECLARATIONS
– COMMON POLICY CONDITIONS
– ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
• ONE OR MORE COVERAGE FORMS
• APPLICABLE FORMS AND ENDORSEMENTS

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless signed by our authorized representative.

President & CEO                                                Secretary

BJP-190-1 (12-98)



# Risk Management Services

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

As a free service benefit to its policyholders, PHLY has partnered with nationally recognized law firm Wilson, Elser, Moskowitz, Edelman & Dicker LLP (WEMED), to offer a toll-free Loss Assistance Hotline. The telephone number is 877.742.2201 or you can contact a WEMED attorney online at: apps.wilsonelser.com/pic/. This hotline provides you with 2 free hours of legal consultation with a knowledgeable attorney on any matter that you feel could result in a Claim under your professional or management liability policy. The Loss Assistance Hotline is NOT a Claim reporting service. To report a Claim, follow the Claim reporting instructions in your policy and also notify your insurance agent. If you have any questions concerning the Loss Assistance Hotline, please contact us at 800.759.4961 x2967.



800.873.4552

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Insurance Companies, All Rights Reserved.





22

Ed.081513

PP 20 15 (06/15)

## PHILADELPHIA INSURANCE COMPANIES PRIVACY POLICY NOTICE

### Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies value your privacy and we are committed to protecting personal information that we collect during the course of our business relationship with you. The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information that we collect and how it may be used or disclosed. This does not reflect a change in the way we do business or handle your information.

**Information We Collect:**

We collect personal information about you from the following sources:
- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

**Information We Disclose:**

We will only disclose the information described above to our affiliates and non-affiliated third parties, as permitted by law, and when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:
- Your agent or broker (producer);
- Parties who perform a business, professional or insurance functions for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, attorneys, other insurers or medical care providers who need information to investigate, defend or settle a claim involving you;
- Regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having a legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes. We do not disclose the personal information of persons who have ceased to be our customers.

**Protection of Information:**

The Philadelphia Insurance Companies maintain physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

**Use of Cookies and Opt-Out:**

We may place electronic "cookies" in the browser files of your computer when you access our website. Cookies are text files placed on your computer to enable our systems to recognize your browser and so that we may tailor information on our website to your interests. We or our third party service providers or business partners may place cookies on your computer's hard drive to enable us to match personal information that we maintain about you so that we are able to pre-populate on-line forms with your information. We also use cookies to help us analyze traffic on our website to better understand your interests. Although we do not use your non-public personal information for this purpose, you may opt-out of cookies and advertising features through one of the available options including but not limited to Ads Settings in Google.com or the Network Advertising Initiative (NAI) Consumer Opt-out. Opting out does not mean you will no longer receive online advertising. It does mean that companies from which you opted out will no longer customize ads based on your interests and web usage patterns using cookies.

**How to Contact Us:** Philadelphia Insurance Companies, One Bala Plaza, Suite 100, Bala Cynwyd, PA 19004
Attention: Chief Privacy Officer

23



**PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

# COMMON POLICY DECLARATIONS

**Policy Number:** PHSD1249816

**Named Insured and Mailing Address:**
Geostellar, Inc.
224 W King St
Martinsburg, WV 25401-3212

**Producer:** 952
MAURY DONNELLY & PARR, INC.
24 Commerce Street
BALTIMORE, MD 21202

(410)685-4625

**Policy Period From:** 05/31/2017  **To:** 05/31/2018

at 12:01 A.M. Standard Time at your mailing
address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS
INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | 29,847.26 |
| Crime Protection Plus | 1,754.60 |

**Total**   $   **31,601.86**
Total Includes Fees and Surcharges (See Schedule Attached)                    **172.86**

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (06/14)

Secretary

President and CEO

24

Philadelphia Indemnity Insurance Company

## Form Schedule – Policy

**Policy Number:** PHSD1249816

## Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| Recurring Payment Flyer | 1212 | Recurring Payment Flyer |
| CSNotice-1 | 1014 | Making Things Easier |
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 0813 | Policyholder Notice (Loss Assistance Hotline) |
| PP2015 | 0615 | Privacy Policy Notice |
| CPD-PIIC | 0614 | Common Policy Declarations |
| Fees and Surcharge Schedule | 0110 | Fees and Surcharge Schedule |

Philadelphia Indemnity Insurance Company

Fees and Surcharge Schedule

Policy Number: **PHSD1249816**

Policy Term  Effective Date:   **05/31/2017**
Policy Term Expiration Date: **05/31/2018**

**West Virginia Insurance Premium Surcharge**                    **$        172.86**

Change Date: 01/22/2018                                                    PI-PRD-1 (09/02)



**PHILADELPHIA**
**INSURANCE COMPANIES**

*A Member of the Tokio Marine Group*

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

## Philadelphia Indemnity Insurance Company

Policy Number:  PHSD1249816

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND R REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FO DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item    1.        Private Company Name and Address:
                    Geostellar, Inc.
                    2426 Steamboat Run Rd
                    Shepherdstown, WV 25443-4115


                    Internet Address: www. geostellar.com

Item    2.        Policy Period:        From:  05/31/2017        To:  05/31/2018
                                         (12:01 A.M. local time at the address shown in Item 1.)


Item    3.        Limits of Liability:
         (A)      Part 1, D&O Liability:            $        3,000,000 each Policy Period.
         (B)      Part 2, Employment Practices:    $        1,000,000 each Policy Period.
         (C)      Part 3, Fiduciary Liability:      $        1,000,000 each Policy Period.
         (D)      Aggregate, All Parts:             $        5,000,000 each Policy Period.


Item    4.        Retention:
         (A)      Part 1, D&O Liability:      $        50,000  for each Claim under Insuring Agreement B & C.
                   Private Offering: $        50,000  for each Claim under Insuring Agreement B & C.
         (B)      Part 2, Employment Practices:  $        25,000  for each Claim.
         (C)      Part 3, Fiduciary Liability:   $             0  for each Claim.


Item    5.        Prior and Pending Date: Part 1    05/16/2013    Part 2    05/06/2013  Part 3    05/16/2013


Item    6.        Premium:        Part 1 $  23,270.00      Part 2 $  5,709.00      Part 3 $    705.00

                                         *Total Premium*: $    29,847.26

Item    7.        Endorsements:  SEE SCHEDULE

PAGE 1 OF 2

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

Authorized Representative                    Countersignature                    Countersignature Date

Philadelphia Indemnity Insurance Company

Form Schedule – Private Company Protection Plan

**Policy Number:** PHSD1249816

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| PI-PRD-1 | 0902 | Private Company Protection Plus Declarations |
| PI-BELL-1 | 1109 | Bell Endorsement |
| PI-CME-1 | 1009 | Crisis Management Enhancement Endorsement |
| PI-PRD-2 | 0902 | Private Company Protection Plus Policy |
| PI-PRD-5 | 0902 | Professional Services Exclusion |
| PI-PRD-70 | 0803 | Health Insurance Portability and Accountability Act |
| PI-PRD-73 | 0506 | Corporate Advantage Pro-Pak Elite Coverage |
| PI-PRD-75 | 1203 | Amendment of Exclusions |
| PI-PRD-77 | 0104 | Amendment of Cancellation Provision |
| PI-PRD-112 | 0115 | Breach Of Contract Exclusion |
| PI-MANU-1 | 0100 | SIDE-A NON-RESCINDABLE COVERAGE |
| PI-MANU-1 | 0100 | DEFENSE ONLY WAGE & HOUR CARVEBACK |
| PI-PRD-WV-1 | 0303 | West Virginia Amendatory Endorsement |
| PI-SLD-001 | 0115 | Cap On Losses From Certified Acts Of Terrorism |

PI-CRP-01 (06/05)



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

## *CRIME PROTECTION PLUS DECLARATIONS*

Policy Number:  PHSD1249816

In return for the payment of the premium, and subject to all the terms of this Policy, we agree with you to provide the insurance stated in this Policy.

