## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

LEVINE, DAVID ANDREW
LEVINE, MONICA LARSON

       Debtors.

_____

THOMAS H. FLUHARTY, Trustee of the
Bankruptcy Estate of David Levine and Monica
Levine,

       Plaintiff,

MARTIN P. SHEEHAN, Trustee of the
Bankruptcy Estate of Geostellar, Inc.

       Co-Plaintiff,

v.

PHILADELPIA INDEMNITY INSURANCE
COMPANY and DAVID A. LEVINE,

       Defendants.

Bankruptcy Case No.: 3:19-bk-1048

Adversary Proceeding No. 3:21-ap-00019

## PHILADELPHIA INDEMNITY INSURANCE COMPANY'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR A BRIEFING SCHEDULE

Philadelphia Indemnity Insurance Company ("PIIC") provides this Response to the Motion

for a Preliminary Injunction filed by co-Plaintiffs Thomas Fluharty, Trustee of the Bankruptcy

Estate of David Levine and Monica Levine (the "Levine Trustee") and Martin P. Sheehan, Trustee

of the Bankruptcy Estate of Geostellar, Inc. (the "Geostellar Trustee") (collectively, "Plaintiffs") in

regard to the subject of an Adversary Complaint Plaintiffs filed to commence this case on August

13, 2021.  The Adversary Complaint concerns issues in regard to insurance coverage for Defendant

David A Levine, under Private Company Protection Plus Policy No. PHSD1249816 (the "Policy") issued by PIIC to Geostellar, Inc. which was in effect for a Policy Period of May 31, 2017 to May 31, 2018.  A true and correct copy of the Policy with an Extended Reporting Period Endorsement, which has been numbered in the bottom right corner consecutively for ease of reference, is attached to Exhibit 1, the Declaration of Dirk E. Ehlers ("Ehlers Dec."), as Exhibit 1.1, and is referenced herein as "Ex. 1.1".  Mr. Levine is being defended by PIIC as an "Individual Insured" under the Policy in the Lawsuit captioned *Sheehan v. Levine*, Bankruptcy Case No. 3:19-ap-00024 (the "Geostellar Lawsuit"), which is also pending in this Court.

Defendant PIIC respectfully requests that this Court deny Plaintiffs' improper and unsupported request for a preliminary injunction because:  (1) they do not meet the requirements for the injunction they seek, because (a) it is a mandatory injunction; (b) they have not provided a valid factual record; and (c) they cannot demonstrate irreparable harm; (2) they both lack standing; (3) the equitable concerns for settlement do not favor them; and (4) the matter is non-core.

## I.    Plaintiffs' Preliminary Injunction Request is Improper

### A.    Mandatory Injunctions are Disfavored

Plaintiffs here improperly seek a mandatory injunction to change the status quo, rather than to preserve it.  The primary function of a preliminary injunction is to maintain or restore the status quo.  See *Di Biase v. SPX Corp*., 872 F.3d 224, 231 (4th Cir. 2017); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (explaining that "a preliminary injunction preserves the status quo pending a final trial on the merits[.]").  Accordingly, any preliminary injunction must "be tailored to restrain no more than what is reasonably required to accomplish its ends."  *Consolidation Coal Co. v. Disabled Miners of S. W. Va*., 442 F.2d 1261, 1267 (4th Cir. 1971).  Plaintiffs seek a mandatory injunction because they seek to take control of a directors &

officers liability insurance Policy issued for the benefit of Mr. Levine as an "Individual Insured," and thereby to confer a benefit to the Levine Trustee (the propriety of which is also not established, as discussed below).  Moreover, Plaintiffs seek to force PIIC to engage in settlement negotiations before its Insured's liability has been determined.

The law disfavors mandatory injunctions.  See, *e.g.*, *Vollette v. Watson*, Civil Action No. 2:12cv231, 2012 U.S. Dist. LEXIS 103322 (E.D. Va. July 24, 2012) ("… Plaintiffs have the burden to demonstrate that a preliminary injunction should issue in this case.  Furthermore, because Injunction Plaintiffs seek a mandatory injunction that would alter the status quo during the pendency of the litigation, the Court's inquiry is even more searching than in a typical case, and entry of the requested mandatory injunction is 'disfavored' by governing law."); *Sun Microsystems, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litig.)*, 333 F.3d 517 (4th Cir. 2003)  ("Our application of this exacting standard of review is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature.")

## B.  Plaintiffs' Factual Record is Inadequate

Courts must evaluate facts when deciding a preliminary injunction and enter an injunction only when the facts support the movant's claims of harm and interest.  It is a general principle that a court on a motion for a preliminary injunction must see evidence in support of movant's claims. "When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party."  *Queen Virgin Remy, Co. v. Thomason*, No. 1:15-CV-1638-SCJ, 2015 U.S. Dist. LEXIS 186411, 2015 WL 11422300, at *2 (N.D. Ga. June 10, 2015), *modified*, No. 1:15-CV-1638-SCJ, 2015 U.S. Dist. LEXIS 185667, 2015 WL 11455760 (N.D. Ga. Oct. 21, 2015) (citing *Imaging Business Machines, LLC. v. BancTec, Inc*., 459 F.3d 1186,

1192 (11th Cir. 2006)).  If the evidence is contested, however, the court "'must assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications.'"  *Weaver v. Henderso*n, 984 F.2d 11, 14 (1st Cir. 1993) (quoting *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co*., 864 F.2d 927, 929 (1st Cir. 1988)).

Here there is no evidentiary record.  Plaintiffs produce no affidavits in support of their motion, and the verification of their Adversary Complaint is inadequate because it does not meet the standards required for an affidavit in support of summary judgment.

Plaintiffs title their Adversary Complaint a "Verified Complaint," but the verification is insufficient.  The verification states only: "the facts and allegations therein contained are true except so far as they are therein stated to be on information, and that so far as they are therein stated to be on information, he believes them to be true."  (Verification, Dckt No. 1-1.)  Such language is insufficient because it does not state the affiant's competence to make that statement, nor does it provide sufficient verification.  For example, in *Tillery v. Borden*, Civil Action No. CBD-07-1092, 2010 U.S. Dist. LEXIS 92501, *7-8 (D. Md. Sep. 3, 2010) a court presented with a similarly inadequate verification commented as follows:

> In large measure, a verified complaint is intended to provide the same evidentiary foundations as an affidavit.  A properly verified complaint can provide a sufficient basis to oppose a motion for summary judgment.  Pursuant to Fed. R. Civ. P. 56(e) an affidavit must "set out facts that would [be] admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Assuming the Court were to give credence to the original verified Complaint, the verification is inadequate in that it merely states that the information set forth therein is believed to be "true and correct to the best of our knowledge, information and belief."  Such an affidavit, or verification, is inadequate to withstand a motion for summary judgment.  Information "believed" to be "true and correct" is not "admissible in evidence."

Accordingly, the verification of the Adversary Complaint is deficient on its face and the Court has no adequate factual record to establish Plaintiffs' right to injunctive relief.

### C.      Plaintiffs Do Not Establish Irreparable Harm

Plaintiffs assert only that allowing Mr. Levine to continue to assert a right to consent to a settlement will then change which party will receive money—this is merely a money damage issue and not an irreparable harm that is sufficient to require mandatory injunctive relief.  The Supreme Court's "frequently reiterated standard requires [a plaintiff] seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) (internal emphasis omitted).  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough."  *Roe v. United States DOD*, 947 F.3d 207, 228 (4th Cir. 2020) (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)) (internal quotation marks and alteration omitted).

Plaintiffs have not established a risk of irreparable injury at this point for several reasons.  First, their only argument is that if the current state of affairs continues, and a settlement of the Geostellar Lawsuit is not negotiated, a portion of the limit of liability provided by the Policy will be paid for the Defense Costs for Mr. Levine, which will reduce the limit of liability available to the Geostellar Estate in settlement.  However, Plaintiffs have not provided anything remotely close to a factual or legal record that indicates the limit of liability under the Policy is insufficient to both fund Mr. Levine's defense and to provide payment for damages, if any, caused by Mr. Levine's alleged misconduct.  Second, the party that seeks to coopt Mr. Levine's right of consent to a settlement that would be paid by PIIC, the Levine Trustee, cannot in any way be impacted by such a settlement, or a lack of such a settlement.  An insured settlement will not create a liability that will actually then be paid from the personal bankruptcy estate of Mr. Levine and his wife.  The impact upon the Levine Trustee in allowing him to approve or block a settlement is zero.

Furthermore, in regard to the Geostellar Estate, it is already the case that some creditors will not be paid the entirety of debts owed, whether the limit of liability would be sufficient, after payment of Mr. Levine's defense, or not; the monetary risk does not rise to the level of "irreparable harm" to the Geostellar Trustee.  Moreover, the Geostellar Trustee does not have standing to assert control over Mr. Levine's rights under the Policy, in any event.  The Geostellar Trustee is adverse to Mr. Levine as a claimant in the Geostellar Lawsuit, and as such, the Geostellar Trustee cannot coopt Mr. Levine's rights under the Policy, as an Individual Insured, when the Geostellar Trustee is acting as any non-Insured plaintiff in a lawsuit on behalf of creditors, against Mr. Levine.  In *In re Allied Digital Technologies Corp.,* 306 B.R. 505, 512-513 (Bankr. D. Del. 2004), the court explained the importance of this distinction, finding:

> Here, the Trustee brought the action against the directors and officers.  The policy in question provides direct coverage to the directors and officers for claims and defense costs (which are real), and indemnification coverage to the company for amounts paid to the directors and officers (which is hypothetical).  The Trustee has made no credible showing that the direct coverage of Allied Digital under Clause B(i) for securities claims has any continuing vitality.  *The Trustee's real concern is that payment of defense costs may affect his rights as a plaintiff seeking to recover from the D&O Policy rather than as a potential defendant seeking to be protected by the D&O Policy.  In this way, Trustee is no different than any third party plaintiff suing defendants covered by a wasting policy.*  No one has suggested that such a plaintiff would be entitled to an order limiting the covered defendants' rights to reimbursement of their defense costs.
>
> The bottom line is that the Trustee seeks to protect the amount he may receive in his suit against the directors and officers while limiting coverage for the defense costs of the directors and officers.  This is not what the directors and officers bargained for.  In bringing the action against the directors and officers, the Trustee knew that the proceeds could be depleted by legal fees and he took that chance.  The law does not support the Trustee's request to regulate defense costs.

(Emphasis added.)

The court's approach in *In re Allied Digital Technologies Corp.* has been widely adopted by courts in other jurisdictions.  See, *e.g., In re Beach First Nat'l Bancshares, Inc.*, 451 B.R. 406,

411 (D. S.C. 2011) (citing *Allied Digital* in rejecting the plaintiff trustee's argument that defendants should not be able to receive their defense costs paid from the policy because by doing so it would reduce the trustee's recovery as a plaintiff); *In re Laminate Kingdom LLC*, 2008 Bankr. LEXIS 1594, **10-**11 (Bankr. S.D. Fla. Mar. 13, 2008) (following *Allied Digital* in another matter involving a trustee seeking to prevent the payment of defense costs for an individual insured's defense in a lawsuit filed by the trustee); *Miller v. McDonald (In re World Health Alternatives, Inc.)*, 369 B.R. 805, 811 (Bankr. D. Del. 2007) (citing *Allied Digital* for the proposition that the Trustee is no different from any other third party when seeking recovery from an Insured that has a wasting policy); and *In re Licking River Mining, LLC*, 2016 Bankr. LEXIS 2211 (Bank. E.D. KY. Jun. 6, 2016) ("In looking to preserve a funding source to satisfy a judgment, the Trustee is not seeking to preserve estate assets.  As such, there is no reason she should be treated differently than any other third-party plaintiff suing the Movants").  Conversely, Mr. Levine faces potential damage to his reputation as a former director and officer of Geostellar if he is not permitted access to the settlement and litigation process for the Claims being asserted against him.  See, *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 469 (S.D.N.Y. 2005) (finding that if the insured individual is unable to obtain defense costs, "the impact of an adverse judgment will have ramifications beyond the money that will necessarily be involved. There is the damage to reputation, the stress of litigation, and the risk of financial ruin – each of which is an intangible but very real burden."); see also, discussion of reputational risk to Mr. Levine in Section III., below.

## II.     The Trustees Have No Standing as to the Injunctive Relief Sought

To establish standing at this stage of their lawsuit, Plaintiffs are "not entitled to rest on . . . mere allegations" of standing "but must set forth by affidavit or other evidence specific facts" demonstrating the elements of standing.  *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, (1992).  For purposes of deciding the application, the court must take such evidence as true and draw all reasonable inferences therefrom in a light most favorable to the plaintiff.  See *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 213 (4th Cir. 2020); *Pye v. United States*, 269 F.3d 459, 467 (4th Cir. 2001) (citing *Lujan*, 504 U.S. at 561).  Plaintiffs must establish standing for each claim they seek to press and for each form of relief they seek.  See *Md. Shall Issue*, 971 F.3d at 209.

### A.      The Geostellar Trustee Has No Standing

In regard to the Geostellar Trustee, the only basis for standing provided is that the Geostellar Trustee has filed an adversary proceeding against Mr. Levine in connection with the Geostellar bankruptcy.  However, filing a lawsuit against an Insured under the Policy does not establish standing to sue under the Policy as an Insured for Geostellar.  West Virginia is not a direct action state, and a claimant that has brought a lawsuit against an insured under a liability policy under West Virginia law may not bring an action against an insurance company until it obtains a judgment against the insured.  The Geostellar Trustee, as a mere claimant against Levine, has no right to bring a direct action against PIIC.  He is not yet a judgment creditor and liability of Mr. Levine is not established, as is a prerequisite for a claimant – not suing as an Insured – to bring a claim directly against PIIC.

The Geostellar Trustee is conflating his role as a claimant – by which he is seeking to bring a cause of action on behalf of the Geostellar Estate for its creditors – with a role of an Insured under the Policy, for which he asserts the coverage is "first party" insurance.  While Geostellar itself is indeed an "Insured" under the Policy, as the "Private Company," it is not acting as an Insured when it sues its own directors or officers such as Levine.  See *In re Allied Digital Technologies Corp.,* 306 B.R. 505, 512-513 (Bankr. D. Del. 2004) and related case law, discussed above in Section I.C.

The coverage afforded to Geostellar as an Insured "Private Company" under the Policy is coverage either for its own liability, which it certainly is not seeking to establish in its own lawsuit, or coverage for its indemnification of its directors' or officers' liability, which it is certainly not providing to Mr. Levine for the Geostellar Lawsuit.  Geostellar is not making a "first-party" insurance claim; it is asserting liability as a claimant allegedly damaged by Mr. Levine's alleged "Wrongful Acts."  The Policy affords only third-party liability coverage, and not first-party coverage (such as life or property insurance) for Geostellar.

While the Geostellar Lawsuit may give rise to coverage for Mr. Levine, it is not a "Claim" against Geostellar falling within any of the Policy's Insuring Agreements that insure Geostellar, as opposed to Mr. Levine.  The Policy provides coverage for Claims against the Insureds for their "Wrongful Acts."  See definition of "Claim" under Part 4, COMMON POLICY DEFINITIONS, Item B. (defining "Claim," in pertinent part, to be "against an "Insured for a Wrongful Act") and the Insuring Agreements under Part 1 (Insuring "Individual Insureds," such as Mr. Levine, for Claims against them under Part 1, Section I., INSURING AGREEMENTS, Subsection A., while insuring Geostellar, as the "Private Company," either under Part 1, Section I., Subsection B. for its indemnification of an Individual Insured's "Loss" (which Geostellar is *not* providing for Mr. Levine) or under Section I., Subsection C., for Claims against Geostellar itself for its own conduct (which are not involved in the Geostellar Lawsuit); or under Part 2, which likewise provides coverage for Geostellar solely for Claims against it, for its own conduct (which are not involved in the Geostellar Lawsuit).  Ehlers Dec., Ex. 1, ¶¶ 6, 7, 10  and Ex. 1.1, pp.  48, 42, 44-45).

The West Virginia Supreme Court of Appeals held in *Robinson*  v. *Cabell Huntington Hosp., Inc.*, 201 W.Va. 455, 460, 498 S.E.2d 27 (1997), that an injured party suing an insured tortfeasor has no standing to bring a direct action against the defendant's insurance company, with two narrow

exceptions. *Robinson v. Cabell Huntington Hosp., Inc.*, 201 W.Va. 455, 460, 498 S.E.2d 27 (1997), quoting *Mazon v. Camden Fire Ins. Ass'n*, 182 W.Va. 532, 533, 389 S.E.2d 743 (1990).   Those exceptions are:   (1) where the insured fails to pay a judgment entered in a personal injury action (*see Broy v. Inland Mut. Ins. Co.*, 160 W.Va. 138, 233 S.E.2d 131 (1977)), and (2) "where the defendant's insurer has denied coverage" (see *Christian v. Sizemore*, 181 W.Va. 628, 383 S.E.2d 810 (1989)).   *Robinson*, *supra*, 201 W.Va. at 460.[1]   The court in *Robinson* expressly held that such claimants are not "third-party beneficiar[ies]" of the insurance contract.   *Id.*

The first exception obviously is not relevant here – as there is no unpaid judgment on behalf of Geostellar against Levine.   Moreover, there has been no "denial of coverage."   In *Christian v. Sizemore*, 181 W.Va. 628 (1989), the court held, in Syllabus Point 3, that "[a]n injured plaintiff may bring a declaratory judgment action against the defendant's insurance carrier to determine if there is policy coverage before obtaining a judgment against the defendant in the personal injury action where the defendant's insurer has *denied* coverage."   (Emphasis added.)   In *Christian*, the plaintiff brought an action for injuries she suffered in an automobile accident.   The defendants' insurance carrier denied coverage on the ground that the policy had lapsed before the accident occurred.   *Id.* at 629.   Under these circumstances, the court found that a declaratory judgment count against the insurance company could properly be joined with the action against the policyholders. The court acknowledged the principle that, in general, an action against a defendant's insurance carrier should not be joined in an action against the insured, so as to avoid the prejudice inherent in the possible mention of insurance coverage at trial.   *Id.* at 630.   However, because in the case before

---

[1]     *Robinson* identified a third exception, involving third party bad faith claims.   However, such claims were eliminated with the enactment of W.Va. Code § 33-11-4a in 2005, such that the third exception identified in *Robinson* no longer exists.   *Whittaker, LLC v. Nationwide Mut. Ins. Co.*, No. CIV. A. 2:07-963, 2008 WL 2063548, at *3 (S.D.W.Va. May 13, 2008).

it the insurance carrier had *denied* any obligation to pay a judgment against the defendant, the court found it appropriate to seek early resolution of the coverage dispute:

> Declaratory judgment … provides a prompt means of resolving policy coverage disputes so that the parties may know in advance of the personal injury trial whether coverage exists.  This facilitates the possibility of settlements and avoids potential future litigation as to whether the insurer was acting improperly in denying coverage.  Moreover, as this case demonstrates, the use of declaratory judgment protects the plaintiff from an insured who has no independent assets and is not concerned about insurance coverage.

*Id.* at 632.

These concerns are not present here.  The *Christian* court noted that where "the coverage question" is separable from the issues in the underlying action, "it should ordinarily be decided first."  *Id.* at 632-633.  This action to coopt Mr. Levine's right to consent, is not a "coverage question" for the Geostellar Trustee, who is not entitled to coverage under the Policy for liability in the Geostellar Lawsuit as an Insured.  PIIC did not deny coverage for the Geostellar Lawsuit for the Insured defendant – Mr. Levine – but to the contrary – agreed to defend Mr. Levine under a reservation of rights.  Ehlers Dec., Ex. 1, ¶¶ 13-15.  Coverage issues may ultimately exist in regard to the Damages sought in the underlying Geostellar Lawsuit, if liability is determined, but this Adversary Proceeding is not seeking to resolve such a coverage question, which would be premature in the absence of any showing of liability.

A tort claimant such as the Geostellar Trustee does not have a right to file a direct action under West Virginia law in the circumstances for this case.  Post *Christian*, the West Virginia Supreme Court of Appeals in *Anderson v. Robinson*, 186 W. Va. 92, 411 S.E.2d 35 (1991), permitted the plaintiff to proceed in a direct action against the tortfeasor's insurer to satisfy a judgment, which had already been obtained, where the bankruptcy court modified the automatic stay in order for the plaintiff's lawsuit to proceed to the extent of available insurance coverage.  The critical factor in *Anderson*, however, was that a judgment had already been obtained by the plaintiff.

In rendering its ruling, the Court noted it was only in certain circumstances that an injured plaintiff may proceed against the tortfeasor's insurer.  In this case, not only has a judgment not yet been obtained, but the status of the Geostellar Trustee's operative complaint remains the subject of an objection asserted by Mr. Levine, such that neither PIIC nor Levine even know at this time what the allegations in the Geostellar Lawsuit are going be.  (*Sheehan v. Levine*, 3:19-ap-00024, Dckt. Nos. 57-66).

Plaintiffs place their sole reliance upon a ruling by the 10th Circuit in *Olah v. Baird (In re Baird)*, 567 F.3d 1207 (10th Cir. 2009), in which the court ruled that Utah law allowed the claimants, alleged victims of a tort by the debtor, to pursue an action against the insurer for their "loss," which was deemed to have been fixed as to the claimants at the time of the alleged tort, under Utah law.  However, Utah law does not apply in this case.  Under West Virginia law, an insured "loss," and with it the claimants' right to a direct action, has not been determined by a judgment establishing the liability of Levine.  The Geostellar Trustee has no standing to assert a claim against PIIC, because the liability of PIIC's Insured, Mr. Levine, has not been established. The Geostellar Estate is not making an insurance claim under the Policy itself, as an Insured, for its own liability for alleged Wrongful Acts, or for reimbursement for Mr. Levine pursuant to an agreement by Geostellar to indemnify him for alleged Wrongful Acts.

### B.     The Levine Trustee Has No Standing

Plaintiffs assert that Mr. Levine's right of consent to settlement under the Policy as an Individual Insured should be deemed to have been transferred to the Levine Trustee because the rights of Mr. Levine under the Policy have been transferred to the Levine Trustee in connection with Mr. Levine's personal bankruptcy.  However, the Levine Trustee has no interest in the Policy, and the nature and scope of the insurance coverage under the Policy in this case are materially

different from the coverage for the debtor in *Olah* that was found to have been transferred to the trustee in that case.  The same result does not follow in this case.

### 1.    The Levine Trustee Has No Interest in the Policy

Plainly the discharge of a Chapter 7 debtor does not eradicate liability of third parties for their obligations—for example contractually responsible insurance companies must still pay defense costs or indemnity.  See generally, *e.g.*, *First Fidelity Bank v. McAteer*, 985 F.2d 114 (3rd Cir. 1993).  It is black letter law that the permanent discharge injunction contained in 11 U.S.C. § 524(a)(2) does not prevent suit against the debtor solely to determine liability in order to collect from the debtor's (or another entity' s) insurer. See generally, *e.g.*, *First Fidelity Bank v. McAteer*, 985 F.2d 114 (3rd Cir. 1993); *Green v. Welsh*, 956 F.2d 30 (2nd Cir. 1992); *In re Shondel*, 950 F.2d 1301 (7th Cir. 1991); *In re Walker*, 927 F.2d 1138 (10th Cir. 1991).

Thus the bankruptcy code provides that it is permissible to commence or continue prosecution against a debtor, with such litigation taking place outside the debtor's bankruptcy, and with the debtor named as a nominal defendant if such action is necessary to prove liability as a prerequisite to recovery against a liability insurer.[2]  It is emphasized, however, that no collection action may be taken against the debtor.  *Pettibone Corp. v. Hawxhurst*, 163 B.R. 989 (N.D. Ill 1994), aff'd, 40 F.3d 175 (7th Cir. 1994).

