**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

IN RE:  GEOSTELLAR, INC.                          BK. NO. 3:18-BK-0045

**MARTIN P. SHEEHAN, Trustee of
the Bankruptcy Estate of  Geostellar, Inc.,**

     **Plaintiff,**                                    CASE NO. _____

                                                 JUDGE _____

**v.**

**DAVID A. LEVINE, and
INDECO UNION, a Delaware Corporation,**

     **Defendants.**

## COMPLAINT

NOW COMES Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc., by and through his counsel, Patrick S. Cassidy and Timothy F. Cogan, and Cassidy, Cogan, Shapell & Voegelin, L.C., and for his Complaint against David A. Levine and Indeco Union, and states as follows.

### General Allegations

1.       Geostellar, Inc., is a Delaware corporation.  It had been doing business at 224 W. King St., Martinsburg, West Virginia. It filed for Chapter 11 Bankruptcy Relief on January 29, 2018.

2.       On April 26, 2018, the United States Bankruptcy Court for the Northern District of West Virginia entered an order converting the bankruptcy case of Geostellar, Inc., from a case under Chapter 11 to a case under Chapter 7.

3.       As a consequence of conversion to Chapter 7, Martin P. Sheehan was appointed as the interim Chapter 7 Trustee.  In that capacity, Martin P. Sheehan is the successor in interest to all legal and equitable interests of the Corporation at the time of filing of the case, pursuant to

11 U.S.C. § 541(a)(1) and to such additional rights as are contained in 11 U.S.C. § 541(a).

4.      A meeting of creditors was held in the Chapter 7 case on May 24, 2018.  No request for an election of an alternate trustee was made.  When the meeting of creditors concluded, Martin P. Sheehan became the permanent Chapter 7 Trustee of the Bankruptcy Estate of Geostellar, Inc., pursuant to 11 U.S.C. § 704(d).  He remains the successor in interest to all legal and equitable interests of the Corporation at the time of filing of the case, pursuant to 11 U.S.C. § 541(a)(1) and to such additional rights as are contained in 11 U.S.C. § 541(a).

5.      This is an action for civil conspiracy, breach of fiduciary duty, fraud, and breach of contract.

6.      Jurisdiction in this Court exists pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.  Venue is proper pursuant to 28 U.S.C. § 1408.

7.      This is a non-core proceeding.

## The Parties

8.      Plaintiff is Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc. Mr. Sheehan has a business address of 41 Fifteenth St., Wheeling, WV 26003.

9.      Defendant is David A. Levine.  Mr. Levine resides at 2426 Steamboat Run Road, Sheperdstown, WV 25401.

10.     Defendant, Indeco Union is the current name of what had originally been Applied Philosophy Lab, P.B.C., and Indeco, LLC. As detailed below, these entities were formed by, or at the direction of, Defendant, David A. Levine. These entities became a single entity known as Indeco Union on June 27, 2018. Indeco Union is the successor to all benefits and responsibilities of the entities which now compose that entity.

a.  Applied Philosophy Lab, P.B.C., was incorporated on September 25, 2017 by

David A. Levine as a Delaware Public Benefit Company.

b.  Indeco, LLC, was formed as a Delaware Limited Liability Company. It was formed as a wholly owned subsidiary of Applied Philosophy Lab, P.B.C. on November 3, 2017 by Michael Perlowski at the direction of David A. Levine.

c.   On February 14, 2018, the Articles of Incorporation of Indeco, LLC were changed to cause the corporation to be known as Indeco Corporation.  That action was taken by the Chief Executive Officer David A. Levine of Applied Philosophy Lab, P.B.C., which entity was the sole member of Indeco, LLC.

d.  On March 22, 2018, the Articles of Incorporation of Indeco Corporation were again changed.  What had been Indeco Corporation changed its name to Indeco Financial Syndicate by actions of David A. Levine, the Chief Executive Officer of Applied Philosophy Lab, P.B.C., which entity was the sole member of what had been Indeco Corporation.

e.  Also on March 22, 2018, Applied Philosophy Lab, P.B.C., amended its Certificate of Incorporation to change the name of Applied Philosophy Lab, P.B.C. to Indeco Union.  The Amended Certificate of Incorporation was executed by the Chief Executive Officer of what had been Applied Philosophy Lab, P.B.C.

f.  On June 27, 2018, Indeco Financial Syndicate, an entity that had previously been known as Indeco, LLC, and then Indeco Corporation, merged with Indeco Union, an entity that had previously been known as Applied Philosophy Lab, P.B.C.

g.  As a result of the merger, the surviving corporate entity was Indeco Financial Syndicate, formerly Indeco, LLC and Indeco Corporation.

h.  However, the merger documents also reflect that the surviving entity, Indeco

3

Financial Syndicate, formerly Indeco, LLC and Indeco Corporation, again changed its name.

i.   The name adopted by Indeco Financial Syndicate, formerly Indeco, LLC and Indeco Corporation, was Indeco Union.   This was the name of the former subsidiary, that began as Indeco, LLC, and which had become Indeco Union.

11.   The business of Geostellar, Inc., was to provide an efficient solar energy marketplace.

12.   To create an efficient solar market place, Geostellar, Inc., created proprietary software through which it intended to match potential customers, that is persons interested in installing solar power generating capacity with all necessary information to complete a solar installation project, including a list of solar equipment vendors, solar equipment installers, and lending institutions interested in financing solar power projects.

13.   The on going business of Geostellar, Inc., was not generating profits, but had achieved the potential of meeting operational expenses by arranging 30 installations of solar power projects per month.

14.   Geostellar, Inc., had achieved the goal of 30 installations of solar power projects per month a number of times.

15.   Consistently meeting the goal of 30 installations of solar power per month would have permitted Geostellar, Inc. to raise on going capital and other financing to cause the growth and ultimately to the  long term profitability of Geostellar, Inc.

16.   At all times material to this Complaint and prior to January 24, 2018, David A. Levine was the Chief Executive Officer of Geostellar, Inc.   At all times material to this Complaint, and prior to January 24, 2018, David A. Levine was also a member of the Board of

Directors of Geostellar, Inc.  Thereafter, David A. Levine had an official role with Geostellar, Inc., and he testified as the representative of the corporate debtor at meetings of creditors held while the bankruptcy case was in Chapter 11, and after it converted to Chapter 7.

17.     As the Chief Executive Officer and as a member of the Board of Directors of Geostellar, Inc., David A. Levine owed a fiduciary duty to Geostellar, Inc., including the duty of loyalty.

18.     David A. Levine was bound by the terms of an employment contract dated July 28, 2016 with Geostellar, Inc., attached hereto as Exhibit A.

19.     Under the terms of that contract, David A. Levine was obligated, inter alia, to:

    a.   "diligently, conscientiously and exclusively, devote" his "full time and attention" as well as his "best efforts to discharge" his assigned duties;

    b.   be bound by the general employment policies and practices of the Company, including "those relating to protection of confidential information;"

    c.   to "not participate in, directly, or indirectly" "in any other business activity" or to "make or acquire any investment or business or prospects, financial or otherwise in a business adverse or antagonistic to" Geostellar, Inc., or "its prospects, financial or otherwise" without the written approval of the Chairman of the Compensation Committee.

20.     In addition, in the employment contract dated July 28, 2016, David A. Levine agreed inter alia, to pay attorney's fees to the prevailing party in the event of a breach of the contract of employment.

21.     Under the terms of that addendum to the employment contract, attached hereto as Exhibit B,  David A. Levine agreed to:

    a.  recognize and "hold in strictest confidence" all Proprietary Information of the Company; and,

    b.  Not to "directly or indirectly, whether as owner, partner, consultant, agent, coventurer or otherwise" "solicit, induce, or encourage any employee or consultant" of Geostellar, Inc., to "end his relationship with the Company" or "offer any employee or consultant of the Company….employment or engagement elsewhere."

22.    In addition, in the addendum to the employment contract dated July 28, 2016, David A. Levine agreed <u>inter alia</u>, to pay attorney's fees to the prevailing party in the event of a breach of the addendum to the contract of employment.

23.    On October 7, 2016, David A. Levine in his capacity as Chief Executive Officer of Geostellar, Inc., executed a Loan and Security Agreement with Matador Solar Partners, Inc., in which David A. Levine <u>inter alia</u>, pledged assets of Geostellar, Inc., including assets described therein as "Intellectual Property[1]" as collateral for a loan from Matador Solar Partners, Inc.