DECLARATIONS

ITEM

1.  Named Insured:  Geostellar, Inc.
    224 W King St
2.  Mailing Address:  Martinsburg, WV 25401-3212

3.  Policy Period: from 05/31/2017 to 05/31/2018
    (12:01 A.M. Standard Time at Your Mailing Address)

4.  Coverages, Limits of Insurance and Deductibles:

    ☐   Loss Sustained Option     ☒   Discovery Option
    (If no box is checked, the Loss Sustained Option shall apply)

    Insuring Agreements, Limit of Insurance and Deductible Amounts shown below are subject to all of the terms of this policy that apply.

| Insuring Agreements Forming Part of This Policy | Limit of Insurance | Deductible Amount |
|---|---|---|
| A1. EMPLOYEE THEFT AND CLIENT COVERAGE | $ 1,000,000 | $ 10,000 |
| A2. ERISA FIDELITY | $ 1,000,000 | $ NIL |
| B.  FORGERY OR ALTERATION, including Credit, Debit, or Charge Card Extension ($25,000 limit) | $ _____ | $ _____ |
| C.  INSIDE THE PREMISES | $ _____ | $ _____ |
| D.  OUTSIDE THE PREMISES | $ _____ | $ _____ |
| E.  MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY | $ _____ | $ _____ |
| F.  COMPUTER FRAUD AND FUNDS TRANSFER FRAUD | $ _____ | $ _____ |

5.  Form Numbers of Endorsements Forming Part of This Policy When Issued: SEE SCHEDULE
6.  Cancellation of Prior Insurance: By acceptance of this Policy, you give us notice canceling prior policies or bonds numbered: _____
    _____ the cancellations to be effective at the time this policy becomes effective.

This Policy has been signed by the Company's President and Secretary.

Includes copyright material of the Insurance Services Office Inc., used with its permission.

30

Philadelphia Indemnity Insurance Company

## Form Schedule – Crime Protection Plus

**Policy Number:** PHSD1249816

## Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| PI-CRP-01 | 0605 | Crime Protection Plus Declarations |
| PI-BELL-1 | 1109 | Bell Endorsement |
| PI-CME-1 | 1009 | Crisis Management Enhancement Endorsement |
| PI-CRP-02 | 0605 | Crime Protection Plus Policy |
| PI-CRP-13 | 0605 | Policy Bridge - Discovery Replacing Loss Sustained |
| PI-CRP-WV-1 | 0605 | West Virginia Changes |

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## BELL ENDORSEMENT



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

**I.      SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Liability or Limits of Insurance and/or additional coverages provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| Business Travel Accident Benefit | $50,000 |
| Conference Cancellation | $25,000 |
| Donation Assurance | $50,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Fundraising Event Blackout | $25,000 |
| Identity Theft Expense | $50,000 |
| Image Restoration and Counseling | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Kidnap Expense | $50,000 |
| Political Unrest | $5,000 per employee: $25,000 policy limit |
| Temporary Meeting Space Reimbursement | $25,000 |
| Terrorism Travel Reimbursement | $50,000 |
| Travel Delay Reimbursement | $1,500 |
| Workplace Violence Counseling | $50,000 |

© 2009 Philadelphia Insurance Companies

## II.   CONDITIONS

### A.   Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

### B.   Limits of Liability or Limits of Insurance

1.   When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limits of liability or limits of insurance will apply.  In no instance will multiple limits apply to coverages which may be duplicated within this policy.  Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum limits of liability or limits of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limits of liability or limits of insurance under any one coverage part or policy.

2.   Limits of liability or limits of insurance identified in Section **I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS** above are not excess of, but are in addition to the applicable Limits of Liability or Limits of Insurance stated in the Declarations.

### C.   Claim Expenses

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

## III.   ADDITIONAL COVERAGES

### A.   Business Travel Accident Benefit

We will pay a Business Travel Accident Benefit to the insured if a director or officer suffers injury or death while traveling on a common carrier for your business during the policy period.

For the purpose of Business Travel Accident Benefit coverage, injury means:

1.   Physical damage to the body caused by violence, fracture, or an accident that results in loss of life not later than one hundred eighty (180) days after the policy expiration, the date of cancellation or the date of non-renewal;

2.   Accidental loss of limbs or multiple fingers;

3.   Total loss of sight, speech or hearing.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

The Business Travel Accident Benefit shall not be payable if the cause of the injury was:

1.   An intentional act by the insured;

2.   An act of suicide or attempted suicide;

3.   An act of war; or

4.   A disease process.

© 2009 Philadelphia Insurance Companies

**B.  Conference Cancellation**

We will reimburse the insured for any business-related conference expenses, paid by the insured and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend.  The cancellation must be due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference.

With respect to a conference cancellation claim, it is further agreed as follows:

1.  The insured employee must have registered for the conference at least thirty (30) days prior to the cancellation; and

2.  The cancellation must be ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.

The limit of insurance for this coverage is $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

**C.  Donation Assurance**

If the insured is a 501(c)(3) status non-profit organization as defined in the United States Internal Revenue Code, we will reimburse the insured for "failed donation claim(s)."

With respect to any "failed donation claim," it is further agreed as follows:

1.  The donor must not have been in bankruptcy, nor have filed for bankruptcy or reorganization in the past seven (7) years prior to the time said pledge was made to the insured;

2.  For non-cash donations, our payment of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

3.  In the case of unemployment or incapacitation of a natural person donor and as a condition of payment of the "failed donation claim":

    a.  Neither the natural person donor nor the insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date; and

    b.  The donor shall be unemployed for at least sixty (60) days prior to a claim being submitted by the insured;

4.  No coverage shall be afforded for a written pledge of funds or other measurable, tangible property to the insured dated prior to the policy period; and

5.  A donation amount which is to be collected by the insured over more than a twelve (12) month period shall be deemed a single donation.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**D.  Emergency Real Estate Consulting Fee**

We will reimburse the insured any realtor's fee or real estate consultant's fee necessitated by the insured's need to relocate due to the "unforeseeable destruction" of the insured's "principal location" listed in the Declarations during the policy period.  The limit of insurance for this

coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

### E.  Fundraising Event Blackout

We will reimburse the insured for "fundraising expenses" that are incurred due to the cancellation of a fundraising event caused by the lack of electric supply resulting in a power outage, provided the fundraising event is not re-scheduled.  The fundraising event must have been planned at least thirty (30) days prior to the power outage.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

### F.  Identity Theft Expense

We will reimburse any present director or officer of the named insured for "identity theft expenses" incurred as the direct result of any "identity theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the insured's first policy with us.  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

### G.  Image Restoration and Counseling

We will reimburse the insured for expenses incurred for image restoration and counseling arising out of "improper acts" by any natural person.