Because the litigation is proceeding outside of the bankruptcy proceeding and because the debtor is involved solely for the purpose of determining his or her liability, the Chapter 7 trustee for the debtor has no interest in the litigation or in the relevant insurance policy.  The key here is that the purpose of the litigation carried on outside the bankruptcy proceeding is to determine what

---

[2] Indeed, many state laws require that the debtor be a named party. See generally, e.g., In re Edgeworth, 993 F.2d 51 (5th Cir. 1993).

13

the debtor's liability would be on a debt that would be indemnified by another party, notwithstanding the debtor's discharge. *In re Schultz*, 251 B.R. 823, 828 (Bankr. E.D. Tex. 2000) (holding that while the discharge injunction protects a discharged debtor from being adjudged personally liable, it does not "preclude a determination of [a] debtor's liability on the basis of which indemnification would be owed by another party") (quoting *In re Shondel*, 950 F.2d 1301, 1306 (7th Cir. 1991)); *In Re Gibson*, 172 B.R. 47, 49 (collecting cases)(Bankr. W.D. Ark 1994).

Crucially, to understand a trustee's interest in litigation potentially covered by a liability insurance policy, it is important to recognize that bankruptcy courts have found that there is no reason to reopen a Chapter 7 bankruptcy to allow a party to proceed against the debtor solely for the purpose of determining an indemnity to be paid by a third party. Indeed, several courts addressing this issue have determined that it is not necessary to reopen a bankruptcy case or to enter an order "modifying" the discharge injunction allowing a party to proceed with a lawsuit under § 524(e). See, *e.g.*, *Ruvacalba v. Munoz (In re Munoz)*, 287 B.R. 546, 550 (B.A.P. 9th Cir. 2002) ("The assumption … that a bankruptcy court order is required any time an action is taken nominally against a debtor after discharge is . . . incorrect."); *Patronite v. Beeney (In re Beeney)*, 142 B.R. 360, 363 (B.A.P. 9th Cir. 1992) (holding that "reopening [a] case is unnecessary because . . . an action naming the debtor solely to establish the debtor's liability in order to collect on an insurance policy is not barred by . . . § 524"); *In re Christian*, 180 B.R. 548, 550 (denying the creditor's motion to reopen "for the purpose of modifying the injunctive provisions of the Order of Discharge . . . as moot"); *Gibson*, 172 B.R. at 50 (denying creditors' motion to reopen "as it does not present a justiciable issue for the Court"). The Chapter 7 Trustee can have no interest beyond that in the bankruptcy proceeding.

Thus, because the Geosteller Lawsuit is taking place entirely outside of Levine's personal bankruptcy proceeding, and because its sole purpose is to determine an indemnity that would be provided by a third party (PIIC) – and which is available for that limited purpose only – the Levine Trustee cannot have an interest in the litigation or in the Policy.

### 2.    The Policy is Materially Different from the Policy in *Olah*

In *Olah* a malpractice liability insurance purchased by a doctor was deemed to have been assigned to the trustee of his personal bankruptcy estate, and because the doctor's rights under the malpractice liability insurance policy were assigned to the trustee, the trustee was deemed thereby also to have also acquired the doctor's right to consent to a settlement with the claimants who were seeking to establish the personal liability of the doctor – a claim in the bankruptcy estate being administered by the personal bankruptcy trustee – for loss covered by his malpractice liability insurance policy.  However, this case does not involve an insurance policy that Mr. Levine purchased, for himself, that would then automatically be deemed part of his personal assets transferred to a trustee upon his declaration of bankruptcy.  The Policy in this case was purchased by Geostellar, not only for Mr. Levine, but also for Geostellar and a host of other "Individual Insureds" as defined therein.  (Ehlers Dec., Ex. 1, ¶¶ 3, 5 and Ex. 1.1, p. 5, 49).  None of those individuals, either Mr. Levine or anyone else, obtained coverage under the Policy for his or her personal debts.  To the contrary, the insurance provides coverage for "Individual Insureds" only for their conduct in such capacity, which is conduct a director or officer would undertake on behalf of Geostellar.  (Ehlers Dec., Ex. 1, ¶¶ 7, 8, 9, 10 and Ex. 1.1, pp. 42, 44-45, 49 and 64).

Mr. Levine's coverage under the Policy, confined to his conduct and liability as an Individual Insured, does not create a pool of funds for his personal creditors, and its availability or lack of availability will have no impact upon the assets that are a part of his personal estate.

Therefore, the finding in *Olah* by the 10th Circuit that the trustee in a personal bankruptcy had been assigned the debtor's personal malpractice policy, which had been purchased by the debtor himself, only for himself and only for his own personal liability, is not a finding that a directors & officers liability policy, not allowing coverage for personal liability of directors or officers – would be transferred to a personal bankruptcy estate of any one director or officer insured thereunder along with a corporate entity.  The proceeds of a directors and officers liability policy will never be used to reduce the liability of an insured director or officer for his or her own personal debts that are impacted by a personal bankruptcy, and Plaintiffs have provided no example of such a policy being assigned to an individual's personal bankruptcy estate.

The very nature of the directors and officers liability coverage provided to Mr. Levine is to protect him, as well as many others, for incurring liability as directors or officers of Geostellar, the corporation that obtained the coverage for such directors and officers to ensure that any potential loss they might incur as the result of their service in such capacities would remain separate from their personal finances.  This in turn provides an incentive for qualified individuals to serve as directors and officers, free from the significant risks of litigation involving their work on behalf of the companies that they serve.  Courts routinely recognize that the benefits provided to directors and officers by directors & officers liability insurance coverage cannot be stripped from them by a bankruptcy trustee – because the contract is written provides a secure and independent resource to them to rely upon.  See discussion of the ruling in *In re Allied Digital Technologies Corp.,* 306 B.R. 505, 512-513 (Bankr. D. Del. 2004) and numerous additional similar cases in Section I.C., above.

The priority of the rights of directors and officers under the Policy is further reflected by the Policy's treatment of the insured "Private Company" versus the "Individual Insureds" in a circumstance in which there may not be adequate policy limits available for both.  For a situation

16

in which the "Loss" exceeds the Policy's available Limit of Liability for Part 1 (Directors and

Officers Liability Insurance), under Part 6, COMMON POLICY CONDITIONS, Section III.,

DEFENSE AND SETTLEMENT, Subsection H., ORDER OF PAYMENTS, the Policy provides:

> H.    ORDER OF PAYMENTS
>
> In the event of Loss arising from one or more Claims for which payment is
> otherwise due under Part 1 (Directors and Officers Liability Insurance) but
> which Loss in the aggregate exceeds the remaining available Limit of
> Liability for Part 1 (Directors and Officers Liability Insurance), the
> Underwriter shall:
>
> 1.    first, pay such Loss for which coverage is provided under Insuring
> Agreement A (INDIVIDUAL LIABILITY COVERAGE); then
>
> 2.    with respect to whatever remaining amount of the Limit of Liability
> after payment of 1. above, pay such Loss for which coverage is
> provided under any other Insuring Agreement of Part 1 (Directors
> and Officers Liability Insurance).

Ehlers Dec., Ex. 1, ¶ 11 and Ex. 1.1, pp. 55-56.

The foregoing "Order of Payments" provision requires that payments for Loss under

"Coverage A," for an Individual Insured, such as Mr. Levine, be paid before payment of Loss for

which coverage is provided to Geostellar.  This is why, as PIIC had provided in its motion in the

Geostellar bankruptcy proceeding, the Geostellar Trustee – even though Geostellar is itself an

Insured under the Policy – has no right to preclude Mr. Levine from obtaining the benefit of his

coverage for his defense in a lawsuit against him as a former director or officer.  See *In re*

*Geostellar, Inc.*, 3:18-BK-0045, Dckt No. 159.

The hierarchy of rights created by directors and officers liability coverage is clear:  directors

and officers insured thereunder are given the ability to defend themselves from claims against them

for their alleged conduct as directors and officers, which is confined to their capacities as such.

This is reflected in both the priority of payments language (Ehlers Dec., Ex. 1, ¶ 11 and Ex. 1.1, pp.

55-56), and by the fact that even if the Policy could be rescinded as to Geostellar, the coverage for the directors and officers would remain non-rescindable.  (Ehlers Dec., Ex. 1, ¶ 12  and Ex. 1.1, p. 73),  The company that purchased the policy, which also insures the company for its own liability – *which not at issue in this case* – is placed second by the order of payments – a circumstance irrelevant in this case because the company, Geostellar, is not facing any liability for which the policy is required.  Because the Policy that Geostellar purchased from PIIC is an eroding policy – by which the defense of the Insured's directors and officers reduces the limit of liability, the Policy is less expensive than a non-eroding policy, which would maintain a separate source of funds for defense versus liability.  See *West Virginia Mutual Insurance Co. v. Vargas*, 933 F. Supp. 2d 847, 858 (N.D.W. Va. 2013) ("To adopt Vargas's argument and foreclose carriers of tail insurance from including defense costs within the available liability limits upon an insured's default, would, by judicial dictate, increase the cost of tail insurance in West Virginia and run afoul of the legislature's stated goal of promoting stable and affordable tail insurance premiums.  This the Court declines to do. The defense within limits provision in West Virginia Mutual's tail policy therefore does not violate the public policy of West Virginia.").  This means that the contract that was purchased by Geostellar to protect Mr. Levine as a director and officer of Geostellar, first and foremost, is available to enable him to defend against liability, and then for the liability that may be incurred. The limit being a significant amount of funds, either $3 million or $1 million, depending upon the Insuring Agreement that would apply, is reduced by its use for the defense of Mr. Levine, but it is not eliminated.  Creditors who ultimately stand to recover in a lawsuit against Mr. Levine for alleged conduct as a director or officer of Geostellar may, *if* they establish liability, then be entitled to a recovery for such liability from the balance available under the Policy.

18

Purchasers of an eroding Policy – or their successors such as the Geostellar Trustee – cannot rewrite the insurance contract, either to eliminate the priority of payment to allow for the directors to obtain their defense, or to give creditors a right to recover any amount of the limit of liability without first actually establishing liability of an Insured under the Policy.  If Geostellar had wanted to purchase a policy providing for the defense of its directors and officers on top of the limit of liability available to satisfy a judgement, Geostellar could have done so, but it would have then needed to pay a higher premium for such a product.  See *West Virginia Mutual Insurance Co. v. Vargas*, 933 F. Supp. 2d 847, 858 (N.D.W. Va. 2013); see also, *e.g.*, *Fed. Ins. Co. v. Singing River Health Sys.*, 850 F.3d 187, 202 (5th Cir. 2017) (noting generally an insured's option to purchase coverage providing for defense costs in addition to the limit of liability).

The Geostellar Trustee, and Geostellar's creditors, may not like that Mr. Levine has access to the limit of liability for his defense, but that is the contract that was purchased – a contract that incentivizes a claimant to take into consideration that protracted litigation will eliminate the source of funds available to satisfy a judgment.  See *In re Allied Digital Technologies Corp.,* 306 B.R. 505, 512-513 (Bankr. D. Del. 2004) (noting that risk of reduction of settlement funds is a risk that any plaintiff seeking recovery from an insured with an eroding policy must contend with).

Where do the Levine Trustee and Mr. Levine's personal bankruptcy estate sit in this group of potential beneficiaries of the Policy?  Nowhere.  Mr. Levine's personal liability is not a risk insured under the directors and officers liability policy purchased by Geostellar for:  (1) the defense of Mr. Levine, and (2) for liability he may incur for conduct in his capacity as a director or officer, if – and only if – that liability is ever actually established, which certainly has not happened.  The Policy in this case has not been assigned to the Levine Trustee, because it is not and never will be the personal property of Mr. Levine, and will never be used to satisfy any of the debt that is the

subject of his personal bankruptcy.  The *Olah* case has no bearing on the proper result in this case, because the *Olah* case involved a policy purchased by the debtor himself, solely to address his own liability, which had been deemed an asset that had been transferred to his personal bankruptcy estate.  Because it was the transfer of the debtor's own policy in *Olah* to the debtor's personal bankruptcy trustee that was deemed to likewise transfer the right of consent to the trustee as the policy holder, the Levine Trustee is misplaced in relying upon *Olah* in this case to assert he has now acquired that right.  Mr. Levine didn't purchase and doesn't "own" the Policy in this case, even though it provides him with potential coverage.

## III.   Additional Equitable Considerations

A scenario presented by *Olah* as to the insured, a doctor, was that because his personal liability was eliminated by discharge, he would then have no incentive to consider a settlement, but would instead simply refuse to consider any settlement of the underlying malpractice case, and take the matter to trial at all costs, to clear his name.  *Olah*, 567 F.3d at 1214-15.  Better, so the argument goes, to transfer the right of consent to settlement to his trustee, who would take an objective view of the matter.  In this case, the Trustees have not only warned of this potential scenario, but have also asserted that PIIC and Mr. Levine would "collude" to avoid engaging in good faith settlement negotiations with the Geostellar Trustee.

As a threshold matter, Mr. Levine and PIIC have already agreed to participate in settlement discussions with Magistrate Judge Aloi, and remain willing to do so.  It was the decision of the Trustees to resort to litigation of the consent issue in this proceeding rather than continue to engage in settlement negotiations.  As Mr. Levine's counsel advised in the initial hearing in this case, Mr. Levine has not refused to negotiate further.  PIIC likewise is willing to continue to negotiate.

The position taken by the 10th Circuit in *Olah*, based upon a prediction of how a court in Utah would rule, but without citation to any actual case in Utah or elsewhere, was based on a faulty premise.  There is a concern in this scenario of collusion and a skewed incentive, but that scenario in this case involves the Trustees, not PIIC and Mr. Levine.  Moreover, the circumstance for Mr. Levine is not the same as the circumstance for the discharged doctor in *Olah*, in that the nature of the alleged conduct involves potential non-dischargeable liability.  (*Sheehan v. Levine*, 3:19-ap-00024, Dckt. No. 1).

In *Olah*, although the potential financial liability of the doctor was discharged, the doctor nevertheless still had concerns about damage to his reputation, which would carry forward beyond the discharge in his personal bankruptcy, as he would seek to continue to practice as a doctor post-discharge and post-litigation.  This was viewed as eliminating a proper incentive for the doctor to consider anything other than litigating the case at all cost.  *Olah*, 567 F.3d at 1214-15.  This begs the question, however, as to why the insurer would have any reason to agree to waste time and resources for a defense in litigation versus a settlement.  For the insurer, an incentive for a reasonable settlement of the claim, taking into account the potential savings in litigation costs versus the risk of a finding of liability, would have remained with or without personal risk to the debtor.  For the doctor, likewise, there remained the very real scenario of litigation at all costs to the bitter end, concluded with a publicly-stated result that he had in fact committed malpractice as alleged.  Alternatively, a reasonable settlement could have eliminated both any finding of fault, which would not be admitted, as well as the negative publicity of a trial.

Ironically, the trustee in this scenario, on the other hand, has no incentive to engage in a process to weigh the merits of the underlying case to reach an objectively reasonable settlement.  The trustee has no concern about the insured's reputational harm, or any impact of insured's liability

on the estate – which is non-existent.  The only incentive for the personal bankruptcy trustee in this circumstance is to give the claimant a settlement as quickly as possible that will resolve the case. The trustee has no reason to seek any actual determination of the value of the case, but instead has every incentive simply to offer up the limits to the claimant to eliminate any further administrative costs for the estate.  The risk of "collusion" in this case is not a risk properly attributed to the insurer and insured.  The insurer paying for the litigation will not want to waste money on a non-defensible case, and the insured defendant will not want to pursue a meritless case to have his commission of wrongdoing publicly set in concrete.  To the contrary, the scenario involving potential incentive for collusion is created by eliminating the involvement of the actual defendant as an interested party, and instead leaving settlement to a trustee with absolutely no incentive to be objective in valuation of the case.  The incentive for the trustee is just to agree to the claimant's demand no matter how high, close the matter, and never mind that the insured might not have done anything wrong in the first place.  Indeed, this does not cast any aspersion as to Mr. Fluharty's motivations or intent.  Why should Mr. Fluharty care at all about the outcome of the Geostellar Lawsuit?  Mr. Levine has less "skin in the game" as the result of his discharge, but Mr. Fluharty has none whatsoever.  The irony of the Trustees' position in this case is that they urge for the consent to settlement to be transferred to Mr. Fluharty because Mr. Levine is not properly incentivized to engage in good faith negotiations, when in reality Mr. Fluharty is even less incentivized to engage in good faith negotiations than Mr. Levine would be.  The risk of collusion is created by taking the only interested party defendant in the litigation out of the equation.

Conversely, the reputational harm for the insured is the very reason that a consent provision is included in this type of policy.  See, *e.g.*, *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 837 (3rd Cir. 1995) ("Such a consent-to-settle provision protects the professional, such

as a doctor or a lawyer, who is concerned about his or her reputation."); *Teague v. St. Paul Fire & Marine Ins. Co.*, 10 So. 3d 806, 818 (La. App. Ct. 2009 ("'The authority to approve settlements is often granted the insured in professional liability policies because of the belief that the professional should participate in a decision which may damage his professional reputation[,]'" quoting 15 William Shelby McKenzie & H. Alston Johnson III, *Louisiana Civil Law Treatise: Insurance Law and Practice* § 218 (3rd ed. 2006)); *Shelter Mut. Ins. Co. v. Barton,* 822 So. 2d 1149, 1157 (Ala. 2001) ("[the right to consent to a settlement] 'is a valuable right,' and the breach of a contract protecting that right 'may, therefore, give rise to damages not generally recoverable in a conventional breach of contract action.'", quoting *Brion v. Vigilant Ins. Co.*, 651 S.W.2d 183, 184 (Mo. Ct. App. 1983)); *and Clauson v. New Eng. Ins. Co.,* 83 F. Supp. 2d 278, 281 (D. R.I. 2000) ("[Consent-to-settle provisions] commonly are included in professional liability policies in recognition of the fact that settlement of claims may adversely and unjustifiably affect the insured's professional reputation.")  The insurer may determine it is financially more efficient to pay the claimant rather than clear the insured's name.  Allowing the insured a right of consent serves to guarantee that any settlement will take into account the impact upon the defendant's ability to conduct business going forward, even in the absence of an out-of-pocket loss.

Furthermore, Mr. Levine in this case is not financially positioned as the defendant doctor had been in *Olah*.  The doctor's liability was fully discharged.  While Mr. Levine's liability for certain conduct may be discharged, he has been accused of non-dischargeable conduct as well. *Sheehan v. Levine*, 3:19-ap-00024, Dckt. No. 1.  If there would be a finding that Mr. Levine defrauded investors or Geostellar, his liability for such conduct (which he would no doubt vehemently challenge) would not be eliminated as the liability for the debtor had been in *Olah*, which involved fully dischargeable liability of a doctor for liability in a medical malpractice case.

IV.   **The Issue of Consent is Non-Core**

Consideration of the applicability of a provision for consent to a settlement under a liability policy is not a core proceeding.  *See Roman Catholic Diocese of Rockville Ctr. v. Arrowood Indemnity Co.*, 2021 U.S. Dist. LEXIS 94233 *18-20 (S.D.N.Y. May 17, 2021) (In determining that a determination of a coverage issue would not be a core proceeding, the court noted in regard to exercise of a right to consent for a settlement:  "Adding another party to the negotiating table during settlement discussions does not require the estate to make any payments at all, let alone payments that are prerequisites to insurance coverage.  Accordingly, the consent-to-settlement provisions do not render the claims against Arrowood core.")  Mr. Levine's addition to the negotiations in this case, similarly, will not require his estate to make any payments at all.  It is a matter of a contractual right under the insurance contract, and not core bankruptcy matter.

In this regard it should be noted that Mr. Levine's interest in preserving his reputation in regard to his future endeavors, for which he may seek financing that may hinge upon his reputation, is not an "asset" of his personal bankruptcy estate.  *Haley v. Dow Lewis Motors*, 72 Cal. App. 4th 497, 506 (Cal. App. Ct. 1999).  It is protected by the liability insurance that he purchased, but it is not a property that he or his personal bankruptcy trustee could somehow have used to satisfy his creditors.  Mr. Fluharty is not charged with protection of Mr. Levine's reputation, but Mr. Levine has a very real and keen personal interest in maintaining it.  Mr. Levine's ability to consent to a settlement, built into the Policy, which was written to enable his service as a director and officer to Geostellar without personal risk, is a reputational right of value to him alone, and not to his personal bankruptcy estate.  The Trustees provide no valid basis for transfer of the right to consent to his personal bankruptcy estate other than the prospect that it will force the Geostellar Trustee to prove the merits of his case in the Geostellar Lawsuit.  Mr. Levine's ability to consent, and to preserve

his reputation for future business transactions, will have no impact upon his personal bankruptcy estate, and is not a core matter in regard to that estate.

## **CONCLUSION**

For these foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is improper and inadequate, and should be denied.  The case should proceed with Defendants' filing of a response to the Adversary Complaint, after which the myriad of issues that require due consideration of applicable common law and a record of admissible facts should be addressed.

Dated this 3rd day of September, 2021.

**Defendant, PHILADELPHIA
INDEMNITY INSURANCE COMPANY
By Counsel:**

*/s/ Debra Tedeschi Varner*
Debra Tedeschi Varner (WV State Bar #6501)

Varner & Van Volkenburg PLLC
360 Washington Avenue
Clarksburg, WV 26301
Telephone: (304) 918-2840
Facsimile: (304) 566-1161

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

IN RE:

DAVID ANDREW LEVINE
and MONICA LARSON LEVINE,

     Debtors.

Bankruptcy Case No. 3:19-BK-01048
Chapter 7

THOMAS FLUHARTY,
Trustee of the Bankruptcy Estate of
David Levine and Monica Levine,
- and -
MARTIN P. SHEEHAN,
Trustee of the Bankruptcy Estate of
Geostellar, Inc.,

     Plaintiffs,

v.

PHILADELPHIA INDEMNITY
INSURANCE COMPANY,
and DAVID A. LEVINE,

     Defendants.