24.    By pledging such assets, David A. Levine created an expectation that such assets would be preserved for the benefit of Matador Solar Partners, Inc.

25.    The preservation of such assets became a fiduciary obligation of the officers and directors of Geostellar, Inc., including David A. Levine, the Chief Executive Officer.

---

[1]  As specifically provided in those documents,  "Intellectual Property" was defined to mean: (i) all inventions designs, know-how, methods, processes, drawings, specifications or other data or information and all memoranda, notes and records with respect to any research and development, and all embodiment or fixations thereof whether in tangible or intangible form, (ii) Copyrights, Trademarks, Patents and Mask Works; (iii) and all trade secrets, and any and all intellectual property rights in computer software and computer software products; (iv) any and all design rights; (v) any and all claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above; (vi) all licenses or other rights to use any of the Copyrights, Patents, Trademarks, Mask Works, or any other property rights described above; (vii) all amendments, renewals and extensions of any of the Copyrights, Trademarks, Patents or Mask Works; and (viii) all proceeds and products of all the foregoing.

    Such a definition included the proprietary software developed by Geostellar, LLC.

26. In and around, July 2017, David A. Levine changed the focus of Geostellar, Inc, from establishing a solar energy market place as discussed above.

27. Instead, David A. Levine caused employees of the engineering department of Geostellar, Inc., to curtail work related to development of a solar energy marketplace and instead to cause those employees to begin working on the development of a cryptocurrency.

28. A cryptocurrency depends on the existence of software and related programming code known as a "blockchain." Ultimately, the cryptocurrency being developed by the engineering department of Geostellar, Inc., was to be known as Zydeco.

29. On or about August 11, 2017, David A. Levine caused the filing of a form C, as required by 17 C.F.R. § 227.100, et seq., with the Securities and Exchange Commission in connection with efforts to obtain Crowdfunding for Geostellar, Inc.

30. As part of that form, it was represented that Geostellar, Inc., was developing a cryptocurrency.

31. A presentation was made to the Board of Directors of Geostellar, Inc., by David Levine on September 21, 2017 concerning the development of the cryptocurrency to be known as Zydeco. That presentation described how funds could be generated for the benefit of Geostellar, Inc., through development and distribution of a cryptocurrency.

32. In that document, some relationship was identified between the cryptocurrency and a watt of solar energy and further that the cryptocurrency being developed by Geostellar, Inc., had some intrinsic value because of this relationship.

33. In fact, there can be no relationship between a cryptocurrency and a watt of solar energy such as to create an intrinsic value for the cryptocurrency being developed by Geostellar, Inc.

34.     The representations made through the Crowdfunding document filed with the Securities and Exchange Commission represented an effort to obtain monies without further exchange of a tangible asset, or any interest in a tangible asset.  The sole consideration for any monies paid to Geostellar, Inc., through the Crowdfunding solicitation was a speculative interest the cryptocurrency.

35.     On September 25, 2017, David A. Levine, in breach of his contractual and other fiduciary duties and intending to defraud Geostellar, Inc., formed a corporation to compete with Geostellar, Inc,, known as Applied Philosophy Lab, P.B.C., as a Delaware Public Benefit Corporation.

36.     On or about, November 3, 2017, David A. Levine, in breach of his contractual and other fiduciary duties and intending to defraud Geostellar, Inc., formed Indeco, LLC, a Delaware Limited Liability Company to be a wholly owned subsidiary of Applied Philosophy Lab, P.B.C. and to compete with Geostellar, Inc.

37.     The formation of Applied Philosophy Lab, P.B.C., as a Delaware Public Benefit Corporation and the formation of Indeco, LLC, as a Delaware Limited Liability company, was a conflict of interest for David A. Levine because the business plan of both entities was to compete with Geostellar, Inc.  Said actions further defrauded Geostellar, Inc.

38.     According to a Regulation Crowdfunding Form C that had been prepared for filing on November 17, 2017, with the Securities and Exchange Commission on behalf of Applied Philosophy Lab, P.B.C., Applied Philosophy Lab, P.B.C. was going to do business as "Zydeco," the name of the cryptocurrency previously identified by David A. Levine as the cryptocurrency to be developed by Geostellar, Inc.

39.     The "Overview" section of that document included an explanation that the

Company, that is Applied Philosophy Lab, P.B.C., expected to "leverage the capabilities of Geostellar's solar energy platform through a master license agreement." And further that "as part of an arrangement with Geostellar, the Company anticipate financing solar energy, battery storage, smart home, smart city, energy efficiency and related sustainability issues."

40.     At no time, did Applied Philosophy Lab, P.B.C., have any agreement with Geostellar, Inc., to cause Geostellar, Inc., to supply intellectual property to Applied Philosophy Lab, P.B.C., or to Indeco, LLC.

41.     In fact, when the prospect of such an arrangement was presented to the Board of Directors of Geostellar, Inc., that proposal and all related proposals were rejected by the Board of Directors on or about October 20, 2017.

42.     Any and all further action or statements by David A. Levine and/or Applied Philosophy Lab, P.B.C. based on the existence of some arrangement between Geostellar, Inc., and Applied Philosophy Lab, P.B.C., was in breach of contractual and other fiduciary duties of David A. Levine to Geostellar, Inc., and fraudulent, and in furtherance of a civil conspiracy between David A. Levine and others, including but not limited to Applied Philosophy Lab, P.B.C., now known as Indeco Union.

43.     According to a Regulation Crowdfunding Form including Exhibits A to C thereto that had been prepared for filing on December 5, 2017 with the Securities and Exchange Commission for Indeco, LLC, Indeco LLC was going to offer a cryptocurrency to be known as "Indecoin."

44.     The ideas expressed in this document were appropriated by David A. Levine from the Crowdfunding document prepared earlier for Geostellar, Inc.  More than appropriating the ideas expressed in this document, David A. Levine appropriated the business plan of Geostellar,

Inc., for competing companies which he had created.

45.    Said actions were in breach of the contractual and other fiduciary duties of David A. Levine and defrauded Geostellar, Inc.

46.    David A. Levine did not accept direction from the Board of Directors.

47.    Instead, David A. Levine directed that the proprietary software developed by Geostellar, Inc., and used as part of marketing efforts to raise working capital and otherwise to arrange financing for Geostellar, Inc., and as had been specifically pledged as collateral to Matador Solar Partners, LLC, be converted to "open source" software.

48.    The effect of this transformation of proprietary software to open code software caused the proprietary software of Geostellar, Inc., to be available to anyone, including entities created by David A. Levine to compete with Geostellar, Inc. What had previously available exclusively to Geostellar, Inc., was made non-exclusive. Said actions caused Geostellar, Inc., to be in breach of its contractual obligations.

49.    Furthermore, the effect of the transformation of proprietary software to open code software was to render the value of the proprietary software of Geostellar, Inc., which had been developed at considerable expense, to be made valueless as an exclusive asset of Geostellar, Inc.

50.    Said actions were in violation of contractual and fiduciary duties owed by David A. Levine to Geostellar, Inc. and defrauded Geostellar, Inc.

51.    In addition to appropriating intellectual property from Geostellar, Inc., on November 6, 2017, David A. Levine terminated all employees of Geostellar, Inc.

52.    On November 7, 2017, the former employees of the engineering department of Geostellar, Inc., the employees previously assigned to development of proprietary software for Geostellar, Inc., were hired by Indeco, LLC, a competitor of Geostellar, Inc., founded by David

A. Levine, and owned and controlled by him through Applied Philosophy Lab, P.B.C., another entity founded by David A. Levine and owned and controlled by him.

53.     Said actions were in violation of contractual and other fiduciary duties owed by David A. Levine to Geostellar, Inc. and defrauded Geostellar, Inc., and were in furtherance of a conspiracy between David A. Levine and others, including but not limited to Indeco, LLC, now known as Indeco Union.

54.     In November of 2017, David A. Levine traveled to Los Angeles at the expense of Geostellar, Inc., for the ostensible purpose of addressing a conference as the representative of Geostellar, Inc. The purpose of the travel was for David A. Levine to promote the cryptocurrency of Geostellar, Inc., known as Zydeco.

55.     Instead, on November 18, 2017, David A. Levine appeared at the conference and promoted the cryptocurrency known as Indecoin on behalf of Applied Philosophy Lab, G.P.C.

56.     These actions caused a breach of the Loan and Security Agreement in existence with Matador Solar Partners, LLC and exposed Geostellar, Inc., to claims of breach of contract by Matador Solar Partners, Inc.