Covered expenses are limited to:

1. The costs of rehabilitation and counseling for the accused natural person insured, provided the natural person insured is not ultimately found guilty of criminal conduct; this reimbursement to occur after acquittal of the natural person insured;

2. The costs charged by a recruiter or expended on advertising, for replacing an officer as a result of "improper acts"; and

3. The costs of restoring the named insured's reputation and consumer confidence through image consulting.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

### H.  Key Individual Replacement Expenses

We will pay "key individual replacement expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the policy period which results in the loss of life during the policy period.  The limit of insurance for this coverage is the lesser of $50,000 or ten (10) times the annual premium paid for this policy.  No deductible applies to this coverage.

### I.  Kidnap Expense

We will pay on behalf of any director or officer of the insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner," parent or child during the policy period.  Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

1. Fees and costs of independent negotiators;

2. Interest costs for any loan from a financial institution taken by you to pay a ransom demand or extortion threat;

3. Travel costs and accommodations incurred by the named insured;

4. Reward money paid to an informant which leads to the arrest and conviction of parties responsible for loss covered under this insurance; and

5. Salary, commissions and other financial benefits paid by you to a director or officer.  Such compensation applies at the level in effect on the date of the kidnap and ends upon the earliest of:

   a. Up to thirty (30) days after their release, if the director or officer has not yet returned to work;

   b. Discovery of their death;

   c. One hundred twenty (120) days after the last credible evidence following abduction that they are still alive; or

   d. Twelve (12) months after the date of the kidnapping.

The limit of insurance for this coverage is $50,000 each policy period for all insureds combined. No deductible applies to this coverage.

**J.   Political Unrest Coverage**

We will reimburse any present director, officer, employee or volunteer of the named insured while traveling outside the United States of America for "emergency evacuation expenses" that are incurred as a result of an incident of "political unrest."  This "political unrest" must occur during the policy period.  No coverage is granted for travel to countries in a state of "political unrest" at the time of departure of the travel.  The limit of insurance for this coverage is $5,000 per covered person, subject to a maximum of $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**K.   Temporary Meeting Space Reimbursement**

We will reimburse the insured for rental of meeting space which is necessitated by the temporary unavailability of the insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period.  Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**L.   Terrorism Travel Reimbursement**

We will reimburse any present director or officer of the named insured in the event of a "certified act of terrorism" during the policy period which necessitates that he/she incurs "emergency travel expenses."  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

© 2009 Philadelphia Insurance Companies

PI-BELL-1 (11/09)

**M.  Travel Delay Reimbursement**

We will reimburse any present director or officer of the named insured for any "non-reimbursable expenses" they incur as a result of the cancellation of any regularly scheduled business travel on a common carrier.  The limit of insurance for this coverage is $1,500 per policy period for all insureds combined.  A seventy-two (72) hour waiting period deductible applies to this coverage.

**N.  Workplace Violence Counseling**

We will reimburse the insured for emotional counseling expenses incurred directly as a result of a "workplace violence" incident at any of the insured's premises during the policy period.  The emotional counseling expenses incurred must have been for:

1.  Your employees who were victims of, or witnesses to the "workplace violence";

2.  The spouse, "domestic partner," parents or children of your employees who were victims of, or witnesses to the "workplace violence"; and

3.  Any other person or persons who directly witnessed the "workplace violence" incident.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

## IV.  DEFINITIONS

For the purpose of this endorsement, the following definitions apply:

**A.**  "Certified act of terrorism" means any act so defined under the Terrorism Risk Insurance Act, and its amendments or extensions.

**B.**  "Communicable disease" means an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact, or contact with human fluids, waste, or similar agent, such as, but not limited to Meningitis, Measles or Legionnaire's Disease.

**C.**  "Domestic partner" means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the named insured.

**D.**  "Emergency evacuation expenses" mean:

1.  Additional lodging expenses;

2.  Additional transportation costs;

3.  The cost of obtaining replacements of lost or stolen travel documents necessary for evacuation from the area of "political unrest"; and

4.  Translation services, message transmittals and other communication expenses.

provided that these expenses are not otherwise reimbursable.

**E.**  "Emergency travel expenses" mean:

    **1.**   Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of a "certified act of terrorism"; and

    **2.**   The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "certified act of terrorism";

provided that these expenses are not otherwise reimbursable.

**F.**   "Failed donation claim" means written notice to the insured during the policy period of:

    **1.**   The bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable, tangible property to the insured; or

    **2.**   The unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable, tangible property to the insured.

**G.**   "Fundraising expenses" mean deposits forfeited and other charges paid by you for catering services, property and equipment rentals and related transport, venue rentals, accommodations (including travel), and entertainment expenses less any deposits or other fees refunded or refundable to you.

**H.**   "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of any director or officer (or spouse or "domestic partner" thereof) of the named insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

**I.**   "Identity theft expenses" mean:

    **1.**   Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

    **2.**   Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors; and

    **3.**   Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

**J.**   "Improper acts" means any actual or alleged act of:

    **1.**   Sexual abuse;

    **2.**   Sexual intimacy;

    **3.**   Sexual molestation; or

    **4.**   Sexual assault;

committed by an insured against any natural person who is not an insured.  Such "improper acts" must have been committed by the insured while in his or her capacity as an insured.

**K.**   "Injury" whenever used in this endorsement, other than in Section **III. A. Business Travel**,

means any physical damage to the body caused by violence, fracture or an accident.

**L.** "Key individual replacement expenses" mean the following necessary expenses:

    **1.** Costs of advertising the employment position opening;

    **2.** Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

    **3.** Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up an employment contract.

**M.** "Natural catastrophe" means hurricane, tornado, earthquake or flood.

**N.** "Non-reimbursable expenses" means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, and for which your director or officer produces a receipt:

    **1.** Meals and lodging;

    **2.** Alternative transportation;

    **3.** Clothing and necessary toiletries; and

    **4.** Emergency prescription and non-prescription drug expenses.

**O.** "Political unrest" means:

    **1.** A short-term condition of disturbance, turmoil or agitation within a foreign country that poses imminent risks to the security of citizens of the United States;

    **2.** A long-term condition of disturbance, turmoil or agitation that makes a foreign country dangerous or unstable for citizens of the United States; or

    **3.** A condition of disturbance, turmoil or agitation in a foreign country that constrains the United States Government's ability to assist citizens of the United States, due to the closure or inaccessibility of an embassy or consulate or because of a reduction of its staff

for which either an alert or travel warning has been issued by the United States Department of State.

**P.** "Principal location" means the headquarters, home office or main location where most business is substantially conducted.

**Q.** "Unforeseeable destruction" means damage resulting from a "certified act of terrorism," fire, collision or collapse which renders all of the insured's "principal locations" completely unusable.

**R.** "Workplace violence" means any intentional use of or threat to use deadly force by any person with intent to cause harm and that results in bodily "injury" or death of any person while on the insured's premises.