Adv. Proc. No. 3:21-AP-00019
Judge: Becker McKay Wyckoff Mignault

## CERTIFICATE OF SERVICE

  Service of the foregoing ***PHILADELPHIA INDEMNITY INSURANCE COMPANY'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR A BRIEFING SCHEDULE*** was had upon the parties, as set forth below, by electronic notification via the Court's CM/ECF system, and/or by mailing a true copy hereof, by United States Mail, postage prepaid, this 3rd day of September, 2021:

Thomas H. Fluharty, Esquire
thfdebtatty@aol.com
wv12@ecfcbis.com
***Plaintiff***

David Andrew Levine
2426 Steamboat Run Road
Shepherdstown, WV 25443-4115
***Defendant***

Martin P. Sheehan, Trustee
sheehanparalegal@wvdsl.net
sheehanassistant@wvdsl.net
sheehanbankruptcy@wvdsl.com
wv05@ecfcbis.com
***Plaintiff***

Patrick S. Cassidy, Esquire
pcassidy@walslaw.com
kch@walslaw.com
Timothy F. Cogan, Esquire
tfc@walslaw.com
smh@walslaw.com
***Counsel for Plaintiff, Martin P. Sheehan***

        /s/ Debra Tedeschi Varner

EXHIBIT 1

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:                                                  :
                                                        :
LEVINE, DAVID ANDREW                                    :
LEVINE, MONICA LARSON                                   :   Bankruptcy Case No.: 3:19-bk-1048
                                                        :
      Debtors.                                         :
                                                        :
_____                       :
                                                        :
THOMAS H. FLUHARTY, Trustee of the                      :
Bankruptcy Estate of David Levine and Monica            :
Levine,                                                 :
                                                        :
      Plaintiff,                                       :
                                                        :
MARTIN P. SHEEHAN, Trustee of the                       :   Adversary Proceeding No. 3:21-ap-00019
Bankruptcy Estate of Geostellar, Inc.                   :
                                                        :
      Co-Plaintiff,                                    :
                                                        :
v.                                                      :
                                                        :
PHILADELPIA INDEMNITY INSURANCE                         :
COMPANY and DAVID A. LEVINE,                            :
                                                        :
      Defendants.                                      :

## <u>DECLARATION OF DIRK E. EHLERS</u>

I, Dirk E. Ehlers, declare as follows:

I make this Declaration pursuant to 28 U.S.C. §1p746 and state as follows:

1.      I am over the age of twenty-one (21) years and a citizen and resident of the State of

Illinois.  I am competent to make this Declaration and I have personal knowledge of the matters set

forth herein, and if called as a witness to testify I could and would testify competently to those

matters.  I make this Declaration in support of the pleading of Philadelphia Indemnity Insurance

Company ("PIIC") entitled "Philadelphia Indemnity Insurance Company's Response to Motion for

Preliminary Injunction and Request for a Briefing Schedule."

## The Policy

2.      Exhibit 1.1 to this Declaration is a true and correct copy of Private Company Protection Plus Policy No. PHSD1249816 (the "Policy") issued by PIIC to Debtor, Geostellar, Inc. for a Policy Period of May 31, 2017 to May 31, 2018, including an additional Extended Reporting Period Endorsement, as to which consecutive page numbers 1 through 76 have been added in the lower right corner for ease of reference.

3.      The Policy's DECLARATIONS, Item 1. identifies the "Private Company Name and Address" as:

> Geostellar, Inc.
> 2426 Steamboat Run Rd
> Shepherdstown, WV 25443-4115

Ex. 1.1. p. 5.

4.      The Policy defines "Insured" under Part 4., COMMON POLICY DEFINITIONS, Section H. to mean "the Private Company and Individual Insured."  Ex. 1.1, p. 49.

5.      The Policy defines "Individual Insured" under Part 4., COMMON POLICY DEFINITIONS, Section G. to mean, in pertinent part: "any individual who has been, now is or shall become a director, officer, governor, trustee, Employee, volunteer, management committee member, or member of the Board of Managers of the Private Company . . . ." Ex. 1.1, p. 49.

6.      The Policy defines "Claim" under Part 4., COMMON POLICY DEFINITIONS, Section B. to mean, in pertinent part:

1.      a written demand for monetary or non-monetary relief;

2.      a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

3.      a criminal proceeding commenced by a return of an indictment;

4.      a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document,

2

including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

5.      an arbitration or mediation or other alternative dispute resolution proceeding if the Insured is obligated to participate in such proceeding or if the Insured agrees to participate in such proceeding, with the Underwriter's written consent, such consent not to be unreasonably withheld;

6.      solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

against an Insured for a Wrongful Act, including any appeal therefrom; or

7.      a written request received by an Insured to toll or waive a statute of limitations, relating to a potential Claim as described above.

However, Claim shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

Ex. 1.1, p. 48.

7.      Subject to the other terms and conditions of the Policy, the under Part 1, the

DIRECTORS AND OFFICERS LIABILITY INSURANCE, Section I., INSURING

AGREEMENTS, Subsections A., B. and C., the Policy provides as follows:

A.      INDIVIDUAL LIABILITY COVERAGE

The Underwriter shall pay on behalf of the Individual Insured, Loss from Claims made against the Individual Insureds during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&O Wrongful Acts, except to the extent the Private Company has indemnified the Individual Insureds for such Loss.

B.      PRIVATE COMPANY INDEMNITY COVERAGE

The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against Individual Insureds, during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act.

C.      PRIVATE COMPANY LIABILITY COVERAGE

The Underwriter shall pay on behalf of the Private Company, Loss from

Claims made against the Private Company during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act.

Ex. 1.1, p. 42.

8.     Under Part 1, DIRECTORS AND OFFICERS LIABILITY INSURANCE, Section

II., DEFINITIONS, Subsection A., as amended by CORPORATE ADVANTAGE PRO-PAK

COVERAGE, PI-PRD-74 (05/06), the Policy defines "D&O Wrongful Act" as follows:

A.     D&O Wrongful Act means any actual or alleged:

1.     act, error, omission, misstatement, misleading statement, neglect, or breach  of duty committed or attempted by an Individual Insured in his/her capacity as an Individual Insured; or

2.     act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the Private Company; or

3.     act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured arising out of serving in his/her capacity as a director, officer, governor or trustee of an Outside Entity if such service is at the written request of the Private Company.

Ex. 1.1, pp. 42, 64.

9.     Under Part 2, EMPLOYMENT PRACTICE LIABILITY INSURANCE,

Section I., INSURING AGREEMENT, the Policy provides as follows:

The Underwriter shall pay on behalf of the Insured, Loss from Claims made against the Insured during the Policy Period (or, if applicable, the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for an Employment Practice Act.

Ex. 1.1, p. 44.

10.     Under Part 2, EMPLOYMENT PRACTICE LIABILITY INSURANCE,

Section II., DEFINITIONS, the Policy provides as follows:

A.     Employment Practice Act means any actual or alleged:

1. wrongful dismissal, discharge or termination of employment;
2. breach of a written or oral employment contract or implied employment contract;

4

3. employment related misrepresentation;
4. wrongful failure to promote;
5. violation of employment discrimination laws (including harassment);
6. wrongful deprivation of a career opportunity;
7. employment related wrongful discipline;
8. negligent employee evaluation;
9. employment related invasion of privacy;
10. employment related defamation (including libel and slander);
11. sexual or workplace harassment of any kind;
12. constructive discharge of employment;
13. employment related Retaliation;
14. employment related humiliation;
15. wrongful demotion;
16. negligent reassignment;
17. violation of any federal, state or local civil rights laws;

and committed or attempted by an Individual Insured in his/her capacity as an Individual Insured or by the Private Company.

Solely with respect to any Claim brought by or on behalf of any Third Party, Employment Practice Act means any actual or alleged wrongful failure to employ, discrimination, sexual harassment or violation of such Third Party's civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an Individual Insured in his/her capacity as an Individual Insured or by the Private Company.

Ex. 1.1, pp. 44-45.

11.     Under Part 6, COMMON POLICY CONDITIONS, Section III. Subsection H., the

Policy provides:

H.     ORDER OF PAYMENTS

In the event of Loss arising from one or more Claims for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which Loss in the aggregate exceeds the remaining available Limit of Liability for Part 1(Directors and Officers Liability Insurance), the Underwriter shall:

1.     first pay such Loss for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2.     with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such Loss for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

Ex. 1.1, pp. 55-56.

12.     Under SIDE-A NON-RESCINDABLE COVERAGE, PI-MANU-1 (01/00),

the Policy provides, in relevant part:

> The Underwriter shall not be entitled under any circumstances to rescind the coverage granted by PART 1, DIRECTORS & OFFICERS LIABILITY INSURANCE, Section I. INSURING AGREEMENTS paragraph A. INDIVIDUAL LIABILITY COVERAGE.

> Ex. 1.1, p. 73.

13.     Attached as Exhibit 1.2 is a true and correct copy of a letter, from me to David

Levine, which was issued on October 3, 2019 (the "Coverage Letter").

14.     The Coverage Letter advised Mr. Levine that PIIC had agreed to advance reasonable

and necessary "Defense Costs" (as defined by the Policy) incurred in the defense of Mr. Levine,

for conduct allegedly undertaken by him in his capacity as the Chief Executive Office and Board

Member of Geostellar, in the lawsuit then captioned *Martin P. Sheehan, Trustee of the Bankruptcy*

*Estate of Geostellar, Inc.* v. *David A. Levine and Indeco Union*, Case No. 3:19-ap-00024 filed on

May 20, 2019, in the U.S. Bankruptcy Court for the Northern District of West Virginia (the

"Geostellar Lawsuit") under a complete reservation of all of PIIC's rights, remedies and defenses,

whether under the Policy, at law or in equity.  Ex. 1.2, pp. 1-2.

15.     After the issuance of the Coverage Letter, Mr. Levine tendered his defense to PIIC,

and PIIC appointed Mr. Levine's current defense counsel in the Geostellar Lawsuit, Mr. George

Stewart and Mr. Joseph Butcher, of the law firm Zimmer Kunz, PLLC.

I declare under penalty of perjury under the laws of the United States of America and the

State of Illinois that the foregoing is true and correct.

Dated this the 3rd day of September 2021.

_____

**Dirk E. Ehlers**

6

# Exhibit 1.1

# Private Company Protection Plus
# Policy No. PHSD1249816

## POLICY CHANGE DOCUMENT

**POLICY NO.:** PHSD1249816

| Philadelphia Indemnity Insurance Company | 952 | MAURY DONNELLY & PARR, INC. |
|---|---|---|

NAMED INSURED    Geostellar, Inc.

MAILING ADDRESS    2426 Steamboat Run Rd
Shepherdstown, WV 25443-4115

POLICY PERIOD:    FROM   05/31/2017    TO   05/31/2018      at
12:01 A.M. Standard Time at your mailing address shown above.

CHANGE EFFECTIVE   05/31/2018            CHANGE # 2        REVISION # 2

DESCRIPTION

In consideration of the premium reflected, the policy is amended as indicated below:

12 Month Extended Reporting Period Endorsement is added.  Premium for
endorsement is fully earned.

Path ID 11739555

Total Annual
Additional/Return Premium $            15,801.43
ADDITIONAL

Total Prorate
Additional/Return Premium $            15,801.43
ADDITIONAL

COUNTERSIGNED

(Date)

BY

(Authorized Representative)

05/29/2018
Issue Date                           Insurance Policy                    Page 1 of 1      1

PI-PRD-17 (04/02)

## <u>THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.</u>

# EXTENDED REPORTING PERIOD

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Pursuant to PART 6 COMMON POLICY CONDITIONS, section VIII., and in return for additional premium of $ _14,842.00_, it is agreed and understood that an Extension Period is granted, effective 05/31/2018, and:

      ☒ Expiring on 05/31/2019
      ☐ with no expiration.

All other terms of the policy are unchanged.

Page 1 of 1

2

# POLICY CHANGE DOCUMENT

**POLICY NO.:** PHSD1249816

| Philadelphia Indemnity Insurance Company | 952 | MAURY DONNELLY & PARR, INC. |
|---|---|---|

NAMED INSURED     Geostellar, Inc.

MAILING ADDRESS     2426 Steamboat Run Rd
Shepherdstown, WV 25443-4115

POLICY PERIOD:     FROM   05/31/2017     TO   05/31/2018       at
12:01 A.M. Standard Time at your mailing address shown above.

CHANGE EFFECTIVE   01/22/2018              CHANGE # 1          REVISION # 1

DESCRIPTION

In consideration of the premium reflected, the policy is amended as indicated below:

The mailing address is amended to read:

2426 Steamboat Run Rd
Shepherdstown, WV 25443

Path ID 11389091

Total Annual
Additional/Return Premium $                    0.00
                                       NO CHANGE

Total Prorate
Additional/Return Premium $                    0.00
                                       NO CHANGE

COUNTERSIGNED                        BY

_____            _____
           (Date)                      (Authorized Representative)

01/23/2018
_____
Issue Date                          Insurance Policy              Page 1 of 1    3



**PHILADELPHIA INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Philadelphia Indemnity Insurance Company
## COMMON POLICY DECLARATIONS

**Policy Number:** PHSD1249816

**Named Insured and Mailing Address:**
Geostellar, Inc.
2426 Steamboat Run Rd
Shepherdstown, WV 25443-4115

**Producer:** 952
MAURY DONNELLY & PARR, INC.
24 Commerce Street
BALTIMORE, MD 21202

(410)685-4625

**Policy Period From:** 05/31/2017  **To:** 05/31/2018

at 12:01 A.M. Standard Time at your mailing
address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | 29,847.26 |
| Crime Protection Plus | 1,754.60 |

|  | **Total** | **$ 31,601.86** |
|---|---|---|
| Total Includes Fees and Surcharges (See Schedule Attached) | | **172.86** |

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (06/14)

Secretary

President and CEO

4

Change Date: 01/22/2018                                                                PI-PRD-1 (09/02)



PHILADELPHIA
INSURANCE COMPANIES
A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

## Philadelphia Indemnity Insurance Company

Policy Number:  PHSD1249816

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND R REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FO DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item    1.        Private Company Name and Address:
                  Geostellar, Inc.
                  2426 Steamboat Run Rd
                  Shepherdstown, WV 25443-4115


                  Internet Address: www. geostellar.com

Item    2.        Policy Period:        From:  05/31/2017        To:  05/31/2018
                                        (12:01 A.M. local time at the address shown in Item 1.)


Item    3.        Limits of Liability:
        (A)       Part 1, D&O Liability:            $        3,000,000 each Policy Period.
        (B)       Part 2, Employment Practices:     $        1,000,000 each Policy Period.
        (C)       Part 3, Fiduciary Liability:      $        1,000,000 each Policy Period.
        (D)       Aggregate, All Parts:             $        5,000,000 each Policy Period.


Item    4.        Retention:
        (A)       Part 1, D&O Liability:        $        50,000  for each Claim under Insuring Agreement B & C.
                  Private Offering:  $        50,000  for each Claim under Insuring Agreement B & C.
        (B)       Part 2, Employment Practices:  $        25,000  for each Claim.
        (C)       Part 3, Fiduciary Liability:   $             0  for each Claim.


Item    5.        Prior and Pending Date: Part 1      05/16/2013    Part 2      05/06/2013  Part 3      05/16/2013


Item    6.        Premium:        Part 1 $  23,270.00      Part 2 $   5,709.00      Part 3 $      705.00

                                        *Total Premium*:  $      29,847.26


Item    7.        Endorsements:  SEE SCHEDULE

5

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

| Authorized Representative | Countersignature | Countersignature Date |
|---|---|---|

Change Date: 01/22/2018

PI-CRP-01 (06/05)



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

## *CRIME PROTECTION PLUS DECLARATIONS*

Policy Number:  PHSD1249816

In return for the payment of the premium, and subject to all the terms of this Policy, we agree with you to provide the insurance stated in this Policy.

DECLARATIONS

ITEM

1.  Named Insured:  Geostellar, Inc.
    2426 Steamboat Run Rd
2.  Mailing Address: Shepherdstown, WV 25443-4115

3.  Policy Period: from  05/31/2017  to  05/31/2018
    (12:01 A.M. Standard Time at Your Mailing Address)

4.  Coverages, Limits of Insurance and Deductibles:

    ☐   Loss Sustained Option    ☒   Discovery Option
        (If no box is checked, the Loss Sustained Option shall apply)

    Insuring Agreements, Limit of Insurance and Deductible Amounts shown below are subject to all of the terms of this policy that apply.

| Insuring Agreements Forming Part of This Policy | Limit of Insurance | Deductible Amount |
|---|---|---|
| A1. EMPLOYEE THEFT AND CLIENT COVERAGE | $    1,000,000 | $    10,000 |
| A2. ERISA FIDELITY | $    1,000,000 | $    NIL |
| B.  FORGERY OR ALTERATION, including Credit, Debit, or Charge Card Extension ($25,000 limit) | $ | $ |
| C.  INSIDE THE PREMISES | $ | $ |
| D.  OUTSIDE THE PREMISES | $ | $ |
| E.  MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY | $ | $ |
| F.  COMPUTER FRAUD AND FUNDS TRANSFER FRAUD | $ | $ |

5.  Form Numbers of Endorsements Forming Part of This Policy When Issued: SEE SCHEDULE
6.  Cancellation of Prior Insurance: By acceptance of this Policy, you give us notice canceling prior policies or bonds numbered: _____ _____ the cancellations to be effective at the time this policy becomes effective.

This Policy has been signed by the Company's President and Secretary.

Page 1 of 1
Includes copyright material of the Insurance Services Office Inc., used with its permission.

7



**PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, PA 19004

## RENEWAL APPLICATION FOR:

**PRIVATE COMPANY PROTECTION PLUS**
**DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY INSURANCE**
**EMPLOYMENT PRACTICES LIABILITY INSURANCE**
**FIDUCIARY LIABILITY INSURANCE**

**NOTICE: THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE UNDERWRITER PURSUANT TO THE TERMS HEREIN. THIS POLICY PROVIDES A LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS THAT SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS. FURTHER NOTE THAT DEFENSE COSTS PAID SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

### Instructions

- Whenever used in this Application the term **Applicant** shall mean the Named Corporation and its wholly-owned/controlled Subsidiaries and their respective Directors, Officers, Trustees or Governors.
- The **Applicant** is required to complete Application Sections 1 and 5.
- The **Applicant** should complete the other applicable Section(s) for which coverage is desired. (See chart below)

| Check Coverage Desired | Application Section | Requested Limit | Requested Retention | Requested Effective Date |
|---|---|---|---|---|
| General Information | 1 | N/A | N/A | N/A |
| ✓ Directors & Officers | 2 | $3,000,000 | $50,000 | 5/26/2017 |
| ✓ Employment Practices | 3 | $1,000,000 | $25,000 | 5/26/2017 |
| ✓ Fiduciary Liability | 4 | $1,000,000 | $0 | 5/26/2017 |
| General Summary | 5 | N/A | N/A | N/A |

## SECTION 1 – GENERAL INFORMATION

1. Name of **Applicant**: Geostellar, Inc.

2. Change in Address: ✓ None or _____

3. Change in website address: ✓ None or www. _____

4. Have there been any changes in the **Applicant's** operations?: ☐ Yes ✓ No **If yes, please provide details.**

5. The Officer of the **Applicant** designated to receive any and all notices from the Underwriter or their authorized representative concerning this insurance is: Name: David Levine

### Section 2 - DIRECTORS & OFFICERS INFORMATION
(Complete this section **only** if Directors & Officers Liability coverage is desired.)

6. **Ownership Information:**

a) Number of common shares outstanding: 5,104,892          If LLC, number of membership shares: _____

PI-PRD-Renewal App (06/11)

Page 1 of 8

© 2011 Philadelphia Insurance Companies

8

**Directors & Officers information cont'd**

b) Number of common shareholders: 46 _____   Number of active members: _____

c) Total number of shares owned directly or beneficially by Directors & Officers or Board of Managers: Attached _____

d) Does any shareholder(s) or group of affiliated shareholders (including an employee stock ownership plan) own more than five (5)% of the voting shares directly or beneficially? ☑ Yes ☐ No  **If yes, please provide details.**

See attached cap table

_____

e) Are there any changes in ownership from the prior year? ☑ Yes ☐ No **If yes, please provide details**.

See attached cap table

_____

7. Provide a list of all direct and indirect subsidiaries.

Name: NONE _____   Type of Business: _____

Percent Owned by the **Applicant**: _____%   Date Created / Acquired: _____

Name: _____   Type of Business: _____

Percent Owned by the **Applicant**: _____%   Date Created / Acquired: _____

Name: _____   Type of Business: _____

Percent Owned by the **Applicant**: _____%   Date Created / Acquired: _____

**If additional space is needed, please attach a separate page or use the additional information page provided at the end of the application.**

8. In the next twelve (12) months, does the **Applicant** anticipate being involved in any of the following:
   **If yes, provide details by attachment.**

| | |
|---|---|
| Merger, acquisition or consolidation with another entity? | ☐ Yes ☑ No |
| Sales, distribution or divestiture of any assets other than in the ordinary course of business? | ☐ Yes ☑ No |
| Changes in the board of directors or senior management (other than death or retirement)? | ☐ Yes ☑ No |
| Change in the **Applicant's** independent auditors? | ☐ Yes ☑ No |

9. **Offering of Securities Information**

a) Within the next twelve (12) months is the **Applicant** contemplating any private offering of debt or equity of securities? ☑ Yes ☐ No **If yes, please attach the offering memorandum or prospectus describing the essential terms of each transaction, including the effective date, the professionals used, the amount of the offering and the current status of each such transaction.**

10. **Financial Information**

a) Within the next twelve (12) months, is the **Applicant** contemplating any bankruptcy, reorganization or arrangement with creditors under federal or state law? ☐ Yes ☑ No

b) Is the **Applicant** in violation of any of its debts or loan convenants? ☐ Yes ☑ No

c) In the past twelve (12) months, did an Independent CPA render a "going concern" opinion? ☑ Yes ☐ No

**Note: If the Applicant answered yes to 10 (a), (b), or (c) please attach details including the most recent financial audit, review or compilation with the auditors notes.**

11. **Outside Directorship**

Does the **Applicant** direct or request any individual to serve as director, officer, governor or trustee of any other entity? ☐ Yes ☑ No **If yes, please complete questions a – g below.**

a) Name of individual director, officer, governor or trustee: _____ Position held: _____
b) Name of outside entity: _____
c) Nature of entity's business: _____
d) Percentage of ownership by **Applicant**: _____ %  Domestic or Foreign: _____
e) Does the outside entity provide indemnification to its Directors and Officers? ☐ Yes ☐ No
f) Complete the following information regarding the Directors and Officers Liability Insurance carried by the outside entity: Insurer: _____ Limit of Liability _____ Policy Period: _____
g) Has the outside entity or its Directors and Officers been involved in any Directors and Officers Liability litigation? ☐ Yes ☐ No

## Section 3 - EMPLOYMENT PRACTICES INFORMATION
**(Complete this section _only_ if Employment Practices Liability coverage is desired.)**

12. Please provide the following employee count information:

| | Currently | One Year Ago | Two Years Ago |
|---|---|---|---|
| U.S. based employees: | | | |
| Total Full Time: | 30 | 29 | 15 |
| Total Part Time: | 0 | 0 | 0 |
| Volunteers: | 0 | 0 | 0 |
| Temporary: | 0 | 0 | 0 |
| Leased: | 0 | 0 | 0 |
| Total Non U.S. based employees: | 0 | 0 | 0 |
| **TOTAL SUM OF ABOVE:** | 30 | 29 | 15 |

Number of employees per the following states:

| | Currently | One Year Ago | Two Years Ago |
|---|---|---|---|
| CA: | 3 | 2 | 2 |
| FL: | 0 | 0 | 0 |
| NJ: | 0 | 0 | 0 |
| NY: | 0 | 0 | 0 |
| TX: | 0 | 0 | 0 |

13. Total number of current employees with annual compensation greater than $100,000: _____ 9

14. How many employees have been terminated or demoted in the past twelve (12) months?

Voluntary: 7 _____   Involuntary: 9 _____   Laid Off: 6 _____

15. Is any reduction of employees or change of status anticipated or being contemplated in the next year?
☐ Yes ☑ No **If yes, number estimated**: _____

16. Does the **Applicant** anticipate any plant, facility, branch, office, or department closing, consolidation, reorganization or layoff in the next twelve (12) months? ☐ Yes ☑ No **If yes, provide details.**

17. Does the **Applicant** have a human resources department? ☑ Yes ☐ No **If no, describe how this function is handled.**

**Employment Practices Liability (continued)**

18. **Human Resource Policies and Procedures**

Has the **Applicant** implemented any new employment policies or procedures over the past twelve (12) months?
☐ Yes  ☑ No  **If yes, please provide details**.