57.     Said actions were a breach of the contractual and other fiduciary duties owed by David A. Levine to Geostellar, Inc. and defrauded Geostellar, Inc., and were in furtherance of a a civil conspiracy with others, including but not limited to Applied Philosophy Lab, G.P.C., now known as Indeco Union.

58.     Applied Philosophy Lab, P.B.C., was intended to develop "smart contracts, digital tokens, or other digital representations of assets on a distributed blockchain ledger, to finance, track and compensate for the shared ownership of assets, such as solar energy systems, energy storage, smart dwelling sensors and controls, appliances, carpeting real estate, water, soft

11

commodities, vehicles, smart city infrastructure, and other goods and services as well as compensate the suppliers of the assets and collect revenue from those who purchase the assets or subscribe to the goods and services, as well as compensate the suppliers of the asset." Further, Applied Philosophy Lab, P.B.C., was to be responsible for management of Indeco, LLC and to acquire customers, develop distribution channels, contract with suppliers, develop the Blockchain, and otherwise manage Indeco, LLC. Functionally, Applied Philosophy Lab, P.B.C. was created to be a competitor to Geostellar, Inc.

59.     Applied Philosophy Lab, P.B.C., and Indeco, LLC recognized that David A. Levine had a conflict of interest with Geostellar, Inc., through his holdings and representation on the Board of Directors of Geostellar, Inc. Nonetheless, said entities continued to conspire with David A. Levine to defraud Geostellar, Inc.

60.     A website for Geostellar, Inc., was revised to transfer web traffic to a website for Indeco, LLC without the approval of the Board of Directors of Geostellar, Inc., and in violation of the contractual and fiduciary duties of David A. Levine to Geostellar, Inc.

61.     In direct infringement of that contract of employment, David A. Levine breached his fiduciary duty by deceitfully creating a separate entity, which he owned and controlled so that he could take Geostellar's employees, technology, corporate opportunity developed solely for Geostellar, leave creditors and shareholders behind, to pursue crypto on his own, ... ultimately resulting in the demise of Geostellar and a cessation of business thereby damaging Geostellar and its creditors.

WHEREFORE, the Bankruptcy Estate of Geostellar, Inc., demands judgment, jointly and severally against, David A. Levine, and Indeco Union, for its damages including attorney's fees.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE TO A JURY.**

Respectfully submitted,

MARTIN P. SHEEHAN, Trustee of the
Bankruptcy Estate of Geostellar, Inc.,


By: /s/ Patrick S. Cassidy_____
          Of Counsel

Patrick S. Cassidy, Esq. (WV State Bar No. 671)
Timothy F. Cogan, Esq. (WV State Bar No. 764)
CASSIDY, COGAN,
SHAPELL & VOEGELIN, L. C.
The First State Capitol
1413 Eoff Street
Wheeling, WV  26003
Telephone:  (304) 232-8100
Facsimile:  (304) 232-8200
pcassidy@walslaw.com
tfc@walslaw.com

# EXHIBIT A

GEOSTELLAR, INC.

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("*Agreement*") is entered into as of July 28, 2016, by and between DAVID A. LEVINE ("*Executive*") and GEOSTELLAR, INC., a Delaware corporation (the "*Company*").

RECITALS

A.   The Company and Executive are parties to that certain Key Employee Agreement dated as of March 8, 2010 (the "*Prior Agreement*"), which has been terminated effective January 15, 2014.

B.   The Company and Executive desire to amend and restate the Prior Agreement in its entirety as set forth below.

AGREEMENT

Accordingly, in consideration of the mutual promises and covenants contained herein, the parties hereto, intending to be legally bound, agree to the following:

1.   **EMPLOYMENT BY THE COMPANY.**

1.1   **Effective Date.** The effective date of this Agreement shall be the date this Agreement is entered as set forth above (the "*Effective Date*").

1.2   **Position.** Subject to the terms set forth herein, the Company agrees to employ Executive in the position of President and Chief Executive Officer, and Executive hereby accepts such employment under the terms of this Agreement effective as of the Effective Date.

1.3   **Duties.** Executive shall serve in an executive capacity and shall perform such duties as are customarily associated with each of Executive's positions and any other functions reasonably assigned to the Executive from time to time. Executive will report to the Company's Board of Directors (the "*Board*"). Executive shall diligently, conscientiously and exclusively devote Executive's full time and attention and Executive's best efforts to discharge the duties assigned to the Executive by the Company.

1.4   **Other Employment Policies.** The employment relationship between the parties shall also be governed by the general employment policies and practices of the Company, including those relating to protection of confidential information and assignment of inventions, except that when the terms of this Agreement differ from or are in conflict with the Company's general employment policies or practices, this Agreement shall control. As an employee of the Company, Executive agrees to comply with the Company policies, procedures and standards of conduct that may be established by the Company from time to time.

1

2.      COMPENSATION.

2.1      Salary.   As of August 1, 2016, Executive shall receive for Executive's services to be rendered hereunder an annualized base salary of $160,000 (such salary, as may be adjusted pursuant to the immediately following sentences, the "*Base Salary*"), subject to standard federal and state withholding requirements, payable in accordance with Company's standard payroll practices.  At such a time as the Company has raised $1,500,000 in Series BB preferred stock (not including convertible debt), Executive shall receive for Executive's services to be rendered hereunder an annualized base salary of $195,000. The Board or the Compensation Committee of the Board (the "*Compensation Committee*") shall review and may make any adjustments to the Base Salary on at least an annual basis, subject to the covenants contained in that certain Amended and Restated Investors' Rights Agreement dated as of the Effective Date, as amended from time to time.  For the sake of clarity, nothing in this Section 2 alters Executive's at-will employment with the Company or obligates the Company to employ the Executive for any period of time.  Executive's position with the Company is an exempt position, which means Executive will be paid a salary and will be expected to work additional hours as required by the nature of your duties and responsibilities and you will not be eligible for overtime pay.

2.2      Performance Incentive-Based Bonus.   Commencing with the year following the first year in which the Company achieves Free Cash Flow of at least $10,000 per month for three consecutive months, Executive shall be eligible for an annual incentive bonus award (an "*Annual Bonus*") in respect of each fiscal year during his term of employment (each such year shall be referred to as the "*Bonus Year*").  Whether or not Executive earns any bonus will be dependent upon (a) the Company's achievement of a higher annual Free Cash Flow in the applicable Bonus Year over that of the immediately preceding year, and (b) Executive's continuous performance of services to the Company through the end of the applicable Bonus Year for which performance is being measured.  The amount of the Annual Bonus shall be equal to the product of (a) the applicable Bonus Year's percentage increase in the Company's annual Free Cash Flow from the Company's annual Free Cash Flow in the immediately preceding year, multiplied by (b) the Base Salary.  Any Annual Bonus payable to Executive shall be paid to Executive at the same time as annual bonuses are generally payable to other senior executives of the Company, but in any event not later than the date which is two and one-half (2 ½) months following the end of the calendar year in which such Annual Bonus is earned.  For example, if the Board or Compensation Committee, as applicable, determines on March 1, 2017 that Executive has earned a bonus related to fiscal year 2016, that bonus must be paid at the same time as annual bonuses are generally payable to other senior executives of the Company, but in any event not later than March 15, 2017.  Any bonus paid to Executive shall be subject to standard federal and state withholding requirements.

2.3      Retention Bonus.   Executive shall be eligible to earn the following retention bonus awards (collectively, the "*Retention Bonus*"): (a) a Retention Bonus in the amount of 20% of Executive's then current Base Salary if Executive remains in the continuous service of the Company through the two-year anniversary of the Effective Date; (b) a Retention Bonus in the amount of 30% of Executive's then current Base Salary if Executive remains in the

2

continuous service of the Company through the three-year anniversary of the Effective Date; (c) a Retention Bonus in the amount of 40% of Executive's then current Base Salary if Executive remains in the continuous service of the Company through the fourth-year anniversary of the Effective Date; and (d) a Retention Bonus in the amount of 50% of Executive's then current Base Salary if Executive remains in the continuous service of the Company through the five-year anniversary of the Effective Date. The Retention Bonus will be paid in the first full payroll cycle after the applicable anniversary date, but in all cases not later than the date which is two and one-half (2 ½) months following such year's anniversary of the Effective Date.