© 2009 Philadelphia Insurance Companies

PI-CME-1 (10/09)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## CRISIS MANAGEMENT ENHANCEMENT ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

Solely for the purpose of this endorsement:  1) The words  "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  2) The words "we," "us" and "our" refer to the company providing this insurance.

**I.   SCHEDULE OF ADDITIONAL COVERAGE AND LIMITS**

The following is the Limit of Liability provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

Crisis Management Expense                                                          $25,000

**II.   CONDITIONS**

**A.  Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.  All other terms and conditions of the policy or coverage part to which this endorsement is attached remain unchanged.

**B.  Limits of Liability or Limits of Insurance**

When coverage is provided by this endorsement and any other coverage form or endorsement attached to this policy, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Liability or Limit of Insurance.

**C.  Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.   ADDITIONAL COVERAGES**

**A.**  We will reimburse you for "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies.  The amount of such reimbursement is limited as described in Section **II. CONDITIONS, B. Limits of Liability or Limits of Insurance**.  No other obligation or liability to pay sums or perform acts or services is covered.

**B.**  We will reimburse only those "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six (6) months of the date the "crisis" was initiated.

## IV.   DEFINITIONS

**A.**   "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

**B.**   "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm."   However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

**C.**   "Crisis management firm" means any service provider you hire that is acceptable to us.   Our consent will not be unreasonably withheld.

**D.**   "Incident" means an accident or other event, including the accidental discharge of pollutants, resulting in death or serious bodily injury to three or more persons.

**E.**   "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

PI-PRD-2 (09/02)

# PRIVATE COMPANY PROTECTION PLUS

Directors and Officers & Private Company Liability Insurance
Employment Practices Liability Insurance
Fiduciary Liability Insurance

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

## PART 1
### DIRECTORS & OFFICERS LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.      INSURING AGREEMENTS

      A.      INDIVIDUAL LIABILITY COVERAGE

            The **Underwriter** shall pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Private Company** has indemnified the **Individual Insured** for such **Loss**.

      B.      PRIVATE COMPANY INDEMNITY COVERAGE

            The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Private Company** has indemnified such **Individual Insureds** for such **Loss**.

      C.      PRIVATE COMPANY LIABILITY COVERAGE

            The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against the **Private Company** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II.     DEFINITIONS

      A.      **D&O Wrongful Act** means any actual or alleged:

          1.      act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or

          2.      act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the **Private Company**; or

          3.      act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity**, but only:

         a.  if such service is at the written request or direction of the **Private Company**; and

         b.  if, at the time such service began, the **Individual Insured** did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a **Claim** under this Policy.

B.  **Outside Entity** means:

    1.  any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

    2.  any other entity listed as an **Outside Entity** in an endorsement to this Policy.

III.    EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against the **Private Company** under Insuring Agreement C:

A.  arising out of, based upon or attributable to any actual or alleged plagiarism, infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan, piracy or misappropriation of ideas or trade secrets;

B.  arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair competition, or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, the Hart-Scott-Rodino Anti-Trust Improvement Act or any other similar federal, state, or local statutory provision or common law anywhere in the world;

C.  for any actual or alleged liability under any written or oral contract or agreement; however, this exclusion does not apply to any of the following:

    1.  liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

    2.  **Defense Costs**.

D.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

E.  for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law;

F.  for any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

G.  arising out of, based upon or attributable to an **Employment Practices Act** or a **Fiduciary Liability Act**.

IV.  PRESUMPTIVE  INDEMNIFICATION

If the **Private Company** is permitted or required by common or statutory law, but fails to indemnify the **Individual Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Private Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

## PART 2
### EMPLOYMENT PRACTICES LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.  INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act**.

II.  DEFINITIONS

A.  **Employment Practice Act** means any actual or alleged:

1.  wrongful dismissal, discharge or termination of employment;

2.  breach of a written or oral employment contract or implied employment contract;

3.  employment related misrepresentation;

4.  wrongful failure to promote;

5.  violation of employment discrimination laws (including harassment);

6.  wrongful deprivation of a career opportunity;

7.  employment related wrongful discipline;

8.  negligent employee evaluation;

9.  employment related invasion of privacy;

10.  employment related defamation (including libel and slander);

11.  sexual or workplace harassment of any kind;

12.  constructive discharge of employment;

13.  employment related **Retaliation**;

14.  employment related humiliation;

15.  wrongful demotion;

16.  negligent reassignment;

17.  violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practice Act** means any actual or alleged wrongful failure to employ, discrimination, sexual

harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

B.  **Retaliation** means retaliatory treatment against an **Individual Insured** on account of such individual:

1.  exercising his or her rights under law, including but not limited to rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

2.  refusing to violate any law;

3.  having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured**;

4.  disclosing in writing to a superior or to any governmental agency any alleged violations of law;

5.  filing any claim against the **Insured** under the Federal False Claims Act or any other similar "whistle blower" federal, state, or local law.

C.  **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Private Company**.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

B.  for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act  (except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

C.  arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements; provided that this exclusion will not apply to any **Claim** for **Retaliation**;

D.  arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment,  or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

1.  liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

2.    **Defense Costs**;

E.   to the extent such **Loss**, other than **Defense Costs**, constitutes employment-related benefits, stock options, perquisites, deferred compensation, payment of insurance, or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay;

F.   arising out of, based upon or attributable to a **D&O Wrongful Act** or a **Fiduciary Liability Act**.


## PART 3
## FIDUCIARY LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.   INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II.   DEFINITIONS

A.   **Administration** means:  (i) giving counsel to **Employees**, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of **Employees** or participants under any **Benefit Plan**.

B.   **Benefit Plan** means:

1.   any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2.   any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3.   any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

4.   any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date

of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

   C. **Fiduciary Liability Act** means any actual or alleged:

     1. breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

     2. negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

   D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

   E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA.**

III.   EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

   A. arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

   B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

   C. arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

   D. arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

   E. arising out of, based upon or attributable to any failure to comply with any law concerning workers   compensation, unemployment insurance, social security, disability benefits or any similar laws;

   F. arising out of, based upon or attributable to an **Employment Practices Act** or a **D&O Wrongful Act**.

**PART 4**
**COMMON POLICY DEFINITIONS**

A. **Application** means:

    1. the **Application** for this Policy, including any material submitted therewith; and

    2. the **Application**(s), including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

    all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means:

    1.    a written demand for monetary or non-monetary relief;

    2.    a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

    3.    a criminal proceeding commenced by a return of an indictment;

    4.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

    5.    an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Underwriter's** written consent, such consent not to be unreasonably withheld;

    6.    solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

            against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

    7.    a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential **Claim** as described above.

    However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

    A c**laim** shall be considered made when an **Insured** first receives notice of the **Claim**.

C. **Damages** means any monetary judgment (including any pre- and post- judgment Interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage).

D. **Defense Cost**s means:

1.  any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim,** whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim,** except that **Defense Costs** shall not include:

    a.  any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

    b.  salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

    c.  salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**; and

2.  a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E.  **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employees as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall not include any independent contractors, unless specifically scheduled by endorsement.