---

## Section 4 - FIDUCIARY LIABILITY COVERAGE
### (Complete this section **only** if Fiduciary Liability coverage is desired.)

19. List all plans for which coverage is requested (use attachment if necessary):

| Plan Name | Year Established | Assets / Contributions | Type* | Participants | Administrator |
|---|---|---|---|---|---|
| **Example:** | | | | | |
| **The ABC Manufacturing Corp 401K Plan** | **2000** | **$1,000,000** | **3** | **75** | **self** |
| a) Geostellar, Inc. Employee Plan | 2014 | 121,587.51 | 2 | 2 | PEO-TriNet |
| b) | | | | | |
| c) | | | | | |
| d) | | | | | |

* **1** = Employee Welfare Benefit Plan (as defined by ERISA), **2** = Defined Contribution Plan (as defined by ERISA), **3** = Defined Benefit Plan (as defined by ERISA), **4** = Other. **If "Type" is an ESOP a Fiduciary Liability - ESOP Supplement must be completed.**

**If additional space is needed, please attach a separate page or use the additional information page provided at the end of the application.**

20. Have there been any changes to any plan listed above? ☐ Yes ☑ No **If yes, provide details by attachment.**

21. Has any plan requested or contemplated filing a request for termination? ☐ Yes ☑ No **If yes, provide details by attachment.**

22. Has any plan been spun-off (sold), transferred or terminated? ☐ Yes ☑ No **If yes, provide details by attachment.**

**Please attach the most recent tax form 5500 for each plan listed above.**

## SECTION 5 - GENERAL SUMMARY
### (The Applicant must complete this section.)

23. Please provide details on the following insurance coverage currently in place:

| COVERAGES | Insurance Company | Limit of Liability | Deductible | Policy Effective Dates |
|---|---|---|---|---|
| General Liability | Hartford | $ 2,000,000 | $ 500 | 4/12/2017 - 4/11/2018 |
| Professional Liability | | $ | $ | |

24. Has the **Applicant** been the subject or involved in any litigation in the past twelve (12) months? ☐ Yes ☑ No **If yes, provide details by attachment.**

25. In the next twelve (12) months, does the **Applicant** anticipate any substantial change or reorganization of operations? ☐ Yes ☑ No **If yes, provide details by attachment.**

PI-PRD-Renewal App (06/11)

© 2011 Philadelphia Insurance Companies

**Material Change**

If there is any material change to the answers of this Applications questions prior to the policy inception date, the Applicant must notify the Underwriter in writing. Any outstanding quotation may be modified or withdrawn.

### FRAUD NOTICE STATEMENTS

**NOTICE TO APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF ALASKA APPLICANTS:** "A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE AN INSURANCE COMPANY FILES A CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION MAY BE PROSECUTED UNDER STATE LAW."

**RESIDENTS OF ARKANSAS APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**RESIDENTS OF ARIZONA APPLICANTS:** "FOR YOUR PROTECTION ARIZONA LAW REQUIRES THE FOLLOWING STATEMENT TO APPEAR ON THIS FORM. ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF COLORADO APPLICANTS:** "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES."

**RESIDENTS OF DISTRICT OF COLUMBIA APPLICANTS:** "WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

**RESIDENTS OF FLORIDA RESIDENTS APPLICANTS:** "ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE."

**RESIDENTS OF KANSAS APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO, OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF KENTUCKY APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY "MATERIALLY" FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME."

**RESIDENTS OF LOUISIANA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**RESIDENTS OF MAINE APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

© 2011 Philadelphia Insurance Companies

**RESIDENTS OF MARYLAND APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WILLFULLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY AND WILLFULLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**RESIDENTS OF MINNESOTA APPLICANTS:** "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST ANY INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**RESIDENTS OF NEW JERSEY APPLICANTS:** "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF NEW MEXICO APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES."

**RESIDENTS OF NEW YORK APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

**RESIDENTS OF OHIO APPLICANTS:** "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST ANY INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**RESIDENTS OF OKLAHOMA APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY."

**RESIDENTS OF OREGON APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD AN INSURER:  (1) BY SUBMITTING AN APPLICATION, OR (2) BY FILING A CLAIM CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT, MAY BE VIOLATING STATE LAW."

**RESIDENTS OF PENNSYLVANIA APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF TENNESSEE APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

**RESIDENTS OF TEXAS APPLICANTS:**  IF A LIFE, HEALTH AND ACCIDENT INSURER PROVIDES A CLAIM FORM FOR A PERSON TO USE TO MAKE A CLAIM, THAT FORM MUST CONTAIN THE FOLLOWING STATEMENT OR A SUBSTANTIALLY SIMILAR STATEMENT: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR THE PAYMENT OF A LOSS IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN STATE PRISON."

**RESIDENTS OF VERMONT APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE STATEMENT IN AN APPLICTION FOR INSURANCE MAY BE GUILTY OF A CRIMINAL OFFENSE AND SUBJECT TO PENALTIES UNDER STATE LAW."

**RESIDENTS OF VIRGINIA APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

**RESIDENTS OF WASHINGTON APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSES OF DEFRAUDING THE COMPANY.  PENALTIES INCLUDE IMPRISONMENT, FINES, AND DENIAL OF INSURANCE BENEFITS."

© 2011 Philadelphia Insurance Companies

13

**RESIDENTS OF WEST VIRGINIA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

Mike Rhodes

Name (Please Print/Type)

CFO

Title **(MUST BE SIGNED BY THE PRESIDENT, CHAIRMAN OR CEO)**

Signature

5/26/2017

Date

The above signed warrants that he/she is authorized and has the power to complete and execute this Application, including the Warranty Statement on behalf of the **Applicant** and their respective Directors, Officers or other insured persons.

**Produced By: (Section to be completed by Producer/Broker)**

Producer

Agency

Producer License Number

Agency Taxpayer ID or SS Number

Address (Street, City, State, Zip)

As part of this Application, please submit the following documents:
a) **Applicant's latest fiscal year end financial statement (CPA prepared) and latest interim financial statement**
b) List of the **Applicant's** current Directors & Officers
c) Copies of the most recently filed Form(s) 5500 (and attachments) for all ERISA plans for which coverage requested (If Fiduciary Liability coverage is being requested)

PI-PRD-Renewal App (06/11)

© 2011 Philadelphia Insurance Companies

14

## ADDITIONAL INFORMATION

This page may be used to provide additional information to any question on this application. Please identify the question number to which you are referring.

_____     5/26/2017
Signature                                     _____
                                              Date



A Member of the Tokio Marine Group

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900 • Fax 610.617.7940 • PHLY.com

06/07/2017

Geostellar, Inc.
224 W King St
Martinsburg, WV 25401-3212

**Re:  PHSD1249816**

Dear Valued Customer:

Thank you very much for choosing Philadelphia Indemnity Insurance Company for your insurance needs.  Our first class customer service, national presence and A++ (Superior) A. M. Best financial strength rating have made us the selection by over 550,000 policyholders nationwide.  I realize you have a choice in insurance companies and truly appreciate your business.

I wish you much success this year and look forward to building a mutually beneficial business partnership which will prosper for years to come.  Welcome to PHLY and please visit PHLY.com to learn more about our Company!

Sincerely,

Robert D. O'Leary Jr.
President & CEO
Philadelphia Insurance Companies

RDO/sm

Philadelphia Consolidated Holding Corp. • Philadelphia Indemnity Insurance Company • Tokio Marine Specialty Insurance Co • Maguire Insurance Agency, Inc.

- Receive Invoices Electronically
- Pay Your Bills Online
- Set Up Recurring Payments
- Available 24/7
- Safe and Secure
- NO FEE!
- Environmentally Friendly

# Enroll Today!

## Pay Your Bill Online

To pay your bills online you will need a User ID and Password to access our website. If you don't have a User ID please create one by visiting **https://www.PHLY.com/myphly/newuser.aspx**.

If you have a User ID, please login and click on *"Online Bill Pay"* and enter the necessary information to pay your bills.

Philadelphia Insurance Companies accepts electronic checks (a debit from your checking or savings account) as a method of payment. Please allow 2 to 3 business days for your payment to post to your account. This service is offered free of charge. Please note that credit card payments cannot be made online.

## Recurring Payment

Customers that receive their bill directly (and not from their agent) can sign up for recurring payment via automatic withdrawals from a checking, savings, or money market account for direct bill policies.

If you do not already have an account on **PHLY.com** you will need to create one by visiting **https://www.PHLY.com/myphly/newuser.aspx**. Once logged in please refer to "*Links for You*" and click the *"Recurring Payment Instructions"* to learn how to enroll.  You can also click the *"Online Bill Pay"* tab on the left hand side to enroll in Recurring Payment.

### How to Create an Account on PHLY.com

1. Go to **https://www.PHLY.com/myphly/newuser.aspx**
2. Select the applicable BUTTON (insured or producer).
3. Complete the information on the page:
   - You will CREATE your own USER NAME and PASSWORD.
   - The password must be at least 7 characters and contain one number, one lower case letter, and one capital letter.
4. Click CONTINUE when done.
5. On the next page, complete the PASSWORD RESET QUESTION. If you ever forget your password, we will ask you this security question and you will enter the answer you have selected.
6. Once you have received the page that states: "CONTINUE TO MY PHLY," then you have successfully created the account.





PHILADELPHIA
INSURANCE COMPANIES

A Member of the Tokio Marine Group

Focus on the Things that Matter, We'll Handle the Risk!®



**PHILADELPHIA**
INSURANCE COMPANIES

A Member of the Tokio Marine Group

# Making Things Easier for You!

## PHLY CUSTOMER SERVICE

### Did you know…

- The Loss Assistance Hotline provides Management & Professional Liability policyholders with two FREE HOURS of legal consultation with knowledgeable attorneys on any matter that could potentially result in a claim under a PHLY policy
- You can review billing and payment history online
  *For example: Payment verifications go to MyPHLY on PHLY.com*
- You can pull up and print your invoices and policy documents online
- You can update your profile online
  *For example: Billing address or contact information changes*
- We offer live help within seconds: No complicated phone systems
- 94.4% of our policyholders would refer us to prospective customers*
- We provide 48 hour turnaround time on small business quotes and policy issuance in less than 10 days
- We provide interest free installments for accounts that generate at least $2,000 in premium

### Frequently Asked Questions

*How can I get information about my insurance?*
There are 5 different ways to contact Customer Service
- Customer Service 877.438.7459
- Customer Service Fax 866.847.4046
- Customer Service E-mail: custserv@phly.com
- Customer Service online chat
- PHLY.com – "Contact Us"

*When can I contact Customer Service?*
Customer Service is available Monday - Friday from 8:30 a.m. - 8:00 p.m. EST

*What forms of payment does PHLY accept?*
PHLY accepts 3 forms of payment:
- Check sent to the lock box
- Check by phone payments through our IVR (877.438.7459 – Option 1), website, or contact center representatives
- Credit card payments through our live contact center representatives (Visa, MasterCard, and American Express)

### Claims

- Average policyholder first party automobile losses settled in 10 days or less
- Same or next business day acknowledgements of newly reported and opened claims
- Claims representation nationally with Commercial Liability Claims Examiner Niche expertise
- 24/7 claims service. Staff efficiencies with paperless and industry leading systems
- Staff of Subrogation and Recovery Examiners exclusively dedicated to recovery efforts for policyholder paid losses
- Experienced, consistent staff and department structure

### Risk Management Services

- National network of in-house risk management professionals providing direct support to policyholders
- Product specific web-based risk management solutions through PHLY.com
- Interactive Driver Training online courses and examination at no additional charge
- Regular e-flyer communications on relevant risk management issues
- Strategic partnerships with best-in-class vendors for discounted MVR checks, abuse training, GPS, and many more

### Automatically included on most accounts

PHLY Bell Endorsement - Includes $50,000 limits each for Business Travel Accident Benefit, Donation Assurance, Emergency Real Estate Consulting Fee, Identity Theft Expense, Image Restoration and Counseling, Key Individual Replacement Expenses, Kidnap Expense, Terrorism Travel Reimbursement, Workplace Violence Counseling. $25,000 limits for each Conference Cancellation, Fundraising Event Blackout, Political Unrest ($5,000 per employee), Temporary Meeting Space Reimbursement, and $1,500 Travel Delay Reimbursement.

### Honors, Awards, and Ratings

- America's Top 150 Workplaces
- Best Places to Work in Insurance (4th consecutive year)
- Stevie Awards
- ACE Awards
- Top Workplaces in Philadelphia
- Ward's Top 50 (13th consecutive year)
- National Underwriter Top 100 Insurance Groups (Tokio Marine) #29
- National Underwriter Top 100 Insurance Companies #41

*A Passion for Service!*

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Coverage(s) described may not be available in all states and are subject to Underwriting and certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. © 2014 Philadelphia Consolidated Holding Corp., All Rights Reserved.
*All statistics contained herein were generated via an internal company survey of active policy holders.



PHLY.com



TOKIO MARINE GROUP

Ed. 101514



# Risk Management Services

## PHLY RISK MANAGEMENT SERVICES

Welcome to PHLY Risk Management Services Services, PHLY is familiar with the unique Risk Management Services programming needs of you organization and has achieved superior results in this area. We are committed to delivering quality and timely loss prevention services and risk control products to your organization. Customer satisfaction through the delivery of these professional products to achieve measurable risk improvement results is our goal. We know the fulfillment of our Risk Management Services commitment is not complete until we deliver upon our promises.

**OUR MISSION:** We welcome the opportunity to demonstrate how we can tailor a risk management program suitable to our customer's needs. We are committed to providing our customers with improved communications, quicker implementation of loss control servicing initiatives, and specific benchmarking goals that help us quantify the true value of our services.

**OUR MOTTO:** "Innovative Services Producing Optimum Results:" This mantra reflects our commitment to utilize innovative products and solutions to help our customers achieve measurable results. Customer satisfaction through the delivery of these quality professional products is our goal. We know the fulfillment of our Risk Management Services commitment is not complete until we deliver upon our promises.

In order to gain full access to these resources and others, please take a moment to register on our website. If you already have an id to PHLY.com, please login to access Risk Management Services resources.

Risk Management Resources
- IntelliCorp Records, Inc.
- Accountants Resources
- WEMED Loss Assistance Hotline
- in2vate: Web-enabled EPLI (employment practices liability insurance) Risk Management Services

Proprietary Risk Management Services
- PHLY Risk Management Services E-flyers
- Responding to Risk Management Services Recommendations

Contact
- For more information please contact: Customer Service

# 800.873.4552

IMPORTANT NOTICE - The information and suggestions presented by Philadelphia Indemnity Insurance Company in this e-brochure is for your consideration in your loss prevention efforts. They are not intended to be complete or definitive in identifying all hazards associated with your business, preventing workplace accidents, or complying with any safety related, or other, laws or regulations. You are encouraged to alter them to fit the specific hazards of your business and to have your legal counsel review all of your plans and company policies.

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Consolidated Holding Corp., All Rights Reserved.







One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

# Philadelphia Indemnity Insurance Company

# Commercial
# Lines
# Policy

THIS POLICY CONSISTS OF:

&ndash;   DECLARATIONS
&ndash;   COMMON POLICY CONDITIONS
&ndash;   ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
&bull;   ONE OR MORE COVERAGE FORMS
&bull;   APPLICABLE FORMS AND ENDORSEMENTS

BJP-190-1 (12-98)

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless signed by our authorized representative.

President & CEO                                                                Secretary

BJP-190-1 (12-98)



# Risk Management Services

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

As a free service benefit to its policyholders, PHLY has partnered with nationally recognized law firm Wilson, Elser, Moskowitz, Edelman & Dicker LLP (WEMED), to offer a toll-free Loss Assistance Hotline. The telephone number is 877.742.2201 or you can contact a WEMED attorney online at: apps.wilsonelser.com/pic/. This hotline provides you with 2 free hours of legal consultation with a knowledgeable attorney on any matter that you feel could result in a Claim under your professional or management liability policy. The Loss Assistance Hotline is NOT a Claim reporting service. To report a Claim, follow the Claim reporting instructions in your policy and also notify your insurance agent. If you have any questions concerning the Loss Assistance Hotline, please contact us at 800.759.4961 x2967.



800.873.4552

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Insurance Companies, All Rights Reserved.



PHLY.com



Ed.081513

PP 20 15 (06/15)

# PHILADELPHIA INSURANCE COMPANIES PRIVACY POLICY NOTICE

### Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies value your privacy and we are committed to protecting personal information that we collect during the course of our business relationship with you. The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information that we collect and how it may be used or disclosed. This does not reflect a change in the way we do business or handle your information.

**Information We Collect:**

We collect personal information about you from the following sources:
- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

**Information We Disclose:**

We will only disclose the information described above to our affiliates and non-affiliated third parties, as permitted by law, and when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:
- Your agent or broker (producer);
- Parties who perform a business, professional or insurance functions for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, attorneys, other insurers or medical care providers who need information to investigate, defend or settle a claim involving you;
- Regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having a legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes. We do not disclose the personal information of persons who have ceased to be our customers.

**Protection of Information:**

The Philadelphia Insurance Companies maintain physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information.  We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

**Use of Cookies and Opt-Out:**

We may place electronic "cookies" in the browser files of your computer when you access our website. Cookies are text files placed on your computer to enable our systems to recognize your browser and so that we may tailor information on our website to your interests.  We or our third party service providers or business partners may place cookies on your computer's hard drive to enable us to match personal information that we maintain about you so that we are able to pre-populate on-line forms with your information.  We also use cookies to help us analyze traffic on our website to better understand your interests.   Although we do not use your non-public personal information for this purpose, you may opt-out of cookies and advertising features through one of the available options including but not limited to Ads Settings in Google.com or the Network Advertising Initiative (NAI) Consumer Opt-out.  Opting out does not mean you will no longer receive online advertising.  It does mean that companies from which you opted out will no longer customize ads based on your interests and web usage patterns using cookies.

**How to Contact Us:**  Philadelphia Insurance Companies, One Bala Plaza, Suite 100, Bala Cynwyd, PA  19004
Attention:   Chief Privacy Officer



**PHILADELPHIA INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

# COMMON POLICY DECLARATIONS

**Policy Number:** PHSD1249816

**Named Insured and Mailing Address:**
Geostellar, Inc.
224 W King St
Martinsburg, WV 25401-3212

**Producer:** 952
MAURY DONNELLY & PARR, INC.
24 Commerce Street
BALTIMORE, MD 21202

(410)685-4625

**Policy Period From:** 05/31/2017  **To:** 05/31/2018

at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers  Compensation | |
| Private Company Protection | 29,847.26 |
| Crime Protection Plus | 1,754.60 |

**Total**     $ **31,601.86**

Total Includes Fees and Surcharges (See Schedule Attached)     **172.86**

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE
Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (06/14)

Secretary

President and CEO

24

Philadelphia Indemnity Insurance Company

Form Schedule – Policy

**Policy Number:** PHSD1249816

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| Recurring Payment Flyer | 1212 | Recurring Payment Flyer |
| CSNotice-1 | 1014 | Making Things Easier |
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 0813 | Policyholder Notice (Loss Assistance Hotline) |
| PP2015 | 0615 | Privacy Policy Notice |
| CPD-PIIC | 0614 | Common Policy Declarations |
| Fees and Surcharge Schedule | 0110 | Fees and Surcharge Schedule |

Philadelphia Indemnity Insurance Company

Fees and Surcharge Schedule

Policy Number: **PHSD1249816**

Policy Term Effective Date:   **05/31/2017**
Policy Term Expiration Date: **05/31/2018**

**West Virginia Insurance Premium Surcharge**                    **$      172.86**

Change Date: 01/22/2018                                                                 PI-PRD-1 (09/02)



## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

## Philadelphia Indemnity Insurance Company

Policy Number:  PHSD1249816

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND R REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FO DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item    1.        Private Company Name and Address:
                  Geostellar, Inc.
                  2426 Steamboat Run Rd
                  Shepherdstown, WV 25443-4115


                  Internet Address: www.  geostellar.com

Item    2.        Policy Period:          From:  05/31/2017          To:  05/31/2018
                                          (12:01 A.M. local time at the address shown in Item 1.)


Item    3.        Limits of Liability:
        (A)        Part 1, D&O Liability:           $        3,000,000 each Policy Period.
        (B)        Part 2, Employment Practices:    $        1,000,000 each Policy Period.
        (C)        Part 3, Fiduciary Liability:     $        1,000,000 each Policy Period.
        (D)        Aggregate, All Parts:            $        5,000,000 each Policy Period.


Item    4.        Retention:
        (A)        Part 1, D&O Liability:      $        50,000  for each Claim under Insuring Agreement B & C.
                   Private Offering:  $        50,000  for each Claim under Insuring Agreement B & C.
        (B)        Part 2, Employment Practices:   $        25,000  for each Claim.
        (C)        Part 3, Fiduciary Liability:    $             0  for each Claim.


Item    5.        Prior and Pending Date: Part 1      05/16/2013    Part 2      05/06/2013  Part 3      05/16/2013


Item    6.        Premium:         Part 1 $   23,270.00      Part 2 $   5,709.00      Part 3 $      705.00

                                                  *Total Premium*:  $    29,847.26

Item    7.        Endorsements:  SEE SCHEDULE

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

| Authorized Representative | Countersignature | Countersignature Date |

Philadelphia Indemnity Insurance Company

Form Schedule – Private Company Protection Plan

**Policy Number:** PHSD1249816

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-PRD-1 | 0902 | Private Company Protection Plus Declarations |
| PI-BELL-1 | 1109 | Bell Endorsement |
| PI-CME-1 | 1009 | Crisis Management Enhancement Endorsement |
| PI-PRD-2 | 0902 | Private Company Protection Plus Policy |
| PI-PRD-5 | 0902 | Professional Services Exclusion |
| PI-PRD-70 | 0803 | Health Insurance Portability and Accountability Act |
| PI-PRD-73 | 0506 | Corporate Advantage Pro-Pak Elite Coverage |
| PI-PRD-75 | 1203 | Amendment of Exclusions |
| PI-PRD-77 | 0104 | Amendment of Cancellation Provision |
| PI-PRD-112 | 0115 | Breach Of Contract Exclusion |
| PI-MANU-1 | 0100 | SIDE-A NON-RESCINDABLE COVERAGE |
| PI-MANU-1 | 0100 | DEFENSE ONLY WAGE & HOUR CARVEBACK |
| PI-PRD-WV-1 | 0303 | West Virginia Amendatory Endorsement |
| PI-SLD-001 | 0115 | Cap On Losses From Certified Acts Of Terrorism |

PI-CRP-01 (06/05)



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

# *CRIME PROTECTION PLUS DECLARATIONS*

Policy Number:  PHSD1249816

In return for the payment of the premium, and subject to all the terms of this Policy, we agree with you to provide the insurance stated in this Policy.

DECLARATIONS

ITEM

1.  Named Insured:  Geostellar, Inc.
                           224 W King St
2.  Mailing Address:  Martinsburg, WV 25401-3212

3.  Policy Period**:** from 05/31/2017 to 05/31/2018
                             (12:01 A.M. Standard Time at Your Mailing Address)

4.  Coverages, Limits of Insurance and Deductibles**:**

    ☐   Loss Sustained Option     ☒   Discovery Option
        (If no box is checked, the Loss Sustained Option shall apply)

    Insuring Agreements, Limit of Insurance and Deductible Amounts shown below are subject to all of the terms of this policy that apply.

| Insuring Agreements Forming Part of This Policy | Limit of Insurance | Deductible Amount |
|---|---|---|
| A1. EMPLOYEE THEFT AND CLIENT COVERAGE | $ 1,000,000 | $ 10,000 |
| A2. ERISA FIDELITY | $ 1,000,000 | $ NIL |
| B.  FORGERY OR ALTERATION, including Credit, Debit, or Charge Card Extension ($25,000 limit) | $ | $ |
| C.  INSIDE THE PREMISES | $ | $ |
| D.  OUTSIDE THE PREMISES | $ | $ |
| E.  MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY | $ | $ |
| F.  COMPUTER FRAUD AND FUNDS TRANSFER FRAUD | $ | $ |

5.  Form Numbers of Endorsements Forming Part of This Policy When Issued: SEE SCHEDULE
6.  Cancellation of Prior Insurance**:**  By acceptance of this Policy, you give us notice canceling prior policies or bonds numbered: _____
_____ the cancellations to be effective at the time this policy becomes effective.