      **2.4**   **Equity Financing Award.** Excluding the proceeds from the Series BB Preferred Share transaction closing in or about July 28, 2016, after the Effective Date, upon the closing of each equity financing in which the Company issues shares of its Preferred Stock (as defined in the Company's Certificate of Incorporation, as amended from time to time (the "*Charter*")) for total proceeds to the Company of not less than $1,000,000 at a price per share of at least 200% of the Series BB Original Issue Price (as defined in the Charter and such financing, a "*Qualified Financing*"), Executive shall be eligible to receive a Stock Award (as defined in the Company's 2011 Equity Incentive Plan, as amended from time to time) of that number of shares equal to the product of (i) 50,000 times (ii) the quotient of the price per share paid by the investors purchasing the equity securities in that Qualified Financing divided by the price per share paid by the investors who purchased equity securities in the Qualified Financing immediately prior to such Qualified Financing, rounded down to the nearest integer, with a maximum total number of shares equal to 1,000,000.

      **2.5**   **Standard Company Benefits; Accrued Vacation.** During the term of his employment, Executive shall be entitled to participate in the standard benefits plans under the terms and conditions of such plans as may be in effect from time to time and provided by the Company to similarly situated employees. The Company may adopt, change or delete plans, policies and provisions in its sole discretion. Executive will be entitled to vacation benefits per the Company's standard vacation policy.

      **2.6**   **Life Insurance.** For so long as the Company maintains a "key man" insurance policy on Executive, at Executive's election, the Company shall at its expense maintain a term life insurance policy with equivalent benefits to the "key man" insurance policy payable to a beneficiary selected by Executive, up to a maximum total expenditure of $5,000 per year by the Company. Executive may increase, supplement or augment the level of coverage beyond such maximum.

      **2.7**   **Long-Term Disability Insurance.** The Company shall reimburse Executive an amount equal to the long-term disability insurance premiums paid by Executive up to a maximum of 2% of Executive's Base Salary. The Company's obligation to reimburse such insurance premiums will expire at such time that the Company provides long-term disability insurance benefits to Executive under a Company benefit plan.

    **2.8**   **Expense Reimbursement**. The Company will reimburse Executive for reasonable business expenses in accordance with the Company's standard expense reimbursement policy.

    **2.9**   **Withholding**. All payments required to be made by the Company to the Executive pursuant to this Agreement shall be subject to the withholding of such amounts, if any, relating to tax and other payroll deductions as the Company may reasonably determine should be withheld pursuant to any applicable law or regulation, including under Section 409A of the Internal Revenue Code (the "*Code*") and applicable guidance.

    **3.**   **EMPLOYEE PROPRIETARY INFORMATION, INVENTIONS, NON-SOLICITATION AND NON-COMPETITION AGREEMENT.** The obligations of the Company under this Agreement, including its obligation to pay the compensation provided for in this Agreement, to the extent permitted by applicable law, are contingent upon the Executive's performance of Executive's obligations under the Amended and Restated Employee Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement in the form attached hereto as **EXHIBIT A** (the "*Assignment of Inventions Agreement*"). The Assignment of Inventions Agreement contains provisions that are intended by the parties to survive and do survive termination or expiration of this Agreement.

    **4.**   **OUTSIDE ACTIVITIES.**

    **4.1**   **Conflicting Interests.** While employed by the Company, without the written approval of the Chairman of the Compensation Committee of the Board (a) Executive agrees not to participate in, directly or indirectly, any position (whether as an employee, consultant, director, advisor or otherwise) in any other business activity, whether or not such activity is pursued for gain, profit or other pecuniary advantage, or (b) make or acquire any investment or interest in a business adverse or antagonistic to the Company, its business or prospects, financial or otherwise; provided, however, that anything above to the contrary notwithstanding, (i) Executive may own, as a passive investor, securities of any public competitor corporation, so long as Executive's direct holdings in any one such corporation shall not in the aggregate constitute more than 1% of the voting stock of such corporation, and (b) Executive may engage in civic and not for profit activities so long as such activities do not materially interfere with the performance of his or her duties hereunder.

    **5.**   **FORMER EMPLOYMENT.**

    **5.1**   **No Conflict With Existing Obligations.** Executive represents that Executive's performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement or obligation of any kind made prior to Executive's employment by the Company, including agreements or obligations Executive may have with prior employers or entities for which Executive has provided services. Executive has not entered into, and agrees Executive will not enter into, any agreement or obligation either written or oral in conflict herewith.

4

5.2    **No Disclosure of Confidential Information.**    Executive will not intentionally disclose to the Company or use on behalf of the Company any confidential information belonging to any of Executive's former employers (except in accordance with agreements between the Company and any such former employer); but during Executive's employment by the Company Executive will use in the performance of Executive's duties all information which is generally known and used by persons with training and experience comparable to Executive's own and all information which is common knowledge in the industry or otherwise legally in the public domain.

6.    TERMINATION OF EMPLOYMENT. Subject to the terms and requirements below, the parties acknowledge that Executive's employment with the Company is at-will.    Either Executive or the Company may terminate the employment relationship at any time, for any reason, with or without Cause (as defined below).  The provisions of *Sections 6.1* through *6.5* govern the amount of compensation, if any, to be provided to Executive upon termination of employment.

6.1    Termination by the Company Without Cause.

(a)    If and only if sixty percent (60%) or more of the Directors on the Company's Board of Directors vote to authorize Executive's termination without Cause, the Company shall have the right to terminate Executive's employment with the Company without Cause by giving notice as described in *Section 6.6* of this Agreement.

(b)    In the event Executive's employment is terminated without Cause, the Company shall, subject to Section 6.1(d), provide to Executive the following "*Severance Benefits*" (i) continue to pay Executive as severance Executive's then-effective Base Salary for a period of time (the "*Severance Period*") equal to the Severance Length (as defined below) beginning on the date the Release (as defined below) becomes effective and may no longer be revoked by the Executive, less applicable withholding and deductions, on the Company's regular payroll dates and (ii) if Executive is participating in the Company's group health insurance plans on the effective date of termination, and Executive timely elects and remains eligible for continued coverage under COBRA, or, if applicable, state insurance laws, the Company shall pay, up to a maximum aggregate amount of $5,000.00, that portion of Executive's insurance premiums that the Company was paying prior to the effective date of termination for the Severance Period or for the continuation period for which Executive is eligible, whichever is shorter (the "*COBRA Payment Period*"). Notwithstanding the foregoing, if the Company determines, in its sole discretion, that the payment of the COBRA premiums would result in a violation of the nondiscrimination rules of Section 105(h)(2) of the Code or any statute or regulation of similar effect (including but not limited to the 2010 Patient Protection and Affordable Care Act, as amended by the 2010 Health Care and Education Reconciliation Act), then in lieu of providing the COBRA premiums, the Company, in its sole discretion, may elect to instead pay Executive on the first day of each month of the COBRA Payment Period, for the remainder of the COBRA Payment Period, a fully taxable cash payment equal to the COBRA premiums for that month, subject to applicable tax withholdings (such amount, the "Special Severance Payment").   Executive may, but is not obligated to, use such Special Severance

5

Payment toward the cost of COBRA premiums. The Company's insurance premium payment obligation will end immediately if the Executive obtains health care insurance from any other source during the Severance Period.

(c) The "*Severance Length*" means eighteen (18) months.

(d) Notwithstanding anything herein to the contrary, Executive shall not receive the severance payments set forth in Section 6.1(b) above or Section 6.5 below, as applicable, unless and until Executive executes a general release in substantially the form attached to this Agreement as EXHIBIT B, as updated to reflect changes in the law (the "*Release*"), on or before the forty-five (45) day period following his termination of employment and allows the Release to become effective on the eighth day after Executive signs the Release. If the period during which the Executive has discretion to execute or revoke the Release straddles two taxable years of the Executive, then the Company in its sole discretion shall make the severance payments starting in the second of such taxable years, regardless of which taxable year the Executive actually delivers the executed general release of claims to the Company. In addition, notwithstanding anything herein to the contrary, Executive shall forfeit his right to receive the severance payments set forth in Section 6.1(b) above and Section 6.5 below, if Executive fails to (i) return to the Company of all Company property, (ii) comply with the provisions of the Release, including without limitation any non-disparagement and confidentiality provisions contained therein, or (iii) comply with the terms of this Agreement, including, without limitation, the Assignment of Inventions Agreement.

### 6.2 Termination by the Company for Cause.

(a) The Company shall have the right to terminate Executive's employment with the Company at any time for Cause by giving notice as described in *Section 6.6* of this Agreement.