F.  **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

G.  **Individual Insured** means:

    1.  any individual who has been, now is or shall become a director, officer, governor, trustee, **Employee**, volunteer, management committee member, or member of the Board of Managers of the **Private Company** or, solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or **Employee** of any **Benefit Plan**;

    2.  the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person;

    3.  the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in G. (1) or (4) which, in the absence of such death or incompetence, would have been covered by this Policy;

    4.  with respect to a **Private Company** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Private Company** that is equivalent to any position described in (1) above.

H.  **Insured** means the **Private Company** and **Individual Insured**.

I.   **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

J.   **Loss** means:

1.     **Damages**;

2.     **Defense Costs**;

but **Loss** does not include:

1.     criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or

2.     taxes; or

3.     matters deemed uninsurable under the law to which this Policy shall be construed; or

4.     any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

5.     any costs other than **Defense Costs** associated with any accommodation required pursuant to the American With Disabilities Act (removed Civil Rights Act of 1964) and the rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

K.   **Named Corporation** means the first entity named in Item 1 of the Declarations Page.

L.   **Private Company** means:

1.  the **Named Corporation**, and

2.  any **Subsidiary**, and

3. any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, and

4.  solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

M.  **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

N.   **Private Offering** means securities offered or issued by the **Private Company** which are exempt from  registration with the United States Securities and Exchange Commission pursuant to Section 3 (b) of the Securities Act of 1933.

O.   **Public Offering** means securities issued by the **Private Company** for initial public offering, public sale, public solicitation or public distribution to the general public and which is subject to full registration with the United States Securities & Exchange Commission (SEC).  **Public Offering** does not include a **Private Offering**.

P.   **Run-Off Policy** means a new policy of insurance offered by the **Underwriter** at the request of the **Named Corporation** in the event of a **Transaction**. The **Run-Off Policy** shall apply to

**Claims** made and reported to the **Underwriter** during the term of the **Run-Off Policy**, but only for **Wrongful Acts** occurring prior to the effective date of said **Transaction**.

Q. **Subsidiary** means:

1. a corporation of which the **Named Corporation** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its **Subsidiaries** or the right to elect, appoint or designate more than 50% of such entity's **board** of directors, trustees, or managers and which is set forth in the **Application**;

2. a corporation which becomes a **Subsidiary** during the **Policy Period** and whose assets total less than 25% of the total consolidated assets of the **Named Corporation** as of the inception date of this **Policy Period**. The **Named Corporation** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

3. a corporation, which becomes a **Subsidiary** during the **Policy Period** other than a corporation described in paragraph 2. above, but only upon the condition that within 90 days of its becoming a **Subsidiary**, the **Named Corporation** shall have provided the **Underwriter** with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this Policy required by the **Underwriter** relating to such new **Subsidiary**. Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Underwriter** relating to such new **Subsidiary**.

   A corporation becomes a **Subsidiary** when the **Named Corporation** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. A corporation ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. Coverage for **Claims** made against any **Subsidiary** or the **Individual Insureds** of any **Subsidiary** shall only apply to **Wrongful Acts** of such **Subsidiary** or the **Individual Insureds** of such **Subsidiary** occurring after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

R. **Transaction** shall mean:

1 the **Private Company** merging into or consolidating with another entity such that the other entity is the surviving entity; or

2. another entity, or person or group of entities and/or persons acting in concert acquiring securities or   voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more     than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Private Company**; or

3. **Public Offering**.

S.  **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

T.  **Wrongful Act** means:

1.      with respect to Part 1, any **D&O Wrongful Act**,
2.      with respect to Part 2, any **Employment Practice Act**,
3.      with respect to Part 3, any **Fiduciary Liability Act**.

## PART 5
## COMMON POLICY EXCLUSIONS

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.      arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B.      arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

No **Wrongful Act** of any **Insured** shall be imputed to any other **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C.      arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D.      arising out of, based upon or attributable to any bodily injury or property damage in connection with tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E.      arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F.      arising out of, based upon or attributable to:

        1.      any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

        2.      any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

        3.      any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G.    arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.    to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.    for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.    brought or maintained by or on behalf of, or in the right of, the **Private Company** except a derivative action **Claim**        by any person who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** and who brings or maintains the **Claim** without the solicitation, assistance or participation of such persons; provided, however that this exclusion shall not apply to a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for the **Private Company**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

K.    brought or maintained by any **Individual Insured** except:

   1.   any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by this Policy;

   2.   a **Claim** for an **Employment Practice Act** or a **Fiduciary Liability Act**;

   3.   a **Claim** for a **D&O Wrongful Act** brought or maintained by an **Employee**(s) who is not a past or present  director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** if such **Claim** for a **D&O Wrongful Act** is brought and maintained by such **Employee** without the assistance, participation or solicitation of any such persons.

L.    for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.    for service by the **Individual Insured** in any position or capacity in any entity other than the **Private Company**, a **Benefit Plan** or an **Outside Entity**, even if the **Private Company** directed or requested the **Individual Insured** to serve in such other position or capacity;

N.    arising out of, based upon or attributable to a **Public Offering** or any violation of the Securities and Exchange Act of      1933, Securities and Exchange Act of 1934, Investment Act of 1940, any state "Blue Sky" securities law, or any other federal, state or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the actual sale or purchase of securities; provided, however that this exclusion shall not apply:

   1.   to any **Private Offering**, subject to terms and conditions of Part 6, Section XVII;

2.   to any **Claim** made by any securityholder of the **Private Company** for the failure of the **Insured** to undertake or complete a **Public Offering**.

**PART 6
COMMON POLICY CONDITIONS**

I.   LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A.   With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Loss** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B.   With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C.   The **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations.  The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C),  are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D.   **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations.  The **Underwriter** is not obligated to pay any **Loss** after the applicable Limit of Liability has been exhausted.

E.   The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II.   RETENTION CLAUSE

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

III.   DEFENSE AND SETTLEMENT

A.   The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim.** However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**.  Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE  AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

B.     If the **Insured** is defending a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld.  The **Underwriter** shall not be liable for **Loss** admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.  The **Underwriter** reserves the right, but not the duty, at any time to take over control of the defense of any **Claim** and with the consent of the **Insured**, settle any **Claim** as the **Underwriter** deems expedient.

C.     The **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D.     In the event that a **Claim** is made against the **Insured**, the **Insured** shall take reasonable measures to protect their interests.

E.     If more than one **Insured** is involved in a **Claim,** the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds.**

F.     The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G.     If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured.  Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%).  It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer.  If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

H.    ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which **Loss** in the aggregate exceeds the remaining available Limit of Liability for Part 1(Directors and Officers Liability Insurance), the **Underwriter** shall:

    1.   first pay such **Loss** for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

    2.   with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such **Loss** for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

IV.    NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.  Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.    In the event that a **Claim** is made against the **Insured**, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice to the **Underwriter** as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such **Claim**, but, not later than 60 days after the expiration date of this Policy, Extension Period, or **Run-Off Policy**, if applicable.

B.    If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim,** with full particulars as to the **Wrongful Act,** dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.    All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Loss** on account of a one **Claim**.  Such **Claim** shall be deemed to be first made when the earliest of such **Claims** was first made or first deemed made pursuant to Clause B. hereinabove.

V.    CANCELLATION AND NON-RENEWAL

A.    The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least ten (10) days prior to the effective date of cancellation.