This Policy has been signed by the Company's President and Secretary.

Includes copyright material of the Insurance Services Office Inc., used with its permission.

Philadelphia Indemnity Insurance Company

Form Schedule – Crime Protection Plus

**Policy Number:** PHSD1249816

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-CRP-01 | 0605 | Crime Protection Plus Declarations |
| PI-BELL-1 | 1109 | Bell Endorsement |
| PI-CME-1 | 1009 | Crisis Management Enhancement Endorsement |
| PI-CRP-02 | 0605 | Crime Protection Plus Policy |
| PI-CRP-13 | 0605 | Policy Bridge - Discovery Replacing Loss Sustained |
| PI-CRP-WV-1 | 0605 | West Virginia Changes |

PI-BELL-1 (11/09)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## BELL ENDORSEMENT



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

**I.   SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Liability or Limits of Insurance and/or additional coverages provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| Business Travel Accident Benefit | $50,000 |
| Conference Cancellation | $25,000 |
| Donation Assurance | $50,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Fundraising Event Blackout | $25,000 |
| Identity Theft Expense | $50,000 |
| Image Restoration and Counseling | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Kidnap Expense | $50,000 |
| Political Unrest | $5,000 per employee: $25,000 policy limit |
| Temporary Meeting Space Reimbursement | $25,000 |
| Terrorism Travel Reimbursement | $50,000 |
| Travel Delay Reimbursement | $1,500 |
| Workplace Violence Counseling | $50,000 |

© 2009 Philadelphia Insurance Companies

## II.   CONDITIONS

### A.   Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

### B.   Limits of Liability or Limits of Insurance

**1.**   When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limits of liability or limits of insurance will apply.  In no instance will multiple limits apply to coverages which may be duplicated within this policy.  Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum limits of liability or limits of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limits of liability or limits of insurance under any one coverage part or policy.

**2.**   Limits of liability or limits of insurance identified in Section **I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS** above are not excess of, but are in addition to the applicable Limits of Liability or Limits of Insurance stated in the Declarations.

### C.   Claim Expenses

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

## III.   ADDITIONAL COVERAGES

### A.   Business Travel Accident Benefit

We will pay a Business Travel Accident Benefit to the insured if a director or officer suffers injury or death while traveling on a common carrier for your business during the policy period.

For the purpose of Business Travel Accident Benefit coverage, injury means:

**1.**   Physical damage to the body caused by violence, fracture, or an accident that results in loss of life not later than one hundred eighty (180) days after the policy expiration, the date of cancellation or the date of non-renewal;

**2.**   Accidental loss of limbs or multiple fingers;

**3.**   Total loss of sight, speech or hearing.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

The Business Travel Accident Benefit shall not be payable if the cause of the injury was:

**1.**   An intentional act by the insured;

**2.**   An act of suicide or attempted suicide;

**3.**   An act of war; or

**4.**   A disease process.

© 2009 Philadelphia Insurance Companies

**B.  Conference Cancellation**

We will reimburse the insured for any business-related conference expenses, paid by the insured and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend.  The cancellation must be due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference.

With respect to a conference cancellation claim, it is further agreed as follows:

1.  The insured employee must have registered for the conference at least thirty (30) days prior to the cancellation; and

2.  The cancellation must be ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.

The limit of insurance for this coverage is $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

**C.  Donation Assurance**

If the insured is a 501(c)(3) status non-profit organization as defined in the United States Internal Revenue Code, we will reimburse the insured for "failed donation claim(s)."

With respect to any "failed donation claim," it is further agreed as follows:

1.  The donor must not have been in bankruptcy, nor have filed for bankruptcy or reorganization in the past seven (7) years prior to the time said pledge was made to the insured;

2.  For non-cash donations, our payment of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

3.  In the case of unemployment or incapacitation of a natural person donor and as a condition of payment of the "failed donation claim":

    a.  Neither the natural person donor nor the insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date; and

    b.  The donor shall be unemployed for at least sixty (60) days prior to a claim being submitted by the insured;

4.  No coverage shall be afforded for a written pledge of funds or other measurable, tangible property to the insured dated prior to the policy period; and

5.  A donation amount which is to be collected by the insured over more than a twelve (12) month period shall be deemed a single donation.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**D.  Emergency Real Estate Consulting Fee**

We will reimburse the insured any realtor's fee or real estate consultant's fee necessitated by the insured's need to relocate due to the "unforeseeable destruction" of the insured's "principal location" listed in the Declarations during the policy period.  The limit of insurance for this

coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**E.   Fundraising Event Blackout**

We will reimburse the insured for "fundraising expenses" that are incurred due to the cancellation of a fundraising event caused by the lack of electric supply resulting in a power outage, provided the fundraising event is not re-scheduled.  The fundraising event must have been planned at least thirty (30) days prior to the power outage.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**F.   Identity Theft Expense**

We will reimburse any present director or officer of the named insured for "identity theft expenses" incurred as the direct result of any "identity theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the insured's first policy with us.  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**G.   Image Restoration and Counseling**

We will reimburse the insured for expenses incurred for image restoration and counseling arising out of "improper acts" by any natural person.

Covered expenses are limited to:

1.   The costs of rehabilitation and counseling for the accused natural person insured, provided the natural person insured is not ultimately found guilty of criminal conduct; this reimbursement to occur after acquittal of the natural person insured;

2.   The costs charged by a recruiter or expended on advertising, for replacing an officer as a result of "improper acts"; and

3.   The costs of restoring the named insured's reputation and consumer confidence through image consulting.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**H.   Key Individual Replacement Expenses**

We will pay "key individual replacement expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the policy period which results in the loss of life during the policy period.  The limit of insurance for this coverage is the lesser of $50,000 or ten (10) times the annual premium paid for this policy.  No deductible applies to this coverage.

**I.   Kidnap Expense**

We will pay on behalf of any director or officer of the insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner," parent or child during the policy period.  Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

© 2009 Philadelphia Insurance Companies

1. Fees and costs of independent negotiators;

2. Interest costs for any loan from a financial institution taken by you to pay a ransom demand or extortion threat;

3. Travel costs and accommodations incurred by the named insured;

4. Reward money paid to an informant which leads to the arrest and conviction of parties responsible for loss covered under this insurance; and

5. Salary, commissions and other financial benefits paid by you to a director or officer.  Such compensation applies at the level in effect on the date of the kidnap and ends upon the earliest of:

   a. Up to thirty (30) days after their release, if the director or officer has not yet returned to work;

   b. Discovery of their death;

   c. One hundred twenty (120) days after the last credible evidence following abduction that they are still alive; or

   d. Twelve (12) months after the date of the kidnapping.

The limit of insurance for this coverage is $50,000 each policy period for all insureds combined. No deductible applies to this coverage.

**J. Political Unrest Coverage**

We will reimburse any present director, officer, employee or volunteer of the named insured while traveling outside the United States of America for "emergency evacuation expenses" that are incurred as a result of an incident of "political unrest."  This "political unrest" must occur during the policy period.  No coverage is granted for travel to countries in a state of "political unrest" at the time of departure of the travel.  The limit of insurance for this coverage is $5,000 per covered person, subject to a maximum of $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**K. Temporary Meeting Space Reimbursement**

We will reimburse the insured for rental of meeting space which is necessitated by the temporary unavailability of the insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period.  Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**L. Terrorism Travel Reimbursement**

We will reimburse any present director or officer of the named insured in the event of a "certified act of terrorism" during the policy period which necessitates that he/she incurs "emergency travel expenses."  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

© 2009 Philadelphia Insurance Companies

**M. Travel Delay Reimbursement**

We will reimburse any present director or officer of the named insured for any "non-reimbursable expenses" they incur as a result of the cancellation of any regularly scheduled business travel on a common carrier.  The limit of insurance for this coverage is $1,500 per policy period for all insureds combined.  A seventy-two (72) hour waiting period deductible applies to this coverage.

**N. Workplace Violence Counseling**

We will reimburse the insured for emotional counseling expenses incurred directly as a result of a "workplace violence" incident at any of the insured's premises during the policy period.  The emotional counseling expenses incurred must have been for:

**1.** Your employees who were victims of, or witnesses to the "workplace violence";

**2.** The spouse, "domestic partner," parents or children of your employees who were victims of, or witnesses to the "workplace violence"; and

**3.** Any other person or persons who directly witnessed the "workplace violence" incident.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

## IV.  DEFINITIONS

For the purpose of this endorsement, the following definitions apply:

**A.** "Certified act of terrorism" means any act so defined under the Terrorism Risk Insurance Act, and its amendments or extensions.

**B.** "Communicable disease" means an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact, or contact with human fluids, waste, or similar agent, such as, but not limited to Meningitis, Measles or Legionnaire's Disease.

**C.** "Domestic partner" means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the named insured.

**D.** "Emergency evacuation expenses" mean:

**1.** Additional lodging expenses;

**2.** Additional transportation costs;

**3.** The cost of obtaining replacements of lost or stolen travel documents necessary for evacuation from the area of "political unrest"; and

**4.** Translation services, message transmittals and other communication expenses.

provided that these expenses are not otherwise reimbursable.

**E.** "Emergency travel expenses" mean:

© 2009 Philadelphia Insurance Companies

1. Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of a "certified act of terrorism"; and

2. The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "certified act of terrorism";

provided that these expenses are not otherwise reimbursable.

F. "Failed donation claim" means written notice to the insured during the policy period of:

1. The bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable, tangible property to the insured; or

2. The unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable, tangible property to the insured.

G. "Fundraising expenses" mean deposits forfeited and other charges paid by you for catering services, property and equipment rentals and related transport, venue rentals, accommodations (including travel), and entertainment expenses less any deposits or other fees refunded or refundable to you.

H. "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of any director or officer (or spouse or "domestic partner" thereof) of the named insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

I. "Identity theft expenses" mean:

1. Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

2. Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors; and

3. Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

J. "Improper acts" means any actual or alleged act of:

1. Sexual abuse;

2. Sexual intimacy;

3. Sexual molestation; or

4. Sexual assault;

committed by an insured against any natural person who is not an insured.  Such "improper acts" must have been committed by the insured while in his or her capacity as an insured.

K. "Injury" whenever used in this endorsement, other than in Section **III. A. Business Travel**,

means any physical damage to the body caused by violence, fracture or an accident.

**L.** "Key individual replacement expenses" mean the following necessary expenses:

    **1.** Costs of advertising the employment position opening;

    **2.** Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

    **3.** Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up an employment contract.

**M.** "Natural catastrophe" means hurricane, tornado, earthquake or flood.

**N.** "Non-reimbursable expenses" means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, and for which your director or officer produces a receipt:

    **1.** Meals and lodging;

    **2.** Alternative transportation;

    **3.** Clothing and necessary toiletries; and

    **4.** Emergency prescription and non-prescription drug expenses.

**O.** "Political unrest" means:

    **1.** A short-term condition of disturbance, turmoil or agitation within a foreign country that poses imminent risks to the security of citizens of the United States;

    **2.** A long-term condition of disturbance, turmoil or agitation that makes a foreign country dangerous or unstable for citizens of the United States; or

    **3.** A condition of disturbance, turmoil or agitation in a foreign country that constrains the United States Government's ability to assist citizens of the United States, due to the closure or inaccessibility of an embassy or consulate or because of a reduction of its staff

for which either an alert or travel warning has been issued by the United States Department of State.

**P.** "Principal location" means the headquarters, home office or main location where most business is substantially conducted.

**Q.** "Unforeseeable destruction" means damage resulting from a "certified act of terrorism," fire, collision or collapse which renders all of the insured's "principal locations" completely unusable.

**R.** "Workplace violence" means any intentional use of or threat to use deadly force by any person with intent to cause harm and that results in bodily "injury" or death of any person while on the insured's premises.

© 2009 Philadelphia Insurance Companies

PI-CME-1 (10/09)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## CRISIS MANAGEMENT ENHANCEMENT ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

Solely for the purpose of this endorsement:  1) The words  "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  2) The words "we," "us" and "our" refer to the company providing this insurance.

**I.     SCHEDULE OF ADDITIONAL COVERAGE AND LIMITS**

The following is the Limit of Liability provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

Crisis Management Expense                                                                  $25,000

**II.    CONDITIONS**

**A.  Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.  All other terms and conditions of the policy or coverage part to which this endorsement is attached remain unchanged.

**B.  Limits of Liability or Limits of Insurance**

When coverage is provided by this endorsement and any other coverage form or endorsement attached to this policy, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Liability or Limit of Insurance.

**C.  Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.   ADDITIONAL COVERAGES**

**A.**  We will reimburse you for "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies.  The amount of such reimbursement is limited as described in Section **II. CONDITIONS, B. Limits of Liability or Limits of Insurance**.  No other obligation or liability to pay sums or perform acts or services is covered.

**B.**  We will reimburse only those "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six (6) months of the date the "crisis" was initiated.

## IV.   DEFINITIONS

**A.**   "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

**B.**   "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm."  However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

**C.**   "Crisis management firm" means any service provider you hire that is acceptable to us.  Our consent will not be unreasonably withheld.

**D.**   "Incident" means an accident or other event, including the accidental discharge of pollutants, resulting in death or serious bodily injury to three or more persons.

**E.**   "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

PI-PRD-2 (09/02)

# PRIVATE COMPANY PROTECTION PLUS

Directors and Officers & Private Company Liability Insurance
Employment Practices Liability Insurance
Fiduciary Liability Insurance

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

## PART 1
## DIRECTORS & OFFICERS LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.     INSURING AGREEMENTS

    A.     INDIVIDUAL LIABILITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Private Company** has indemnified the **Individual Insured** for such **Loss**.

    B.     PRIVATE COMPANY INDEMNITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Private Company** has indemnified such **Individual Insureds** for such **Loss**.

    C.     PRIVATE COMPANY LIABILITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against the **Private Company** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II.    DEFINITIONS

    A.     **D&O Wrongful Act** means any actual or alleged:

        1.   act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or

        2.   act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the **Private Company**; or

        3.   act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity**, but only:

        a.  if such service is at the written request or direction of the **Private Company**; and

        b.  if, at the time such service began, the **Individual Insured** did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a **Claim** under this Policy.

B.  **Outside Entity** means:

    1.  any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

    2.  any other entity listed as an **Outside Entity** in an endorsement to this Policy.

III.    EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against the **Private Company** under Insuring Agreement C:

A.  arising out of, based upon or attributable to any actual or alleged plagiarism, infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan, piracy or misappropriation of ideas or trade secrets;

B.  arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair competition, or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, the Hart-Scott-Rodino Anti-Trust Improvement Act or any other similar federal, state, or local statutory provision or common law anywhere in the world;

C.  for any actual or alleged liability under any written or oral contract or agreement; however, this exclusion does not apply to any of the following:

    1.  liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

    2.  **Defense Costs**.

D.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

E.  for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law;

F.  for any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

G.  arising out of, based upon or attributable to an **Employment Practices Act** or a **Fiduciary Liability Act**.

IV.  PRESUMPTIVE  INDEMNIFICATION

If the **Private Company** is permitted or required by common or statutory law, but fails to indemnify the **Individual Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Private Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

<u>**PART 2**</u>
**EMPLOYMENT PRACTICES LIABILITY INSURANCE**

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.  INSURING  AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act**.

II.  DEFINITIONS

A.  **Employment Practice Act** means any actual or alleged:

   1.  wrongful dismissal, discharge or termination of employment;

   2.  breach of a written or oral employment contract or implied employment contract;

   3.  employment related misrepresentation;

   4.  wrongful failure to promote;

   5.  violation of employment discrimination laws (including harassment);

   6.  wrongful deprivation of a career opportunity;

   7.  employment related wrongful discipline;

   8.  negligent employee evaluation;

   9.  employment related invasion of privacy;

   10. employment related defamation (including libel and slander);

   11. sexual or workplace harassment of any kind;

   12. constructive discharge of employment;

   13. employment related **Retaliation**;

   14. employment related humiliation;

   15. wrongful demotion;

   16. negligent reassignment;

   17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practice Act** means any actual or alleged wrongful failure to employ, discrimination, sexual

PI-PRD-2 (09/02)

harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

B. **Retaliation** means retaliatory treatment against an **Individual Insured** on account of such individual:

    1. exercising his or her rights under law, including but not limited to rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

    2. refusing to violate any law;

    3. having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured**;

    4. disclosing in writing to a superior or to any governmental agency any alleged violations of law;

    5. filing any claim against the **Insured** under the Federal False Claims Act or any other similar "whistle blower" federal, state, or local law.

C. **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Private Company**.

## III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

B. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

C. arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements; provided that this exclusion will not apply to any **Claim** for **Retaliation**;

D. arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

    1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

2.        **Defense Costs**;

E.   to the extent such **Loss**, other than **Defense Costs**, constitutes employment-related benefits, stock options, perquisites, deferred compensation, payment of insurance, or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay;

F.   arising out of, based upon or attributable to a **D&O Wrongful Act** or a **Fiduciary Liability Act**.


## PART 3
## FIDUCIARY LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.    INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II.   DEFINITIONS

A.   **Administration** means:  (i) giving counsel to **Employees**, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of **Employees** or participants under any **Benefit Plan**.

B.   **Benefit Plan** means:

1.   any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2.   any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3.   any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

4.   any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date

of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

C. **Fiduciary Liability Act** means any actual or alleged:

1. breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

2. negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA.**

III.   EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C. arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D. arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

E. arising out of, based upon or attributable to any failure to comply with any law concerning workers   compensation, unemployment insurance, social security, disability benefits or any similar laws;

F. arising out of, based upon or attributable to an **Employment Practices Act** or a **D&O Wrongful Act**.

### PART 4
### COMMON POLICY DEFINITIONS

A. **Application** means:

    1. the **Application** for this Policy, including any material submitted therewith; and

    2. the **Application**(s), including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means:

    1.     a written demand for monetary or non-monetary relief;

    2.     a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

    3.     a criminal proceeding commenced by a return of an indictment;

    4.     a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

    5.     an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Underwriter's** written consent, such consent not to be unreasonably withheld;

    6.     solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

              against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

    7.     a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential **Claim** as described above.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

A c**laim** shall be considered made when an **Insured** first receives notice of the **Claim**.

C. **Damages** means any monetary judgment (including any pre- and post- judgment Interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage).

D. **Defense Cost**s means:

1.  any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim,** whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim,** except that **Defense Costs** shall not include:

    a.  any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

    b.  salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

    c.  salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**; and

2.  a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E.  **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employees as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall not include any independent contractors, unless specifically scheduled by endorsement.

F.  **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

G.  **Individual Insured** means:

    1.  any individual who has been, now is or shall become a director, officer, governor, trustee,  **Employee**, volunteer, management committee member, or member of the Board of Managers of the **Private Company** or, solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or  **Employee** of any **Benefit Plan**;

    2.  the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person;

    3.  the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in G. (1) or (4) which, in the absence of such death or incompetence, would have been covered by this Policy;

    4.  with respect to a **Private Company** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Private Company** that is equivalent to any position described in (1) above.

H.  **Insured** means the **Private Company** and **Individual Insured**.

I.  **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

J.  **Loss** means:

    1.    **Damages**;

    2.    **Defense Costs**;

but **Loss** does not include:

    1.    criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or

    2.    taxes; or

    3.    matters deemed uninsurable under the law to which this Policy shall be construed; or

    4.    any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

    5.    any costs other than **Defense Costs** associated with any accommodation required pursuant to the American With Disabilities Act (removed Civil Rights Act of 1964) and the rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

K.  **Named Corporation** means the first entity named in Item 1 of the Declarations Page.

L.  **Private Company** means:

    1.  the **Named Corporation**, and

    2.  any **Subsidiary**, and

    3. any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, and

    4. solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

M.  **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

N.  **Private Offering** means securities offered or issued by the **Private Company** which are exempt from  registration with the United States Securities and Exchange Commission pursuant to Section 3 (b) of the Securities Act of 1933.

O.  **Public Offering** means securities issued by the **Private Company** for initial public offering, public sale, public solicitation or public distribution to the general public and which is subject to full registration with the United States Securities & Exchange Commission (SEC).  **Public Offering** does not include a **Private Offering**.

P.  **Run-Off Policy** means a new policy of insurance offered by the **Underwriter** at the request of the **Named Corporation** in the event of a **Transaction**. The **Run-Off Policy** shall apply to

PI-PRD-2 (09/02)

**Claims** made and reported to the **Underwriter** during the term of the **Run-Off Policy**, but only for **Wrongful Acts** occurring prior to the effective date of said **Transaction**.

Q. **Subsidiary** means:

   1. a corporation of which the **Named Corporation** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its **Subsidiaries** or the right to elect, appoint or designate more than 50% of such entity's **board** of directors, trustees, or managers and which is set forth in the **Application**;

   2. a corporation which becomes a **Subsidiary** during the **Policy Period** and whose assets total less than 25% of the total consolidated assets of the **Named Corporation** as of the inception date of this **Policy Period**. The **Named Corporation** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

   3. a corporation, which becomes a **Subsidiary** during the **Policy Period** other than a corporation described in paragraph 2. above, but only upon the condition that within 90 days of its becoming a **Subsidiary**, the **Named Corporation** shall have provided the **Underwriter** with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this Policy required by the **Underwriter** relating to such new **Subsidiary**. Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Underwriter** relating to such new **Subsidiary**.

      A corporation becomes a **Subsidiary** when the **Named Corporation** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. A corporation ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. Coverage for **Claims** made against any **Subsidiary** or the **Individual Insureds** of any **Subsidiary** shall only apply to **Wrongful Acts** of such **Subsidiary** or the **Individual Insureds** of such **Subsidiary** occurring after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

R. **Transaction** shall mean:

   1 the **Private Company** merging into or consolidating with another entity such that the other entity is the surviving entity; or

   2. another entity, or person or group of entities and/or persons acting in concert acquiring securities or   voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more     than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Private Company**; or

   3. **Public Offering**.

S. **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

T. **Wrongful Act** means:

1.   with respect to Part 1, any **D&O Wrongful Act**,
2.   with respect to Part 2, any **Employment Practice Act**,
3.   with respect to Part 3, any **Fiduciary Liability Act**.

## PART 5
## COMMON POLICY EXCLUSIONS

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.   arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B.   arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

No **Wrongful Act** of any **Insured** shall be imputed to any other **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C.   arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D.   arising out of, based upon or attributable to any bodily injury or property damage in connection with tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E.   arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F.   arising out of, based upon or attributable to:

1.   any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

2.   any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

3.   any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G.   arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.   to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.   for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.   brought or maintained by or on behalf of, or in the right of, the **Private Company** except a derivative action **Claim**        by any person who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** and who brings or maintains the **Claim** without the solicitation, assistance or participation of such persons; provided, however that this exclusion shall not apply to a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for the **Private Company**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

K.   brought or maintained by any **Individual Insured** except:

   1.   any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by this Policy;

   2.   a **Claim** for an **Employment Practice Act** or a **Fiduciary Liability Act**;

   3.   a **Claim** for a **D&O Wrongful Act** brought or maintained by an **Employee**(s) who is not a past or present  director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** if such **Claim** for a **D&O Wrongful Act** is brought and maintained by such **Employee** without the assistance, participation or solicitation of any such persons.