(b) "*Cause*" for termination shall mean sixty percent (60%) or more of the Directors on the Company's Board of Directors vote that reasonable cause exists to justify termination for Cause based on one or more of the following factors (as specifically identified prior to the Board vote): (i) conviction of, or plea of *nolo contendere* to, any felony or of any other crime involving dishonesty, moral turpitude or illegal drugs; (ii) Executive's breach of any material provision of this Agreement or of Executive's Assignment of Inventions Agreement; (iii) any act constituting dishonesty, fraud, immoral or disreputable conduct which is materially harmful to the Company or its reputation; (iv) any act of misconduct which is materially injurious to the Company; (v) refusal to follow or implement a clear and reasonable directive of the Board; (vi) gross negligence in the performance of Executive's duties; or (vii) breach of fiduciary duty. Prior to any termination for Cause pursuant to each such event listed in (v) or (vi) above, to the extent such event(s) is capable of being cured by Executive as determined in good faith by the Company, (A) the Company shall give the Executive notice of such event(s), which notice shall specify in reasonable detail the circumstances constituting Cause, and (B) there shall be no Cause with respect to any such event(s) if a majority of the Board determines in

6

good faith that such events have been cured by Executive within thirty (30) days after the delivery of such notice.

(c)     In the event Executive's employment is terminated at any time with Cause, Executive will not receive severance pay or any other such compensation, except that, pursuant to Company's standard payroll policies, the Company shall pay to Executive through the date of termination, together with all compensation and benefits payable to Executive based on his participation in any compensation or benefit plan, program or arrangement the accrued but unpaid salary of Executive through the date of termination.

### 6.3     Voluntary Termination by Executive without Good Reason.

Executive may voluntarily terminate Executive's employment with the Company without Good Reason (as defined below) at any time by giving notice as described in Section 6.6.  In the event Executive voluntarily terminates Executive's employment without Good Reason, Executive will not receive severance pay or any other such compensation, except that, pursuant to Company's standard payroll policies, the Company shall pay to Executive through the date of termination, together with all compensation and benefits payable to Executive based on his participation in any compensation or benefit plan, program or arrangement the accrued but unpaid salary of Executive through the date of termination.

### 6.4     Termination by the Company for Inability to Regularly Perform Duties or Due to Discontinuance of the Business.

(a)     Company may terminate Executive's employment in the event (i) of Executive's death, (ii) of any illness, disability or other incapacity of Executive in such a manner that Executive is physically rendered unable regularly to perform Executive's duties hereunder for a period in excess of one hundred twenty (120) consecutive days or more than one hundred eighty (180) days in any consecutive twelve (12) month period ("*Disability*"), unless otherwise prohibited by any applicable federal, state, or local law or ordinance, or (iii) the Company's business is discontinued because rendered impracticable by substantial financial losses, lack of funding, legal decisions, administrative rulings, declaration of war, dissolution, national or local economic depression or crisis or any reasons beyond the control of the Company (the "*Discontinuance of the Business*").

(b)     In the event of Executive's death or Disability or the Discontinuance of the Business, Executive will not receive severance pay or any other such compensation, except that, pursuant to Company's standard payroll policies, the Company shall pay to Executive the accrued but unpaid salary of Executive through the date of termination, together with all compensation and benefits payable to Executive based on his participation in any compensation or benefit plan, program or arrangement through the date of termination.

(c)     The determination regarding whether Executive is physically unable regularly to perform Executive's duties under (a) above shall be made by the Board based on written certification by a licensed physician.  Executive's inability to be physically present on

7

the Company's premises shall not constitute a presumption that Executive is unable to perform such duties.

      6.5    **Resignation by the Executive for Good Reason**. The Executive may resign Executive's employment for Good Reason within thirty (30) days after the occurrence of one of the events specified in Section 6.5(a) below, by giving notice as described in *Section 6.6* of this Agreement.

      (a)    "*Good Reason*" is limited to the following, without Executive's prior written consent: (i) forced relocation of the Executive by the Company to a location that is outside of a one hundred (100) mile radius of the Washington, D.C.-metropolitan area that increases the one-way driving commute of Executive by more than fifty miles; (ii) willful failure by the Company to provide the Executive the Base Salary in accordance with the terms of this Agreement, except for any reduction which is part of a general reduction or other concessionary arrangement affecting a majority of employees or affecting a majority of senior executive officers, (iii) material diminution in the Executive's job title, reporting structure or material duties prior to a Corporate Transaction; provided, that there will be no "Good Reason" if Executive remains the Chief Executive Officer of the Company, or (iv) material diminution of Executive's material duties on or after a Corporate Transaction unless Executive is performing duties and responsibilities for the Company or its successor that are similar to those Executive was performing for the Company immediately prior to such transaction (for example, if the Company becomes a division or unit of a larger entity and Executive is performing duties for such division or unit that are similar to those Executive was performing prior to such transaction but under a different title as Executive had prior to such transaction, there will be no "Good Reason" for Executive to terminate Executive's employment pursuant to this clause (iv)). However, prior to any termination for Good Reason pursuant to clauses (i), (ii), (iii) or (iv) of this Section 6.5(a), (A) the Executive shall first provide the Board with reasonable written notice, setting forth in reasonable detail the circumstances that the Executive believes exist that give rise to Good Reason for resignation within 90 days after the first occurrence of such circumstance, and (B) there shall be no Good Reason for resignation with respect to any such circumstances cured by the Company within thirty (30) days after the delivery of such notice, and if such circumstance is not reasonably cured within such period, the Executive's resignation from all positions the Executive then holds with the Company is effective not later than 30 days after the expiration of the cure period. Notwithstanding the foregoing, any actions taken by the Company to accommodate a disability of the Executive or pursuant to the Family and Medical Leave Act shall not be a Good Reason for purposes of this Agreement.

      (b)    In the event of Executive's resignation with Good Reason, the Executive shall be entitled to receive the same severance payments as Executive would receive under Section 6.1(b) above had Executive been terminated by the Company without Cause, subject to the provisions of Section 6.1(d) above.

      (c)    If the Executive terminates employment for any reason other than those listed in items (i), (ii), (iii) and (iv) of Section 6.5(a), the termination will not be for Good Reason and the Executive will not be entitled to severance pay or other benefits, except that,

8

pursuant to Company's standard payroll policies, Company shall pay to Executive the accrued but unpaid salary of Executive through the date of termination, together with all compensation and benefits payable to Executive based on his participation in any compensation or benefit plan, program or arrangement through the date of termination.

(d)     "*Corporate Transaction*" means (i) any consolidation, stock exchange or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, stock exchange, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, stock exchange, merger or reorganization continue to hold at least a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, stock exchange, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of fifty percent (50%) of the Company's voting power is transferred; or (iii) a sale of all or substantially all of the assets of the Company; provided, that a Corporate Transaction shall not include (x) any consolidation or merger effected exclusively to change the domicile of the Company, or (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof.

6.6     **Notice; Effective Date of Termination.**

(a)     Termination of Executive's employment pursuant to this Agreement shall be effective on the earliest of:

(i)     immediately after the Company gives written notice to Executive of Executive's termination without Cause, unless the Company specifies a later date, in which case, termination shall be effective as of such later date;

(ii)    immediately after the Company gives written notice to Executive of Executive's termination for Cause, *provided, that* the Company has complied with the procedures set forth in the last sentence of Section 6.2(b) above, as applicable;

(iii)   immediately upon the Executive's death or the Discontinuance of the Business;

(iv)    immediately after the Company gives written notice to Executive of Executive's termination on account of Executive's Disability, unless the Company specifies a later date, in which case, termination shall be effective as of such later date, *provided*, that Executive has not returned to the full time performance of Executive's duties prior to such date;

(v)     immediately after the Executive gives written notice to the Company of Executive's resignation without Good Reason; or

9

**(vi)**     immediately following the date that Executive gives written notice to the Company of Executive's resignation for Good Reason; *provided*, that Executive has complied with the procedures set forth in the second to last sentence of Section 6.5(a) above, as applicable, and the reasons establishing Good Reason have not been cured by the Company during the thirty (30) day period as provided in Section 6.5(a) above.

**(b)**     Executive will receive compensation through any required notice period in the event of termination for any reason. However, subject to any right of Executive to cure during any cure period, the Company reserves the right to require that the Executive not perform any services or report to work during any required notice period.