B.    The **Private Company** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Private Company** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C.      The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be mailed to the **Private Company** at least sixty (60) days prior to expiration of the **Policy Period**.

VI.      REPRESENTATIONS AND SEVERABILITY

A.      The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B.      Except for material facts or circumstances known to the **Individual Insured** signing the **Application,** no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII.      SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery.  The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII.      EXTENSION PERIOD

A.      If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension").  This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim.**

Upon expiration of the Automatic Extension, the **Private Company** shall have the right, upon payment of an additional 50%, 100%, 150% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this

Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B.      If the **Private Company** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium the following will apply:

PI-PRD-2 (09/02)

The **Private Company** shall have the right, upon payment of an additional 50%, 100%, or 150% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C.     All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX.     CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X.     ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI.     AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Private Company** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Private Company** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Private Company** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Private Company** shall be the agent of any **Insured** to effect changes in this Policy.

XII.     OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

In event of a **Claim** against the **Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** or an **Employment Practices Act** against or committed by a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.

XIII.   ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XIV.   ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.   No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.   Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XV.   CHANGE IN OWNERSHIP OR CONTROL

A.   If after the inception of the **Policy Period** a **Transaction** occurs then coverage under Parts 1, 2, and 3 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and only if the following conditions are met:

1.   the **Insured** provides written notice of the **Transaction** (other than **Public Offering**) to the **Underwriter** as soon as practicable but no later than 45 days of the effective date of such **Transaction**; and

2.   the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary; and

3.   in the case of a **Public Offering,** the **Insured** provides written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission.  The **Underwriter** shall provide a quotation for the **Public Offering**.

If **Insured** fails to meet conditions 1., 2., & 3. above, coverage under this Policy shall cease as of the effective date of the **Transaction** and the **Underwriter** shall return any unearned premium on a pro-rata basis.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years.  If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** by the **Insured** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

XVI.   TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVII.   COVERAGE FOR A PRIVATE OFFERING

The **Insured** shall give the **Underwriter** written notice of a **Private Offering**, together with full details and as soon as practicable, but not later than 60 days after the effective date of such **Private Offering**. However, any **Claim** arising out of, based upon or attributable to a **Private Offering** shall be subject to the Private Offering Retention stated in Item 4. of the Declarations Page. Such Private Offering Retention shall be borne by the **Insureds**, uninsured and at their own risk, except that a Private Offering Retention shall not apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.

XVIII.  TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Private Company** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim**. Notwithstanding the foregoing, if more than one coverage part applies to the same **Wrongful Act** or **Interrelated Wrongful Acts**, then the maximum Limit of Liability under all such coverage parts combined shall not exceed the highest applicable Limit of Liability under any one coverage part. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Private Company** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX.    ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Private Company**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss.  Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

PI-PRD-5 (09/02)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

It is provided, however, that the foregoing shall not be applicable to any derivative or shareholder class action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

All other terms and conditions of this Policy remain unchanged

PI-PRD-70 (08/03)

## <u>THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY</u>.

# HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) EXTENSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY PROTECTION PLUS**

Under **PART 3**, **FIDUCIARY LIABILITY INSURANCE**:

The following is added to Section II. DEFINITIONS:

**C. Fiduciary Liability Act** also means:

3. a. any actual or alleged breach by an **Insured** of the responsibilities, obligations or duties imposed upon  fiduciaries of any **Benefit Plan** by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) including amendments thereto; or, by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) including amendments thereto; or

   b. any other actual or alleged violation of HIPAA by the **Insured** due solely to such **Insured's** service as a fiduciary of a **Benefit Plan**; or

   c. any actual or alleged negligent violation of HIPAA by any **Insured** in the **Administration** of any **Benefit Plan**.

It is further agreed that Section III. EXCLUSIONS is amended as follows:

Paragraph B. is deleted in its entirety and replaced with:

B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable laws, except to the extent that::

   (1)  the benefits are payable by an **Individual Insured** as a personal obligation; and

   (2)  recovery for the benefits is based upon a covered **Fiduciary Liability Act,**

   however, this exclusion shall not apply to **Defense Costs.**

PI-PRD-70 (08/03)

Paragraph E. is deleted in its entirety and replaced with:

E.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, disability benefits, unemployment insurance, social security, or any similar laws, except with regard to:

    1.  the Consolidated Omnibus Budget Reconciliation Act of 1985 and any amendments thereto; or

    2.  the Health Insurance Portability and Accountability Act of 1996 and any amendments thereto.

All other terms and conditions of this Policy remain unchanged.

PI-PRD-73 (05/06)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CORPORATE ADVANTAGE PRO-PAK ELITE COVERAGE

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended as follows:

1. **OUTSIDE DIRECTORSHIP MODIFICATION**

   **PART 1 DIRECTORS & OFFICERS LIABILITY INSURANCE**, Section II (DEFINITIONS), item A. (**D&O Wrongful Act**), item 3. is replaced by the following:

   3.  act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** if such service is at the written request or direction of the  **Private Company**.

2. **AMENDMENT OF PRIOR AND PENDING LITIGATION**

   PART 5, (COMMON POLICY EXCLUSIONS), item F. is replaced by the following:

   1. any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

   2. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other similar policy in which this Policy is a renewal or replacement .

3. **DELETION OF EXCLUSIONS**

   PART 5, (COMMON POLICY EXCLUSIONS), item G. and H. are hereby omitted in their entirety.

4. **SECURITIES CLAIM CARVE BACK**

   **PART 1** (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), Section III (EXCLUSIONS), items A. and F. are amended to include the following:

   Exclusions A. and F. shall not apply to any **Claim** brought by any security holder of the **Private Company** (whether directly or derivatively) provided that such security holder is acting totally independently of, and totally without the solicitation, assistance, participation, or intervention of any Director or Officer of the **Private Company**, or any affiliate thereof.

PI-PRD-73 (05/06)

**5. SEVERABILITY AMENDMENT**

PART 6, (COMMON POLICY CONDITIONS), Section VI (REPRESENTATIONS AND SEVERABILITY), items A. and B. are replaced by the following:

(A) In granting coverage to the **Insureds** under this Policy, the **Underwriter** has relied upon the declarations and statements in the written application(s) for this Policy.  Such declarations and statements are the basis of the coverage under this Policy and shall be considered as incorporated in and constituting part of this Policy.

(B) Any written application(s) shall be construed as a separate application(s) for coverage by each **Insured**. With respect to the declarations and statements in such application(s):

(1) no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available; and

(2) only facts pertaining to and knowledge possessed by the Chief Financial Officer, President, general counsel, risk manager, Chief Executive Officer, director of human resources  or Chairperson of any part of the **Private Company** or any other individual signing such application(s) shall be imputed to the **Private Company** for the purpose of determining if coverage is available.

**6. MODIFIED CHANGE IN OWNERSHIP OR CONTROL**

PART 6, (COMMON POLICY CONDITIONS), Section XV (CHANGE IN OWNERSHIP OR CONTROL), is replaced by the following:

If after the inception of the **Policy Period** a **Transaction** occurs then this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and the premium shall immediately be considered fully earned.