L.   for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.   for service by the **Individual Insured** in any position or capacity in any entity other than the **Private Company**, a **Benefit Plan** or an **Outside Entity**, even if the **Private Company** directed or requested the **Individual Insured** to serve in such other position or capacity;

N.   arising out of, based upon or attributable to a **Public Offering** or any violation of the Securities and Exchange Act of        1933, Securities and Exchange Act of 1934, Investment Act of 1940, any state "Blue Sky" securities law, or any other federal, state or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the actual sale or purchase of securities; provided, however that this exclusion shall not apply:

   1.   to any **Private Offering**, subject to terms and conditions of Part 6, Section XVII;

2.   to any **Claim** made by any securityholder of the **Private Company** for the failure of the **Insured** to undertake or complete a **Public Offering**.

## PART 6
## COMMON POLICY CONDITIONS

I.   LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A.   With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Loss** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B.   With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C.   The **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations.  The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C),  are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D.   **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations.  The **Underwriter** is not obligated to pay any **Loss** after the applicable Limit of Liability has been exhausted.

E.   The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II.  RETENTION CLAUSE

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

III. DEFENSE AND SETTLEMENT

A.   The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim.** However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**.  Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE  AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

PI-PRD-2 (09/02)

B.     If the **Insured** is defending a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld.  The **Underwriter** shall not be liable for **Loss** admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.  The **Underwriter** reserves the right, but not the duty, at any time to take over control of the defense of any **Claim** and with the consent of the **Insured**, settle any **Claim** as the **Underwriter** deems expedient.

C.     The **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D.     In the event that a **Claim** is made against the **Insured**, the **Insured** shall take reasonable measures to protect their interests.

E.     If more than one **Insured** is involved in a **Claim,** the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds.**

F.     The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G.     If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured.  Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%).  It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer.  If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

H.     ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which **Loss** in the aggregate exceeds the remaining available Limit of Liability for Part 1(Directors and Officers Liability Insurance), the **Underwriter** shall:

1.  first pay such **Loss** for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2.  with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such **Loss** for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

IV.   NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.  Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.   In the event that a **Claim** is made against the **Insured**, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice to the **Underwriter** as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such **Claim**, but, not later than 60 days after the expiration date of this Policy, Extension Period, or **Run-Off Policy**, if applicable.

B.   If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim,** with full particulars as to the **Wrongful Act,** dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.   All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Loss** on account of a one **Claim**.  Such **Claim** shall be deemed to be first made when the earliest of such **Claims** was first made or first deemed made pursuant to Clause B. hereinabove.

V.    CANCELLATION AND NON-RENEWAL

A.   The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least ten (10) days prior to the effective date of cancellation.

B.   The **Private Company** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Private Company** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C. The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be mailed to the **Private Company** at least sixty (60) days prior to expiration of the **Policy Period**.

VI. REPRESENTATIONS AND SEVERABILITY

A. The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B. Except for material facts or circumstances known to the **Individual Insured** signing the **Application,** no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII. SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII. EXTENSION PERIOD

A. If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim.**

Upon expiration of the Automatic Extension, the **Private Company** shall have the right, upon payment of an additional 50%, 100%, 150% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this

Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B. If the **Private Company** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium the following will apply:

PI-PRD-2 (09/02)

The **Private Company** shall have the right, upon payment of an additional 50%, 100%, or 150% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C.   All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX.   CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X.   ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI.   AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Private Company** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Private Company** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Private Company** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Private Company** shall be the agent of any **Insured** to effect changes in this Policy.

XII.   OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

In event of a **Claim** against the **Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** or an **Employment Practices Act** against or committed by a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.

XIII.    ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XIV.    ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.    No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.    Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XV.    CHANGE IN OWNERSHIP OR CONTROL

A.    If after the inception of the **Policy Period** a **Transaction** occurs then coverage under Parts 1, 2, and 3 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and only if the following conditions are met:

1.    the **Insured** provides written notice of the **Transaction** (other than **Public Offering**) to the **Underwriter** as soon as practicable but no later than 45 days of the effective date of such **Transaction**; and

2.    the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary; and

3.    in the case of a **Public Offering,** the **Insured** provides written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission.  The **Underwriter** shall provide a quotation for the **Public Offering**.

If **Insured** fails to meet conditions 1., 2., & 3. above, coverage under this Policy shall cease as of the effective date of the **Transaction** and the **Underwriter** shall return any unearned premium on a pro-rata basis.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years.  If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** by the **Insured** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

XVI.    TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVII.   COVERAGE FOR A PRIVATE OFFERING

The **Insured** shall give the **Underwriter** written notice of a **Private Offering**, together with full details and as soon as practicable, but not later than 60 days after the effective date of such **Private Offering**. However, any **Claim** arising out of, based upon or attributable to a **Private Offering** shall be subject to the Private Offering Retention stated in Item 4. of the Declarations Page. Such Private Offering Retention shall be borne by the **Insureds**, uninsured and at their own risk, except that a Private Offering Retention shall not apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.

XVIII.   TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Private Company** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim**. Notwithstanding the foregoing, if more than one coverage part applies to the same **Wrongful Act** or **Interrelated Wrongful Acts**, then the maximum Limit of Liability under all such coverage parts combined shall not exceed the highest applicable Limit of Liability under any one coverage part. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Private Company** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX.   ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Private Company**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss.  Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

PI-PRD-5 (09/02)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

It is provided, however, that the foregoing shall not be applicable to any derivative or shareholder class action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

All other terms and conditions of this Policy remain unchanged

PI-PRD-70 (08/03)

## <u>THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY</u>.

# HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) EXTENSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

> ***PRIVATE COMPANY PROTECTION PLUS***

Under **PART 3**, **FIDUCIARY LIABILITY INSURANCE**:

The following is added to Section II. DEFINITIONS:

**C. Fiduciary Liability Act** also means:

3. a. any actual or alleged breach by an **Insured** of the responsibilities, obligations or duties imposed upon  fiduciaries of any **Benefit Plan** by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) including amendments thereto; or, by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) including amendments thereto; or

   b. any other actual or alleged violation of HIPAA by the **Insured** due solely to such **Insured's** service as a fiduciary of a **Benefit Plan**; or

   c. any actual or alleged negligent violation of HIPAA by any **Insured** in the **Administration** of any **Benefit Plan**.

It is further agreed that Section III. EXCLUSIONS is amended as follows:

Paragraph B. is deleted in its entirety and replaced with:

B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable laws, except to the extent that::

   (1)  the benefits are payable by an **Individual Insured** as a personal obligation; and

   (2)  recovery for the benefits is based upon a covered **Fiduciary Liability Act,**

   however, this exclusion shall not apply to **Defense Costs.**

PI-PRD-70 (08/03)

Paragraph E. is deleted in its entirety and replaced with:

E.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, disability benefits, unemployment insurance, social security, or any similar laws, except with regard to:

    1.  the Consolidated Omnibus Budget Reconciliation Act of 1985 and any amendments thereto; or

    2.  the Health Insurance Portability and Accountability Act of 1996 and any amendments thereto.

All other terms and conditions of this Policy remain unchanged.

PI-PRD-73 (05/06)

**<u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>**

## CORPORATE ADVANTAGE PRO-PAK ELITE COVERAGE

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended as follows:

1.  **OUTSIDE DIRECTORSHIP MODIFICATION**

    **PART 1 DIRECTORS & OFFICERS LIABILITY INSURANCE**, Section II (DEFINITIONS), item A. (**D&O Wrongful Act**), item 3. is replaced by the following:

    3.  act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** if such service is at the written request or direction of the  **Private Company**.

2. **AMENDMENT OF PRIOR AND PENDING LITIGATION**

    PART 5, (COMMON POLICY EXCLUSIONS), item F. is replaced by the following:

    1. any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

    2. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other similar policy in which this Policy is a renewal or replacement .

3. **DELETION OF EXCLUSIONS**

    PART 5, (COMMON POLICY EXCLUSIONS), item G. and H. are hereby omitted in their entirety.

4. **SECURITIES CLAIM CARVE BACK**

    **PART 1** (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), Section III (EXCLUSIONS), items A. and F. are amended to include the following:

    Exclusions A. and F. shall not apply to any **Claim** brought by any security holder of the **Private Company** (whether directly or derivatively) provided that such security holder is acting totally independently of, and totally without the solicitation, assistance, participation, or intervention of any Director or Officer of the **Private Company**, or any affiliate thereof.

PI-PRD-73 (05/06)

**5. SEVERABILITY AMENDMENT**

<u>PART 6</u>, (COMMON POLICY CONDITIONS), Section VI (REPRESENTATIONS AND SEVERABILITY), items A. and B. are replaced by the following:

(A) In granting coverage to the **Insureds** under this Policy, the **Underwriter** has relied upon the declarations and statements in the written application(s) for this Policy.  Such declarations and statements are the basis of the coverage under this Policy and shall be considered as incorporated in and constituting part of this Policy.

(B) Any written application(s) shall be construed as a separate application(s) for coverage by each **Insured**. With respect to the declarations and statements in such application(s):

(1) no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available; and

(2) only facts pertaining to and knowledge possessed by the Chief Financial Officer, President, general counsel, risk manager, Chief Executive Officer, director of human resources  or Chairperson of any part of the **Private Company** or any other individual signing such application(s) shall be imputed to the **Private Company** for the purpose of determining if coverage is available.

**6. MODIFIED CHANGE IN OWNERSHIP OR CONTROL**

<u>PART 6</u>, (COMMON POLICY CONDITIONS), Section XV (CHANGE IN OWNERSHIP OR CONTROL), is replaced by the following:

If after the inception of the **Policy Period** a **Transaction** occurs then this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and the premium shall immediately be considered fully earned.

However, in the case of a **Public Offering**, the **Insured** shall provide written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission.  The **Underwriter** shall provide a quotation for the **Public Offering**.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years.  If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

**7. FORMER OFFICER I VS. I CARVE BACK**

<u>PART 5</u>, (COMMON POLICY EXCLUSIONS), item K. will not apply to any **Claim**:

1. in which the party bringing the **Claim** has not served as a director, trustee, manager, officer or equivalent executive of the **Private Company** within four (4) years immediately preceding the date the **Claim** is first made;

2.  in which the party bringing the **Claim** has not brought the **Claim** in concert or cooperation with, at the suggestion of, or with the participation, active assistance, or intervention of any other **Insured** not described in line 1 above; or

3.  based upon, arising from, or attributable to any **Public Offering**.

## 8. INDEPENDENT CONTRACTORS AS EMPLOYEES

PART 4, (COMMON POLICY DEFINITIONS), item E. is deleted and replaced with the following:

E.  **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employed persons as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall include **Independent Contractor** as defined below.

**Independent Contractor** means an individual who is contracted to perform services for the **Private Company**; provided that such individual shall be deemed an **Employee** only if and to the extent that the **Private Company** provides indemnification to such individual for services rendered as if they were rendered by an actual **Employee** of the **Private Company**, and provided further that such individual(s) have been identified by the **Private Company** to the **Underwriter**. This Policy does not cover any **Loss** which any **Insured** is obligated to pay an **Independent Contractor** for overtime pay, vacation pay, employee benefit, or any compensation for services rendered.

## 9. AGGREGATE RETENTION

Part 6 (COMMON POLICY CONDITIONS), section II (RETENTION CLAUSE), is replaced by:

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

The Aggregate Retentions, which must be borne by the **Insured**, for all **Claims** made during the **Policy Period**, will be triple the amount of the per claim Retentions stated in Item 4. of the Declarations Page.

## 10. MODIFICATION OF SETTLEMENT CONDITION

Part 6 (COMMON POLICY CONDITIONS), section III (DEFENSE AND SETTLEMENT), item G is replaced by:

G.  If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 75% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 25% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by twenty-five percent (25%).  It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer.  If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

## 11. MODIFICATION OF SPOUSAL EXTENSION

PART 4, (COMMON POLICY DEFINITIONS), item G. paragraph 2, is deleted and replaced with the following:

2.  the lawful spouse or **Domestic Partner** of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person.  Domestic Partner means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the **Private Company**;

## 12. MODIFICATION OF PART 3 (FIDUCIARY LIABILITY INSURANCE)

**This section only applies if a Limit of Liability is noted for Fiduciary Liability on the Declarations Page.**

Part 3, Section I( Insuring Agreement), is deleted in its entirety and is replaced by the following:

A.  The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.  This coverage shall not apply any claims arising out of any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated under such law concerning privacy of health information or arising out of **Managed Care** liability.

In the event of the Insured enters into a voluntary settlement program with the Internal Revenue Service (or any similar state or federal agency), the **Company,** following prior notice provided by the **Company** to the **Underwriter,** during the **Policy Period** (or any applicable Extended Reporting Period), of the **Company's** intent to enter into said settlement program, shall pay on behalf of the **Insureds** any fees, penalties or sanctions imposed by law under said settlement program for which Inured is legally liable as a result of a **Fiduciary Liability Act** in an amount not to exceed $50,000. Such amount shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.  In no case, however, shall the Underwriter pay for any costs of corrections.

B.  The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** arising from any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated

PI-PRD-73 (05/06)

under such law concerning privacy of health information.   Coverage under this paragraph is subject to a sublimit of liability of $25,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

C. The **Underwriter** shall pay on behalf of the **Insured**, **Defense Costs** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** in connection with **Managed Care** liability solely as regards any **Managed Care** plans sponsored solely by the **Private Company** and insured and administered by an outside insurance carrier. Coverage under this paragraph is subject to a sublimit of liability of $100,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

For the purposes of this endorsement **Managed Care** shall mean any  plan providing comprehensive medical care to plan members on the basis of a prepaid contract and which by virtue thereof limits the choices of medical care and service providers available to plan members.

Part 3, Section II, Definitions, Paragraph B is deleted in its entirety and is replaced by the following:

B. **Benefit Plan** means:

1. any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2. any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3. any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion.  The 90-day notice requirement shall not apply, however, if the total assets of the acquired or formed **Pension Benefit Plan**, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the Insured Organization, or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period; and

4. any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan or any employee stock ownership plan unless said plan is added by specific written endorsement to this policy.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

PI-PRD-73 (05/06)

### 13. AMEND DEFINITION OF THIRD PARTY

Part 2, Section II Definitions, Paragraph C is deleted in its entirety and replaced with the following:

C.   **Third Party** means any natural person who is not an **Employee** of the **Private Company**.

PI-PRD-75 (12/03)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), section III (EXCLUSIONS), item E. is replaced by:

E.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 4 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

PI-PRD-77 (01/04)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMENDMENT OF CANCELLATION PROVISION

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 6 Common Policy Conditions, section V. Cancellation and Non-Renewal, item B. is amended to include the following:

If, during the policy period, the **Underwriter's** *A.M. Best* rating is downgraded, and the **Private Company** elects to cancel the policy, then the earned premium will be calculated on a pro-rata basis.

All other terms and conditions of this Policy remain unchanged.

71

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

# BREACH OF CONTRACT EXCLUSION

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended as follows:

I.   <u>PART 1</u>, DIRECTORS & OFFICERS LIABILITY INSURANCE, Section III. EXCLUSIONS, Item C. is hereby deleted in its entirety and replaced with the following:

C. arising out of, based upon or attributable to any actual or alleged liability under any written or oral agreement; however this exclusion does not apply to liability which would have attached even in the absence of such contract or agreement.

All other terms and conditions remain unchanged.

PI-MANU-1 (01/00)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

### SIDE-A NON-RESCINDABLE COVERAGE

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

SIDE-A NON-RESCINDABLE COVERAGE

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:


The Underwriter shall not be entitled under any circumstances to rescind the coverage granted by PART 1, DIRECTORS & OFFICERS LIABILITY INSURANCE, Section I. INSURING AGREEMENTS paragraph A. INDIVIDUAL LIABILITY COVERAGE.
.

All other terms and conditions of this Policy remain unchanged.

PI-MANU-1 (01/00)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY</u>

DEFENSE ONLY WAGE & HOUR CARVEBACK

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


DEFENSE ONLY WAGE & HOUR CARVEBACK

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS


1.    Part 2, EMPLOYMENT PRACTICES LIABILITY INSURANCE, Section III.
EXCLUSIONS, paragraph B. is amended by adding the following sentence to the
end thereof:

Notwithstanding the above, this exclusion shall not apply to Defense Cost
incurred in the defense of any Claim for violation of the Fair Labor
Standards Act (FLSA) or any similar federal, state, local or foreign
statutory law or common law or regulation governing or related to wage and
hour practices, including but not limited to, (i) any unfair business
practices alleged because of the failure to pay Earned Wages, or (ii)
seeking Earned Wages because any Employee(s) status was misclassified or
mislabeled or (iii) any dispute involving the distribution or pooling of tip
monies.  Coverage herewith in is subject to a Wage & Hour Sublimit of
Defense Cost of $100,000.  This Wage & Hour Sublimit of Defense Cost shall
be part of and not in addition to the Limit of Liability shown in Item 3.
(B) of the Declarations.


For the purpose of this endorsement, Earned Wages means wage compensation or
overtime pay for services rendered.


ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

All other terms and conditions of this Policy remain unchanged.

PI-PRD-WV-1 (03/03)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**.

## WEST VIRGINIA AMENDATORY ENDORSEMENT

Section XIV, paragraph B. is replaced with the following:

Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter,** may be submitted to binding arbitration.  Both parties must mutually agree to arbitration.  The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel.  The panel shall consist of one arbitrator selected by such **Insured,** one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

PI-SLD-001 (01/15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS LIABILITY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions  of the federal Terrorism Risk Insurance Act, to be an act of terrorism subject to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

# Exhibit 1.2



120 West Madison Street
Suite 1300
Chicago, Illinois 60602
Dirk E. Ehlers
312 549-9382 P
312 549-9389 F
DEhlers@CopeEhlers.com

October 3, 2019

**VIA EMAIL AND U.S. MAIL (to: _moto@ind.eco_)**

Mr. David Levine
2426 Steamboat Run Rd.
Shepherdstown, WV 25443

| Re: | Insured: | **Geostellar, Inc.** |
|---|---|---|
| | **Insurer:** | **Philadelphia Indemnity Insurance Company** |
| | **Claimant:** | **Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc.** |
| | **Policy No.:** | **PHSD1249816** |
| | **Policy Period:** | **May 31, 2017 to May 31, 2018 (with ERP until May 31, 2019)** |
| | **Claim No.:** | **1279780** |
| | **Our File No.:** | **100-627** |

Dear Mr. Levine:

Please be advised that our law firm represents the interests of Philadelphia Indemnity Insurance Company ("PIIC") under Private Company Protection Plus Insurance Policy No. PHSD1249816 (the "Policy") issued by PIIC to Geostellar, Inc. ("Geostellar"), with respect to the lawsuit captioned _Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc. v. David A. Levine and Indeco Union,_ Case No. 3:19-ap-00024 (the "Lawsuit") filed on May 20, 2019, in the U.S. Bankruptcy Court for the Northern District of West Virginia (the "Bankruptcy Court"). This letter provides PIIC's preliminary coverage position with respect to coverage for the Lawsuit under the Policy, based upon the allegations in the Complaint filed in the Lawsuit and the terms and conditions of the Policy. Please note that our discussion of the allegations in the Lawsuit in this letter should not be construed as any indication that it is PIIC's position that such allegations have been substantiated. We are providing this letter to you as the contact person for coverage communications identified in the notice materials that PIIC received from Geostellar's insurance agent Cherie Meyer at Kastendike Insurance Group / Maury, Donnelly & Parr, Inc., with a copy to Ms. Meyer. If any other party should receive a copy of this or any additional coverage-related correspondence, please advise.

As explained in detail below, PIIC will agree to advance reasonable and necessary "Defense Costs" (as defined by the Policy) incurred by you for conduct allegedly undertaken by you in the capacity of the Chief Executive Office and Board Member of Geostellar, subject to a complete reservation of all of PIIC's rights, remedies, and defenses, whether under the Policy, at law, or in equity, including but not limited to PIIC's potential coverage defenses as discussed herein, including (1) PIIC's right to assert that the Policy would not provide coverage for your

Mr. David Levine
October 3, 2019
Page 2

conduct in a capacity other than your capacity as an Individual Insured, which would include either alleged conduct for your personal benefit undertaken in a personal capacity, or alleged conduct undertaken in your capacity as a director, officer or employee of an entity other than Geostellar; and (2) PIIC's right to seek a fair and proper allocation of "Loss," including "Defense Costs," in light of the allegation of conduct that would not give rise to coverage under the Policy as well as the sharing of a defense by a non-Insured uncovered co-Defendant in the Lawsuit.  Please note, however, that because the Policy, which provides coverage for Geostellar itself in addition to Individual Insureds would therefore be considered to be an asset of the Geostellar Bankruptcy Estate, and therefore subject to the automatic bankruptcy stay under Bankruptcy Code Section 362, please be advised that before PIIC can advance Defense Costs under the Policy, it will be necessary for PIIC to obtain what is commonly referred to as a "comfort order" from the Bankruptcy Court before PIIC can begin advancing Defense Costs under the Policy.

## I.  The Lawsuit

On January 29, 2018, Geostellar filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Northern District of West Virginia (the "Bankruptcy Court")  On April 26, 2018 the Bankruptcy Court entered an order converting the Geostellar bankruptcy to a Chapter 7 proceeding, and thereafter Martin P. Sheehan (the "Trustee") was appointed Chapter 7 Trustee of the Bankruptcy Estate of Geostellar.  On May 20, 2019, the Trustee filed the Lawsuit, which is an adversary proceeding against you and Indeco Union alleging civil conspiracy, breach of fiduciary duty, fraud, and breach of contract.  The Trustee's counsel, Patrick S. Cassidy of the law firm Cassidy, Cogan, Shapell & Voeglin, L.C., provided notice of the Lawsuit in the form of a May 29, 2019 letter directed to Eric Kastendike at KIG with a copy of the Complaint that had been filed in the Lawsuit, which Mr. Kastendike's colleague Cherie Meyer forwarded to PIIC on May 30, 2019.

In the Complaint the Trustee alleges that Geostellar was a business that provided an efficient solar energy marketplace.  The Trustee asserts that in order to create the marketplace, Geostellar created proprietary software that was intended to match potential customers with the necessary information to complete a solar energy installation project.  The software also allegedly provided potential customers with a list of solar equipment vendors, solar equipment installers, and lending institutions interested in financing solar power projects.  The Trustee alleges that although Geostellar was not generating profits, it had achieved the potential of meeting operational expenses by arranging thirty solar power project installations per month, and allegedly it had met the thirty installations goal for a number of months.  The Trustee alleges that if Geostellar would have continued to consistently meet the thirty installation per month goal, Geostellar would have been able to raise on-going capital and other financing to become profitable.

The Trustee alleges that at all material times, you were the Chief Executive Officer and member of the Board of Directors of Geostellar, and that you were subject to the terms of an employment contract with Geostellar dated July 28, 2016.  In that regard, you allegedly owed fiduciary duties to Geostellar, including a duty of loyalty.  According to the Trustee, in the event

Mr. David Levine
October 3, 2019
Page 3

of litigation in regard to a breach of the employment contract, the prevailing party is entitled to payment of attorney's fees by the non-prevailing party. In addition, the Trustee asserts that pursuant to an addendum to the employment contract, you had agreed to hold Geostellar's proprietary information in the "strictest confidence" and you agreed that you would not "directly or indirectly . . . solicit, induce, or encourage any employee or consultant of Geostellar . . . to end his relationship with [Geostellar] . . . or offer any employee or consultant of [Geostellar] . . . employment or engagement elsewhere."