## 7.    GENERAL PROVISIONS.

**7.1    Notices.**  Any notices provided hereunder must be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by electronic mail, telex or confirmed facsimile if sent during normal business hours of the recipient, and if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery.  All communications shall be sent to the Company at its primary office location and to Executive at Executive's address as listed on the Company payroll, or at such other address as the Company or the Executive may designate by ten (10) days advance written notice to the other.

**7.2    Amendment of Agreement.**  This Agreement may not be modified or amended except by an instrument in writing signed by the parties hereto; provided, however, that Executive agrees to execute any and all amendments to this Agreement as may be necessary to ensure compliance with the distribution provisions of Section 409A of the Code or as otherwise needed to ensure that this Agreement complies with Section 409A of the Code and all related rules and regulations as determined in the sole and absolute discretion of the Company.

**7.3    Severability.**  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provisions had never been contained herein.

**7.4    Waiver.**  If either party should waive any breach of any provisions of this Agreement, such party shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

**7.5    Complete Agreement.**  This Agreement and Executive's Assignment of Inventions Agreement constitute the entire agreement between Executive and the Company with regard to the subject matter hereof.  This Agreement is the complete, final, and exclusive embodiment of their agreement with regard to this subject matter and supersedes any prior oral

discussions or written communications and agreements, including the Prior Agreement. This Agreement is entered into without reliance on any promise or representation other than those expressly contained herein, and it cannot be modified or amended except in writing signed by Executive and an authorized officer of the Company. The parties have entered into a separate Assignment of Inventions Agreement and may have entered into other agreement related to equity grants, which governs other aspects of the relationship between the parties, have or may have provisions that survive termination of Executive's employment under this Agreement, may be amended or superseded by the parties without regard to this Agreement and is enforceable according to its terms without regard to the enforcement provision of this Agreement.

   **7.6** **Counterparts.** This Agreement may be executed in separate counterparts, any one of which need not contain signatures of more than one party, but all of which taken together will constitute one and the same Agreement.

   **7.7** **Headings.** The headings of the sections hereof are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof.

   **7.8** **Successors and Assigns.** This Agreement is intended to bind and inure to the benefit of and be enforceable by Executive and the Company, and their respective successors, assigns, heirs, executors and administrators, except that Executive may not assign any of Executive's duties hereunder without the written consent of the Company.

   **7.9** **Survival.** Executive's obligations under the Assignment of Inventions Agreement shall survive termination of Executive's employment with the Company, as provided therein.

   **7.10** **Choice of Law.** All questions concerning the construction, validity and interpretation of this Agreement will be governed by the law of the State of West Virginia. Time is of the essence hereunder.

   **7.11** **Arbitration.** To ensure the rapid and economical resolution of disputes that may arise in connection with the Executive's employment with the Company, the Executive and the Company agree that any and all disputes, claims, or causes of action, in law or equity, arising from or relating to the enforcement, breach, performance, or interpretation of this Agreement, the Executive's employment, or the termination of the Executive's employment, shall be resolved, to the fullest extent permitted by law, by final, binding and confidential arbitration in Martinsburg, West Virginia, conducted by the Judicial Arbitration and Mediation Services, Inc. ("*JAMS*") or its successor, under the then applicable rules of JAMS. The Executive and the Company acknowledge that by agreeing to this arbitration procedure, each party waives the right to resolve any dispute through a trial by jury or judge or administrative proceeding. The Arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (b) issue a written arbitration decision including the arbitrator's essential findings and conclusions and a statement of the award. The arbitrator shall be authorized to award any or all remedies that the Executive or the Company would be entitled to seek in a court of law. Nothing

11

in this Agreement is intended to prevent either the Executive or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. Notwithstanding anything herein to the contrary, the provisions of this Section 7.11 shall not apply to any issue or dispute arising under the Assignment of Inventions Agreement. The parties shall split the costs of the arbitration.

**7.12    Attorneys' Fees.**    In the event that any arbitration, suit or action is instituted to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all reasonable fees, costs and expenses of appeals.

**7.13    Advice of Counsel.**    Executive acknowledges that this Agreement has been prepared on behalf of the Company by Carrington, Coleman, Sloman & Blumenthal, LLP ("CCSB"), counsel to the Company, and that CCSB does not represent, and is not acting on behalf of, Executive. Executive has been provided with an opportunity to consult with Executive's own counsel with respect to this Agreement. This Agreement shall not be construed against any party by reason of the drafting or preparation hereof.

**7.14    Section 409A.**    It is intended that all of the severance benefits and other payments payable under this Agreement satisfy, to the greatest extent possible, the exemptions from the application of Section 409A of the Code and the regulations and other guidance thereunder and any state law of similar effect (collectively, "*Section 409A*") provided under Treasury Regulations Sections 1.409A-1(b)(4), 1.409A-1(b)(5) and 1.409A-1(b)(9), and this Agreement will be construed in a manner that complies with Section 409A. The provisions of this Agreement shall be interpreted and construed in favor of satisfying any applicable requirements of Section 409A. However, the Company does not guarantee any particular tax effect for income provided to Executive pursuant to this Agreement. Notwithstanding anything in this Agreement to the contrary, to the extent that any severance payments or benefits paid or provided to Executive, if any, under this Agreement are considered deferred compensation subject to Section 409A (such payments, the "*Deferred Payments*"), then to the extent required by Section 409A, no Deferred Payments will be payable unless Executive's termination of employment also constitutes a "separation from service," as defined in Treasury Regulations Section 1.409A-1(h) (without regard to any alternative definition thereunder) (a "*Separation from Service*"). Similarly, no Deferred Payments payable to Executive, if any, under this Agreement that otherwise would be exempt from Section 409A pursuant to Treasury Regulations Section 1.409A-1(b)(9) will be payable until Executive has a Separation from Service. For clarity, if Executive terminates employment with the Company in a manner entitling Executive to severance payments and benefits under Section 6.1(b), but does not incur a separation from service within the meaning of Section 409A, then any severance payments or benefits that are Deferred Payments and that are not immediately payable under this Section 7.14 will instead be paid to Executive when Executive incurs a Separation from Service, notwithstanding that Executive may no longer be employed under this Agreement. For purposes of Section 409A (including, without limitation, for purposes of Treasury Regulations Section 1.409A-2(b)(2)(iii)),

12

Executive's right to receive any installment payments under this Agreement (whether severance payments, reimbursements or otherwise) shall be treated as a right to receive a series of separate payments and, accordingly, each installment payment hereunder shall at all times be considered a separate and distinct payment.  Anything in this Agreement to the contrary notwithstanding, if, at the time of Executive's Separation from Service, the Company determines that Executive is a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code and that delayed commencement of any portion of the Deferred Payments is required to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code (any such delayed commencement, a "*Payment Delay*"), such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (i) six months and one day after the Executive's separation from service, (ii) the Executive's death, or (iii) such earlier date as is permitted under Section 409A.  If any such delayed cash payment is otherwise payable on an installment basis, the first payment shall include a catch-up payment covering amounts that would otherwise have been paid during the six-month period but for the application of this provision, and the balance of the installments shall be payable in accordance with their original schedule.  All in-kind benefits provided and expenses eligible for reimbursement under this Agreement shall be provided by the Company or incurred by the Executive during the time periods set forth in this Agreement.  All reimbursements shall be paid as soon as administratively practicable, but in no event shall any reimbursement be paid after the last day of the taxable year following the taxable year in which the expense was incurred.  The amount of in-kind benefits provided or reimbursable expenses incurred in one taxable year shall not affect the in-kind benefits to be provided or the expenses eligible for reimbursement in any other taxable year.  Such right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.  For purposes of Section 409A, the right to a series of installment payments under this Agreement shall be treated as a right to a series of separate payments.

[SIGNATURE PAGE FOLLOWS]

13

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Employment Agreement on the day and year first written above.

GEOSTELLAR, INC.