However, in the case of a **Public Offering**, the **Insured** shall provide written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission.  The **Underwriter** shall provide a quotation for the **Public Offering**.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years.  If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

**7. FORMER OFFICER I VS. I CARVE BACK**

PART 5, (COMMON POLICY EXCLUSIONS), item K. will not apply to any **Claim**:

1. in which the party bringing the **Claim** has not served as a director, trustee, manager, officer or equivalent executive of the **Private Company** within four (4) years immediately preceding the date the **Claim** is first made;

2.  in which the party bringing the **Claim** has not brought the **Claim** in concert or cooperation with, at the suggestion of, or with the participation, active assistance, or intervention of any other **Insured** not described in line 1 above; or

3.  based upon, arising from, or attributable to any **Public Offering**.

## 8.  INDEPENDENT CONTRACTORS AS EMPLOYEES

PART 4, (COMMON POLICY DEFINITIONS), item E. is deleted and replaced with the following:

E.  **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employed persons as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall include **Independent Contractor** as defined below.

**Independent Contractor** means an individual who is contracted to perform services for the **Private Company**; provided that such individual shall be deemed an **Employee** only if and to the extent that the **Private Company** provides indemnification to such individual for services rendered as if they were rendered by an actual **Employee** of the **Private Company**, and provided further that such individual(s) have been identified by the **Private Company** to the **Underwriter**.  This Policy does not cover any **Loss** which any **Insured** is obligated to pay an **Independent Contractor** for overtime pay, vacation pay, employee benefit, or any compensation for services rendered.

## 9.  AGGREGATE RETENTION

Part 6 (COMMON POLICY CONDITIONS), section II (RETENTION CLAUSE), is replaced by:

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

The Aggregate Retentions, which must be borne by the **Insured**, for all **Claims** made during the **Policy Period**, will be triple the amount of the per claim Retentions stated in Item 4. of the Declarations Page.

## 10.  MODIFICATION OF SETTLEMENT CONDITION

Part 6 (COMMON POLICY CONDITIONS), section III (DEFENSE AND SETTLEMENT), item G is replaced by:

G.    If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 75% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 25% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by twenty-five percent (25%).  It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer.  If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

## 11. MODIFICATION OF SPOUSAL EXTENSION

<u>PART 4</u>, (COMMON POLICY DEFINITIONS), item G. paragraph 2, is deleted and replaced with the following:

2. the lawful spouse or **Domestic Partner** of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person.  Domestic Partner means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the **Private Company**;

## 12. MODIFICATION OF PART 3 (FIDUCIARY LIABILITY INSURANCE)

**This section only applies if a Limit of Liability is noted for Fiduciary Liability on the Declarations Page.**

Part 3, Section I( Insuring Agreement), is deleted in its entirety and is replaced by the following:

A. The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.  This coverage shall not apply any claims arising out of any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated under such law concerning privacy of health information or arising out of **Managed Care** liability.

In the event of the Insured enters into a voluntary settlement program with the Internal Revenue Service (or any similar state or federal agency), the **Company,** following prior notice provided by the **Company** to the **Underwriter,** during the **Policy Period** (or any applicable Extended Reporting Period), of the **Company's** intent to enter into said settlement program, shall pay on behalf of the **Insureds** any fees, penalties or sanctions imposed by law under said settlement program for which Inured is legally liable as a result of a **Fiduciary Liability Act** in an amount not to exceed $50,000. Such amount shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.  In no case, however, shall the Underwriter pay for any costs of corrections.

B. The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** arising from any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated

PI-PRD-73 (05/06)

under such law concerning privacy of health information.   Coverage under this paragraph is subject to a sublimit of liability of $25,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

C.  The **Underwriter** shall pay on behalf of the **Insured**, **Defense Costs** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** in connection with **Managed Care** liability solely as regards any **Managed Care** plans sponsored solely by the **Private Company** and insured and administered by an outside insurance carrier. Coverage under this paragraph is subject to a sublimit of liability of $100,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

For the purposes of this endorsement **Managed Care** shall mean any  plan providing comprehensive medical care to plan members on the basis of a prepaid contract and which by virtue thereof limits the choices of medical care and service providers available to plan members.

Part 3, Section II, Definitions, Paragraph B is deleted in its entirety and is replaced by the following:

B.  **Benefit Plan** means:

1.  any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2.  any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3.  any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion.  The 90-day notice requirement shall not apply, however, if the total assets of the acquired or formed **Pension Benefit Plan**, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the Insured Organization, or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period; and

4.  any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan or any employee stock ownership plan unless said plan is added by specific written endorsement to this policy.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

PI-PRD-73 (05/06)

**13. AMEND DEFINITION OF THIRD PARTY**

Part 2, Section II Definitions, Paragraph C is deleted in its entirety and replaced with the following:

C.   **Third Party** means any natural person who is not an **Employee** of the **Private Company**.

PI-PRD-75 (12/03)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

# AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), section III (EXCLUSIONS), item E. is replaced by:

E.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 4 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMENDMENT OF CANCELLATION PROVISION

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 6 Common Policy Conditions, section V. Cancellation and Non-Renewal, item B. is amended to include the following:

If, during the policy period, the **Underwriter's** *A.M. Best* rating is downgraded, and the **Private Company** elects to cancel the policy, then the earned premium will be calculated on a pro-rata basis.

All other terms and conditions of this Policy remain unchanged.

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## BREACH OF CONTRACT EXCLUSION

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended as follows:

I.    <u>PART 1</u>, DIRECTORS & OFFICERS LIABILITY INSURANCE, Section III. EXCLUSIONS, Item C. is hereby deleted in its entirety and replaced with the following:

C. arising out of, based upon or attributable to any actual or alleged liability under any written or oral agreement; however this exclusion does not apply to liability which would have attached even in the absence of such contract or agreement.

All other terms and conditions remain unchanged.

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

### SIDE-A NON-RESCINDABLE COVERAGE

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

SIDE-A NON-RESCINDABLE COVERAGE

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:


The Underwriter shall not be entitled under any circumstances to rescind the coverage granted by PART 1, DIRECTORS & OFFICERS LIABILITY INSURANCE, Section I. INSURING AGREEMENTS paragraph A. INDIVIDUAL LIABILITY COVERAGE.
.

All other terms and conditions of this Policy remain unchanged.

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

DEFENSE ONLY WAGE & HOUR CARVEBACK

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


DEFENSE ONLY WAGE & HOUR CARVEBACK

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS


1.    Part 2, EMPLOYMENT PRACTICES LIABILITY INSURANCE, Section III. EXCLUSIONS, paragraph B. is amended by adding the following sentence to the end thereof:

Notwithstanding the above, this exclusion shall not apply to Defense Cost incurred in the defense of any Claim for violation of the Fair Labor Standards Act (FLSA) or any similar federal, state, local or foreign statutory law or common law or regulation governing or related to wage and hour practices, including but not limited to, (i) any unfair business practices alleged because of the failure to pay Earned Wages, or (ii) seeking Earned Wages because any Employee(s) status was misclassified or mislabeled or (iii) any dispute involving the distribution or pooling of tip monies.  Coverage herewith in is subject to a Wage & Hour Sublimit of Defense Cost of $100,000.  This Wage & Hour Sublimit of Defense Cost shall be part of and not in addition to the Limit of Liability shown in Item 3. (B) of the Declarations.