In regard to Geostellar's proprietary information, the Trustee alleges that you, in your capacity as Chief Executive Officer of Geostellar, had executed a Loan and Security Agreement with Matador Solar Partners, Inc. ("Matador") and pledged Geostellar's Intellectual Property to Matador as collateral for the loan. You allegedly had thereby created an expectation that such assets would be preserved for the benefit of Matador. The Trustee asserts that the preservation of such assets allegedly was a fiduciary obligation of Geostellar's directors and officers.

The Trustee further alleges that in or around July 2017, you changed the focus of Geostellar from establishment of a solar energy marketplace to the development of a cryptocurrency that was to be known as "Zydeco," which would depend upon the development of software and related programming known as a "blockchain." The Trustee asserts that on August 11, 2017, you caused the filing of a "Form C" with the Securities and Exchange Commission (the "SEC") in connection with Geostellar's efforts to obtain crowdfunding. The Trustee claims that in the Form C filing with the SEC you had identified a relationship between Zydeco and a watt of solar energy and further noted that Zydeco would have an intrinsic value because of that relationship. However, according to the Trustee, there was no actual relationship between the Zydeco cryptocurrency and a watt of solar energy that would create any intrinsic value for Zydeco. The Trustee characterizes the Form C filing as an effort to obtain monies without further exchange of a tangible asset or any interest in a tangible asset.

The Trustee further claims that on September 25, 2017, you allegedly breached your employment contract and fiduciary duties and intended to defraud Geostellar by forming entities known as Applied Philosophy Lab. P.B.C. ("Applied Philosophy") and a subsidiary of Applied Philosophy known as Indeco, LLC ("Indeco")[1] which was in breach of both your employment agreement with Geostellar and your fiduciary duties to Geostellar, and which was intended to defraud Geostellar. The Trustee alleges that the formation of Applied Philosophy and Indeco was a conflict of interest for you because the business plan of both was to compete with Geostellar. The Trustee alleges that your actions defrauded Geostellar.

The Trustee also asserts that a Form C filed with the SEC by Applied Philosophy on November 17, 2017 stated that Applied Philosophy was going to do business as Zydeco (the name of the cryptocurrency that was allegedly being developed by Geostellar). According to the Trustee,

---

[1] According to the allegations of the Trustee in the Complaint in the Lawsuit, Indeco Union was formed on June 27, 2018 by the merger of Applied Philosophy and Indeco, LLC.

Mr. David Levine
October 3, 2019
Page 4

the "Overview" section of Applied Philosophy's Form C allegedly included an explanation that Applied Philosophy expected to "leverage the capabilities of Geostellar's solar energy platform through a master license agreement." Additionally, "as part of an arrangement with Geostellar, [Applied Philosophy] anticipate[s] financing solar energy, battery storage, smart home, smart city, energy efficiency and related sustainability issues." The Trustee alleges, however, that Geostellar did not have any agreement with Applied Philosophy to supply its intellectual property. Moreover, Geostellar's Board of Directors had rejected any proposal to supply intellectual property to other companies.

Furthermore, according to the Trustee, yet another Form C, which was prepared for Indeco and filed with the SEC on December 5, 2017, stated that Indeco was going to offer a cryptocurrency to be known as "Indecoin." The Trustee alleges that the ideas expressed in Indeco's filing were misappropriated by you from Geostellar's crowdfunding documents. Additionally, the Trustee alleges that you misappropriated Geostellar's business plan for Applied Philosophy and Indeco. Your actions were allegedly in breach of your employment contract and your fiduciary duties to Geostellar.

The Trustee further claims that you directed the proprietary software developed by Geostellar, which had already been pledged as collateral to Matador, to be converted to "open source" software. The Trustee alleges that the transformation of the software to "open source" caused the software to be available to anyone, including Applied Philosophy and Indeco. The Trustee alleges that making the software available to anyone caused Geostellar to be in breach of its contractual obligations to Matador and effectively eliminated the value of the pledged software.

Moreover, the Trustee alleges that you breached your fiduciary duties and employment contract when you terminated all of Geostellar employees on November 6, 2017. Subsequently, for Indeco, you allegedly hired former Geostellar engineers who had previously worked on the development of Geostellar's proprietary software. In addition, according to the Trustee, in November 2017 you traveled to Los Angeles, at Geostellar's expense, for the purpose of addressing a conference as a representative of Geostellar and to promote its cryptocurrency. On November 18, 2017, however, you allegedly appeared at the conference to promote the Indecoin cryptocurrency on behalf of Applied Philosophy.

Last, the Trustee alleges that you breached your employment contract and fiduciary duties to Geostellar by "deceitfully creating a separate entity" which you owned and controlled so that you could take "Geostellar's employees, technology, corporate opportunity developed solely for Geostellar, leave creditors and shareholders behind, to pursue crypto" on your own, which ultimately resulted in the "demise of Geostellar" and a cessation of its business. The Trustee alleges that your conduct had damaged both Geostellar and its creditors.

The online docket for the Lawsuit indicates that you were served with the Complaint on June 27, 2019, and that on August 23, 2019 attorney Cortland Putbrese of the law firm Dunlap Bennett & Ludwig PLLC filed an appearance on behalf of you and co-Defendant Indeco Union

Mr. David Levine
October 3, 2019
Page 5

(collectively, "Defendants").  In addition, on August 23, 2019, Defendants filed a Joint Motion to Dismiss and Strike.  The Motion to Dismiss or Strike seeks:  (1) dismissal of the Lawsuit based upon an arbitration clause in the employment agreement between you and Geostellar and based upon a forum selection clause in an assignment of inventions agreement between you and Geostellar; (2) dismissal of a number of claims that have not been adequately pled, due to lack of documentation or other factual or legal insufficiency, including duplication of a breach of contract action which has been improperly asserted as entailing torts, and a lack of requisite specificity of allegations of fraud; or (3) that certain paragraphs of the Complaint be stricken as immaterial because Geostellar lacks standing to bring such allegations, which purport to assert claims that would involve third parties' causes of action against Defendants.

On September 12, 2019 the Trustee filed a Response to Defendants' Motion to Dismiss and Strike, which argues that only small portions of the Lawsuit would fall within the arbitration clause or the forum selection clause, and that the court could in its discretion exercise jurisdiction.  The Trustee further argues that the Complaint sufficiently pleads the various causes of action therein.  The Bankruptcy Court has given Defendants until September 20, 2019 to file a Reply in support of their Motion to Dismiss or Strike.

## II.    The Policy

PIIC issued the Policy to Geostellar in Martinsburg, West Virginia, which was effective from May 31, 2017 to May 31, 2018, with a one-year Extended Reporting Period that expired on May 31, 2019.  Geostellar purchased coverage under three parts: the Directors & Officers Liability Insurance under Part 1 (the "D&O Insurance"), the Employment Practices Liability Insurance under Part 2 (the "EPL Insurance"), and the Fiduciary Liability Insurance under Part 3 (the "Fiduciary Insurance").

The Policy provides a $3,000,000 Limit of Liability each Policy Period for Claims under Part 1, the D&O Insurance is $3,000,000 a $1,000,000 Limit of Liability each Policy Period for Claims under Part 2, the EPL Insurance and a $1,000,000 Limit of Liability each Policy Period for Claims under Part 3, the Fiduciary Liability Insurance.  The foregoing Limits of Liability are subject to a $5,000,000 Limit of Liability for each Policy Period.  Please note that under Part 6, COMMON POLICY CONDITIONS, Section I. LIMITS OF LIABILITY, Subsection D., "Defense Costs" (as defined in the Policy) are part of, and not in addition to, the Policy's Limit of Liability.  Therefore, payment by PIIC of Defense Costs incurred on account of any Claim shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations.  PIIC is not obligated to pay any Loss after the applicable Limit of Liability has been exhausted.

Coverage under the Policy is subject to a $50,000 Retention for each Claim under Part 1, the D&O Insurance, Insuring Agreements I.B. and I.C., and a $25,000 Retention for each Claim under Part 2, the EPL Insurance.  However, under the Corporate Advantage Pro-Pak Elite Enhancement Endorsement, PI-PPD-73 (05/06 (the "Pro-Pak Endorsement"), the Policy provides as follows:

Mr. David Levine
October 3, 2019
Page 6

A.      AGGREGATE RETENTION

Part 6 (COMMON POLICY CONDITIONS), section II (RETENTION CLAUSE), is replaced by:

The Underwriter shall only be liable for that portion of Loss arising from each Claim which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the Insured, uninsured and at their own risk, provided no Retention shall apply to Loss incurred by Individual Insureds for which the Private company is not permitted or required to indemnify the Individual Insured or is financially unable to do so.  A single Retention shall apply to Loss arising from all Claims alleging Interrelated Wrongful Acts.

The Aggregate Retentions, which must be borne by the Insured, for all Claims made during the Policy Period, will be triple the amount of the per claim Retentions stated in Item 4. of the Declarations Page.

Given that Geostellar is currently the subject of a Chapter 7 bankruptcy, and that its Trustee has asserted conduct that includes fraud, any claim for indemnification that you may have asserted may have been declined by the Trustee either due to insolvency or the nature of the alleged conduct.  Nevertheless, please advise whether a claim for indemnification has been asserted by you and please provide us with a copy of any correspondence relating to any indemnification claim against Geostellar, if such a claim has been asserted.[2]  Moreover, if you would have a copy of by-laws or articles of incorporation that may specify Geostellar's indemnification obligations to you as a former director or officer of Geostellar, please provide us with a copy of such documents.  Furthermore, please provide us with a copy of any communications between you or any of your representatives and the Trustee or any of his representatives regarding your assertion of any indemnification right in connection with the Lawsuit.

---

[2] Part 1, the D&O Insurance, as discussed below, includes an Insuring Agreement under Part 1, Section I., Subsection A., which provides coverage for an Individual Insured when the Geostellar does not indemnify an Individual Insured, and an Insuring Agreement under Part 1, Section I., Subsection B., which provides coverage for Geostellar when it does indemnify an Individual Insured.  Pursuant to Under Part 1, Section IV, PRESUMPTIVE INDEMNIFICATION, the Policy provides:

If the Private Company is permitted or required by common or statutory law, but fails to indemnify the Individual Insured for Loss (except by reason of its financial insolvency), any payment by the Underwriter of such Loss shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations.  The charter, by-laws, shareholder and board of director's resolutions of the Private Company shall be deemed to provide indemnification for such Loss to the fullest extent permitted by law.

Mr. David Levine
October 3, 2019
Page 7

In addition, please advise whether you have asserted any right to indemnification from Indeco Union or any other entity related to Indeco Union in regard the Lawsuit, and if so, please provide us with any response from Indeco Union.  Similarly, as is discussed further below, please advise whether you have sought coverage under any additional coverage, such as coverage that you may be entitled to as a director, officer or employee of Indeco Union.

Please be advised that pending PIIC's receipt of additional information in regard to whether the Geostellar Bankruptcy Estate has any ability to provide you with indemnification for Defense Costs you may incur in connection with your defense in the Lawsuit, or confirmation that cannot do so due to insolvency, PIIC is reserving its rights in regard to any applicable Retention that may apply in regard to your Defense Costs in connection with the Lawsuit, and PIIC is reserving its right to supplement its position in regard any applicable Retention.

## III.    Coverage Discussion

### A.    Definition of "Insured"

Under Part 4, COMMON POLICY DEFINITIONS, Item H., "Insured" means "the Private Company and Individual Insured."  Under Part 4, COMMON POLICY DEFINITIONS, Item L., the Policy defines "Private Company," in relevant part, to mean "the Named Corporation."  Under Part 4, Common Policy Definitions, Item K., "Named Corporation" means "the first entity named in Item 1 of the Declarations Page," which is "Geostellar, Inc."  Accordingly, Geostellar is an Insured under the Policy.  However, your co-Defendant in the Lawsuit, Indeco Union, is not an Insured under the Policy.

Under Part 4, COMMON POLICY DEFINITIONS, Item G., "Individual Insured" means "any individual who has been, now is or shall become a director, officer, governor, trustee Employee, volunteer, management committee member, or member of the Board of Managers of the Private Company, or solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or Employee of any Benefit Plan[.]"  Accordingly, you are an Insured under the Policy because you are a former Chief Executive Officer of Geostellar and former member of its Board of Directors.  However, we note that the Trustee includes allegations in the Complaint against you for wrongful conduct you would have undertaken as an individual, for your own benefit, and as a director, officer or employee of Applied Philosophy, Indeco and Indeco Union.  Please note, that you are not an Insured under the Policy in for conduct not undertaken by you in your capacity as an Individual Insured, which would be conduct undertaken either in an individual capacity, such as alleged self-dealing, or conduct as a director, officer or employee of another entity, such as Applied Philosophy, Indeco or Indeco Union.  Accordingly, please be advised that PIIC is reserving its right to deny coverage for any Loss sustained by you in connection with the Lawsuit the result of conduct you had undertaken in any non-Insured capacity. This is further discussed below in connection with the scope of the language of the Insuring Agreements in the Policy.

Mr. David Levine
October 3, 2019
Page 8

**B.     Definition of "Claim"**

The Policy defines "Claim," under Part 4, COMMON POLICY DEFINITIONS, Item B., as follows:

1.     a written demand for monetary or non-monetary relief;

2.     a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

3.     a criminal proceeding commenced by the return of an indictment;

4.     a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

5.     an arbitration or mediation or other alternative dispute resolution proceeding if the Insured is obligated to participate in such proceeding or if the Insured agrees to participate in such proceeding, with the Underwriter's written consent, such consent not to be unreasonably withheld;

6.     solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

       against an Insured for a Wrongful Act, including any appeal therefrom; or

7.     a written request received by an Insured to toll or waive a statute of limitations, relating to a potential Claim as described above.

However, a Claim shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

A claim shall be considered made when an Insured first receives notice of the Claim.

The Lawsuit constitutes a Claim under the Policy because it is "a written demand for monetary or non-monetary relief . . . against an Insured for a Wrongful Act" and a "judicial or civil proceeding commenced by the service of a complaint or similar pleading."

Mr. David Levine
October 3, 2019
Page 9

### C.     Applicable Coverage Parts

As discussed above, the Policy purchased by Geostellar provides for coverage for Claims under Part 1 the D&O Insurance, Part 2, the EPL Insurance, and Part 3, the Fiduciary Liability Insurance.  For the reasons discussed below, the applicable Coverage Part in regard to the Lawsuit for certain Claims would be under Part 1, the D&O Insurance, while for certain other Claims the applicable Coverage Part would be Part 2, the EPL Insurance.  Part 3, the Fiduciary Liability Insurance, does not provide coverage for the Lawsuit.

### 1.     Coverage under Part 1, the D&O Liability Insurance

Under Part 1, the D&O Liability Insurance, Section I., INSURING AGREEMENTS, Subsections, A. and B. the Policy provides the following, in pertinent part:

A.     INDIVIDUAL LIABILTY COVERAGE

The Underwriter shall pay on behalf of the Individual Insured, Loss from Claims made against Individual Insureds during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&O Wrongful Acts, except to the extent the Private Company has indemnified the Individual Insured for such Loss.

B.     PRIVATE COMPANY INDEMNITY COVERAGE

The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against Individual Insureds during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&) Wrongful Acts, if the Private Company has indemnified such Individual Insureds for such Loss.

The Policy, as amended by the Pro-Pak Endorsement, defines the term "D&O Wrongful Act" as included in the aforementioned Insuring Agreements under Part 1, the D&O Liability Insurance, Section II, Item A., in relevant part, as follows:

A.     D&O Wrongful Act means any actual or alleged:

1.     act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured in his/her capacity as an Individual Insured; or

Mr. David Levine
October 3, 2019
Page 10

\*     \*     \*

3.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured arising out of serving in his/her capacity as director, officer, governor or trustee of an Outside Entity if such service is at the written request or direction of the Private Company.

The Lawsuit contains allegations within the scope of the foregoing definition of "D&O Wrongful Act," which would include allegedly making misleading statements and misrepresentations in connection with Geostellar's Form C filing with the SEC.  Furthermore, the Trustee alleges that you breached a fiduciary duty of loyalty when you terminated Geostellar's employees.  Accordingly, PIIC acknowledges that the Policy would provide coverage for you in connection with the Lawsuit for alleged D&O Wrongful Acts.

Please note, however, that the foregoing definition of "D&O Wrongful Act" by the Policy an act, error, misstatement, misleading statement, neglect or breach of duty must be committed or attempted by an Individual Insured either "in his/her capacity as an Individual Insured" or "arising out of serving in his/her capacity as a director, officer, governor or trustee of an Outside Entity if such service is at the written request or direction of the Private Company."  In regard to the second type of capacity – that of a director, officer, governor or trustee of an Outside Entity, please note that an "Outside Entity" is defined under Part 1, the D&O Liability Insurance, Section II., DEFINITIONS, Subsection B. to mean:

1.    any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

2.    any other entity listed as an Outside Entity in an endorsement to this Policy.

As noted above, an "Individual Insured" is defined as to Part 1 and Part 2 to mean "any individual who has been, now is or shall become a director, officer, governor, trustee Employee, volunteer, management committee member, or member of the Board of Managers of the Private Company."[3]  Accordingly, while you are an Insured under the Policy for Claims asserting your conduct as the former Chief Executive Officer of Geostellar or as a former member of its Board of Directors, the Policy would not provide coverage under Part 1 for wrongful conduct you would have undertaken as an individual, for your own benefit, or for your conduct as director, officer or employee of Applied Philosophy, Indeco or Indeco Union.  We note that Applied Philosophy, Indeco and Indeco Union are not "Outside Entities" under the Policy, since none of them are either

---

[3] The definition of "Individual Insured" solely with respect to Part 3, the Fiduciary Liability Insurance, is "a director, officer, governor, trustee or Employee of any Benefit Plan."  This is not relevant in regard to consideration of coverage under Part 1 or Part 2 of the Policy, and for reasons discussed below, the coverage under Part 3 is not applicable in connection with the Lawsuit.

Mr. David Levine
October 3, 2019
Page 11

a not-for-profit entity within the scope of 501(c)(3) of the Internal Revenue Code or listed as an
Outside Entity by endorsement to the Policy.

### 2.    The Employment Practices Liability Coverage Part

Under Part 2, the EPL Insurance, Section I., INSURING AGREEMENT, the Policy
provides as follows:

> The Underwriter shall pay on behalf of the Insured, Loss from Claims made against
> the Insured during the Policy Period (or, if applicable, during the Extension Period),
> and reported to the Underwriter pursuant to the terms of this Policy, for an
> Employment Practices Act.

Under Part 2, the EPL Insurance, Section II., DEFINITIONS, Subsection A., "Employment
Practice Act" as referenced in the foregoing Insuring Agreement is defined as follows:

A.    Employment Practice Act shall mean any actual or alleged:

1.    wrongful dismissal, discharge or termination of employment;

2.    breach of written or oral employment contract or implied
employment contract;

3.    employment related misrepresentation;

4.    wrongful failure to promote;

5.    violation of employment discrimination laws (including
harassment);

6.    wrongful deprivation of a career opportunity;

7.    employment related wrongful discipline;

8.    negligent employee evaluation;

9.    employment related invasion of privacy;

10.    employment related defamation (including libel and slander);

11.    sexual or workplace harassment of any kind;

12.    constructive discharge of employment;

Mr. David Levine
October 3, 2019
Page 12

13.     employment related Retaliation;

14.     employment related humiliation;

15.     wrongful demotion;

16.     negligent reassignment;

17.     violation of any federal, state or local civil rights laws;

and committed or attempted by an Individual Insured in his/her capacity as
an Individual Insured or by the Private Company.

\*        \*        \*

The Lawsuit asserts certain conduct within the scope of an "Employment Practice Act,"
within the foregoing definition under Part 3, Section II., Subsection of the Policy, which includes
"wrongful dismissal, discharge or termination of employment," "breach of written or oral
employment contract or implied employment contract" and an "employment related
misrepresentation." The Trustee alleges that you breached your employment contract with
Geostellar by forming Applied Philosophy and Indeco. Those actions allegedly breached your
contractual obligation to "not participate in, directly, or indirectly" "in any business activity" or to
"make or acquire any investment or business or prospects, financial or otherwise in a business
adverse or antagonistic to" Geostellar, Inc., or "its prospects, financial or otherwise" without the
written approval of the Chairman of the Compensation Committee. Additionally, the Trustee
alleges that on November 6, 2017, you wrongfully terminated all Geostellar employees and then
hired all former Geostellar employees from the engineering department to work for Indeco.

Accordingly, PIIC acknowledges that the Lawsuit asserts an Employment Liability Act
that may give rise to coverage under Part 2 of the Policy, subject to the additional terms and
conditions of the Policy and applicable common law. However, please be advised further that just
as a "D&O Wrongful Act" giving rise to coverage under to Part 1 is confined to your alleged
conduct as an "Individual Insured," an "Employment Practice Act" giving rise to coverage under
Part 2, the EPL Insurance is confined to conduct "committed or attempted by an Individual Insured
in his/her capacity as an Individual Insured." Accordingly, the Policy does not provide coverage
for you in connection with the Lawsuit under Part 2 for wrongful conduct you would have
undertaken as an individual, for your own benefit, or for your conduct as a director, officer or
employee of Applied Philosophy, Indeco or Indeco Union.

Mr. David Levine
October 3, 2019
Page 13

**3.       Lack of Coverage under Part 3, the Fiduciary Liability Insurance**

Under Part 3, the Fiduciary Liability Insurance, Section I. INSURING AGREEMENT, as amended by the Pro-Pak Endorsement, the Fiduciary Policy provides, in relevant part, under Subsections A., B. and C., "Loss from Claims made against the Insured during the Policy Period (or, if applicable, the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a Fiduciary Liability Act . . . ."  Under Part 3, the Fiduciary Liability Insurance, Section II., DEFINITIONS, Subsection C., the Fiduciary Liability Insurance defines "Fiduciary Liability Act" as referenced in the foregoing Insuring Agreement to mean:

1.       breach by an Insured of the responsibilities, obligations or duties imposed upon fiduciaries of any Benefit Plan by ERISA; or

2.       negligent act, error or omission by an Insured solely in the Administration of any Benefit Plans.

Under Part 3, the Fiduciary Liability Insurance, Section II., DEFINITIONS, Subsection A., the Policy defines "Administration" to mean: "(i) giving counsel to Employees, beneficiaries or participants regarding any Benefit Plan, (ii) providing interpretations and handling reports in connection with any Benefit Plan, or (iii) effecting enrollment, termination or cancellation of Employees or participants under any Benefit Plan."