By: _____
     Tracy McKibben
     Chairman of the Board

DAVID A. LEVINE

14

# EXHIBIT B

# EXHIBIT A

## GEOSTELLAR, INC.

## EMPLOYEE PROPRIETARY INFORMATION,
## INVENTIONS, NON-SOLICITATION AND NON-COMPETITION AGREEMENT

I am executing an Amended and Restated Employment Agreement ("*Employment Agreement*") with GEOSTELLAR, INC. (the "*Company*" or "*Geostellar*") contemporaneously with the execution and delivery of this Employee Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement ("*Agreement*"), which is attached as Exhibit A to my new Employment Agreement. Pursuant to the Employment Agreement, I will continue to serve as an executive of the Company and will receive a material increase in my base salary and become eligible for certain incentive bonuses, retention bonuses, equity awards, and benefits to which I am not already entitled. In consideration of my continued employment by the Company and the changes in the terms and conditions of my continued employment with the Company pursuant to my new Employment Agreement, I hereby agree as follows:

**1.** NONDISCLOSURE.

**1.1** Recognition of Company's Rights; Nondisclosure. At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at Company and/or incorporates any Proprietary Information. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns. I have been informed and acknowledge that the unauthorized taking of the Company's trade secrets may subject me to civil and/or criminal penalties.

**1.2** Proprietary Information. The term "*Proprietary Information*" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company. By way of illustration but not limitation, "*Proprietary Information*" includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (collectively, "*Inventions*"); and (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers; and (c) information regarding the skills and compensation of other employees of the Company. Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information which is generally known in the trade or industry, which is not gained as result of a breach of this Agreement, and my own, skill, knowledge, know-how and experience to whatever extent and in whichever way I wish.

**1.3** Third Party Information. I understand, in addition, that the Company has received and in the future will receive from third parties confidential or proprietary information ("*Third Party Information*") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

**1.4** No Improper Use of Information of Prior Employers and Others. During my employment by the Company I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer, or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person. I will use in the performance of my duties only information which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided, owned or developed by the Company.

**2.** ASSIGNMENT OF INVENTIONS.

**2.1** Proprietary Rights. The term "*Proprietary Rights*" shall mean all trade secret, patent, copyright, mask work and other intellectual property rights or "moral rights" throughout the world. "Moral rights" refers to any rights to claim authorship of an Invention or to object to or prevent the modification of any Invention, or to withdraw from circulation or control the publication or distribution of any Invention, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

**2.2** Prior Inventions. Inventions, if any, patented or unpatented, which I made prior to the commencement of my employment with the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on *Exhibit A* (Previous Inventions) attached hereto a complete list of all Inventions that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively, "*Prior Inventions*"). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in *Exhibit A* but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. A space is provided on *Exhibit A* for such purpose. If no such disclosure is attached, I represent that there are no Prior Inventions. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent.

**2.3** Assignment of Inventions. Subject to Sections 2.4, and 2.6, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment with the Company. Inventions assigned to the Company, or to a third party as directed by the Company pursuant to this Section 2, are referred to as "*Company Inventions*."

**2.4** Unassigned Inventions. I recognize that this Agreement will not be deemed to require assignment of any invention that was developed entirely on my own time without using the Company's equipment, supplies, facilities, or trade secrets and neither related to the Company's actual or anticipated business, research or development, nor resulted from work performed by me for the Company.

**2.5** Obligation to Keep Company Informed. During the period of my employment and for six (6) months after termination of my employment with the Company, I will promptly disclose to the Company fully and in writing all Inventions authored, conceived or reduced to practice by me, either alone or jointly with others. In addition, I will promptly disclose to the Company all patent applications filed by me or on my behalf within a year after termination of employment. The Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to the Company pursuant to this Agreement.

**2.6** Government or Third Party. I also agree to assign all my right, title and interest in and to any particular Company Invention to a third party, including without limitation the United States, as directed by the Company.

**2.7** Works for Hire. I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C. Section 101).

**2.8** Enforcement of Proprietary Rights. I will assist the Company in every proper way to obtain, and from time to time enforce, United States and foreign Proprietary Rights relating to Company Inventions in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in obtaining, perfecting, evidencing, sustaining and enforcing such Proprietary Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee. My obligation to assist the Company with respect to Proprietary Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of my employment, but

1.

the Company shall compensate me at a reasonable rate after my termination for the time actually spent by me at the Company's request on such assistance

In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and in my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company

**3.** RECORDS. I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all Proprietary Information developed by me and all Inventions made by me during the period of my employment with the Company, which records shall be available to and remain the sole property of the Company at all times

**4.** DUTY OF LOYALTY DURING EMPLOYMENT. I understand that my employment with the Company requires my full attention and effort. I agree that during the period of my employment by the Company I will not, without the Company's express written consent, engage in any employment or business activity other than for the Company, including but not limited to employment or business activity which is competitive with, or would otherwise conflict with, my employment by the Company

**5.** NO SOLICITATION OF EMPLOYEES, CONSULTANTS, SUPPLIERS, CONTRACTORS OR CUSTOMERS. I agree that for the period of my employment by the Company and for two (2) years after the date my employment by the Company ends for any reason, including but not limited to voluntary termination by me or involuntary termination by the Company, I will not, either directly or through others, (i) solicit, induce or encourage any employee or consultant of the Company to end his or her relationship with the Company; (ii) offer any employee or consultant of the Company (or anyone who was an employee or consultant of the Company within the six (6) month period prior thereto) employment or engagement elsewhere; (iii) hire any employee or consultant of the Company (or anyone who was an employee or consultant of the Company within the six (6) month period prior thereto) to work elsewhere; or (iv) solicit or contact any supplier, contractor, or customer of the Company, with whom I had contact or whose identity I learned as a result of my employment with the Company, for the purpose or effect of competing or interfering with any part of the Company's Business

The parties agree that for purposes of this Agreement, a customer is any person or entity to which the Company has provided goods or services at any time during the period commencing six (6) months prior to my employment with the Company and ending on the date my employment with the Company ends

**6.** NON-COMPETE PROVISION. I agree that for the period of my employment with the Company, and for the period of eighteen (18) months after the later of (1) the date my employment ends for any reason, including but not limited to voluntary termination by me or involuntary termination by the Company, or (2) the date a court of competent jurisdiction enters an order enforcing this provision in the event the Company enforces this Agreement through a court order, I will not, directly or indirectly, whether as owner, partner, consultant, agent, co-venturer or otherwise, compete with the Company or its affiliates in the Company's business in West Virginia, Virginia, Maryland, the District of Columbia, and any other state, province, or similar political unit in which the Company has employees, consultants, suppliers, contractors, or customers. The parties agree that the geographic scope of this non-competition provision is fair and reasonable in light of the geographically broad scope of the Company's business and the nature of its products and/or services. As a senior member of the Company's management team I acknowledge that I will be involved with, and knowledgeable about, all aspects of the Company's business in all locations

The parties agree that for purposes of this Agreement, "Company's Business" means the business of the Company or its affiliates with respect to any product, service, or process or the research and development of (a) software that uses large scale Geomatics data to compute high resolution, integrated models from multiple data sources, (b) software that serves as a renewable energy value-chain integration platform, marketplace or exchange based on modeling and predicting resource and production values, or (c) any other products, services or processes that has been or is being researched, designed, developed, manufactured, marketed, or sold by the Company during my employment

**7.** NO CONFLICTING AGREEMENT OR OBLIGATION. I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement or obligation of any kind made prior to my employment by the Company, including agreements or obligations I may have with prior employers or entities for which I have provided services. I have not entered into, and I agree I will not enter into, any agreement or obligation either written or oral in conflict herewith.

**8.** RETURN OF COMPANY DOCUMENTS. When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all tangible and electronic copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement

**9.** LEGAL AND EQUITABLE REMEDIES. I recognize that in the course of employment with the Company, I will have access to Proprietary Information, to Third Party Information, and to employees, consultants, suppliers, contractors, and customers of the Company. I also recognize that the services I will be employed to provide are personal and unique. I understand that because of this the Company may sustain irreparable injury if I violate this Agreement. In order to limit or prevent such irreparable injury, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement

**10.** NOTICES. Any notices required or permitted hereunder shall be given in the appropriate party or the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

**11.** NOTIFICATION OF NEW EMPLOYER. In the event that I leave the employ of the Company, I authorize the Company to provide notice of my rights and obligations under this Agreement to my subsequent employer and to any other entity or person to whom I provide services

**12.** GENERAL PROVISIONS.

**12.1** Governing Law; Consent to Personal Jurisdiction. This Agreement will be governed by and construed according to the laws of the State of Delaware. Any action to enforce or construe this Agreement shall be exclusively initiated in any federal or state court of competent jurisdiction in Wilmington, Delaware and the parties consent to the personal jurisdiction of these courts

**12.2** Attorneys' Fees. I agree to indemnify the Company for its reasonable attorneys' fees and costs incurred in enforcing the terms of this Agreement should I violate any of its terms

**12.3** Severability. In case any one or more of the provisions, subsections, or sentences contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Moreover, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear

**12.4** Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns

**12.5** Survival. The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee

**12.6** Waiver. No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement

**12.7** Entire Agreement. The obligations pursuant to Sections 1 and 2 of this Agreement shall apply to any time during which I was previously employed, or am in the future employed, by the Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions or agreements between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement

This Agreement shall be effective as of the first day of my employment with the Company, namely _____ 201__.