For the purpose of this endorsement, Earned Wages means wage compensation or overtime pay for services rendered.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

All other terms and conditions of this Policy remain unchanged.

PI-PRD-WV-1 (03/03)

### <u>THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY</u>.

## WEST VIRGINIA AMENDATORY ENDORSEMENT

Section XIV, paragraph B. is replaced with the following:

Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter,** may be submitted to binding arbitration.  Both parties must mutually agree to arbitration.  The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel.  The panel shall consist of one arbitrator selected by such **Insured,** one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

PI-SLD-001 (01/15)

## <u>THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY</u>.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS LIABILITY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions  of the federal Terrorism Risk Insurance Act, to be an act of terrorism subject to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

# Exhibit 1.2

**From:** "Sheehan Paralegal" <sheehanparalegal@wvdsl.net>
**Subject: New Adversary Proceeding Re Consent under the D&O policy**
**Date:** August 13, 2021 at 11:57:31 AM CDT
**To:** <bblinckenstaff@turnerjohns.com>, "'George Stewart'" <stewart@zklaw.com>, "Debra T. Varner" <dtvarner@vv-wvlaw.com>, <dehlers@copeehlers.com>
**Cc:** <THFAAL@aol.com>, "'Patrick S. Cassidy'" <pcassidy@walslaw.com>, "Martin P. Sheehan" <sheehanbankruptcy@wvdsl.net>, "'Timothy F. Cogan'" <tfc@walslaw.com>

Mr. Ehlers, Mr. Stewart, Mr. Blinckenstaff, and Ms. Varner:

Today, Tom Fluharty, in his capacity as the Trustee in the David Levine case, and I, in my capacity as Trustee in the Geostellar case, have filed the attached Complaint. The Complaint seeks a declaratory judgment that right to consent on the D&O policy belongs to Mr. Fluharty and not to Mr. Levine. The suit is intended to be primarily against Philadelphia Insurance but Mr. Levine was deemed a necessary party-in-interest. He has been named a defendant also.

As you will see, we rely on an Opinion in the 10th Circuit in support of our position.

The attachments above include the Complaint and a Motion for Preliminary Injunction and a brief in support thereof. Because the PI motion may be heard more quickly, I have endeavored to identify anyone and everyone who might be counsel in the case. Service of the Complaint will be formally made with the Summons as is the ordinary practice, but it is included herein as a courtesy to all of you.

/s/ Marty


Thank you,

**Molly Sovich**
Legal Assistant to Martin P. Sheehan, Trustee
<image001.gif>
**A** 1 Community St., Ste 200, Wheeling, WV  26003
**P** (304) 232-1064  **F** (304) 232-1066
**E** sheehanparalegal@wvdsl.net


<complaint - levine.phil.pdf>
<Insurance Policy.pdf>
<mps verification.pdf>
<levine ap cos.pdf>
<motion for pi.pdf>
<memo in support of pi.pdf>

# Exhibit 1.3

**From:** George Stewart <stewart@zklaw.com>
**Sent:** Wednesday, August 18, 2021 3:24 PM
**To:** 'Lisa McNeil' <Lisa_McNeil@wvnb.uscourts.gov>; Martin Sheehan (sheehanbankruptcy@wvdsl.net)
<sheehanbankruptcy@wvdsl.net>; Brian R. Blickenstaff (bblickenstaff@turnerjohns.com)
<bblickenstaff@turnerjohns.com>; thfaal_aol.com <thfaal@aol.com>
**Cc:** sheehanparalegal_wvdsl.net <sheehanparalegal@wvdsl.net>; 'Dirk Ehlers'
<dehlers@copeehlers.com>; Debra T. Varner <dtvarner@vv-wvlaw.com>
**Subject:** RE: Aug 19 Docket - Judge Mignault

Thank you Lisa.

I do not believe that our office had  been formally served with said notice of hearing, a copy of  which
we obtained  from the docket  but I note further that we are not counsel of record for Mr Levine in this
new adversary proceeding filing involving the Philadelphia Insurance policy. . Also, we are obviously not
counsel for Philadelphia Insurance(PIIC) either herein . It does not appear that counsel who appeared
before the court for PIIC previously in the original Sheehan/Geostellar  adversary proceeding Deb
Varner  nor Dirk Ehlers who appeared at the mediation last month for PIIC received this notice/call-in
information so I am forwarding it to them as well and  adding them to this email list .

Our office will likely call-in to listen in as to the discussion but unfortunately I am unable to do so  as I
am already scheduled at that same time for an evidentiary expert witness deposition for a September 7
trial. I am trying to make arrangements for my partner Joe Butcher to call in to monitor ,but I know he is
in a deposition as well that starts earlier tomorrow.

Regards,

George N. Stewart, Esquire
Zimmer Kunz, PLLC

Greensburg Office
132 South Main Street, Suite 400
Greensburg, PA  15601
Phone:  724-836-5400
Mobile: 724-493-6224
Fax:  724-836-5149

West Virginia  Office
243 Three Springs Road, Ste 14A
Weirton, WV  26505
Phone:  304-292-8531
Fax:  304-292-7529

Pittsburgh Office
310 Grant Street
Suite 3000
Pittsburgh, PA  15219
412-434-5427

**ZIMMER KUNZ, PLLC's RESPONSE TO COVID-19:**

Due to the Governor's order to work from home, we are sending this communication via email only. We ask that you communicate via email as well. Once we are back working in the physical office , we would be happy to send you hard copies upon your request.

Thank you for your anticipated cooperation as we work through this challenge together.

This e-mail message, which is from a law firm, contains CONFIDENTIAL and PRIVILEGED INFORMATION. In addition, the information may be protected by state and federal laws, including, without limitation, the provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPPA), which prohibit unauthorized disclosure.  If you have received this communication in error (you are not the addressee or authorized to receive the message for the addressee), you may not use, copy or disclose the message or any information contained in the message.  If you have received this e-mail in error, please advise the sender immediately by reply e-mail and delete this message.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

**From:** Lisa McNeil <Lisa_McNeil@wvnb.uscourts.gov>
**Sent:** Wednesday, August 18, 2021 1:25 PM
**To:** Martin Sheehan (sheehanbankruptcy@wvdsl.net) <sheehanbankruptcy@wvdsl.net>; Brian R. Blickenstaff (bblickenstaff@turnerjohns.com) <bblickenstaff@turnerjohns.com>; thfaal_aol.com <thfaal@aol.com>
**Cc:** George Stewart <stewart@zklaw.com>; sheehanparalegal_wvdsl.net <sheehanparalegal@wvdsl.net>
**Subject:** Aug 19 Docket - Judge Mignault

Counsel,

You are scheduled to appear before Judge Mignault for a telephonic hearing tomorrow afternoon.  Please dial-in promptly and mute your line until your case is called.  If there is any background noise Judge Mignault's staff will mute all lines.   If you cannot be heard please press *6 to unmute your line.

**Please use Judge Mignault's conference line to join the hearing:**

**Dial: 888-273-3658**
**Access Code 1039652#**

Thank you,
Lisa

**Lisa McNeil**
US Bankruptcy Court NDWV
Courtroom Deputy

(304) 234-4003 Work
(304) 231-8977 Mobile
Lisa_McNeil@wvnb.uscourts.gov