Because the Lawsuit does not involve either a "breach by an Insured of the responsibilities, obligations or duties imposed upon fiduciaries of any Benefit Plan[4] by ERISA," or a "negligent

---

[4] Under Part 3, Section II. DEFINITIONS, Subsection B., as amended by the Pro-Pak Endorsement, the Fiduciary Policy defines "Benefit Plan" to mean:

1.  any Welfare Benefit Plan which was, is now or becomes sponsored by the Private Company solely for the benefit of the Employees of the Private Company;

2.  any Pension Benefit Plan which was, on or prior to the effective date of this Policy, sponsored by the Private Company solely for the benefit of the Employees of the Private Company, provided that coverage was available in respect of such Pension benefit Plan under any policy of which this Policy is a renewal or replacement and such Pension Benefit Plan has been reported in writing to the Underwriter as part of the Application;

3.  any Pension Benefit Plan created or acquired (through merger, consolidation or otherwise) during the Policy Period by the Insured solely for the benefit of the Employees of the Private Company, but only upon the condition that within 90 days after such creation or acquisition, the Insured shall have (i) provided written notice to the Underwriter of such newly created Pension Benefit Plan, and (ii) agreed to any additional terms and paid any additional premium required by the Underwriter in its sole discretion.  The 90-day notice requirement shall not apply, however, if the total assets of the acquired or formed Pension Benefit Plan, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the Insured Organization, or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period; and

Mr. David Levine
October 3, 2019
Page 14

act, error or omission by an Insured solely in the Administration of any Benefit Plans," please be advised that the Lawsuit does not assert a "Fiduciary Liability Act" that would trigger coverage for any Insured under Part 3 of the Policy.

**D.    Exclusions as to the EPL Insurance under Part 2.**

Please be advised that coverage under Part 2, the EPL Insurance, is subject to certain exclusions under Part 2, Section III., as follows.

**1.    The Exclusion under Part 2, Section III., Subsection D.**

Under Part 2, Section III., EXCLUSIONS, Subsection D., the Policy provides that PIIC "shall not be liable under this Part 2 to make any payment for Loss in connection with any Claim made against the Insured:"

> D.    arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:
>
> > 1.    liability of the Private Company which would have attached even in the absence of such contract or agreement; or
> >
> > 2.    Defense Costs[.]

The Trustee alleges that you and Geostellar entered into an employment contract on July 28, 2016, including additional addenda thereto, which you have breached in connection with certain conduct asserted by the Trustee in the Lawsuit.  Accordingly, please note that while coverage for Defense Costs is provided under Part 2 of the Policy in connection with such Claims,

---

4.    any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for Employees of the Private Company.

However, Benefit Plan does not include any multi-employer plan or any employee stock ownership plan unless said plan is added by specific written endorsement to this policy.

Coverage for Benefit Plans which are sold, terminated or spun-off during or prior to the Policy Period shall apply only with respect to any Fiduciary Liability Act occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such Benefit Plan.

Under Part 3, Section II. DEFINITIONS, Subsections D. and E. the Fiduciary Policy provides as follows:

D.    Pension Benefit Plan means any employee pension benefit plan, as defined in ERISA.

E.    Welfare Benefit Plan means any employee welfare benefit plan, as defined in ERISA.

Mr. David Levine
October 3, 2019
Page 15

PIIC reserves its right to assert that coverage for liability arising out of any employment contract or agreement between you and Geostellar that would not arise in the absence of such contract or agreement would not give rise to coverage under the Policy for "Damages" as defined therein. We note in this regard that pursuant to the foregoing exclusion under Part 2, Section III., Subsection D. of the Policy, excluded Damages would include an obligation for you to provide payment of attorneys' fees, costs and expenses if Geostellar were to prevail in a dispute regarding the employment contract at issue (as to which the Trustee has alleged the applicability of a contractual fee shifting provision in the contract).

### 2.    The Exclusion under Part 2, Section III., Subsection F.

Under Part 2, Section III., EXCLUSIONS, Subsection F., the Policy provides that PIIC "shall not be liable under this Part 2 to make any payment for Loss in connection with any Claim made against the Insured" "arising out of, based upon or attributable to a D&O Wrongful Act or a Fiduciary Liability Act.

As described in above, the Lawsuit asserts certain conduct that constitutes a D&O Wrongful Act under Part 1. Accordingly, PIIC reserves its right to deny coverage under Part 2 of the Policy for any conduct that comprises a "D&O Wrongful Act" as opposed to an "Employment Liability Act," pursuant to the foregoing exclusion under Part 2, Section III., Subsection F., of the Policy.

### E.    Limitations and Exclusions Applicable to Both Coverage Parts 1 and 2

Please be advised that PIIC is reserving its right to assert the applicability of the following coverage defenses under the Policy and related common law.

### 1.    The Scope of Covered "Loss"

Under Part 4, COMMON POLICY DEFINITIONS, Item J., the Policy defines "Loss," as follows:

J.    Loss means:

1.    Damages;

2.    Defense Costs;

but Loss does not include:

1.    criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) Loss includes

Mr. David Levine
October 3, 2019
Page 16

      fines or penalties imposed under Section 502 (i) and (I) of ERISA;
      or

  2.  taxes; or

  3.  matters deemed uninsurable under the law to which this Policy shall
      be construed; or

  4.  any amounts other than Defense Costs, which an Insured is
      obligated to pay as a result of a Claim seeking relief or redress in
      any form other than monetary damages; or

  5.  any costs other than Defense Costs associated with any
      accommodation required pursuant to the Americans with
      Disabilities Act (removed Civil Rights Act of 1964) and the rules or
      regulations promulgated thereunder, amendments thereto, or similar
      provisions of any federal, state or local law or common law.

  "Damages" within the aforementioned definition of "Loss" is defined under Part 4 COMMON POLICY DEFINITIONS, Item C., as follows:

    Damages means any monetary judgment (including any pre- and post-judgment interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the Insured or to the Claim seeking such damage and which is most favorable to the insurability of such damage).

  PIIC reserves its right to disclaim coverage for any Loss sustained by you to the extent that the Loss is deemed uninsurable or do not fall within the Policy's definition of "Loss" or "Damages," under the Policy and related common law.  Please note that to the extent that the Lawsuit asserts that a you had obtained a benefit to which you were not entitled, which you must return to Geostellar, such a return of improper gain would not constitute "Loss," regardless of whether the improper gain was obtained through fraud or through an innocent mistake.  *See Level 3 Communications, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 910-11 (7th Cir. 2001) (the term "loss" within the meaning of a directors and officer's liability insurance policy does not include the restoration of ill-gotten gain); *Ryerson Inc. v. Fed. Ins. Co.*, 676 F.3d 610 (7th Cir. 2012) (reimbursement does not constitute an insurable "loss," whether based on fraud or upon an innocent mistake); *CNL Hotels & Resorts, Inc. v. Twin City Fire Ins. Co.*, 291 Fed. Appx. 220 (11th Cir. 2008); *St. Paul Fire and Marine Ins. Co. v. Village of Franklin Park*, 523 F. 3d 754 (7th Cir. 2008) (noting that whether the cause of failure to fund a pension was intentional or the result of using the wrong funding formula or failing to retain an actuary, the insured "would not suffer a 'loss' under the policy because it would still only be paying for an amount offset by a benefit it

Mr. David Levine
October 3, 2019
Page 17

had already received."); *Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.,* 316 Ill.App.3d 391, 249 Ill. Dec. 75, 735 N.E.2d 679, 684 (Ill. App. 2000); *Conseco, Inc. v. National Union Fire Insurance Co. of Pittsburgh, PA,* No. 49D130202CP000348, 2002, WL 31961447 (Ind. Cir. Ct. Dec. 31, 2002) ("Courts have generally found that if an insured wrongfully acquires funds and then is forced to return the funds, or if an insured is held liable to pay its corporate obligations incurred in the ordinary course of business, it has not suffered a loss, regardless of whether the wrongful conduct was intentional."); *Central Dauphin School District v. Amer. Cas. Co.*, 493 Pa. 254, 426 A.2d 94, 97 (Pa.1981); *Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489, 494 (Tex.Civ.App.1970) ("An insured . . . does not sustain a covered loss by restoring to its rightful owners that which the insured, having no right therein, has inadvertently acquired . . . . The insured's innocence and good faith are immaterial"); *Republic Western Ins. Co. v. Spierer Woodward, Willens, Denis and Furstman*, 68 F.3d 347, 349, 351 (9th Cir. 1995); and *Safeway Stores, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 64 F.3d 1282, 1286 (9th Cir.1995).

Moreover, to the extent that you would incur an obligation to pay any amounts due under a contract or agreement with Geostellar, even in the absence of an exclusion, courts in a number of jurisdictions have recognized that payment of such contractual obligation is not a "loss" from a wrongful act. *See, e.g.*, *Entitle Ins. Co. v. Darwin Select Ins. Co.*, 2013 U.S. Dist. LEXIS 14218 (N.D. Ohio Feb. 1, 2013) *aff'd*, *Entitle Insurance Co. v. Darwin Select Insurance Co.*, 553 F. App'x 543 (6th Cir. 2014), citing *August Entertainment, Inc. v. Philadelphia Indemnity Ins. Co.*, 146 Cal. App. 4th 565, 52 Cal. Rptr. 3d 908 (Cal. App. 2 Dist. 2007). Accordingly, please be advised that PIIC is also reserving its right to deny coverage under either Part 1 or Part 2 of the Policy for any liability to provide a payment arising under a contract or agreement.

## 2.    The Exclusions under Part 5, Sections A. and B.

Under Part 5, COMMON POLICY EXCLUSIONS, Sections A. and B., the Policy provides that PIIC shall not be liable to make any payment for a Loss in connection with any Claim made against the Insured:

A.    arising out of, based upon or attributable to such Insured gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall inly apply if a final and non-appealable judgment or adjudication establishes the Insured committed such act or omission;

B.    arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such Insured; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the Insured committed such act or omission;

No Wrongful Act of any Insured shall be imputed to any other Individual Insured for the purpose of determining the applicability of Exclusions A and B above.

Mr. David Levine
October 3, 2019
Page 18

The Lawsuit asserts that you had defrauded Geostellar by forming competing companies, appropriating Geostellar's proprietary information, and promoting Applied Philosophy's cryptocurrency when you represented that you were promoting Geostellar's cryptocurrency at a conference in Los Angeles.  Although PIIC does not assert that dishonesty or improper gain by any Insured has been substantiated, please be advised that PIIC is reserving its right to deny coverage for Loss incurred by you in the event a final and non-appealable judgment establishes that you engaged in any conduct within the scope of the aforementioned exclusions under Part 5, Sections A. and B. of the Policy.

### 3.      The Exclusion under Part 5, Section M.

Consistent with the scope of "D&O Wrongful Acts" that give rise to coverage under Part 1 of the Policy and the scope of "Employment Practice Acts" that give rise to coverage under Part 2 of the Policy, under Part 5, COMMON POLICY EXCLUSIONS, Section M. the Policy provides that PIIC shall not be liable to make any payment for a Loss in connection with any Claim made against the Insured:

> M.      for service by the Individual Insured in any position or capacity in any entity other than the Private Company, a Benefit Plan or an Outside Entity, even if the Private Company directed or requested the Individual Insured to serve in such other position or capacity[.]

Because the Lawsuit alleges that you committed wrongful conduct in your capacities as an individual, and as a director, officer or employee of Applied Philosophy, Indeco and Indeco Union, PIIC reserves its right to deny coverage for Loss incurred by you to the extent you were not acting in your capacity of Chief Executive Office and Board member of Geostellar within the scope of the aforementioned exclusion under Part 5, Section M. of the Policy.

### 4.      Other Insurance and the Scope of Covered "Defense Costs"

Under Part 6, COMMON POLICY CONDITIONS, Section XII., OTHER INSURANCE, the Policy provides:

> If the Insured has any other insurance for Claims covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

> In event of a Claim against the Insured arising out of serving in his/her capacity as a director, governor or trustee of an Outside Entity or an Employment Practices Act against or committed by a leased Employee, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity or

Mr. David Levine
October 3, 2019
Page 19

such leasing company and any insurance provided to such Outside Entity or such leasing company.

In addition, under Part 4, COMMON POLICY DEFINITIONS, Item D., covered "Defense Costs" under the Policy do not include, in relevant part, "any amount incurred in defense of any Claim for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty. . . ."

Accordingly, please advise whether you have any other insurance that may provide coverage in connection with the Lawsuit, which may include coverage provided for you as a director, officer or employee of Applied Philosophy, Indeco or Indeco Union.  Additionally, please advise whether you have provided or will provide notice of this matter to any other insurance carrier.  If so, please advise of any coverage communications with such other carrier(s), even if coverage has been denied, and please provide us with a copy of any policy under which you have sought coverage.

Please note that pending its receipt of additional information regarding your entitlement to other insurance in connection with the Lawsuit, PIIC is reserving a right to assert the applicability of the foregoing "other insurance" provision under Part 6, COMMON POLICY CONDITIONS, Subsection XII., and a right to assert that if any other insurer has a duty to defend, any defense expenses incurred by you would not be considered covered "Defense Costs" under Part 4, COMMON POLICY DEFINITIONS, Item D. of the Policy.

### 5.      Single Limit of Liability

Under Part 8, COMMON POLICY CONDITIONS, Section XVIII., the Policy provides as follows:

XVIII.   TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER

It is the Underwriter's stated intention that the various coverage parts or policies issued to the Parent Organization by the Underwriter, or any affiliated company, do not provide any duplication or overlap of coverage for the same Claim or Workplace Violence Act.  Notwithstanding the other insurance provision, if this Policy and any other policy issued to the Parent Organization by the Underwriter, or any affiliated company, apply to the same Wrongful Act, Workplace Violence Act, professional incident, occurrence, offense, accident or Loss, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

Mr. David Levine
October 3, 2019
Page 20

Based upon the foregoing, the highest available Limit of Liability for Loss in connection with the Lawsuit would be the $3,000,000 Limit of Liability for coverage under Part 1, the D&O Insurance.

### 6.     Subrogation

Under Part 6, COMMON POLICY CONDITIONS, Subsection VII., SUBROGATION, the Policy provides:

> In the event of any payment under this Policy, the Underwriter shall be subrogated to the extent of such payment to all of the Insured's rights of recovery.  The Insured shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the Underwriter's express written consent.

Please be advised that PIIC reserves its right to assert the applicability of the foregoing subrogation provision under Part 6, COMMON POLICY CONDITIONS, Item VII. to the extent that you would have any rights in regard to a third party in connection with any liability for which PIIC may provide payment of "Loss" under the Policy.

PIIC reserves its right to assert the applicability of the foregoing subrogation provision under Part 6, COMMON POLICY CONDITIONS, Item VII.

### 7.     Allocation

Under Part 6, COMMON POLICY CONDITIONS, Item XIX., the Policy provides, in relevant part, as follows:

> If both Loss covered by this Policy and Loss not covered by this Policy are incurred either because a Claim includes both covered and uncovered maters, or because a Claim is made against both the Individual Insured and/or the Private Company, and others, the Insured and the Underwriter shall use their best efforts to agree upon a fair and proper allocation of such amount between covered Loss and uncovered loss.  Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered maters.

In light of (1) the lack of coverage for co-Defendant Indeco Union, and (2) the lack of coverage for you for conduct in non-Individual Insured capacities, as discussed above, pursuant to the foregoing provision PIIC proposes that a fair and proper allocation between covered and uncovered issued raised above, please be advised that PIIC reserves its right to seek a fair and proper allocation between covered Loss and uncovered loss would provide coverage for 33 percent of your defense expenses as "Defense Costs" in connection with the Lawsuit.

Mr. David Levine
October 3, 2019
Page 21

## IV.    Defense Issues

Under Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, the Policy provides as follows, in relevant part:

A.    The Insured and not the Underwriter shall have the responsibility to defend any Claim.  However, the Insured shall have the right, as soon as practicable after a Claim is first made, to tender the defense of such Claim to the Underwriter.  Upon written notice to the Underwriter of such election by the Insured and subject to all of the provisions of this Section III. DEFENSE AND SETTLEMENT, the Underwriter shall undertake and manage the defense of such Claim, even if such Claim is groundless, false or fraudulent.

B.    If the Insured is defending a Claim pursuant to A. above, the Underwriter shall advance Defense costs prior to the final disposition of a Claim.  The Insured shall elect counsel of its choice subject to approval by the Underwriter, such approval shall not be unreasonably withheld.  The Underwriter shall not be liable for Loss admitted by the Insured without the Underwriter's prior written consent, which shall not be unreasonably withheld.  The Underwriter reserves the right, but not the duty, at any time, to take over control of the defense of any Claim and with the consent of the Insured, settle any Claim as the Underwriter deems expedient.

It is our understanding that as permitted by the foregoing provisions under Part 6, Section III., Subsections A. and B. of the Policy, you have elected to retain your choice of counsel, Mr. Cortland Putbrese of the law firm  Dunlop Bennet & Ludwig PLLC, and to control and manage your defense in the Lawsuit.  Please advise us as soon as possible if this is not correct.

In addition, under Part 4, COMMON POLICY DEFINITIONS, Item D., the Policy Defines "Defense Costs" to mean:

1.    any reasonable and necessary legal fees and expenses incurred in the defense of a Claim, whether by the Insured with the Underwriter's consent or directly by the Underwriter, in the investigation, adjustment, defense and appeal of a Claim, except that Defense Costs shall not include:

a.    any amounts incurred in defense of any Claim for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

b.    salaries, wages, overhead or benefit expenses associated with any Insured except as specified in subparagraph 2 below; or

Mr. David Levine
October 3, 2019
Page 22

        c.        salaries, wages, overhead or benefit expenses associated with employees of the Underwriter; and

2.        a $250 per day per Individual Insured supplemental payment for the attendance at the request or with the consent of the Underwriter by such Individual Insured at hearings, trials or depositions.  Such payment shall not exceed $5000 in the aggregate for all Individual Insureds in each Claim.

Please note that PIIC requests that your defense counsel comply with the terms of the Policy and PIIC's defense billing guidelines, which provide PIIC's guidance as to what it considers to be "reasonable and necessary" defense expenses pursuant to the foregoing definition of covered "Defense Costs" under the Policy.  Please note further that PIIC considers hourly rates of $220 for partners, $195 for associates, and $100 for paralegals to be usual and customary for the defense of this type of matter in this jurisdiction.

Please be advised further that that you and your defense counsel must comply with the following provisions for the defense under Part 6, COMMON POLICY CONDITIONS, Section III, as amended by the Pro-Pak Elite Endorsement, which includes, but is not limited to, the following:

C.        The Underwriter is not obligated to pay any Loss after the Limit of Liability has been exhausted.

D.        In the event that a Claim is made against the Insured, the Insured shall take reasonable measures to protect their interests.

E.        If more than one Insured is involved in a Claim, the Underwriter may, in its sole discretion, appoint separate counsel for one or more of such Insureds if there is a material (actual or potential) conflict of interest among any such Insureds.

F.        The Insured agrees to provide the Underwriter with all information, assistance and cooperation which the Underwriter reasonably requests and agree that in the event of a Claim the Insured will do nothing that may prejudice the Underwriter's position or its potential rights of recovery.

G.        If with respect to any Claim the Insured refuses to consent to the first settlement acceptable to the claimant which the Underwriter recommends to the Insured in writing, and elects to further contest the Claim, then the Underwriter's liability for such Claim shall not exceed the amount for which the Claim could have been settled, including Defense Costs incurred, up to the date of such refusal, plus 75% of covered Loss in excess of such first settlement amount, it being a condition of this insurance that the remaining

Mr. David Levine
October 3, 2019
Page 23

25% of such Loss excess of the first settlement amount shall be borne by the Insured at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the Underwriter recommends a first settlement of a Claim within the Policy's applicable Limit of Liability which is acceptable to the claimant, and the Insured consents to such settlement, then the Insured's applicable Retention for such Claim shall be retroactively reduced by twenty-five percent (25%). It shall be a condition to such reduction that the Insured must consent to the first settlement amount within thirty (30) days after the date the Underwriter recommends to the Insured such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the Underwriter recommends to the Insured such first settlement offer. If the Insured does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

Please keep us apprised of all developments in the Lawsuit as they occur and provide us with copies of all pleadings. PIIC also must be involved in strategic decisions. Electronic communications, to the extent that email is available, will be appropriate for reporting purposes. Your defense counsel should submit an initial litigation plan within thirty (30) days of the date of this letter, or of retention, if the matter cannot likely be resolved by settlement. The report should provide the following:

D.    Summary of the facts known to date;
E.    Evaluation of the strengths and weaknesses of Plaintiff's claim;
F.    Evaluation of the strengths and weaknesses of your defenses;
G.    Evaluation of elements of relief;
H.    Evaluation of jurisdictional issues (if any) and characteristics of all parties;
I.    Proposed defense strategy up to and through trial;
J.    Likelihood of any dispositive motions;
K.    Potential verdict if claimant prevails; and
L.    Anticipated staffing of the case.

Please provide us with copies of all defense invoices, which includes invoices that are paid to satisfy any applicable Retention (which will depend upon whether Geostellar may be required to provide indemnification for any portion of your Defense Costs), and thereafter invoices for which you are seeking advancement, which will be paid by PIIC directly to defense counsel.

Mr. David Levine
October 3, 2019
Page 24

     If it is necessary for any experts or outside litigation support vendor (such as an e-discovery vendor) to be retained for your defense, PIIC will require that it be provided the credentials, proposed terms of for the expert or vendor's retention, and an estimate of the total cost for such expert or vendor, such that PIIC can provided its prior and informed written consent for the retention of any expert or vendor as required under the Policy.

     As a final note, as discussed at the beginning of this correspondence, because the Policy provides coverage for both an entity that has sought bankruptcy protection such as Geostellar and for the former directors, officers or employees of Geostellar, such as yourself, the proceeds of the Policy may be considered an asset of the Bankruptcy Estate that is subject to the automatic stay under Bankruptcy Code Section 362.  Accordingly, before PIIC can provide advancement of any Defense Costs for your defense in the Lawsuit, it will first need to obtain an order from the Bankruptcy Court providing that such payments of Defense Costs will not be considered to be in violation of the automatic stay under Bankruptcy Code Section 362.

     PIIC continues to reserve all of its rights, remedies, and defenses in connection with the Lawsuit, whether under the Policy, at law, or in equity, including, but not limited to the matters specifically addressed herein, as well as PIIC's right to supplement its reservations as further information or developments may warrant.  Please do not hesitate to contact us if you have any questions regarding this letter, PIIC's coverage position, or the Policy once you have had an opportunity to review this correspondence.

     Sincerely yours,

     Dirk E. Ehlers

Enclosures

cc:    Ms. Cherie Meyer, Kastendike Insurance Group / Maury, Donnelly & Parr, Inc.
        (by email to:  Cherie-Meyer@MDPIns.com)

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

In re:

LEVINE, DAVID ANDREW
LEVINE, MONICA LARSON                    Bankruptcy Case No.: 3:19-bk-1048

      Debtors.

_____

THOMAS H. FLUHARTY, Trustee of the
Bankruptcy Estate of David Levine and Monica
Levine,

      Plaintiff,

MARTIN P. SHEEHAN, Trustee of the Bankruptcy    Adversary Proceeding No. 3:21-ap-00019
Estate of Geostellar, Inc.

      Co-Plaintiff,

v.

PHILADELPIA INDEMNITY INSURANCE
COMPANY and DAVID A. LEVINE,

      Defendants.

# ORDER OF COURT

        AND NOW, this _____ day of _____, 2021, upon consideration of Plaintiffs' Motion

for Preliminary Injunction and Defendant Philadelphia Indemnity Insurance Company's Response

thereto, it is hereby **ORDERED** Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

                      ENTER:        _____


                                _____

PREPARED BY:                   U.S. Bankruptcy Judge

*/s/ Debra Tedeschi Varner*
Debra Tedeschi Varner (WV State Bar #6501)
Varner & Van Volkenburg PLLC
360 Washington Avenue
Clarksburg, WV 26301
Telephone:  (304) 918-2840
Facsimile:  (304) 566-1161
***Counsel for Defendant***
***Philadelphia Indemnity Insurance Company***