Rev.
519015 v5/RE

I HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS.  I HAVE COMPLETELY FILLED OUT EXHIBIT A TO THIS AGREEMENT.

Dated: 7/28/16

_____
(Signature)

_____
(Printed Name)

ACCEPTED AND AGREED TO:

GEOSTELLAR, INC.

By: _____

Title: CEO - Chairman

224 W. King Street
Martinsburg, WV 25401

Dated: July 28, 2016

3.

519015 v5/RE

# EXHIBIT A

## PREVIOUS INVENTIONS

TO:      Geostellar, Inc.

FROM:    _____

DATE:    _____

SUBJECT:  Previous Inventions

1.      Except as listed in Section 2 below, the following is a complete list of all inventions or improvements relevant to the subject matter of my employment by Geostellar, Inc. (the "*Company*") that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

☐    No inventions or improvements.

☐    See below:

_____

_____

_____

☐  Additional sheets attached.

2.      Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

☐  Additional sheets attached.

160295 v5/DC

## Exhibit B

### Form Of Release Agreement

A blank copy of this Release Agreement was attached to the Amended and Restated Employment Agreement as Exhibit A (the "*Employment Agreement*").

I understand that my position with GEOSTELLAR, INC. (the "*Company*") terminated effective _____, _____ (the "*Separation Date*"). The Company and I have agreed that if I choose to sign and return this Release, allow it to be effective, and comply with its terms, then following the Release Date (as defined below) the Company will provide severance benefits to me as follows: [described benefits and payment schedule]

I understand that I am not entitled to such severance benefits unless I sign this Release and otherwise comply with the surviving terms of the Agreement. I understand that, regardless of whether I sign this Release, the Company will pay me all of my accrued Base Salary through the Separation Date and any other benefits to which I am entitled by law.

In consideration for the severance benefits I am receiving under the Agreement, I hereby release, acquit and forever discharge the Company, its parents and subsidiaries, and their officers, directors, agents, servants, employees, attorneys, stockholders, successors, assigns and affiliates, of and from any and all claims, liabilities, demands, causes of action, costs, expenses, attorneys fees, damages, indemnities and obligations of every kind and nature, in law, equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed (collectively, "*Claims*"), arising out of or in any way related to agreements, events, acts or conduct at any time prior to and including the execution date of this Agreement, including but not limited to: all such Claims directly or indirectly arising out of or in any way connected with my employment with the Company or the termination of that employment; Claims related to salary, bonuses, commissions, stock, stock options, or any other ownership interests in the Company, vacation pay, fringe benefits, expense reimbursements, severance pay, or any other form of compensation; Claims pursuant to any federal, state or local law, statute, or cause of action including, but not limited to, the federal Civil Rights Act of 1964, as amended; the federal Americans with Disabilities Act of 1990; the federal Age Discrimination in Employment Act of 1967, as amended (the "*ADEA*"); 42 U.S.C. §1981, as amended, the Equal Pay Act, the Family Medical Leave Act, the Employee Retirement Income Security Act, Section 510; the West Virginia Human Rights Act; tort law; contract law; wrongful discharge; discrimination; harassment; fraud; defamation; emotional distress; breach of the implied covenant of good faith and fair dealing; and any and all other federal, state and local statutes, cases, authorities or laws (including common law) providing a cause of action that can be the subject of a release under applicable law. THIS IS A GENERAL RELEASE.

I expressly acknowledge that this Agreement is intended to include and does include in its effect, without limitation, all claims, including those which, as of the time I execute this Agreement, I do not know or suspect to exist I may have against the Company, and that this Agreement

160295 v5/DC

contemplates the extinguishment of any such claim or claims except as expressly provided herein.

Notwithstanding the foregoing, nothing in the above Release shall cover any of my (i) rights under this Release; (ii) rights under any written agreement executed by the Company after the Separation Date; (iii) rights of indemnification; or my rights under any directors and officers insurance policy with regard to my service with the Company; or (iv) any claims that cannot be waived as a matter of law. The parties agree that this Release does not eliminate my right to file a charge with a government agency or to participate in a government agency investigation. I am waiving, however, my right to any monetary recovery should any governmental agency or entity, such as the EEOC or the DOL, pursue any charge or claims on my behalf.

I further acknowledge that the benefits provided to me pursuant to the Agreement based on my execution of this Release represent full and complete satisfaction of any and all monetary and non-monetary claims I have or might have against the Company, and that, except as expressly provided herein, no other amounts remain due and owing to me.

Within ten (10) days of the effective date of the Separation Date, I agree to return to the Company all Company documents (and all copies thereof) and other Company property then in existence that you have had in your possession at any time, including, but not limited to, Company files, notes, drawings, records, business plans and forecasts, financial information, specifications, computer-recorded information, tangible property (including, but not limited to, computers), credit cards, entry cards, identification badges and keys; and, any materials of any kind that contain or embody any proprietary or confidential information of the Company (and all reproductions thereof). **Receipt of the severance payments and benefits describe above in this Release expressly conditioned upon return of all such Company Property.**

I acknowledge and agree that this Release does not affect or supersede any agreements I have signed with the Company concerning confidentiality and non-disclosure, non-competition, non-solicitation, and assignment of inventions or other intellectual property developments, which agreements will remain in full force and effect.

I agree to keep the Agreement and its contents confidential and I will not disclose the Agreement or its contents to any person, other than my spouse, and my legal or tax advisor, unless compelled by legal process. I will refrain from taking action or making statements, written or oral, that disparage or defame the goodwill or reputation of the Company, its directors, officers, stockholders, agents and employees, as applicable. However, I understand nothing in the Agreement prevents me from providing accurate information to a government agency or participating in an agency investigation.

If I am forty (40) years of age or older as of the Separation Date, I acknowledge that I am knowingly and voluntarily waiving and releasing any rights I may have under the ADEA. I also acknowledge that the consideration given for the waiver in the above paragraph is in addition to anything of value to which I was already entitled. I have been advised by this writing, as required by the ADEA that: (a) my waiver and release do not apply to any claims that may arise

160295 v5/IXC

after my signing of this Release; (b) I should consult with an attorney prior to executing this Release; (c) I have twenty-one (21) days within which to consider this Release (although I may choose to voluntarily execute this Release earlier); (d) I have seven (7) days following the execution of this release to revoke the Release; and (e) this Release will not be effective until the eighth day after this Release has been signed both by me and by the Company (the "*Release Date*").

I and the Company, acting through its executive officers, agree not to disparage the other party, and in addition with respect to the Company, I agree not to disparage the Company's officers, directors, employees, shareholders and agents, in each case in any manner likely to be harmful to them or their business, business reputation or personal reputation; provided that both the Company and I will respond accurately and fully to any question, inquiry or request for information when required by legal process.

This Release does not constitute an admission by the Company of any wrongful action or violation of any federal, state, or local statute, or common law rights, including those relating to the provisions of any law or statute concerning employment actions, or of any other possible or claimed violation of law or rights.

This Release constitutes the complete, final and exclusive embodiment of the entire agreement between you and the Company with regard to this subject matter. It is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties or representations. This Release may not be modified or amended except in a writing signed by both you and a duly authorized officer of the Company. This Release will bind the heirs, personal representatives, successors and assigns of both you and the Company, and inure to the benefit of both you and the Company, their heirs, successors and assigns. If any provision of this Release is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement and the provision in question will be modified by the court so as to be rendered enforceable. This Release will be deemed to have been entered into and will be construed and enforced in accordance with the laws of the State of West Virginia as applied to contracts made and performed entirely within West Virginia.

**I HAVE READ THE FOREGOING OFFER AND I FULLY UNDERSTAND ITS TERMS. I AM SIGNING THIS AGREEMENT FREELY AND VOLUNTARILY, HAVING BEEN GIVEN A FULL AND FAIR OPPORTUNITY TO CONSIDER IT AND CONSULT WITH ADVISORS OF MY CHOICE.**

**AGREED AND ACCEPTED:**

_____        _____

160295 v5/DC

David A. Levine                         Date