# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re: )
) CHAPTER 11
GEOSTELLAR, INC. )
) CASE No. 3:18-bk-00045
Debtor. )
)

## MOTION TO CONVERT OR DISMISS BANKRUPTCY CASE FILED IN BAD FAITH

Secured creditors Matador Solar Partners, LLC ("Matador") and Novus Capital Group, LLC ("Novus") (Novus and Matador are collectively referred to as "Movants"), by and through counsel, Michael L. Scales, Esq., Michael J. Lichtenstein, Esq., and Shulman, Rogers, Gandal, Pordy & Ecker, P.A., move this Court to convert or dismiss Debtor's Chapter 11 bankruptcy case. The basis for the requested relief is set forth in the Memorandum filed in support of this Motion.

WHEREFORE, for the reasons stated in the Memorandum of Points and Authorities filed in connection with this Motion, Movants respectfully request that the Court convert this case to a case under Chapter 7 of the Bankruptcy Code or dismiss this case and award any other relief deemed just and proper.

Respectfully Submitted,

/s/ Michael L. Scales
Michael L. Scales, Esq. (WV Bar No. 3277)
Michael L. Scales, PLLC
314 W. John Street
Martinsburg, WV 25401
Tel: 304-263-0000
Fax: 304-263-0739
mlscales@frontier.com
*Counsel for Movants*

Michael J. Lichtenstein (Federal Bar No. 05604)
12505 Park Potomac Avenue, Sixth Floor
Potomac, Maryland 20854
TEL: (301) 230-5231
FAX: (301) 230-2891
Email: mjl@shulmanrogers.com
*Counsel for Movants - Pro Hac Vice Motion Pending*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of February, 2018, a true copy of the foregoing

**Motion to Dismiss** was mailed, postage prepaid, and/or served by the Court's ECF system along

with its related **Memorandum in Support**, to:

Geostellar, Inc.
224 W. King Street
Martinsburg, WV 25401
*Debtor*

Arch W. Riley, Jr., Esq.
Bernstein-Burkley, P.C.
Hare Building
48 14th Street, Suite 301
P.O. Box 430
Wheeling, WV 26003
*Counsel for Debtor*

Debra A. Wertman, Esq.
U.S. Trustee's Office
300 Virginia Street East
Room 2025
Charleston, WV 25301
*Counsel for U.S. Trustee*

The creditors shown on the attached matrix.

/s/ Michael L. Scales
Michael L. Scales

F: 130376.00002
motion to convert or dismiss.docx

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

In re:                                    )
                                          )      CHAPTER 11
GEOSTELLAR, INC.                          )
                                          )      CASE No. 3:18-bk-00045
            Debtor.                       )
                                          )
_____   )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CONVERT OR DISMISS BANKRUPTCY CASE FILED IN BAD FAITH

Secured creditors Matador Solar Partners, LLC ("Matador") and Novus Capital Group, LLC ("Novus") (Novus and Matador are collectively referred to as "Movants"), by and through counsel, Michael L. Scales, Esq., Michael J. Lichtenstein, Esq., and Shulman, Rogers, Gandal, Pordy & Ecker, P.A., have moved this Court to convert this Chapter 11 bankruptcy case filed by Geostellar, Inc. ("Debtor") to a case under Chapter 7 of the Bankruptcy Code or to dismiss it for the reasons stated herein. Debtor is a non-operating company that has not operated since it transferred its employees and all of its assets to two related entities, Indeco, LLC ("Indeco") and Applied Philosophy Lab, P.B.C. ("APL"), formed for the purpose of trying to evade Debtor's obligations to its creditors. Debtor's former CEO, David Levine ("Mr. Levine"), took proactive steps to conceal and transfer Debtor's property (the "Collateral"), which constitutes the Collateral for Movants' secured loans. Mr. Levine has relinquished his role as the Debtor's CEO and closed the Debtor, but not before he took steps to take Movants' Collateral for himself and his newly formed companies, Indeco and APL, which Movants contend also constitute part of their Collateral.

## I.    STATEMENT OF FACTS

1.    On December 18, 2017, Mr. Levine made statements to the media that Debtor had failed to maintain cash reserves or to keep and maintain the Collateral. Specifically, Mr. Levine

publicly stated that Debtor's board of directors had authorized collaboration with Indeco, that Indeco acquired the Debtor's key personnel, that Debtor was going forward with a new cryptocurrency model and that "Indeco has pioneered a new shared ownership model...." Mr. Levine followed this by stating "[w]e are hopeful that this effort will restore liquidity to our joint endeavor." http://www.mlive.com/news/ann-arbor/index.ssf/2017/12/_cash_crunch_ deals_blow_to_ann.html (the "Article"). A true and correct copy of the Article is attached hereto as Exhibit 1.

2.     The same day, Debtor's website was updated to direct all web traffic to the website for Indeco. Debtor's website stated in extra-large font "New Platform, Same Team" and "As we transition to the blockchain, support for Geostellar customers, installers and partners is being provided by Indeco, the crypto asset for a better human habitat." A true and correct copy of Debtor's website from December 18, 2017 is attached hereto as Exhibit 2.

3.     Following the link on Debtor's website brought Movants to Indeco's website. True and correct copies of Indeco's website on December 18, 2017 are attached hereto as Exhibit 3. Indeco's website showcases a cryptocurrency platform and follows that with a timeline of how Indeco began and where it was going. *See* Exhibit 3, at pp. 1-3. The timeline shows a chain of events indicating intellectual property portions of the Collateral were transferred to Indeco. *See id.* at p. 4. It shows Mr. Levine incorporated APL and its subsidiary Indeco while acting as CEO for the Debtor. *See id.* Then, Debtor prepared for an initial coin offering for itself on the blockchain. *See id.* Next, Debtor's engineers left the Debtor to join Indeco under Mr. Levine while Mr. Levine was serving as CEO for both the Debtor and Indeco. *See id.* Then, Indeco, with Debtor's former employees, the Collateral,

and Mr. Levine acting as CEO for both Indeco and Debtor, prepared for Indeco's initial coin offering on the blockchain. *See id.*

4.    The website continues by introducing Mr. Levine as Indeco's CEO, complete with a video interview of Mr. Levine discussing Indeco. *See id.* at p. 5. The website then introduces other Indeco personnel, including the introduction of Debtor's Vice President of Engineering as Indeco's Vice President of Engineering and Co-Founder. *See id.* at p. 6.

5.    Further investigation revealed that on November 9, 2017, Indeco had issued an Offering Memorandum for an initial coin offering (the "Offering Memo"). A true and correct copy of the cited pages of the Offering Memo are attached hereto as Exhibit 4. In the Offering Memo, Indeco discloses that APL is its parent company. *See* Exhibit 4, at p. 1. The Offering Memo continues to indicate that Mr. Levine is the founder of Indeco, the sole stockholder and founder of APL, and the CEO of the Debtor. *See id*, at p. 2. On this same page, the Offering Memo clearly acknowledges "We may be subject to infringement, misappropriation and indemnity claims in the future..." and that Mr. Levine's various roles constitute a conflict of interest. *See id.* A subsequent Offering Memorandum issued December 5, 2017, confirms that Mr. Levine is also the CEO of Indeco.

6.    On December 19, 2017, Movants issued a cease and desist notice ("Cease and Desist") upon Movants' discovery that the Debtor had transferred the Collateral. A true and correct copy of the Cease and Desist is attached hereto as Exhibit 5.

7.    Debtor and Mr. Levine took steps to evade their creditors knowing that Movants were exercising their rights under their Loan and Security Agreements (the "Security Agreements"). On December 14, 2017, Movants issued a joint notice to Debtor to arrange the Collateral for Movant to inventory and pick-up, as permitted under the terms of their Security

3

Agreements (the "First Demand for Turnover"). *See* Exhibit 6, at p. 9; *see also* Exhibit 7, at p. 21. True and copies of the Security Agreements are attached hereto as Exhibit 6 and Exhibit 7. A true and correct copy of the First Demand for Turnover is attached hereto as Exhibit 8.

8.     On January 5, 2018, Movants issued a second Demand for Immediate Turnover of the Collateral (the "Second Demand to Turnover") after Debtor failed to comply with the First Demand for Turnover. A true and correct copy of the Second Demand to Turnover is attached hereto as Exhibit 9.

9.     Then, on January 12, 2018, Movants issued a Demand to Debtor, Indeco and APL (the "Third Demand for Turnover") to place Indeco and APL on notice that they constituted part of Movants' Collateral and that legal action would be taken for failure to turnover the Collateral. A true and correct copy of the Third Demand for Turnover is attached hereto as Exhibit 10.

10.     Debtor is indebted to Novus by virtue of a Promissory Note in the original principal amount of $500,000.00 dated February 26, 2016 (Exhibit 11), which is secured as a lien against the Collateral by virtue of a UCC-1 Financing Statement recorded with the Delaware Department of State as filing no. 20161242419.

11.     Debtor is indebted to Matador by virtue of Promissory Notes in the original principal amount of $3,000,000.00 dated October 7, 2016 (Exhibit 12) and in the original principal amount of $450,000.00 dated January 30, 2017 (Exhibit 13), which are secured as liens against the Collateral by virtue of a UCC-1 Financing Statement recorded with the Delaware Department of State as filing no. 20166176422. Matador extended an additional $100,000.00 to the Debtor on September 18, 2017. True and correct copies of the Promissory Notes evidencing Debtor's indebtedness to the Movants (the "Notes") are attached hereto as Exhibit 11, Exhibit 12 and Exhibit 13.

## II.   **LEGAL STANDARD**

A Chapter 11 case shall be converted to one under Chapter 7 of the Bankruptcy Code or dismissed if cause exists. *See* 11 U.S.C. § 1112(b)(1). Section 1112(b) of the Bankruptcy Code defines cause to include, *inter alia:* (a) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (b) gross mismanagement of the estate; and an "unexcused failure to satisfy timely any filing or reporting requirement...." *See* 11 U.S.C. § 1112(b)(4). Section 1112(b)(4) is not an exclusive list of all conditions that might constitute cause for dismissal of a Chapter 11 case. A Chapter 11 case may be dismissed if it was filed in bad faith. *See In re Premier Auto. Servs., Inc.* 492 F.3d 274, 279 (4th Cir. 2007); *Carolin Corp. v. Miller,* 886 F.2d 693, 700 (4th Cir. 1989).

> In this circuit, a lack of good faith in filing a Chapter 11 petition requires a showing of "objective futility" and "subjective bad faith." The objective test focuses on whether "there exists the 'realistic possibility of an effective reorganization.' The subjective test asks whether a Chapter 11 petition is motivated by an honest intent to effectuate reorganization or is instead motivated by some improper purpose. Subjective bad faith is shown where a petition is filed "to abuse the reorganization process," or "to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay."

*In re Premier Auto. Servs., Inc.* 492 F.3d 274, 279-280 (internal citations omitted).

## III.   **ARGUMENT**

Debtor has suffered substantial and continuing losses due to the gross mismanagement of the Debtor's estate and the Debtor is not an operating company. Therefore, objective bad faith exists because the Debtor does not have any reasonable likelihood of rehabilitation. This is illustrated by Mr. Levine's public statements, the cessation of Debtor's business activity, the transfer of Debtor's employees and the Collateral to Indeco and APL, and Mr. Levine and

Debtor's efforts to evade creditors. Debtor has also demonstrated subjective bad faith by filing this bankruptcy case solely to hinder or delay the Movants. The Debtor has failed to allow the Secured Creditors to retrieve their Collateral and has obstructed such efforts. For these reasons, the instant case should be converted to a case under Chapter 7 of the Bankruptcy Code or should be dismissed for the reasons stated in Section 1112(b)(4) of the Bankruptcy Code and due to the Debtor filing the instant case in bad faith.

This Court's decisions in *In re 210 West Liberty Holdings, LLC*, 2009 WL 1522047 (Bankr. N.D. W. Va. 2009) ("*In re West Liberty*") and *In re Erchak*, 152 B.R. 68 (Bankr. N.D.W. Va. 1993) provide guidance as to when a bankruptcy case should be dismissed or converted. A true and correct copy of *In re West Liberty* is attached hereto as Exhibit 14. In *In re West Liberty*, the Court recognized that the debtor had been mismanaged due to debtor's failure to make any efforts to recover outstanding accounts receivable, which were owed by an entity established by a managing member of the debtor "...created solely for the purpose of operating the restaurant and paying rent to the Debtor." *See In re West Liberty*, 2009 WL 1522047, at 8. Evidence was also presented to the Court indicating that the debtor would not take steps to recover the obligation owed to the debtor solely because of the friendly relationship between the debtor's members and the members of other entity. *See id.* at 6. Upon taking this into account, the Court converted the case to a case under Chapter 7 of the Bankruptcy Code, noting that there were "...potential claims against insiders to consider." *Id.* at 9.

In *In re Erchak*, the Court focused on the fact that a bankruptcy case can be converted or dismissed if there is a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. *See In re Erchak*, 152 B.R. at 71. The Court observed that the debtor's petition stayed a levy by a creditor against debtor's property, preventing the

creditor from obtaining the benefit of its collateral. *See id.* The Court found that it was clear there was no reasonable likelihood of rehabilitation, making debtor's Chapter 11 case objectively futile under the bad faith analysis. *See id.* at 72. The Court then stated as to debtor's subjective intent that "[t]he Court believes that the debtor intends to delay, for as long as possible, the effect of the levy upon his property.... A creditor whose rights are wrongfully delayed by a bankruptcy filing suffers damages and constitutes an abuse of the bankruptcy system." *Id.* The Court ultimately dismissed the bankruptcy case for not being filed in good faith. *See id.* at 72-73.

The instant case bears resemblance to both *In re West Liberty* and *In re Erchak.* Prior to the bankruptcy, the Debtor's CEO admitted the Debtor did not have sufficient assets to reorganize. *See* Exhibit 1. After learning this, Movants promptly notified the Debtor of their intent to levy against the Collateral. *See* Exhibit 8. Debtor undertook efforts to hinder and delay Movants' efforts while breaching its agreement to keep, maintain, preserve and not dispose of the Collateral. Mr. Levine, Debtor's former CEO, has been transferring the Collateral to entities he has created to syphon off all of Debtor's Collateral of value while doing anything he can to hinder and delay Debtor's creditors from obtaining said Collateral. It is clear that Debtor's subjective intent is to delay creditors and constitutes an abuse of the bankruptcy system. Mr. Levine's actions also evidence gross mismanagement of the Debtor and a substantial or continuing loss to or diminution of the Debtor's estate. Therefore, this bankruptcy case should be converted or dismissed for the reasons stated under 11 U.S.C. § 1112(b)(4) and for Debtor's failure to file this case in good faith.

## IV.     CONCLUSION

Debtor's Chapter 11 Petition was filed in bad faith. The evidence clearly establishes both the objective futility of any possible reorganization and Debtor's subjective bad faith. Reorganization is objectively futile because there is no going concern to preserve the Debtor's estate and no hope of rehabilitation. Debtor acted in subjective bad faith because its real motivation was to abuse the reorganization process and delay creditors by resorting to the Chapter 11 device while transferring the Collateral to Indeco and APL, which Movants contend also constitute part of their Collateral. It is also apparent that the Debtor has been grossly mismanaged and that there has been a substantial or continuing loss to or diminution of the Debtor's estate.

WHEREFORE, for the reasons stated in this Memorandum of Points and Authorities, Movants respectfully request that the Court convert this case to a case under Chapter 7 of the Bankruptcy Code or dismiss this case and award any other relief deemed just and proper.

Respectfully Submitted,

/s/ Michael L. Scales
Michael L. Scales, Esq. (WV Bar No. 3277)
Michael L. Scales, PLLC
314 W. John Street
Martinsburg, WV 25401
Tel: 304-263-0000
Fax: 304-263-0739
mlscales@frontier.com
*Counsel for Movants*

Michael J. Lichtenstein (Federal Bar No. 05604)
12505 Park Potomac Avenue, Sixth Floor
Potomac, Maryland 20854
TEL: (301) 230-5231
FAX: (301) 230-2891
Email: mjl@shulmanrogers.com
*Counsel for Movants - Pro Hac Vice Motion Pending*

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February, 2018, a true copy of the foregoing **Memorandum** was mailed, postage prepaid, and/or served by the Court's ECF system along with its related **Motion**, to:

Geostellar, Inc.
224 W. King Street
Martinsburg, WV 25401
*Debtor*

Arch W. Riley, Jr., Esq.
Bernstein-Burkley, P.C.
Hare Building
48 14th Street, Suite 301
P.O. Box 430
Wheeling, WV 26003
*Counsel for Debtor*

Debra A. Wertman, Esq.
U.S. Trustee's Office
300 Virginia Street East
Room 2025
Charleston, WV 25301
*Counsel for U.S. Trustee*

The creditors shown on the attached matrix.

/s/ Michael L. Scales
Michael L. Scales

F: 130376.00002
motion to convert or dismiss - memo.docx

# EXHIBIT 1

**ANN ARBOR NEWS**

# 'Cash crunch' deals blow to Ann Arbor solar program, residents upset

Updated Dec 23;
Posted Dec 18

328
◥

374
shares

**By Ryan Stanton,** ryanstanton@mlive.com

ANN ARBOR, MI - A city-backed program intended to help Ann Arbor area residents go solar is having financial problems, leaving several residents without panels months after they made payments.

Local residents still waiting for their promised rooftop solar arrays say they're frustrated after shelling out thousands of dollars.

Geostellar, the West Virginia-based private company that launched a solar group-purchase program in Ann Arbor this year in partnership with the city and the

nonprofit Clean Energy Coalition, acknowledged the problem in response to questions from The Ann Arbor News.

"Geostellar has suffered liquidity issues due to aggressive actions of secured creditors. This has negatively impacted our ability to fulfill certain commitments in a timely manner," said David Levine, CEO of Geostellar, an online platform that guides residents through the process of getting solar panels installed on their homes.

The company has had financial problems and openly acknowledged on a crowdfunding webpage this year that it incurred losses totaling several million dollars over the two previous years.

The company is now putting its faith in the launch of a new cryptocurrency token similar to Bitcoin.



**Thinking About Going Solar? Read This First!**

[READ HERE]

HOMESOLARPROGRAMS.COM

"We've developed a cryptocurrency token, Zydeco, planned for release later this year in an Initial Coin Offering ('ICO')," the crowdfunding page states. "Each token will represent a

watt of potential solar capacity. The purchase price of tokens will be applied to the development of solar projects. When the total solar power capacity represented by a campaign is deployed, value will be transferred back to the token."

Geostellar is now working with an entity called Indeco, and the token is being referred to as "the indecoin."

Geostellar partnered with the city of Ann Arbor and the CEC to launch the solar group-purchase program known as the Ann Arbor Solar Club at the beginning of this year.

Open to anyone in Washtenaw County, it was intended to help make going solar simple and affordable, but going through Geostellar -- an out-of-state middleman -- instead of going directly through a local solar installer such as Homeland Solar or SUR Energy in Ann Arbor, has proven to be more of a hassle for some.

For several others, it has worked out and they now have solar panels on their homes.

Levine said there are nine local homeowners who made payments for solar installations that haven't happened yet.



GET STARTED WITH
E*TRADE AND
GET UP TO $600.

OPEN AN ACCOUNT

DON'T GET MAD GET
E*TRADE

The Original Place To Invest Online
E*TRADE Securities LLC

He said Geostellar is still working with Waterford Township-based Oak Electric Service to fulfill commitments in the Ann Arbor area. Residents say they've been waiting months and can't get any assurances when that might happen.

The Geostellar website is no longer functioning and emails to its staff bounce back with auto-reply messages.

"We are very close to resolving this," Levine said of the financial problems, indicating he thinks the solution that's in the works could be important for the whole solar industry.

Scio Township resident Andy Adamson is one of the residents who've been waiting months for solar panels through Geostellar.

He said he joined the program in February, made two payments to Geostellar in April and August, and next to nothing has happened.

He said the permits "took forever" to obtain, the Suniva-brand panels that were promised were said to be unavailable, and he doesn't think Geostellar has been honest about everything.

"I have been promised solar-panel installation on my house since June," Adamson said, adding he's still waiting after paying thousands of dollars and Geostellar appears to be out of business.

Lodi Township resident Julie Wietzke said she and her husband are in a similar situation, still waiting for their promised panels after paying Geostellar thousands of dollars.

Wietzke said she and her husband turned to Geostellar shortly after the program was announced early this year.

Geostellar sent them an initial proposal in February for a 20-panel, 5.6-kilowatt array, with an estimated installation cost of $11,506 after a group-purchase discount and a 30-percent federal rebate, which would come in the form of a

tax credit the following year. Geostellar estimated the panels would provide 77 percent of their energy needs and save them $38,675 in the first 30 years of use. Solar panels can last decades and are typically warrantied for 25 years.

Wietzke said she and her husband agreed to the proposal in February and made an initial down payment equal to one third of the total.

After an onsite review, the proposal was amended in May, changing it to a 19-panel, 5.6-kilowatt array that would meet 74 percent of their energy needs, cost them $11,942 after discounts and tax credits, and save them an estimated $34,581 over the first 30 years.

The installation was to be done by Oak Electric.

Wietzke said months went by before they were told in September the necessary permit approvals were secured and another one-third payment was needed, which they paid. She said they were told the money would be used to buy the solar equipment and the installation would be scheduled soon. But on Oct. 18, they were told by Geostellar the company was having a "cash crunch."



**Residential & Commercial Solar Power Systems**

  Green Solar Technologies        **Get Quote**

"I can only imagine your frustration, and I do apologize for it. As you may have heard, Geostellar is experiencing a cash crunch. We are still in business and working very hard to get your installation completed," Goestellar's Glenn Twyman wrote in an Oct. 18 email, saying there were several possible solutions in the works.

In an Oct. 26 email, Twyman again offered reassurances that Geostellar still planned to meet its obligations eventually.

But by December, emails to Twyman began to bounce back with an auto-response message saying he was not able to assist, directing anyone contacting him to instead contact Levine, the CEO. Wietzke said she and her husband haven't been able to get any response from the company this month.

Representatives for the city of Ann Arbor and the Clean Energy Coalition didn't immediately respond to requests for comment.

Ann Arbor is trying to get residents to go solar to help meet the city's community-wide goals of significantly reducing carbon emissions and moving away from fossil fuels to cleaner, renewable energy.

Mark Clevey, vice chairman of the city's Energy Commission and founder of the Ann Arbor Solar Users Network, said he couldn't comment on the matter because he and other members of the Energy Commission have been directed by the city attorney's office not to discuss or answer questions regarding Ann Arbor's solar program and instead refer all questions to Nate Geisler.



Geisler, the city's energy programs analyst, said the city would be providing a response on the matter on Monday, Dec. 18.

Geostellar's financial problems have been known for months. The company launched an online crowdfunding campaign earlier this year to try to get people to invest in "the dawn of the solar age."

The crowdfunding page shows the company raised $321,838 from 725 different investors as of Oct. 11. The company openly warned investors of potential risks, though.

"We have incurred operating losses since our inception on February 22, 2010," the crowdfunding page states. "We have incurred net losses of $3,581,413 and $5,778,487 for the two fiscal calendar years 2015 and 2016, as we have invested in our patented online (web, mobile and tablet) big-data geomatic technology platform ... focused on lead generation, developed our sales and fulfillment processes, and worked towards cash flow breakeven point.

"We expect to continue to incur net losses from operations as we finance our operations, expand our fulfillment, engineering, administrative, sales and marketing staffs, and implement internal systems and infrastructure to support our growth."

ADVERTISING

Failure to grow at a sufficient rate to support those investments, the crowdfunding page states, could adversely affect the business. The company said its ability to achieve profitability depended on a number of factors, including growing its customer base, finding more investors, maintaining and further lowering capital costs, and reducing the time between first customer contact and interconnection to the power grid. That last factor, it said, would improve customer satisfaction and conversion rates, and reduce "fallout."

It's unclear how many homeowners in the Ann Arbor area successfully had panels installed on their homes through the Geostellar program this year. As of May, it was said that at least six installations had been completed and at least 12 more were in the works.

The Ann Arbor News has asked for an updated count but has not gotten a response yet.

To remedy the situation in which the company finds itself, Levine said Geostellar's board of directors has authorized collaboration with a new entity called Indeco, which he said has hired key Geostellar personnel in management, engineering and customer support.

"Indeco has pioneered a new shared ownership model for solar energy on the blockchain, transforming a watt of solar power into a tradable digital asset," Levine said. "We

are hopeful that this effort will restore liquidity to our joint endeavor and allow us to rapidly meet our commitments to homeowners in Ann Arbor."



Deliciously Simple
**cream cheese.**
TRY IT FOR
**FREE**
save **NOW** with coupon
Arla  LIVE UNPROCESSED

He said Jeremy Zinn of Oak Electric has offered to work with Indeco to complete projects in the Ann Arbor area.

"We're still ironing out the details but making rapid progress and are committed to meeting our commitments," Levine said.

The Indeco "crypto asset token" is explained on another crowdfunding page that shows $53,280 raised from 117 investors:

"At Indeco (which stands for Independent Ecosystem), we're leveraging the power of the blockchain to bring about positive environmental, social and economic change," the page states.

"Our standard unit of measure, the indecoin (INDE, pronounced "indy"), is based on a single watt of solar power capacity! We believe the energy, economic and environmental benefits of solar power are sufficiently quantifiable and universal. As such, solar power should support a stable, reliable, crypto asset in the global economy."

Homeland Solar, a local solar installer in the Ann Arbor area, recently received the Great Lakes Renewable Energy Association's "Business Leadership Award." The company has completed close to 100 solar installations in and around Washtenaw County since 2011 and owner Dave Friedrichs says he hopes to double that number in 2018.

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**

© 2017 MLive Media Group. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of MLive Media Group.

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷ **Ad Choices**

# EXHIBIT 2



# EXHIBIT 3



About   Platform   SEC Compliance   Timeline   Videos   White Paper   Team   Connect   Contact   SIGN

# INTRODUCING INDECOIN: THE FIRST TOKEN TO TRANSFORM A WATT OF POWER INTO A DIGITAL ASSET TRADABLE ON THE BLOCKCHAIN

...o provides shared ownership in the assets that make a smart planet hum. These assets include solar panels to ...ate energy, batteries for energy storage, microgrids for effective energy distribution and systems to manage ...dwellings. By bringing liquid capital in the form of exchangeable tokens to this global market, we can meet th... ...ng challenge of increasing clean energy capacity while building wealth and improving quality of life around the... ...and right here at home.



THE PLATFORM: HOW IT WORKS

JOIN OUR CAMPAIGN



# THE PLATFORM: HOW IT WORKS

**Investors purchase tokens**
al raised in token sales
ted in project
lopment.
n holders share in the
ership of projects
s.

**Sponsors propose projects**
•Any property can earn income hosting solar, storage & sensors.
•Great for schools, churches, farms, stores.

**Contractors deploy and maintain assets**
•Qualified local contractors engineer, procure, construct, operate and maintain project assets.
•Quality control, oversight and monitoring by Indeco.

**Partners sell subscriptions**
•Subscriptions to solar energy, storage and smart sensor and control systems offered by local reps.
•Businesses and individuals earn a new income stream.

**Subscribers purchase energy & services**
•Solar energy, battery storage and control systems available by subscription.
•Save on services with low monthly payments.

**Investors share in benefits**
•As an owner of the deployed project assets, token holders participate in the income stream.
•Dividends are paid directly to the token holder.

**ommunities are due for an upgrade.** Most of us are living in a human habitat that was designed for an indust
omy. Let's participate in, and benefit from, the massive effort required to transition from a wasteful, resource-
sive industrial past to a clean, joyful and p           ll.

**JOIN OUR CAMPAIGN**

 Bett   × +

https://www.ind.eco   ··· ✦ ☆   Search

 CO   About   Platform   SEC Compliance   Timeline   Videos   White Paper   Team   Connect   Contact   **SIGN**

sive industrial past to a clean, joyful and prosperous future for us all.

## SEC COMPLIANCE: WHY IT'S IMPORTANT

mplying with SEC regulations designed to
ct investors, we aim to make crypto assets
portant part of every investment portfolio.

lieve issuing Indecoin as a security will
ive the liquidity, stability, availability and
of our token and increase access to clean,
lable power worldwide.

### Reg CF

Under the SEC's
Regulation Crowdfunding
rules everyone in the US
can participate in our
pre-sale, regardless of
income level or net
worth, with a check,
credit card or debit card.

### Reg D

The Reg D exemption
allows accredited
investors anywhere in
the world to participate
in our pre-sale with
check, credit card, debit
card, paypal, bitcoin or
ether.

### Reg A⁺

We are planning an ICO
under Reg A+ early next
year, subject to
qualification by the SEC,
for issuance to the
general public.

## A CRYPTO ASSET THAT FUELS A CLEANER ECONOMY

JOIN OUR CAMPAIGN

TIMELINE: WHERE ... RE WE'RE GOING

search



About   Platform   SEC Compliance   Timeline   Videos   White Paper   Team   Connect   Contact

**SIGN**

# TIMELINE: WHERE WE'VE BEEN & WHERE WE'RE GOING

      

| ...mber 23 2017 | October 11 2017 | November 7 2017 | November 10 2017 | February 2018 | May 2018 | Novembe... 2018 |
|---|---|---|---|---|---|---|
| ...vine ...ates Applied ...hy Lab (APL) ...ware Public ...orporation ...d to design ...lop SEC- ...t tradable ...ssets. | Geostellar breaks regulation crowdfunding record on Republic with token perk and possibility of ICO. | Former Geostellar engineering team joins Indeco LLC, an APL subsidiary, to build shared ownership platform on the blockchain. First APL Board Meeting. | Indeco co-founders present world's first token presale under SEC's Regulation Crowdfunding rules at StartEngine ICO 2.0 conference. | Planned launch of Indeco distributed marketplace platform on the blockchain for sponsors, contractors, partners and customers of energy assets. | Planned ICO under Reg A+ for tradable power capacity on the blockchain. | First solar genera... energy storage a... smart dwelling controls and sen... commissions, subscription rev... collections and dividend payme... begin. |

# VIDEOS

...tocurrency and Bitcoin Regulation: Indeco CEO o...

**JOIN OUR CAMPAIGN**

# WHITE PAPER

...ur White Paper describes a security token be... ...der the SEC's Regulation Crowdfunding rule... ...y provide our full White Paper in our comple...



① ① 🔒 https://www.ind.eco ··· ♥ ☆ 🔍 *Search*

 **About   Platform   SEC Compliance   Timeline   Videos   White Paper   Team   Connect   Contact** SIGN

## VIDEOS

## WHITE PAPER



**CRYPTOCURRENCY REGULATION**
U.S. SEC cracks down on allegedly fraudulent CO

Because our White Paper describes a security token be
offered under the SEC's Regulation Crowdfunding rule
we can only provide our full White Paper in our comple
offering memorandum, which is available once you ha
registered on our site.

A brief summary of our White Paper is available on ou
blog.

**ed video:** Indeco CEO David Levine is interviewed by
Armstrong on the popular CBC show "On the Money"
the regulation of cryptocurrencies shortly after the SEC
he assets of a Quebec company that had raised $15
in a non-compliant ICO.

ur YouTube channel for more.

**JOIN OUR CAMPAIGN**

search                ∧ 



About   Platform   SEC Compliance   Timeline   Videos   White Paper   Team   Connect   Contact   **SIGN**

# FOUNDERS: EXECUTIVE, ENTREPRENEURIAL AND ENGINEERING EXPERIENCE







## David Levine
### Chief Executive Officer, Co-Founder
*CEO of Geostellar, perpetual entrepreneur, Yale grad.*



## Jason Parikh
### Chief Financial Officer
*CFO of Public and Private Companies, Capital Formation, M&A, System Implementations, SEC Filings & Compliance, CPA*

**JOIN OUR CAMPAIGN**

## Joey Tutela
### VP Engineering, Co-Founder
*Former VP Engineering of Geostellar. Rock hard abs, rock solid code.*





Bett ✕ ╋

ⓘ 🛡 🔒 https://www.ind.eco/#about     ⋯ 🛡 ☆    🔍 Search

About   Platform   SEC Compliance   Timeline   Videos   White Paper   Team   Connect   Contact   **SIGN**

# THE TEAM






**lark Wirt**

Master of
Analytics

*sicist, scientific
ing aficionado and
ig data guru.*



**Abby Fowler**

Art Director

*UX, illustration and
typographic design
master.*

**Beau Randall**

Senior Software
Engineer

*React!*



**Matthew Melmon**

Senior Software
Engineer

*Live to code, code to live.*



**Jennifer Easterly**

Marketing
Manager

*Crypto nerd, support
specialist, all-around
everything for everyone*



# BOARD OF DIRECTORS







**JOIN OUR CAMPAIGN**

search



ⓘ 🔒 https://www.ind.eco/#about    ··· ▽ ☆   🔍 Search

**About   Platform   SEC Compliance   Timeline   Videos   White Paper   Team   Connect   Contact**    **SIGN**

# BOARD OF DIRECTORS











**Russell ruemmer**

Director

*Partner and Chair erHale Financial ons Group, Former eral Counsel, Chief el-Congressional irs for the FBI.*

*e about Russ...*

**Denise Denson**

Director

*Angel Investor & Advisor, Golden Seeds; Former EVP Global Content Distribution, Viacom.*



**Paul Feldman**

Board Chair

*Currently Board Director of Opus One Solutions and EnergySec; Advisor to several energy companies. Previous Chairman, Midcontinent ISO; CEO of Columbia Energy; Utilicorp United; GM of Novell, and VP of AT&T.*



**Jeff Hembrock**

Director

*Investor, Advisor to Bioverse & New Fashion Pork; Former President, Miller Brewing Company.*

**David Heyman**

Director

*Founder, Smart City Works; Former Assistan Secretary for Policy, Department of Homelar Security; Senior Advisor DOE.*



**JOIN OUR CAMPAIGN**

search    🎤 ▢ 🖿 🖳 ● ◉ 🅰 🎨 🖥️



About   Platform   SEC Compliance   Timeline   Videos   White Paper   Team   Connect   Contact     SIGN

# ADVISORY BOARD

   

### an Casto

Advisor

s Chief Financial
er and General
unsel for VOR
ology. Specialist in
and accounting
s of securities law
applies to digital
assets.



### Suleman Khan

Advisor

Structured finance guru
specializing in energy
generation and storage.
Swell, Tesla, NRG Energy
and Citigroup.

### Jason Kay

Advisor

Advisor to the Chief
Creative Officer, Magic
Leap; Venture Partner, AID
Partners; Former Chief
Strategy Officer, THQ;
Executive Consultant,
HBO; Business
Development Executive,
Activision.

### Jeff Lamkin

Advisor

Head of trading in Chicago
for the CMT Asset
Management, manages
high frequency trading
operations, oversees the
development of
cryptocurrency trading
strategies and
infrastructure.

### Chris Sweis

Advisor

Force of nature, investor
business architect with
passion for all things
crypto. Host of Crypto
Dinner Club, founder $K
Influencer Token Networ
ICO Tank, Tokei.




JOIN OUR CAMPAIGN

Case 3:22-cv-00050-GMG   Document 7-2   Filed 04/19/22   Page 37 of 131  PageID #: 910



① ◐ 🔒 https://www.ind.eco/contacts/new   •••  ▽  ☆   🔍 Search

About   Platform   SEC Compliance   Timeline   Videos   White Paper   Team   Connect   Contact   SIG

# tact Us

Name

Name

Name

ment

Contact

Indeco LLC, Applied Philosophy Lab PBC Sole Member. All rights reserved.
reedom Dr, 8th floor, Reston, VA 20190
ons made by Freepik from www.flaticon.com is licensed by CC 3.0 BY

iew

search                ∧  

EXHIBIT 4

|  | The Intermediary Platform may, in its sole discretion, also accept ether or Bitcoin from an Investor. |
| Documentation ............................................ | The purchase and sale of the rights shall be on the terms and conditions set forth in the SAFT, which contains certain representations, warranties and covenants of the Company and the Investors. The form of the SAFT is attached to this memorandum. |
| Company Objective ..................................... | The Company intends to invest in solar energy systems, energy storage, smart dwelling sensors and controls, appliances, carpeting, real estate, water, soft commodities, vehicles, smart city infrastructure or other green assets, as well as contract with suppliers of green assets, goods and services and collect revenue from those who purchase or subscribe to goods and services provided from the asset. |
|  | The Company may, in the Parent Company's sole discretion, hold assets through one or more limited liability companies, limited partnerships or other entities. |
| Parent Company ........................................... | Applied Philosophy Lab, P.B.C., a Delaware public benefit corporation. The Parent Company will be the manager of the Company and may not be removed as a manager by the Investors. |
|  | Upon the closing of this Offering, the Company intends to pay to the Parent Company approximately 80% of the aggregate offering amount as an initial management fee payment to use for the purposes listed in "USE OF PROCEEDS." From and after such payment, the Company intends pay to the Parent Company additional amounts as needed for the purposes listed in "USE OF PROCEEDS." In the future, the Company intends to pay to the Parent Company approximately 30% of the revenue stream paid to the Company on a monthly basis as a management fee. The amount and timing of payments to the Parent Company may be modified at the sole discretion of the Parent Company. |
| Expenses ...................................................... | The Company will bear all costs and expenses incurred in connection with the Company's formation and organization, the offering, marketing and sale of the SAFTs and Tokens and the Company's business, including originating, evaluating, acquiring, owning, hedging, financing, |

9

***We may be subject to infringement, misappropriation and indemnity claims in the future, which may cause us to incur significant expenses, pay substantial damages and be prevented from providing our services or technologies.***

Our success depends, in part, on our ability to carry out our business without infringing the intellectual property rights of third parties. Some third party intellectual property rights may be extremely broad and it may not be possible for us to conduct our operations in such a way so as to avoid infringement of those intellectual property rights. Our proprietary or licensed technologies, processes or methods may be covered by third-party patents or copyrights, either now existing or to be issued in the future. Geostellar has issued and pending patent applications, rights in software code, and other intellectual property in the solar energy industry, including with respect to solar energy marketplaces, and our founder is the Geostellar CEO and some of our software engineers also worked for Geostellar.

Third parties, including Geostellar, may raise claims against us alleging infringement or violation of their intellectual property and any such litigation may cause us to incur significant expenses. Third-party claims, if successfully asserted against us may result in us to paying substantial damages, seeking licenses from third parties, paying ongoing royalties, redesigning our services or technologies, or prevent us from providing services or technologies subject to these claims. Even if we were to prevail, any litigation would likely be costly and time-consuming and divert the attention of our management and key personnel from our business operations.

***Certain conflicts of interest exist between us, our Parent Company and certain of its officers, directors and stockholders.***

The primary conflict of interest that affects the Company is that our Founder and sole stockholder of the Parent Company, David Levine, serves as the CEO of Geostellar, Inc., a company with a patented platform that tailors a solar plan to best meet the unique energy needs of individual homes or businesses, and effectively controls Geostellar through his holdings and representation on Geostellar's board of directors. Additionally, some of our Parent Company's directors and/or officers may invest in other business ventures, and as investors, they may be engaged in, and may continue to engage in, investments in other business ventures including ventures in alternative and/or renewable energy markets. Efforts by those parties to maximize the value of such other business interests could conflict with the interests of the Company.

***If we are unable to satisfy security, data privacy and other government- and industry-specific requirements, our growth could be harmed.***

Developers and issuers of digital assets frequently encounter cybersecurity and data privacy risks. A number of digital asset indexes and exchanges have been hacked in recent years, and millions of dollars of cryptocurrencies have been stolen without recovery. The autonomous nature of the Internet and digital asset indices and exchanges exacerbate these risks. We could be the target of malicious attacks seeking to identify and exploit weaknesses in our software or any exchange on which any of our future digital assets may be traded which may result in the loss or theft of our digital assets or customer information. Such an event could interrupt or damage our operations, financial condition and relationships with investors, customers and business partners.

22

# EXHIBIT 5



SHULMAN
ROGERS

GANDAL
PORDY
ECKER

**BENJAMIN P. SMITH** ATTORNEY
T 301.230.5241  E bsmith@shulmanrogers.com

December 19, 2017

## SENT VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED

**To:** Geostellar, Inc.                                    - *Notice also provided by email*
224 West King Street
Martinsburg, WV 25401
Attention: David Levine
david.levine@geostellar.com

Greenberg Traurig, LLP                              - *Notice also provided by email*
Attn: David Black
2200 Ross Ave.
Suite 5200
Dallas, TX 75201
blackda@gtlaw.com

Arch W. Riley, Jr., Esq.                              - *Notice also provided by email*
48 14th Street
Suite 301
Hare Building
Wheeling, WV 26003
ariley@bernsteinlaw.com
*Counsel for Geostellar, Inc.*

David Levine                                          - *Notice also provided by email*
224 West King Street
Martinsburg, WV 25401
david.levine@geostellar.com

Geostellar, Inc.
c/o Corporation Service Company, R/A
251 Little Falls Drive
Wilmington, DE 19808

## Re:  NOTICE TO CEASE AND DESIST

To Whom It May Concern:

As you are aware from the prior correspondence issued on December 14, 2017, this firm represents Matador Solar Partners, LLC and Novus Capital Group, LLC (collectively the "Lenders"). It has come to the attention of the Lenders that Geostellar, Inc. (the "Borrower") developed a new cryptocurrency token with Indeco, LLC, at the direction of David Levine ("Mr. Levine"), the Borrower's CEO and the Borrower's board of directors.



SHULMAN ROGERS | GANDAL PORDY ECKER

Specifically, Mr. Levine has publicly stated that Borrower's board of directors has authorized collaboration with Indeco, LLC, which has hired key Geostellar personnel in management, engineering and customer support. Mr. Levine was quoted by the media as stating "Indeco has pioneered a new shared ownership model for solar energy on the blockchain, transforming a watt of solar power into a tradable digital asset." Mr. Levine further stated "We are hopeful that this effort will restore liquidity to our joint endeavor and allow us to rapidly meet our commitments to homeowners in Ann Arbor."

On December 18, 2017, the Geostellar.com website was updated to state "As we transition to the blockchain, support for Geostellar customers, installers and partners is being provided by Indeco, the crypto asset for a better human habitat." The Geostellar.com website then directs all visitors to www.ind.eco, the website for Indeco, LLC. Mr. Levine is identified on the front page of www.ind.eco as the CEO and Co-Founder, as well as the "CEO of Geostellar."

You were previously notified by the correspondence issued December 14, 2017 that any and all personal property, including, but not limited to, intellectual property, data, software and information related in any way to cryptocurrency or to a digital currency/token model is collateral securing the Lenders' loans to the Borrower, and to the extent any collateral had been transferred to any other entity, such collateral is to be returned immediately and arranged for the Lenders to inventory and take possession. Pursuant to this notice, you are directed to immediately comply with the December 14, 2017 correspondence and to cease and desist all actions related to the transfer of Borrower's property or business opportunities to any other person or entity. You are further directed to immediately cease and desist directing web traffic on the Geostellar.com website to any other website or any other entity.

Please contact the undersigned immediately to confirm you will comply with the demands made in this correspondence. A failure to cease and desist and to return the Lenders' collateral, including without limitation, intellectual property, will result in immediate legal action, seeking damages for, inter alia, breaches of fiduciary duties, conversion and theft of corporate opportunity.

Very truly yours,

Benjamin P. Smith, Esq.

SHULMAN
ROGERS

GANDAL
PORDY
ECKER

CC:

Robert Tobin
Chief Investment Officer
Persimmon Capital Partners
robert.tobin@persimmoncap.com

Geostellar Capital Fund I LLC
c/o Valentis Solar Equity Fund I, LLC
7921 Jones Branch Drive
Suite 222
McLean, VA 22102
Attn: Mehmet Ogden

Geostellar Capital Fund I, LLC
c/o The Corporation Trust Company, R/A
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

Geostellar Capital Fund II, LLC
Attn: Todd Cimano-Johnson
224 W. King Street
Martinsburg, WV 25401
solarventuredebtfund@gmail.com

Geostellar Capital Fund II, LLC
c/o Registered Agent Solutions, Inc., R/A
9 E. Loockerman Street
Suite 311
Dover, DE 19901

Edinger Associates PLLC
1875 I Street, NW
Suite 500
Washington, D.C. 20006
Attn: Brook Edinger
bedinger@edingerlaw.net

# EXHIBIT 6



CAPITAL GROUP, LLC
A Delaware Limited Liability Company
4500 SW Kruse Way, Suite 170 • Lake Oswego, OR 97035
(503) 303-5100 • (855) 696-6887 • Fax (855) 696-6888

## LOAN AND SECURITY AGREEMENT NUMBER 1055

DEBTOR:     Geostellar, Inc., a Delaware corporation ("Debtor")

LENDER:     NOVUS CAPITAL GROUP, LLC, a Delaware limited liability company ("Lender")

**THIS LOAN AND SECURITY AGREEMENT** is made by and between Debtor and Lender in consideration of the mutual agreements contained herein, the parties hereto agree as follows:

### SECTION 1.    DEFINITIONS.

1.1      Defined Terms. As used in this Agreement the following terms have the following defined meanings, unless the context otherwise requires (such terms to be equally applicable to both singular and plural forms of the terms defined):

"Agreement" means this Loan and Security Agreement, as the same may from time to time be amended, modified, replaced or supplemented.

"Business Day" means a day other than a Saturday, Sunday or legal holiday under the laws of the State of Oregon.

"Closing Date" means each date on which a Loan is made pursuant hereto.

"Code" means the Uniform Commercial Code as from time to time in effect in the State of Oregon.

"Collateral" means any of Debtor's assets which are pledged to secure this Agreement and as identified on one or more Schedules that are attached to or incorporated in this Agreement.

"Commencement Date" means the beginning of the contracted term under each Loan. The Commencement Date of each Loan will be the 10th day of the month. If the Disbursement Date occurs on or before the 10th of the month, the Commencement Date shall be the 10th day of the month in which the Disbursement Date occurred. If the Disbursement Date occurs after the 10th of the month, the Commencement Date shall be the 10th day of the month immediately following the Disbursement Date.

"Commitment" means the obligation of Lender to make the Loans in the aggregate principal amount specified in Section 2.1.

"Default" shall mean any event which with notice, lapse of time, or any further condition, event or act would constitute an Event of Default.

"Disbursement Date" means the date on which the Note for each Loan is signed by both Debtor and Lender and funds are disbursed under the terms of such Note.

"Disbursed Principal" means the original principal amount borrowed on each Loan.

Loan and Security Agreement

Confidential

Page 1 of 17
(initials)

"Draw Period" means the period of time from the date of this Agreement through the earlier to occur of (i) March 31, 2016, or (ii) the occurrence of an Event of Default.

"Event of Default" has the meaning set forth in Section 7.

"Final Payment Fee" means a payment (in addition to and not a substitution for the regular monthly payments of principal plus accrued interest) due on the earlier to occur of the maturity date for the Loans or Prepayment and will be equal to the principal amount of the Loan(s) multiplied by the Final Payment Percentage.

"Final Payment Percentage" means for each Loan, Ten percent (10%).

"Financial Statements" means Debtor's financial statements and shall be comprised of at least a balance sheet and profit and loss statement and may include a cash flow statement.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law (including any receivership or like proceeding), assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Interim Interest" means interest that is paid on the Disbursed Principal for that period of time between the Disbursement Date and the Commencement Date. Interim Interest shall be paid at a daily rate equal to the Interest Rate divided by 365.

"Interest Rate" is a fixed per annum rate per each Loan equal to 13.75%.

"Liens" means liens, mortgages, security interests, pledges, title retentions, charges, or other encumbrances of any kind whether voluntarily incurred or arising by operation of law or otherwise on the Collateral.

"Loan" means each loan or credit extension made by Lender to Debtor pursuant to each Note and this Agreement.

"Loan Documents" means this Agreement, the Notes, Supplements, Schedules, any other security agreement or loan documents executed by Debtor in connection with this Agreement, and any other agreement entered into, now or in the future, by Debtor and Lender or any guarantor in connection herewith.

"Note" means each Promissory Note of Debtor evidencing a Loan, as described in Section 2.2, substantially in the form of Exhibit A hereto, as the same may from time to time be amended, modified, replaced or supplemented.

"Obligations" means (i) the aggregate unpaid principal amount of, and accrued interest on, the Notes; (ii) all other obligations and liabilities of Debtor, now existing or hereafter incurred, under, arising out of or in connection with this Agreement, any Note, or any other Loan Document; and (iii) any and all other present and future indebtedness, obligations and liabilities of any kind whatsoever of Debtor to Lender, whether direct or indirect, joint or several, absolute or contingent, liquidated or unliquidated, secured or unsecured, matured or unmatured and whether originally contracted with Lender or otherwise acquired by Lender or from time to time reduced and thereafter increased, including the Final Payment Fee.

"Payment Due Date" shall be the 10ᵗʰ day of each month and the first scheduled payment shall be due on the 10ᵗʰ day of the month immediately following the Commencement Date.

"Permitted Liens" shall mean with respect to the property of the Debtor:

    (a) Liens for taxes, assessments or similar charges incurred by the Debtor in the ordinary course of business that are not yet due or payable; and

    (b) Pledges or deposits of segregated cash or cash equivalents made by Debtor in the ordinary course of business to secure worker's compensation, unemployment insurance, old-age pensions, or other social security programs; and

    (c) Liens of mechanics, materialmen, warehousemen, carriers, or other like liens in specified assets relating to the work performed or services provided in the ordinary course of Debtor's business; and

    (d) Purchase money Liens (i) on equipment acquired or held by Debtor incurred for financing the acquisition of the equipment securing no more than Two Hundred Fifty Thousand Dollars and 00/100 ($250,000.00) in the aggregate amount outstanding; or (ii) existing on equipment when acquired, if the Lien is confined to the property and improvements and the proceeds of the equipment;

    (e) Such other liens or encumbrances may be permitted, from time to time, in accordance with a written consent given by the Lender in its sole discretion; and

    (f) Liens that may be granted from time to time to one or more other lenders to Borrower provided that such other lender agrees to sign an inter-creditor agreement between Lender and such other lender consistent with Lender's prior inter-creditor agreements involving Borrower, and with the understanding that such other lender may have a first lien on Borrower's accounts receivable, inventory, customer deposits and/or proceeds of any thereof.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, estates, other organizations and entities, and governmental agencies and political subdivisions.

"Prepayment" means payment in full of the Loans prior to their maturities by paying Lender an amount equal to the sum of i) all accrued interest, charges and fees; ii) unpaid principal; iii) any applicable Prepayment Premium; and iv) Final Payment Fee.

"Prepayment Premium" means a charge paid by Debtor to Lender to terminate Debtor's Loan(s) prior to the maturity of each Loan. The Prepayment Premium shall be an amount equal to:

    $P \times M \times 0.10\%$

    Where:

    $P$ = Disbursed Principal, and

    $M$ = Remaining number of months to maturity of Loan.

"Supplement" means each Supplement executed and delivered by Debtor in substantially the form of Exhibit B attached hereto.

Loan and Security Agreement

Confidential

1.2     Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles.

## SECTION 2.    AMOUNT AND TERMS OF LOAN.

2.1     Commitment. Subject to the terms and conditions of this Agreement, Lender agrees to make Loans, from time to time during the Draw Period, to Debtor in an aggregate principal amount not to exceed Five Hundred Thousand Dollars and 00/100 ($500,000.00). Each Loan shall be in an amount which is not less than Sixty Thousand Dollars and 00/100 ($60,000.00). The obligation of Lender to make Loans hereunder shall terminate on the expiration of the Draw Period. Debtor shall give Lender at least five (5) Business Days prior written notice of the date and amount of each proposed Loan. No Loan which is repaid may be reborrowed.

2.2     The Notes. Each Loan shall be evidenced by a Note of Debtor substantially in the form of Exhibit A hereto, with appropriate insertions therein as to amounts, dates and interest rate, in each case, as determined by Lender. Debtor's obligation to repay the Notes and all other amounts payable hereunder is absolute and unconditional under any and all circumstances and shall not be affected by any circumstances of any character whatsoever. Each Note shall (i) be dated the date on which the Loan evidenced thereby is made; (ii) be for the term specified in such Note; and (iii) be stated to be paid in consecutive monthly installments of principal plus interest, on the dates and in the amounts set forth in such Note. The Notes (and the related Loans) may be prepaid in whole. Debtor may prepay its obligation under the Notes in full (but not in part) upon giving Lender at least thirty (30) days advance written notice of its intention to prepay and, at the time of prepayment, payment of any applicable Prepayment Premium.

2.3     Use of Proceeds. Debtor shall use the proceeds of each Loan solely as working capital to support the business of Debtor and not for personal, family, or household purposes.

## SECTION 3.    CONDITIONS OF BORROWING.

3.1     Conditions of Each Loan. Lender shall not be required to make any Loan hereunder (including the initial Loan) unless on the Closing Date of such Loan:

(a)     Note. The Note evidencing such Loan and all related Loan Documents shall have been duly executed and delivered to Lender.

(b)     Insurance. Lender shall have received evidence satisfactory to it that the Collateral used to secure such Loan is insured against loss, theft, damage or destruction in an amount not less than the full replacement value of the Collateral, with loss payable to Lender. At Lender's request, Debtor also shall provide and maintain primary comprehensive general all risk liability insurance.

(c)     Security Interest. All filings deemed necessary or desirable by Lender to establish, protect, preserve and perfect its security interest in any of Debtor's assets that are pledged as security for such Loan as a valid first priority perfected security interest shall have been duly effected, and all fees, taxes and other charges relating to such filings and recordings shall have been paid by Debtor.

(d)     Representations. (i) The representations and warranties contained in this Agreement shall be true and correct in all respects on and as of the date of the making of such Loan with the same effect as if made on and as of such date; (ii) no Default or Event of Default shall be in existence on the date of the making of such Loan or shall occur as a result of such Loan; and (iii) the acceptance by Debtor of each Loan shall constitute a representation by Debtor that the statements contained in clauses (i) and (ii) above are true and correct on the date of such Loan.

Loan and Security Agreement                                                                 Page 4 of 17

Confidential                                                                                        _____ (initials)

(e)     Other Documents and Information. Lender shall have received from Debtor, in form and substance satisfactory to Lender, such other documents and information as Lender shall reasonably request.

(f)     Legal Matters. All legal matters with respect to and all legal documents executed in connection with the transactions contemplated by this Agreement shall be satisfactory to counsel for Lender.

(g)     Default. No Default shall have occurred or will exist after making such Loan.

## SECTION 4.   REPRESENTATIONS AND WARRANTIES.

To induce Lender to enter into this Agreement and to make each Loan, Debtor represents and warrants to Lender that as of the closing date of the Agreement:

4.1     Organization. Debtor is a corporation duly organized or formed, validly existing and in good standing under the laws of Delaware and is qualified and licensed to do business and is in good standing in any jurisdiction in which the conduct of its business or its ownership of property requires that it be qualified.

4.2     Power and Authority. Debtor has full power, authority and legal right to execute and deliver this Agreement and the Notes, to perform its obligations hereunder and thereunder, to borrow hereunder and to grant the security interest created by this Agreement.

4.3     Consents and Permits. No consent of any other party, and no consent, license, approval or authorization of, exemption by, or registration or declaration with, any governmental body, authority, bureau or agency is required in connection with (i) the execution, delivery or performance by Debtor of this Agreement or the Notes; or (ii) the validity or enforceability of this Agreement or the Notes.

4.4     No Legal Bar. The execution, delivery and performance by Debtor of this Agreement, the Notes and other Loan Documents do not and will not violate any provision of any applicable law or regulation or of any judgment, award, order, writ or decree of any court or governmental instrumentality, will not violate any provision of the organizational documents of Debtor and will not violate any provision of or cause a default under any mortgage, indenture, contract, agreement or other undertaking to which Debtor is a party or which purports to be binding upon Debtor or upon any of its assets, and will not result in the creation or imposition of any lien on any of the assets of Debtor other than the security interest intended to be created hereby.

4.5     No Defaults. Debtor is not in default, and no event or condition exists which, after the giving of notice or lapse of time or both, would constitute an event of default, under any mortgage, indenture, contract, agreement, judgment or other undertaking to which Debtor is a party or which purports to be binding upon Debtor or upon any of its assets.

4.6     Enforceability. This Agreement, and each Note or other Loan Document Debtor is required to execute hereunder, when delivered, have been duly authorized, executed and delivered by Debtor and constitute legal, valid and binding obligations of Debtor enforceable in accordance with their terms.

4.7     No Litigation. There is no action, suit, investigation or proceeding pending or, to Debtor's knowledge, threatened against or affecting Debtor or any of its assets which could have an adverse effect upon the Collateral or repayment of the Loans or a material adverse effect on the business, operations or financial condition of Debtor.

4.8     Taxes. Debtor has filed all Federal, state and local income tax returns that are required to be filed, and has paid (or provided for the payment of) all taxes as shown on said returns and all assessments received by it to the extent that such taxes and assessments have become due, and Debtor does not have any knowledge or any actual or proposed deficiency or additional assessment in connection therewith. The charges,

accruals and reserves on the books of Debtor in respect of Federal, state and local taxes for all open years, and for the current fiscal year, make adequate provision for all unpaid tax liabilities for such periods.

4.9    Financial Statements.  All financial statements for Debtor and any guarantor, if applicable, delivered to Lender are true and accurate as of the dates thereof, and there has not been any adverse change in Debtor's or any guarantor's financial condition since the date of the most recent financial statements submitted to Lender.

4.10    Full Disclosure.  No written representation, warranty or other statement of Debtor in any certificate, agreement or other document given to Lender, as of the date such representations, warranties, or other statements were made, taken together with all such written certificates, agreements and other document statements given to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not misleading.

## SECTION 5.    COVENANTS.

Debtor covenants and agrees that from and after the date hereof and so long as the Commitment or any Obligation is outstanding:

5.1    Notices.  Debtor will give timely written notice to Lender of (i) the occurrence of any Default or Event of Default; (ii) the commencement or threat of any material litigation or proceedings affecting Debtor; and (iii) any dispute between Debtor and any governmental authority or other Person that might materially interfere with the normal business operations of Debtor.

5.2    Laws; Obligations; Operations.  Debtor will (i) comply with all laws in all material respects and duly observe and conform to all requirements of any governmental authorities relating to the conduct of its business or to its properties or assets, except for any such requirements for which the results of non-compliance, individually or in the aggregate, would not affect Debtor's ability to perform its obligations under the Agreement or result in a Lien upon any of the Collateral; (ii) maintain its existence as a legal entity and obtain and keep in full force and effect all rights, franchises, licenses and permits which are necessary to the proper conduct of its business; and (iii) obtain or cause to be obtained as promptly as possible any governmental, administrative or agency approval and make any filing or registration therewith which at the time shall be required with respect to the performance of its obligations under this Agreement or the operation of its business.

5.3    Inspection.  Lender or its authorized representative may during normal business hours inspect the Collateral and the books and records of Debtor related thereto.

5.4    Further Assurances.  Debtor will promptly, at any time and from time to time, at its sole expense, execute and deliver to Lender such further instruments and other documents, and take such further action, as Lender may from time to time reasonably request to further carry out the intent and purpose of this Agreement and to establish and protect the rights, interests and remedies created, or intended to be created, in favor of Lender hereby, including, without limitation, any and all security agreements, assignments, endorsements of certificates of title, and all other documents that Lender may reasonably request, in form and substance satisfactory to Lender, to create, perfect and continue to perfect or to better perfect the Lender's Liens in the Collateral. To the maximum extent permitted by applicable law, Debtor authorizes Lender to execute any such additional documents in Debtor's name and authorizes Lender to file such executed additional documents in any appropriate filing office. Debtor will pay or reimburse Lender for any and all reasonable fees, costs and expenses of whatever kind or nature incurred in connection with the creation, preservation and, upon the occurrence of an Event of Default which is continuing, protection of Lender's security interest in the Collateral.

5.5     No Disposition of Collateral. Without the prior written consent of Lender, Debtor will not sell, convey, transfer, exchange, lease or otherwise relinquish possession or dispose of any of the Collateral, except for the sale of inventory and the processing of accounts receivable in the normal course of Debtor's business.

5.6     No Liens. Debtor will not create, assume or suffer to exist any Lien of any kind upon the Collateral, even if junior in priority to Lender, except for the Permitted Liens and/or the security interest created hereby.

5.7     Insurance. Debtor shall maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Debtor's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Debtor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Debtor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Debtor will provide Lender with such lender's loss payable or other endorsements as Lender may require.

#### WARNING

**Unless you (Debtor) provide us (Lender) with evidence of insurance coverage as required by our agreements, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.**

**You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your loan balance. If the cost is added to your loan balance, the interest rate on the underlying loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.**

**The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.**

5.8     No Changes in Debtor. Without the prior written consent of Lender, Debtor will not (i) enter into any merger or consolidation; (ii) liquidate or dissolve; (iii) sell, transfer or otherwise dispose of all or substantially all of its assets; (iv) change the form of organization of its business or state of organization or formation; or (v) without thirty (30) days prior written notice to Lender, change its name or its chief place of business.

5.9     Financial Statements. Debtor, unless it is a publicly traded company, will prepare Financial Statements on a monthly basis and will provide Lender with copies of such Financial Statements not more than twenty (20) days after the end of each calendar month. Financial Statements shall include, but not be limited to i) monthly balances sheets and profit and loss statements, ii) quarterly cash flow statements and AR and AP aging reports, and iii) annually a detailed capitalization statement listing its stockholder or owners. If Debtor is a publicly traded company, Debtor will provide to Lender its Financial Statements included in its 10-Q, 10-K and 8-K filings with the Securities and Exchange Commission, consistent with SEC guidelines and within ten (10) days after each filing.

Loan and Security Agreement

Confidential

## SECTION 6.   SECURITY INTEREST.

6.1      Grant of Security Interest. As collateral security for the prompt and complete payment and performance when due of all the Obligations and to induce Lender to enter into this Agreement and make the Loans in accordance with the terms hereof, Debtor hereby grants to Lender a security interest in, all Debtor's right, title and interest in and to the Collateral.

6.2      Filing of Financing Statements. Debtor authorizes Lender to prepare and file any financing statement necessary or desirable to perfect Lender's security interest in the Collateral, and any continuation statement or amendment with respect thereto, in any appropriate filing office. Debtor hereby ratifies the filing of any financing statement filed without the signature of Debtor prior to the date hereof.

6.3      Lender Appointed as Attorney-in-Fact. For so long as Debtor has any financial obligations to Lender, Debtor hereby irrevocably makes, constitutes, and appoints Lender (and any of Lender's officers, employees, or agents designated by Lender) as Debtor's true and lawful attorney, with power to (i) if Debtor refuses to, or fails timely to execute and deliver any of the documents requested by Lender pursuant to Section 5.4, sign Debtor's name on any such document; and (ii) upon an occurrence of an Event of Default and for as long as said default remains uncured and continuing, endorse Debtor's name on any of its payment items that may come into Lender's possession. The appointment of Lender as Debtor's attorney, and each and every one of its rights and powers, being coupled with an interest, is irrevocable.

## SECTION 7.   EVENTS OF DEFAULT.

Each of the following shall constitute an event of default ("Event of Default") under this Agreement:

(a)      Debtor shall fail to (i) make any payment of principal or interest on any Loan when due or (ii) pay any other Obligation after the same becomes due; and such default remains uncured for a period of ten (10) days;

(b)      Any material representation or warranty made by Debtor in this Agreement or in connection with any Loan, or by Debtor in any document, certificate or financial or other statement now or hereafter furnished by Debtor to Lender in connection with this Agreement, shall at any time prove to be untrue or misleading in any material respect as of the time when made;

(c)      Debtor shall fail to observe any covenant, condition or agreement contained in Section 5, and such failure shall continue unremedied for period of ten (10) days from the earlier of discovery or of notice;

(d)      Debtor shall fail to observe or perform any other covenant, condition or agreement contained in this Agreement or any other Loan Documents, and such failure shall continue unremedied for a period of ten (10) days from the earlier of discovery or notice, or more;

(e)      There is, under any agreement to which Debtor is a party, a default in the payment or performance of any obligation to a Person resulting in a right by such Person to accelerate the maturity of any indebtedness, realize on any collateral, or terminate any agreement material to Debtor's business, and such Person begins the formal process of pursuing remedies;

(f)      Debtor is unable to pay its material debts (including trade debts) as they become due or otherwise becomes insolvent, or Debtor or any subsidiary of Debtor commences an Insolvency Proceeding;

(g)      An Insolvency Proceeding shall have been commenced against Debtor or any subsidiary of Debtor and is not dismissed or stayed within forty-five (45) days after the commencement of such proceeding;

(h)     Any material adverse change in the business, operations or financial condition of Debtor occurs, and the security interest of Lender or Debtor's ability to repay Lender is jeopardized or adversely affected in any material respect;

(i)     A change in ownership of more than fifty percent (50%) or more of the stock or other equity interests in Debtor; or

(j)     Any of the preceding events occurs with respect to any guarantor of the Loans or any guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any guaranty of the Loans.

## SECTION 8.   REMEDIES.

8.1     Termination: Acceleration.  If an Event of Default specified in Section 7(f) (only with respect to commencement of an Insolvency Proceeding) or (g) shall occur, then the Commitment shall immediately terminate and the Loans and all other Obligations shall become immediately due and payable without any notice or other action by Lender.  **If any other Event of Default shall occur and be continuing**, then, and in any such event, Lender may, without any notice or demand, (i) suspend or terminate forthwith the Commitment and (ii) declare the Loans and all other Obligations to be immediately due and payable.

8.2     Additional Remedies.  If an Event of Default shall occur and be continuing, Lender may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a creditor, whether secured or unsecured, under the Code or under any other applicable law. Without limiting the generality of the foregoing, Debtor agrees that in any such event, Lender, without notice or demand of any kind (except the notice specified below of the time and place of public or private sale) to or upon Debtor or any other Person (all and each of which demands and notices are hereby expressly waived), may forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, transfer, give option or options to purchase or otherwise dispose of and deliver the Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at any of Lender's offices or elsewhere at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Lender shall have the right upon any such public sale or sales, to the extent permitted by law, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Debtor, which right or equity is hereby expressly released.  Lender shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization, disposition or sale (after deducting all reasonable costs and expenses of every kind incurred by Lender or incidental to the sale, disposition, care, safekeeping, preparation for sale or otherwise of any or all of the Collateral or in any way relating to the rights of Lender hereunder, including reasonable attorneys' fees and legal expenses) to the payment in whole or to part of the Obligations, in such order as Lender may elect and only after so applying such net proceeds and after the payment by Lender of any other amount required by any provision of law, shall Lender account for the surplus, if any, to Debtor.  To the extent permitted by applicable law, Debtor waives all claims, damages, and demands against Lender arising out of the repossession, retention or sale of the Collateral.  Debtor agrees that Lender need not give more than ten (10) days notice (which notification shall be deemed given when mailed in accordance with Section 9.2) of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.  Debtor shall be liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay the Obligations and all other amounts to which Lender is entitled.

8.3     Cumulative Remedies.  Lender's rights and remedies under this Agreement and the other Loan Documents are cumulative and may be exercised singularly or concurrently.  Lender has all rights and remedies provided under this Agreement, the Code, by law, or in equity.  Lender's exercise of any right or remedy is not an election, and no failure or delay on the part of Lender in exercising any right, remedy, power or privilege hereunder or under any Note shall operate as a waiver thereof, nor shall any single or partial exercise of any right,

Loan and Security Agreement

Confidential

Page 9 of 17

(initials)

remedy, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

8.4    Waiver by Debtor. Debtor hereby waives presentment, demand, protest or any notice, except as expressly provided in Section 8 (to the extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral. To the extent permitted by the Code or other applicable law, Debtor waives any rights now or hereafter conferred by statute or otherwise which limit or modify any of Lender's rights or remedies under this Agreement.

## SECTION 9.    MISCELLANEOUS.

9.1    Joint and Several Obligations. If Debtor consists of more than one person or entity, all Obligations of Debtor under this Agreement shall be joint and several, and all references to Debtor shall mean each and every Debtor.

9.2    Notices. All notices, requests and demands to or upon any party hereto shall be deemed to have been duly given (i) three (3) Business Days after being deposited in the United States mail, proper postage prepaid when sent by registered or certified mail, addressed to such party as follows, or to such other address as may be hereafter designated in writing by such party to the other party hereto; (ii) as of the Business Day after the day delivered to a nationally recognized overnight courier when delivered to such courier by sender in timely fashion so as to permit next-day delivery; (iii) upon delivery, when personally delivered; and (iv) upon dispatch when sent by facsimile machine with confirmation of transmittal completion received by sender:

> Debtor:    Geostellar, Inc., a Delaware corporation
> 224 West King Street
> Martinsburg, WV 25401
> Attention: David Levine
> Fax: (240) 465-1069

> Lender:    NOVUS CAPITAL GROUP, LLC, a Delaware limited liability company
> 4500 SW Kruse Way, Suite 170
> Lake Oswego, OR 97035
> Attention: David Dolezal
> Fax: (855) 696-6888

9.3    Indemnity.

(a)    Debtor agrees to pay, and to indemnify and save Lender harmless from any and all taxes, including, without limitation, sales, use, stamp and personal property taxes (other than any corporate income, capital, franchise or similar taxes payable by Lender with respect to the payments made to Lender hereunder) and all license, filing, and registration fees and assessments and other charges, if any, which may be payable or determined to be payable in connection with the execution, delivery and performance of this Agreement or the Notes or any modification thereof.

(b)    Debtor hereby further agrees to pay, indemnify, and hold Lender harmless from and against any and all other liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, out-of-pocket costs, expenses (including legal expenses) or disbursements of any kind or nature whatsoever arising out of or relating to the Loan Documents or transactions described therein, provided, that Debtor shall have no obligation hereunder with respect to indemnified liabilities arising from the gross negligence or willful misconduct of Lender, as finally determined by a court of competent jurisdiction.

Loan and Security Agreement

Confidential

9.4     Payment of Lender's Costs. Debtor agrees to pay upon demand all of Lender's out-of-pocket expenses, including attorneys' fees, incurred in connection with the negotiation and preparation of the Loan Documents, including any amendments or modifications thereto. If an Event of Default shall occur and be continuing, Debtor agrees to reimburse Lender for its reasonable attorney's fees, court costs and collection costs, whether or not any litigation is commenced by Lender, which are incurred by Lender to enforce or interpret any of the Loan Documents or collect any Obligations due to Lender, including, without limitation, (i) the reasonable costs and fees of a collection agency; and (ii) attorney's fees and costs incurred at trial, on appeal and in any mediation, arbitration or bankruptcy proceeding. All such amounts shall, until paid by Debtor to Lender, constitute Obligations of Debtor secured by the Collateral and shall be payable on demand.

9.5     Expenditures by Lender. If not discharged or paid when due, Lender may (but shall not be obligated to) discharge or pay any amounts required to be discharged or paid by Debtor under this Agreement, including without limitation all taxes, liens, encumbrances, and other claims, at any time levied or placed on the Collateral. Lender also may (but shall not be obligated to) pay all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the highest rate applicable to the Obligations from the date incurred or paid by Lender to the date of repayment and shall be payable on demand. Any action by Lender hereunder shall not be construed as curing any default so as to bar Lender from any remedy that it would otherwise have.

9.6     Survival of Representations and Warranties. All representations and warranties made in this Agreement and any certificates delivered pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the making of the Loans hereunder, and the agreements contained in Section 9.3 shall survive payment of the Notes.

9.7     Amendment; Waivers. No provision of this Agreement, the Notes, or any related agreements, may be amended or modified in any way, nor may noncompliance therewith be waived, except pursuant to a written instrument executed by Lender and Debtor.

9.8     Counterparts. This Agreement may be executed by the parties hereto on any number of separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument. Executed counterparts may be transmitted between Debtor and Lender as i) documents bearing original signatures sent via mail or overnight express, ii) facsimile, or iii) PDF copies sent electronically and all executed counterparts, no matter how transmitted shall be legally binding on both Debtor and Lender.

9.9     Headings. The headings of the Sections and paragraphs are for convenience only, are not part of this Agreement and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

9.10    Successors or Assigns. This Agreement shall be binding upon and inure to the benefit of Debtor and Lender and their respective successors and assigns, except that Debtor may not assign or transfer its rights or any interest hereunder.

9.11    Entire Agreement. This Agreement, including all Notes, Supplements, Schedules and Loan Documents related hereto, contain the complete, final and exclusive statement of the terms of the agreement between Lender and Debtor relating to the transactions hereby contemplated.

9.12    Choice of Law and Venue; Jury Trial Waiver.

(a)    **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OREGON, WITHOUT REGARD TO ITS CONFLICT OF LAW PROVISIONS.**

Loan and Security Agreement

Confidential

Page 11 of 17

(initials)

(b)     **DEBTOR IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF ANY STATE OR FEDERAL COURT IN THE STATE OF OREGON WITH VENUE IN CLACKAMAS COUNTY, OREGON; PROVIDED THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION AGAINST DEBTOR OR THE COLLATERAL IN ANY OTHER JURISDICTION. EACH OF THE PARTIES HERETO EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO IT AT THE ADDRESS SET FORTH HEREIN, AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH PARTY'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAIL, PROPER POSTAGE PREPAID.**

(c)     **DEBTOR AND LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. DEBTOR AND LENDER REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

9.13     Correction of Loan Documents. Lender may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

9.14     Severability; Intent to Limit Charges to Maximum Lawful Rate. If a court of competent jurisdiction finds any provision of this Agreement or other Loan Documents to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable. In no event shall the interest rate or rates payable under the Notes, plus any other amounts paid in connection herewith or therewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.

9.15     Time is of the Essence. Time is of the essence in the performance of this Agreement.

**UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY US (LENDER) CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY THE DEBTOR'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY US TO BE ENFORCEABLE.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the 26ᵗ day of  Fe b r u a r y   , 2016.

Agreed and consented to by LENDER:                    DEBTOR:

Loan and Security Agreement

Confidential

Page 12 of 17

_____ (initials)

**NOVUS CAPITAL GROUP, LLC,**
a Delaware limited liability company

By: _____

Name: __John Saefke_____

Title: __Chief Executive Officer_____

Date: ___2-26-16_____

**GEOSTELLAR, INC.,**
a Delaware corporation

By: _____

Name: __David Levine_____

Title: __Chief Executive Officer_____

Date: ___2/25/16_____

## SCHEDULE TO LOAN AND SECURITY AGREEMENT NUMBER 1055

## DESCRIPTION OF COLLATERAL:

All personal property of Debtor of every kind, whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to: accounts receivable, notes receivable, contract rights, drafts, instruments and chattel paper, whether tangible or electronic, equipment, machinery, furniture, fixtures, tools and supplies, inventory, general intangibles, deposit accounts, investment property, securities, financial assets, customer lists, and the proceeds thereof. Collateral shall include copyrights, patents, trademarks, or goodwill associated with trademarks of Debtor, and includes any proceeds arising from the disposition of any interest in the foregoing (the "Intellectual Property"). Intellectual Property shall include, but not be limited to United States Patent No. US 9,087,338 B2 dated July 21, 2015 encompassing geomatic modeling of a solar resource based on radiance paths and a normalized slope.

Lender's security interest in Debtor's accounts receivable and proceeds thereof shall be subordinate to Geostellar Capital Fund I LLC.

LENDER:                                          DEBTOR:

**NOVUS CAPITAL GROUP, LLC,**                    **GEOSTELLAR, INC.,**
a Delaware limited liability company             a Delaware corporation

By: _____                      By: _____

Name: John Saefke                                Name: David Levine

Title: Chief Executive Officer                   Title: Chief Executive Officer

Date: 2-26-16                                     Date: 2/25/2016

EXHIBIT 7

## LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT,** dated as of October 7, 2016 (this *"Agreement"*), is entered into by and between **GEOSTELLAR, INC.,** a Delaware corporation (*"Borrower"*), and **MATADOR SOLAR PARTNERS, LLC,** a Texas limited liability company (*"Lender"*).

## RECITALS

A. Borrower has requested that Lender extend a credit facility to Borrower in the original principal amount of up to the Total Loan Limit to be used as described in Section 2.03(a).

B. Lender is willing to provide the credit facility to Borrower upon the terms and conditions set forth in this Agreement.

C. Borrower has agreed to grant to Lender a security interest in all of its assets as further described and subject to the conditions set forth in this Agreement.

## AGREEMENT

In consideration of the covenants, conditions and agreements set forth herein and intending to be legally bound, the parties agree as follows:

## Article 1. DEFINITIONS

The following capitalized terms shall have the meanings set forth below:

*"Acquirer"* shall have the meaning set forth in Section 7.03 of this Agreement.

*"Acquisition"* shall mean any transaction or series of related transactions constituting (a) the acquisition of all or substantially all of the assets of a Person, or of any line of business or division of a Person, (b) the acquisition of in excess of fifty percent (50%) of the Equity Securities of any Person, whether or not involving a merger or consolidation with such other Person, or otherwise causing any Person to become a Subsidiary, or (c) any merger or consolidation of a Person (other than a Subsidiary) with and into Borrower or a Subsidiary in which Borrower or the Subsidiary is the surviving Person.

*"Additional Loan"* shall have the meaning set forth in Section 2.01 of this Agreement.

*"Affiliate"* as to any Person, means any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, *"control"* of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person, or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

*"Agreement"* shall mean this Loan and Security Agreement, as amended, restated, replaced, modified or otherwise supplemented from time to time.

*"Applicable Prepayment Premium"* shall mean an amount equal to 50% of all interest that would have been otherwise payable to Lender under the applicable Note(s) if the amount of any prepayment had not been prepaid from the date of such prepayment through the original Maturity Date(s) of the applicable Note(s).

*"Borrower's Segregated Account"* shall have the meaning set forth in Section 6.04 of this Agreement.

"***Business Day***" shall mean any day, Monday through Friday, on which commercial banks within the National banking system are not authorized or required to close.

"***Claim***" shall have the meaning set forth in Section 11.04 of this Agreement.

"***Closing***" shall mean the date, time and place as the parties may agree for the execution of this Agreement.

"***Closing Date***" shall mean the date of the Closing.

"***Code***" shall mean the Uniform Commercial Code as in effect from time to time in the state of Delaware.

"***Collateral***" shall mean all of Borrower's assets which are pledged to secure this Agreement and which are described on **Exhibit B** attached hereto.

"***Contractual Obligation***" of any Person shall mean, any indenture, note, security, deed of trust, mortgage, security agreement, lease, guaranty, instrument, contract, agreement or other form of obligation or undertaking to which such Person is a party or by which such Person or any of its property is bound.

"***Copyrights***" shall mean any and all copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret, now or hereafter existing, created, acquired or held.

"***Default***" shall mean any event or circumstance not yet constituting an Event of Default but which, with the giving of any notice, the lapse of any period of time or the occurrence of any other condition, would become an Event of Default.

"***Default Rate***" shall mean an interest rate equal to eighteen percent (18%).

"***Equity Securities***" of any Person shall mean (i) all common stock, preferred stock, participations, shares, partnership interests, membership interests or other equity interests in and of such Person (regardless of how designated and whether or not voting or non-voting) and (ii) all warrants, options and other rights to acquire any of the foregoing.

"***Event of Default***" shall have the meaning set forth in Section 9.01 of this Agreement.

"***Event of Loss***" shall have the meaning set forth in Section 6.07(a) of this Agreement.

"***Financial Statements***" shall mean, with respect to any accounting period for any Person, statements of operations, cash flows and, with respect to audited statements only, stockholder's equity of such Person for such period, and a balance sheet of such Person as of the end of such period, setting forth in each case in comparative form figures for the corresponding period in the preceding fiscal year if such period is less than a full fiscal year or, if such period is a full fiscal year, corresponding figures from the preceding fiscal year, all prepared in reasonable detail and in accordance with generally accepted accounting principles, except, in the case of unaudited Financial Statements, for the absence of footnotes and normal year-end adjustments. Unless otherwise indicated, each reference to Financial Statements of any Person shall be deemed to refer to Financial Statements prepared on a consolidated basis, if applicable.

"***Funding Date***" shall mean any date on which a Loan is made to or on account of Borrower under this Agreement.

"***Funding Period***" shall mean the period of time from the date of this Agreement through the earlier to occur of (i) December 31, 2016 or (ii) the occurrence of any Event of Default.

"***GAAP***" shall mean generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants

*Loan and Security Agreement – Page 2*

and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"*Governmental Authority*" shall mean any domestic or foreign national, state or local government, any political subdivision thereof, any department, agency, authority or bureau of any of the foregoing, or any other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"*Governmental Rule*" shall mean any law, rule, regulation, ordinance, order, code interpretation, judgment, decree, directive, guidelines, policy or similar form of decision of any Governmental Authority.

"*Indebtedness*" of any Person shall mean and include the aggregate amount of, without duplication (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services (other than accounts payable incurred in the ordinary course of business aged not more than 90 days), (iv) all obligations under capital leases of such Person, (v) all obligations or liabilities of others secured by a Lien on any asset of such Person, whether or not such obligation or liability is assumed, (vi) all guaranties of such Person of the obligations of another Person, (vii) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even if the rights and remedies of the seller or lender under such agreement upon an event of default are limited to repossession or sale of such property), and (viii) all reimbursement and other payment obligations, contingent or otherwise, in respect of letters of credit.

"*Initial Loan*" shall have the meaning set forth in Section 2.01 of this Agreement.

"*Intellectual Property*" shall mean: (i) all inventions, designs, know-how, methods, processes, drawings, specifications or other data or information and all memoranda, notes and records with respect to any research and development, and all embodiments or fixations thereof whether in tangible or intangible form, (ii) Copyrights, Trademarks, Patents and Mask Works; (iii) any and all trade secrets, and any and all intellectual property rights in computer software and computer software products; (iv) any and all design rights; (v) any and all claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above; (vi) all licenses or other rights to use any of the Copyrights, Patents, Trademarks, Mask Works, or any other property rights described above; (vii) all amendments, renewals and extensions of any of the Copyrights, Trademarks, Patents or Mask Works; and (viii) all proceeds and products of the foregoing.

"*Investment*" shall mean (i) the purchase, acquisition or beneficial ownership of any Equity Securities, or any obligations or other securities of, any Person, (ii) the making of any loan, extension of credit or capital contribution to, or any other investment in, any Person, or (iii) any Acquisition.

"*Lien*" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing.

"*Loan*" shall mean each loan or credit extension made by Lender to Borrower pursuant to each Note and this Agreement, and shall include the Initial Loan and each Additional Loan.

"*Mask Works*" shall mean all mask works or similar rights available for the protection of semiconductor chips, now owned or hereafter acquired.

"*Material Adverse Effect*" shall mean a material adverse effect on (i) the business, assets, operations, or financial or other condition of Borrower, taken as a whole; *provided, however,* that the effects or changes that are generally applicable to general economic, political or financial market conditions shall be excluded from the determination of Material Adverse Effect; (ii) the validity or enforceability of any Transaction Document; (iii) the perfection or priority of any Lien purported to be created by any Transaction Document, (iv) the rights or remedies

of the Lender under any Transaction Document or (v) the ability of Borrower to pay or perform any of its Obligations in accordance with the terms of this Agreement and the other Transaction Documents.

"*Maturity Date*" of a Loan means the date that is five (5) years after the Funding Date of such Loan.

"*MNPA*" shall mean that certain Master Note Purchase Agreement, dated February 25, 2016 (as amended by that certain Side Agreement, dated June 29, 2016, and that certain Agreement, dated July 13, 2016) between the Borrower and Geostellar Capital Fund I, LLC ("*GCF*"), and the promissory notes issued thereunder.

"*Note*" shall mean each promissory note of Borrower substantially in the form attached as **Exhibit A** hereto evidencing a Loan, as the same may from time to time be amended, modified, replaced or supplemented.

"*Novus Loan Agreement*" shall mean that certain Loan and Security Agreement, dated as of February 26, 2016, by and between the Borrower and Novus Capital Group, LLC, a Delaware limited liability Company ("*Novus*"), and its related loan documents all related to the venture debt described therein ("*NCVD*").

"*Obligations*" shall mean and include all loans, advances, debts, liabilities, and obligations, including, without limitation, the obligation to make each payment scheduled to be made under each subsection of Section 2.02, howsoever arising, owed by Borrower to Lender of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Agreement or the other Transaction Documents, including, without limitation, all interest, fees, charges, expenses, attorneys' fees and costs payable by Borrower hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U.S.C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"*Patents*" shall mean all patents, patent applications and like protections, including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"*Payment Date*" shall have the meaning set forth in Section 2.02(b)(i) of this Agreement.

"*Perfection and Disclosure Certificate*" shall mean the Perfection and Disclosure Certificate delivered by Borrower to Lender on or prior to the date of this Agreement which is attached hereto as **Exhibit E**.

"*Permitted Indebtedness*" shall mean: (i) Indebtedness of Borrower in favor of Lender arising under this Agreement or any other Transaction Document; (ii) Indebtedness secured by a Lien described in clause (iii) of the definition of Permitted Liens secured by any certificate of deposit, cash deposit or letter of credit issued in favor of any landlord or vendor, provided such Indebtedness does not exceed $50,000 in the aggregate at any given time; (iii) Indebtedness secured by a Lien described in clause (v) of the definition of Permitted Liens, provided (A) such Indebtedness does not exceed the lesser of the cost or fair market value of the equipment or inventory financed with such Indebtedness, (B) such Indebtedness does not exceed $100,000 in the aggregate at any given time, and (C) if applicable, the holder of such Indebtedness agrees to waive any rights of set off such holder may have with respect to such Indebtedness in the deposit or investment accounts of Borrower on terms reasonably satisfactory to Lender; (iv) Subordinated Debt; (v) Indebtedness of Borrower under any Qualified Commercial Bank Financing; (vi) Indebtedness of Borrower under the Reg A+ Financing; (vii) Indebtedness of Borrower under any Qualified Line of Credit; (viii) Indebtedness of Borrower under the Novus Loan Agreement; (ix) other Indebtedness in an aggregate amount not to exceed $100,000 outstanding at any time; (x) Borrower's obligations under any warranty it offers to customers; and (xi) extensions, refinancings, modifications, amendments and restatements of any item of Permitted Indebtedness described in (i), (ii), (iii), (v) (vi) and (vii).

"*Permitted Investments*" shall mean: (i) Investments existing at Closing disclosed in the Perfection and Disclosure Certificate; (ii) (A) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, (B) commercial paper maturing no more than one (1) year from the date of creation thereof and currently

having a rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, Inc., and (C) certificates of deposit maturing no more than one (1) year from the date of investment therein; (iii) temporary advances to cover incidental expenses in the ordinary course of business; (iv) investments in joint ventures, strategic alliances, licensing and similar arrangements customary in Borrower's industry and which do not require Borrower to assume or otherwise become liable for the obligations of any third party not directly related to or arising out of such arrangement or require Borrower to transfer ownership of non-cash assets to such joint venture or other entity; (v) Investments consisting of travel advances, employee relocation loans and other employee loans and advances in the ordinary course of business not to exceed $100,000 in the aggregate at any given time; (vi) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business; (vii) Investments consisting of trade or notes receivable of, or prepaid royalties from and other credit obligations of, customers, suppliers and debtors of Borrower, who are not Affiliates, in the ordinary course of business; and (viii) other Investments in an aggregate amount not to exceed $150,000 outstanding at any time.

"*Permitted Liens*" shall mean and include:  (i) Liens created under any Transaction Document in favor of Lender; (ii) other Liens subordinated to the Liens in favor of Lender; (iii) Liens of carriers, warehousemen, mechanics, materialmen, vendors, and landlords incurred in the ordinary course of business for sums not overdue or being contested in good faith, provided provision is made to the reasonable satisfaction of Lender for the eventual payment thereof if subsequently found payable; (iv) leases or subleases and non-exclusive licenses or sublicenses granted in the ordinary course of Borrower's business; (v) Liens upon or in any equipment or inventory which was acquired or held by Borrower to secure the purchase price of such equipment (and any accessions, attachments, replacements or improvements thereon) or indebtedness incurred solely for the purpose of financing the acquisition of such equipment or inventory (and any accessions, attachments, replacements or improvements thereon); (vi) Liens existing on any equipment or inventory (and any accessions, attachments, replacements or improvements thereon) at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and any accessions, attachments, replacements or improvements thereon, and the proceeds of such equipment (and any accessions, attachments, replacements or improvements thereon); (vii) bankers' liens, rights of setoff and similar Liens incurred on deposits or securities accounts made in the ordinary course of business to the extent Lender has a security interest in such accounts; (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default; (ix) Liens for taxes not at the time delinquent or thereafter payable without penalty or being contested in good faith, provided provision is made to the reasonable satisfaction of Lender for the eventual payment thereof if subsequently found payable; (x) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of customs duties in connection with the importation of goods; (xi) Liens on insurance proceeds in favor of insurance companies granted solely as security for financed premiums; (xii) Liens securing Subordinated Debt; (xiii) Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business; (xiv) Liens created in connection with any Qualified Commercial Bank Financing; (xv) Liens created in connection with the Reg A+ Financing, (xvi) Liens created in connection with any Qualified Line of Credit, (xvii) Liens created in connection with the Novus Loan Agreement, (xviii) liens created to secure the Borrower's credit card issued by Silicon Valley Bank, and (xix) Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (i), (ii), (xiv), (xv), and (xvi) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

"*Permitted Uses*" shall have the meaning set forth in Section 2.03(a) of this Agreement.

"*Person*" shall mean and include an individual, any type of partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture, trusts, estates or other entity or a Governmental Authority.

"*Qualified Commercial Bank Financing*" means any debt financing obtained after the expiration of the Funding Period in accordance with Section 3.03(b) from any commercial banking institution carrying an interest rate of 9% or less and which does not involve the issuance of any of the Company's Equity Securities to obtain the financing at such interest rate (and Lender shall not be entitled to place any other qualifications on the terms of the

Qualified Commercial Bank Financing so long as Lender's Liens with respect to the Collateral are pari pasu with any Liens granted to the lender(s) providing the Qualified Commercial Bank Financing).

"*Qualified Line of Credit*" means (i) until the Company has positive monthly cash flow as evidenced by the Financial Statements delivered to Lender pursuant to Section 6.01, a working capital line of credit up to $1,000,000 provided by a commercial banking institution, and (ii) after the Company has had positive cash flows for six (6) consecutive months as evidenced by the Financial Statements delivered to Lender pursuant to Section 6.01, a working capital line of credit up to $2,500,000 provided by a commercial lender in accordance with Section 3.03(c) (and Lender shall not be entitled to place any other qualifications on the terms of the Qualified Line of Credit so long as Lender's Liens with respect to the Collateral are only subordinated to the lender providing the Qualified Line of Credit in the manner specified in Section 3.03(c)).

"*Reg A+ Financing*" means the financing of up to $40,000,000 intended to be obtained by the Borrower from the issuance and sale of secured promissory notes with detachable warrants pursuant to the filing of a Form 1-A with the Securities and Exchange Commission in accordance with Section 3(b) of the Securities Act of 1933 and Regulation A issued thereunder, as amended in accordance with the Jumpstart Our Business Startups Act of 2012.

"*Requirement of Law*" applicable to any Person shall mean (i) the certificate of incorporation and bylaws or other organizational or governing documents of such Person, (ii) any Governmental Rule applicable to such Person, (iii) any license, permit, approval or other authorization granted by any Governmental Authority to or for the benefit of such Person, (iv) any judgment, decision or determination of any Governmental Authority or arbitrator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Subordinated Debt*" shall mean any debt incurred by Borrower that is subordinated to the debt owing by Borrower to Lender (and identified as being such by Borrower pursuant to a written subordination agreement approved by Lender in its sole but reasonable discretion).

"*Subsidiary*" of any Person shall mean (i) any corporation of which more than fifty percent (50%) of the issued and outstanding Equity Securities having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries, and (ii) any partnership, limited liability company, joint venture, or other business entity of which more than fifty percent (50%) of the Equity Securities having the power to vote, direct or control the management of such partnership, limited liability company, joint venture or other business entity is at the time owned and controlled by such Person, by such Person and one or more of the other Subsidiaries or by one or more of such Person's other Subsidiaries.

"*Target Amount*" shall mean the difference of (i) $6,000,000, minus (ii) the amount of the gross sales proceeds from the sale of the Company's Series BB Preferred Stock sold to cash purchasers pursuant to that certain Confidential Private Placement Memorandum of the Company dated effective July 14, 2016 for the offering of up to $2,925,000 in Series BB Preferred Stock.

"*Total Loan Limit*" shall mean an amount equal to the Target Amount multiplied by three (3).

"*Trademarks*" shall mean any trademark and service mark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

"*Transaction Documents*" shall mean, collectively, this Agreement, the Notes, and any other agreements, documents, certificates and instruments executed and delivered to the Lender by Borrower in connection therewith but excluding all documents related to the Stock Purchase Agreement.

"*Transfer*" shall have the meaning set forth in Section 7.02 of this Agreement.

All terms defined in the Code and not otherwise defined herein shall have the respective meanings specified in the Code. All accounting terms not specifically defined herein shall be construed in accordance with GAAP.

**Article 2.   THE LOANS.**

**Section 2.01.   Term Loan Facility.** Subject to the terms and conditions of this Agreement, Lender shall have the right to make Loans from time to time during the Funding Period to Borrower in an aggregate principal amount not to exceed the Total Loan Limit, unless mutually agreed to in writing by the parties. The initial Loan shall be made on the Closing Date in an amount less than $3,000,000.00 (the "*Initial Loan*"). Lender shall be permitted to make additional Loans to Borrower (each being referred to herein as an "*Additional Loan*"), which when combined with the amount of the Initial Loan shall not exceed the Total Loan Limit. Each such Additional Loan shall be in an amount of not less than $1,000,000.00 unless such lesser amount is required to reach the Total Loan Limit, and in connection with each such Additional Loan, Lender shall purchase shares of Borrower's Series C Preferred Stock pursuant to that certain Series C Preferred Stock Purchase Agreement (the "**Stock Purchase Agreement**"), dated as of the date hereof, by and between the Borrower and Lender, with an aggregate purchase price equal to one-third of the amount of any such Additional Loan. The right of Lender to make Loans hereunder shall terminate on the expiration of the Funding Period. Lender shall give Borrower at least five (5) Business Days prior written notice of the date and amount of each proposed Additional Loan. Borrower may prepay any Loan only in accordance with Section 2.02(c).

**Section 2.02.   Interest and Payments.**

(a)   Interest. Borrower shall pay interest in arrears on the unpaid principal amount of any Loan from the date of such Loan until such Loan is paid in full at a per annum rate of interest equal to 15%, which shall be payable in accordance with the terms of Section 2.02(b)(i). Interest on any Loan shall be calculated based upon a year of 365/366 days and actual days elapsed. In no event shall Borrower be obligated to pay Lender interest, charges or fees at a rate in excess of the highest rate permitted by Governmental Rules from time to time in effect. If Borrower pays interest on a Loan which is judicially determined to be in excess of the then legal maximum rate, then that portion of each interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of any Loan.

(b)   Payments of Principal and Interest.

(i)   Payments Principal and Interest. With respect to each Loan, on the first Business Day of each month (each a "*Payment Date*"), commencing on the first Payment Date after a Funding Date and on each of the subsequent eleven (11) Payment Dates thereafter, Borrower shall make a monthly payment to Lender of all accrued but unpaid interest on such Loan. Unless otherwise agreed by Lender, with respect to each Loan, commencing on the thirteenth (13th) Payment Date and on each Payment Date through and including the Maturity Date for the Loan, Borrower shall make equal monthly payments to Lender of principal and accrued but unpaid interest amortized on a straight-line basis over sixty (60) months.

(ii)   Payments on Maturity Date. On the Maturity Date of a Loan, Borrower shall pay to the Lender the entire principal amount of the Loan then outstanding, all accrued and unpaid interest and all other amounts then due to the Lender.

(c)   Prepayment. After the expiration of the Funding Period, upon ten (10) Business Days' prior written notice to Lender, Borrower may, at its option, at any time, make a partial prepayment on any Loan provided that such prepayment must be in an amount of not less than $1,000,000 plus (A) the Applicable Prepayment Premium, plus (B) any other amounts then due and payable to Lender under all Loans. After the expiration of the Funding Period, upon ten (10) Business Days' prior written notice to Lender, Borrower may, at its option, at any time, prepay all of the Loans outstanding, in an amount equal to (A) the outstanding principal amounts of all Loans, plus (B) all accrued and unpaid interest thereon through and including the date of such prepayment; **plus** (C) the Applicable Prepayment Premiums for the Loans, plus (D) any other amounts then due and payable to Lender. Amounts prepaid may not be reborrowed.

**Section 2.03.  Use of Proceeds; the Loans and the Notes; Disbursement**.

(a)  Use of Proceeds.  The proceeds of any Loan shall be used solely (i) to provide short-term funding for customer residential and commercial solar installation projects including equipment purchases, labor, permitting, service fees, dealer fees, customer interest reimbursements and other fees directly related to such projects, until the installation is completed and the customer has paid for such installation or financed the cost of such installation through a separate third-party lender, (ii) to pay fees, commissions and other amounts (but specifically excluding monthly salary or consulting fees and bonus payments) that may be due to inside or outside sales representatives, distributors, and/or channel partners that are specifically related to installation projects; (iii) payoff and terminate MNPA, (iv) payoff and terminate the Novus Loan Agreement; (v) interest payments and principal payments associated with this Agreement or any Note, and (vi) up to $47,500.00 to cover fees, closing costs, and attorneys' fees associated with this Agreement or a Loan, (vii) up to $100,000 per month for October 2016, November 2016 and December 2016 to pay for direct channel costs, and (viii) for such other purposes as the Lender may, from time to time, approve in writing in its sole and absolute discretion (the *"Permitted Uses"*).  Borrower agrees it shall not Transfer any proceeds of any Loan to or make any Investment with proceeds of any Loan in a Subsidiary.

(b)  The Loans and the Notes.  The obligation of Borrower to repay the aggregate unpaid principal amount of and interest on any Loan shall be evidenced by a Note in favor of the Lender setting forth the principal amount of the Loan payable to Lender and the payments due.  Borrower's obligation to repay the Notes and all other amounts payable hereunder is absolute and unconditional under any and all circumstances and shall not be affected by any circumstances of any character whatsoever. Each Note shall (i) be dated as of the Funding Date of the Loan; (ii) be for a term of five (5) years; and (iii) be stated to be paid in consecutive, monthly installments of interest for the first twelve (12) months and then equal monthly installments of principal plus interest for the remaining forty-eight (48) months, on the dates and in the amounts set forth in such Note.  Lender shall keep a record of the payments made under each Note on its books which records shall be rebuttable prima facie evidence of the amounts paid under the Notes.

(c)  Notice and Disbursement.  Lender shall notify Borrower in writing of the desired Funding Date of any Additional Loan to be made in accordance with the terms of Section 2.01.  Lender's funding of any Loan shall be subject to the satisfaction of the conditions set forth in Section 4.01 unless waived by Lender. Lender shall have the right to request that Borrower furnish Lender such additional information with respect to any Loan and the satisfaction of the conditions set forth in Section 4.01 as Lender shall reasonably request.  Subject to the satisfaction of the conditions set forth in this Agreement which shall be confirmed to Lender in writing as of the Funding Date, Lender shall disburse any Loan to Borrower's Segregated Account specified in **Schedule 1**.

**Section 2.04.  Other Payment Terms**.

(a)  Place and Manner.  All regular payments due to the Lender hereunder shall be paid in lawful money of the United States, in immediately available funds, according to the wire instructions for payments to Lender specified in **Schedule 1**.

(b)  Date.  Whenever any payment due hereunder shall fall due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be included in the computation of interest or fees, as the case may be.

(c)  Default Rate.  After the occurrence and during the continuance of an Event of Default and after Borrower has received notice from Lender of such Event of Default, Borrower shall pay interest on the aggregate, outstanding principal balance hereunder from the date due until such past due amounts are paid in full, at a per annum rate equal to the Default Rate.  All computations of such interest shall be based on a year of 365/366 days and actual days elapsed.

(d)  Upon request, Lender shall deliver to Borrower the payoff amount (including, and broken down into, principal, interest, penalties and fees) under each outstanding Loan.

*Loan and Security Agreement – Page 8*

**Article 3.    CREATION OF SECURITY INTEREST.**

**Section 3.01.  Grant of Security Interest**.  To induce Lender to enter into this Agreement and make the Loans in accordance with the terms hereof, Borrower grants and pledges to Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral in order to secure prompt payment of any and all Obligations and in order to secure prompt performance by Borrower of each of its covenants and duties under the Transaction Documents.  Notwithstanding termination of this Agreement, Lender's Lien on the Collateral shall remain in effect for so long as any Obligations (other than inchoate indemnity obligations) are outstanding. Borrower is and shall remain absolutely and unconditionally liable for the performance of its Obligations under the Transaction Documents, including, without limitation, any deficiency by reason of the failure of the Collateral to satisfy all amounts due Lender under any of the Transaction Documents.

**Section 3.02.  Filing of Financing Statements**.  Borrower authorizes Lender to prepare and file any financing statement necessary or desirable to perfect Lender's security interest in the Collateral, and any continuation statement or amendment with respect thereto, in any appropriate filing office.

**Section 3.03.  Priority of Security Interest**.

(a)   Subject to subsections (b), (c) and (d) below, on the Closing Date and for so long as any Obligations are outstanding, Lender shall have a first priority Lien on the Collateral described herein, prior and superior in right to any other Person (other than with respect to the Permitted Liens and as described in this Section 3.03 and all other liens expressly permitted under this Agreement).

(b)   If Borrower obtains Qualified Commercial Bank Financing or the Reg A+ Financing, the Lender agrees to cause its first priority Lien on the Collateral to become pari pasu with any Liens on the Indebtedness owed to the lender(s) providing the Qualified Commercial Bank Financing or the Reg A+ Financing, and the Lender agrees to enter into a reasonable and customary intercreditor/syndication or participation/collateral sharing agreement governing the Liens shared by the Lender and the lenders providing the Qualified Commercial Bank Financing or the Reg A+ Financing.  Borrower agrees to pay Lender's reasonable costs and expenses, including without limitation, reasonable attorneys' fees and disbursements expended or incurred in the negotiation, documentation, execution and delivery of the intercreditor/collateral sharing agreement.

(c)   At any time after the Funding Period, if Borrower obtains a Qualified Line of Credit, the Lender agrees to subordinate its first priority Lien on the Collateral, and agrees to enter into a reasonable and customary subordination agreement with the financial institution providing the Qualified Line of Credit. Borrower agrees to pay Lender's reasonable costs and expenses, including without limitation, reasonable attorneys' fees and disbursements expended or incurred in the negotiation, documentation, execution and delivery of the subordination agreement. Upon receipt by Borrower of a commitment/term sheet for a Qualified Line of Credit, Borrower shall provide such commitment/term sheet to Lender.  Upon receipt of such commitment/term sheet, Lender shall have five (5) days to notify Borrower of its commitment to provide Borrower with a working capital line of credit on the terms in such commitment/term sheet.  If Lender fails to commit to provide Borrower with such working capital line of credit within such five-day period, Borrower may proceed with obtaining the Qualified Line of Credit from the third-party financial institution on the terms contained in the commitment/term sheet.  However, if Lender commits to provide Borrower with a working capital line of credit on the terms in such commitment/term sheet within such five-day period, Lender and Borrower shall act in good faith and use commercially reasonable efforts to put in place a working capital line of credit on the terms in such commitment/term sheet within 30 days, and if not completed within such time then Borrower shall be entitled to pursue a Qualified Line of Credit from the lender under the original commitment/term sheet or from another lender (in which case Lender shall not be entitled to additional notice and right to provide the loan based on the new commitment/term sheet).

(d)   If the Indebtedness under the Novus Loan Agreement is not paid in full on the Closing Date, the Lender agrees to subordinate its first priority Lien as to the Collateral to Novus, other than Borrower's accounts receivable, customer contracts supporting work in progress, work in progress and inventory and the Segregated Account, and agrees to enter into an Intercreditor Agreement with Novus, substantially in the

same form as that certain Intercreditor Agreement, dated as of February 25, 2016, by and among NOVUS and GCF whereby Lender shall replace GCF. Upon the mutual agreement of the Borrower and Lender, the Indebtedness under the Novus Loan Agreement shall be paid in full, and any subordination of Lender's Liens in the Collateral shall be terminated resulting in Lender having a first priority Lien in the Collateral.

**Article 4.**    **CLOSING.**

**Section 4.01.** ·**Conditions Precedent to Loans**.

(a)  <u>Conditions to Closing</u>.  Borrower shall have provided to Lender on or before the Closing and funding of the Initial Loan the following in form and substance reasonably satisfactory to Lender:

(i)  This Agreement, duly executed by Borrower to be held in escrow until the Funding Date.

(ii)  The Note evidencing the Initial Loan, duly executed by Borrower to be held in escrow until the Funding Date.

(iii)  Satisfactory evidence that each document (including any Uniform Commercial Code financing statement and appropriate filings with the United States Patent and Trademark Office or United States Copyright Office) required by the Transaction Documents or any Requirement of Law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender a perfected first priority Lien on the Collateral described herein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted under this Agreement), shall be in proper form for filing, registration and recording.

(iv)  Copies, certified by the Secretary or Assistant Secretary of Borrower, of: (A) the Certificate of Incorporation and Bylaws of Borrower (as amended to the date of this Agreement), (B) the resolutions adopted by Borrower's board of directors authorizing the transaction and the documents being executed in connection therewith, and (C) the incumbency of the officers executing this Agreement and the other Transaction Documents on behalf of Borrower.

(v)  Good Standing Certificate(s) with respect to Borrower from Borrower's state of incorporation and principal place of business, if different, (each) as of a date acceptable to Lender.

(vi)  Certificate(s) of insurance and evidence of the insurance coverage in the form, scope and substance required by <u>Section 6.05(b)</u> of this Agreement.

(vii)  The Perfection and Disclosure Certificate attached hereto as **Exhibit E** hereto.

(viii)  A landlord lien waiver and collateral access agreement between Lender and ThreeSquare, LLC (*"ThreeSquare"*) providing Lender with a lien waiver from ThreeSquare and the right to access the Collateral located at the premises leased to Borrower by ThreeSquare, in forms reasonably acceptable to Borrower.

(ix)  A legal opinion of counsel to Borrower covering the matters set forth in **Exhibit C** hereto in form and substance reasonably satisfactory to Borrower.

(x)  Duly executed payoff letters from GCF that all of their respective indebtedness and security interests shall have been terminated and all amounts thereunder shall have been paid in full, or will be paid in full from the proceeds from the Initial Loan.

(xi)  Results of a recent lien search in the jurisdiction where the Borrower is organized and the assets of the Borrower are located, and such searches reveal no liens on any of the assets of the Borrower, except for liens permitted under this Agreement or to be discharged on or prior to the Closing Date pursuant to payoff letters referenced in (xii) above.

(xii) All other documents and information as Borrower shall have reasonably requested.

(b) Conditions to Funding of Each Additional Loan. Prior to the funding of any Additional Loan, Borrower shall have provided to Lender on or before the funding of the Additional Loan the following in form and substance reasonably satisfactory to Lender:

(i) Borrower shall have executed and delivered to Lender an Additional Loan Certificate in substantially similar form as **Exhibit D** hereto.

(ii) Borrower shall have executed and delivered a Note in favor of Lender setting forth the terms of the Additional Loan.

(iii) No uncured Event of Default shall have occurred and be continuing on the Funding Date of the Additional Loan or as a result of the Additional Loan.

(iv) Each of representations and warranties made by Borrower contained in this Agreement and the other Transaction Documents to which Borrower is a party shall be true and correct in all material respects as if made on the Funding Date of the Additional Loan, except to the extent such representations and warranties expressly refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

(v) Each of the Transaction Documents shall be in full force and effect.

(vi) Borrower shall have provided to Lender such documents, instruments and agreements, including financing statements or amendments to financing statements, as Lender shall reasonably request to evidence the perfected first priority Lien on the Collateral granted to Lender.

### Article 5.    REPRESENTATIONS AND WARRANTIES OF BORROWER.

To induce the Lender to enter into this Agreement and to make the Loans hereunder, the Borrower represents and warrants to the Lender as of the date hereof and as of the Funding Date of each Additional Loan:

**Section 5.01. Due Incorporation, Qualification, etc.** Borrower (i) is a corporation duly organized, validly existing and in good standing under the Governmental Rules of its jurisdiction of incorporation or formation; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) except as set forth on the Perfection and Disclosure Certificate, is duly qualified, licensed to do business and in good standing as a foreign registered organization in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a Material Adverse Effect. Borrower has no Subsidiaries.

**Section 5.02. Authority.** The execution, delivery and performance by Borrower of each Transaction Document to be executed by Borrower and the consummation of the transactions contemplated thereby (i) are within the power of Borrower and (ii) have been duly authorized by all necessary actions on the part of Borrower.

**Section 5.03. Enforceability.** Each Transaction Document executed, or to be executed, by Borrower has been, or will be, duly executed and delivered by Borrower and constitutes, or will constitute, a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as limited by bankruptcy, insolvency or other similar Governmental Rules of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

**Section 5.04. Non-Contravention.** The execution and delivery by Borrower of the Transaction Documents executed by Borrower and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate its certificate of incorporation or bylaws, (ii) violate in any material respect any other Requirement of Law applicable to Borrower; (iii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or

*Loan and Security Agreement – Page 11*

both), any material Contractual Obligation of Borrower; or (iv) result in the creation or imposition of any Lien upon any property, asset or revenue of Borrower (except such Liens as may be created in favor of Lender pursuant to this Agreement or the other Transaction Documents)..

**Section 5.05. Approvals.** No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority or other Person (including, without limitation, the shareholders of any Person) is required in connection with the execution and delivery of the Transaction Documents executed by Borrower and the performance and consummation of the transactions contemplated thereby, other than consents, approvals, orders or authorizations, or registrations, declarations or filings that have already been obtained.

**Section 5.06. No Violation or Default.** Borrower is not in violation of or in default with respect to (i) its certificate of incorporation or bylaws; (ii) any other Requirement of Law applicable to Borrower; or (iii) any Contractual Obligation (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a Material Adverse Effect. No Event of Default has occurred and is continuing.

**Section 5.07. Litigation.** Except as set forth in Section 7 of the Perfection and Disclosure Certificate, no actions (including, without limitation, derivative actions), suits, proceedings or investigations are pending or, to the knowledge of Borrower, threatened against Borrower at law or in equity in any court or before any other Governmental Authority which if adversely determined (i) could reasonably be expected (alone or in the aggregate) to have a Material Adverse Effect or (ii) seeks to enjoin, either directly or indirectly, the execution, delivery or performance by Borrower of the Transaction Documents or the transactions contemplated thereby. Except as set forth in the Perfection and Disclosure Certificate, the Borrower holds no commercial tort claims of which it has knowledge.

**Section 5.08. Collateral.** Borrower has good and marketable title to all Collateral, free and clear of all Liens, other than Permitted Liens except as set forth in Section 11 of the Perfection and Disclosure Certificate, and except for the Lien of an existing lender which will be paid in full with proceeds of the Loan and such Lien discharged. Borrower has no deposit accounts or securities accounts, other than the deposit accounts and securities accounts described in the Perfection and Disclosure Certificate and those permitted under Section 7.09. Except as described in the Perfection and Disclosure Certificate or as permitted under Section 6.08, the Collateral is not in the possession of any third party bailee (such as at a warehouse) except that it may be in transit from the manufacturer or to an installation site and/or at the installation site awaiting installation.

**Section 5.09. Financial Statements.** The Financial Statements of Borrower which have been delivered to Lender (i) are in accordance with the books and records of Borrower, which have been maintained in accordance with good business practice in all material respects; (ii) have been prepared in conformity with GAAP in all material respects (other than, with respect to interim Financial Statements, the absence of footnotes and normal year-end adjustments); and (iii) fairly present in all material respects the financial position of Borrower as of the dates presented therein and the results of operations, cash flows, and, if applicable stockholders' equity, for the periods presented therein. As of the date hereof, Borrower does not have any contingent obligations, liability for taxes or other outstanding obligations which are material in the aggregate, except as disclosed in the most recent Financial Statements (including the notes thereto) furnished by Borrower to Lender prior to the date hereof. There have not been any changes in the financial condition or results of operations of Borrower which are material in the aggregate since the most recent Financial Statements furnished by Borrower to Lender.

**Section 5.10. No Material Adverse Effect.** Since June 30, 2015, no development or event has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 5.11. Solvency.** Borrower is not left with unreasonably small capital after the transactions in this Agreement; and Borrower is generally able to pay its debts (including trade debts) as they mature.

**Section 5.12. Taxes.** Borrower has filed or caused to be filed all tax returns that are required to be filed by it except where the failure to do so could not reasonably be expected to have a Material Adverse Effect. Such tax returns are, or will be, true, complete and correct in all respects. As of the date hereof, Borrower has paid, or

made provision for the payment of, all taxes which have or may have become due pursuant to said returns or otherwise, except such taxes, if any, which are being contested in good faith and as to which adequate reserves (determined in accordance with generally accepted accounting principles) have been provided or which could not reasonably be expected to have a Material Adverse Effect if unpaid. Except as set forth on the Perfection and Disclosure Certificate, as of the date hereof, Borrower is not a party to any audit or tax proceeding by any taxing authority except that Borrower has received notice of a pending audit from the State of West Virginia. There are no pending or threatened audits, proceedings or lawsuits by any taxing authority. There are no Liens for taxes upon the Collateral nor, to Borrower's knowledge, is any taxing authority in the process of imposing any Liens for taxes on any Collateral (other than for current taxes not yet due and payable).

**Section 5.13.  Catastrophic Events; Labor Matters.**  Neither Borrower not any of its properties is or has been affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or other casualty that could reasonably be expected to have a Material Adverse Effect. There are no disputes presently subject to grievance procedure, arbitration or litigation under any of the collective bargaining agreements, employment contracts or employee welfare or incentive plans to which Borrower is a party, and there are no strikes, lockouts, work stoppages or slowdowns, or, to the best knowledge of Borrower, jurisdictional disputes or organizing activity occurring or threatened in all cases which could reasonably be expected to have a Material Adverse Effect. All payments due in respect of employee health and welfare insurance from Borrower have been paid or properly accrued on the books of the Borrower.

**Section 5.14.  First Priority.**  Subject to Section 3.03 and assuming the timely filing of financing statements, and all appropriate filings with the United States Patent and Trademark Office and the United States Copyright Office as well as execution and delivery of all appropriate control agreements, the security interest granted hereby constitutes a legal, valid, continuing and enforceable first priority security interest in, and Lien on, all of the Collateral, subject only to Permitted Liens.

**Section 5.15.  Perfection and Disclosure Certificate.**  All of the information set forth in the Perfection and Disclosure Certificate delivered to Lender is correct as of the date hereof.

**Section 5.16.  Intellectual Property.**  Except as set forth in Section 12 of the Perfection and Disclosure Certificate, Borrower is the sole owner of, or has the right to use, all Intellectual Property necessary for the conduct of its business as currently conducted or proposed to be conducted, except for non-exclusive licenses granted by Borrower to its customers in the ordinary course of business. To Borrower's knowledge, no part of its Intellectual Property has been judged invalid or unenforceable, in whole or in part, and no claim has been made that any material part of Borrower's Intellectual Property violates the rights of any third party. To the Borrower's knowledge, the conduct of the Company's business as currently, formerly and proposed to be conducted (including the sale of any product or service ) has not infringed, misappropriated, diluted or otherwise violated, and does not and will not infringe, dilute, misappropriate or otherwise violate the Intellectual Property or other rights of any Person.

**Section 5.17.  Insurance.**  To the best of Borrower's knowledge, the properties of Borrower are insured with financially sound and reputable insurance companies, in such amounts, with such deductibles and covering such risks, as to Borrower's knowledge, are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Borrower operates.

**Section 5.18.  Compliance with Laws.**  Borrower is in compliance with all Requirements of Laws except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 5.19.  Segregated Account.**  Borrower's Segregated Account is the only bank, brokerage or other deposit account used by Borrower to deposit, hold and make payments with funds from the Loans provided by Lender.

**Section 5.20.  Accuracy of Information.**  No statement or information contained in this Agreement, any other Transaction Document, or any other document, certificate or statement furnished by or on behalf of the Borrower to the Lender, for use in connection with the transactions contemplated by this Agreement or the other

Transaction Documents, when taken as a whole, contained as of the date such statement and to Borrower's knowledge, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statement contained herein or therein not misleading.

## Article 6. AFFIRMATIVE COVENANTS.

While any Obligations remain outstanding:

**Section 6.01. Financial Statements.** Borrower shall provide to Lender the Financial Statements specified in Sections 6.01(a) - (c) and the other information specified below including only Borrower and not any other entities or individuals; provided, however, that after the effective date of the initial registration statement covering a public offering of Borrower's securities (for avoidance of doubt, the Reg A+ Financing shall not constitute a public offering), Borrower shall only be required to deliver those Financial Statements and other information required to be filed by the Securities and Exchange Commission, to be provided as soon as practicable and no less frequently than quarterly.

(a) As soon as practicable (and in any event within thirty (30) days after the end of each month), unaudited Financial Statements for such month, certified by Borrower's Chief Executive Officer or Chief Financial Officer to fairly present in all material respects the data reflected therein.

(b) As soon as practicable (and in any event within forty five (45) days after the end of each quarter), unaudited Financial Statements for such quarter, certified by Borrower's Chief Executive Officer or Chief Financial Officer to fairly present in all material respects the data reflected therein.

(c) As soon as practicable (and in any event within one hundred fifty (150) days after the end of each fiscal year), audited Financial Statements for such year, setting forth in comparative form the corresponding figures for the preceding fiscal year, and accompanied by an audit report and unqualified opinion (except for a qualification related to going concern) of the independent certified public accountants of recognized national standing selected by Borrower and reasonably satisfactory to Lender. Notwithstanding the foregoing, if Borrower's Board of Directors determines that it is in Borrower's best interest not to have an audit for a particular financial reporting year then Lender waives the requirements of this Section 6.01(c) for such financial reporting year; provided Borrower delivers to Lender unaudited year-end Financial Statements certified by Borrower's Chief Executive Officer or Chief Financial Officer to fairly present in all material respects the data reflected therein.

(d) No later than 60 days after the end of each fiscal year of Borrower, an annual operating plan and financial projections for the next fiscal year approved by Borrower's Board of Directors.

(e) Copies of all 409(A) valuation reports, if any, each within five (5) days after approved by Borrower's Board of Directors.

**Section 6.02. Other Information.** Borrower shall promptly provide to Lender:

(a) deleted;

(b) notice of the commencement or written threat of any actions, lawsuits, investigations and proceedings before any Governmental Authority that could reasonably be expected to result in costs or damages to Borrower of One Hundred Thousand Dollars ($100,000) or more or which might materially interfere with the normal business operations of Borrower;

(c) written notice of any event of default under any material Contractual Obligation of the Company;

(d) notice of any Default, Event of Default, or Event of Loss;

(e) notice of the formation of any Subsidiary of the Company; and

*Loan and Security Agreement – Page 14*

(f)   any additional information as Lender shall reasonably request to evaluate Borrower's continuing financial obligations.

**Section 6.03.  Corporate Identity.**  Borrower shall preserve, renew and maintain in full force and effect its corporate existence and take all reasonable action to maintain all rights, privileges, registrations, permits and franchises necessary or desirable in the normal conduct of its business, except in each case as otherwise permitted under this Agreement.  Borrower shall notify Lender in writing thirty (30) days prior to any change in Borrower's principal place of business or chief executive office and any change of Borrower's name, type of entity or jurisdiction of formation.

**Section 6.04.  Establishment of Segregated Account.**  Borrower shall maintain a separate deposit account at its financial institution for the sole purpose of receiving, holding and disbursing the proceeds from the Loans in accordance with the Permitted Uses as set forth in Section 2.03(a) (the "*Segregated Account*").  The location and account number of the Segregated Account are set forth on **Schedule 1.**  Borrower shall maintain a separate accounting and tracking system for the Segregated Account so that Lender can confirm and track the permitted use of the Loan proceeds and shall provide access to Lender of such accounting and tracking system upon request.  In addition, Borrower shall provide Lender with online access to the Segregated Account for the purpose of observation only.  Borrower shall provide Lender at least thirty (30) days prior written notice of any change in the Segregated Account, and if the Segregated Account is being moved to a different financial institution, Borrower shall insure that a control agreement sufficient to perfect a security interest is entered into with such financial institution in favor of Lender prior to such account being moved.  The Segregated Account shall be a cash collateral account, with all cash, checks and other items of payment in such account securing payment of the Loans, and in which Borrower shall have granted a Lien to Lender pursuant to this Agreement. All amounts deposited into the Segregated Account shall be applied in accordance with this Agreement. Borrower shall cause its Affiliates, officers, employees, agents, directors or other persons acting for or in concert with Borrower (each a "Related Person") to (i) within three (3) Business Days after receipt by Borrower or any such Related Person of any such cash, checks or other items of payment, deposit the same into the Segregated Account, and (ii) direct all persons obligated to make payment, and all persons who may hold or facilitate payment to Borrower in respect of any solar installation project to pay and/or deposit such amounts directly into the Segregated Account.

**Section 6.05.  Maintenance of Property; Insurance.**

(a)   Borrower shall maintain and preserve all of its property that is materially useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.

(b)   Borrower shall, at its own expense, obtain and carry insurance in amounts and forms reasonably acceptable to Lender and consistent with industry standards, including insurance against loss or damage to the Collateral and commercial general liability insurance.  The insurance against loss or damage to the Collateral shall name Lender as sole loss payee with respect to the Collateral, shall not be invalidated by any action of or breach of warranty by Borrower of any provision thereof and shall waive subrogation against Lender.  The liability policy(ies) shall name Lender as an additional insured in the full amount of Borrower's liability coverage limits contained within the insurance policy (or the coverage limits of any successor to Borrower or such successor's parent which is providing coverage), be primary and without contribution as respects any insurance carried by Lender and contain cross liability and severability of interest clauses.  All policies of insurance shall provide that Lender shall be given thirty (30) days' notice of cancellation of coverage.  Within 30 days after the Closing Date and prior to each policy renewal, Borrower shall furnish to Lender, certificates of insurance or other evidence satisfactory to Lender that insurance complying with all of the above requirements is in effect.

**Section 6.06.  Taxes.**  Borrower shall pay all taxes and other governmental or regulatory assessments of which it has knowledge before delinquency or before any penalty attaches thereto, except as may be contested in good faith by the appropriate procedures and for which Borrower shall maintain appropriate reserves; and timely file all required tax returns.

**Section 6.07.  Loss; Damage; Destruction and Seizure.**

(a) If while payment Obligations are outstanding any item of Collateral is lost, stolen, destroyed, damaged beyond repair or seized by a Governmental Authority (an "*Event of Loss*"), then, if no Event of Default has occurred and is continuing, any proceeds of insurance or any award paid by the seizing Governmental Authority that is received by Lender or Borrower shall be applied, at Borrower's option, (i) to the Obligations, or (ii) to purchase an item of Collateral to replace the item of Collateral which was subject to the Event of Loss, or to purchase other property used in Borrower's business, and such replacement item, or such other property, shall become part of the Collateral. If any such proceeds or awards are paid while an Event of Default has occurred and is continuing, Lender may, at its option, apply such proceeds or awards to the Obligations.

(b) So long as no Event of Default has occurred and is continuing, any proceeds of insurance received by Lender or Borrower with respect to an item of Collateral the repair of which is practicable shall, at the election of Borrower, be applied either to the repair of such Collateral or to the reimbursement of Borrower for the cost of such repair. If any such proceeds or awards are paid while an Event of Default has occurred and is continuing, Lender may at its option apply such proceeds or awards to the Obligations.

**Section 6.08.  Collateral Control**. Except for Collateral that is of a type that is moved from location to location in the ordinary course of business, Borrower shall keep all items of Collateral at (i) Borrower's facility located at the address specified in Section 11.06, (ii) the locations specified in the Perfection and Disclosure Certificate, or (iii) such other places identified in writing by Borrower to Lender ten (10) days in advance. Borrower shall furnish to Lender from time to time such statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Lender may reasonably request, all in reasonable detail.

**Section 6.09.  Compliance with Requirements of Law and Contractual Obligations**. Borrower shall comply in all material respects with all Requirements of Law and its Contractual Obligations.

**Section 6.10.  Intentionally Deleted**.

**Section 6.11.  Formation or Acquisition of Domestic Subsidiaries**.  Notwithstanding and without limiting the notice requirement in Section 6.02(f) and the negative covenant in Section 7.06 of this Agreement, at the time that Borrower forms or acquires any direct Subsidiary, Borrower shall, upon Lender's request (a) cause such new Subsidiary to provide to Lender a joinder to this Agreement to cause such Subsidiary to become a co-borrower hereunder, together with such appropriate financing statements and/or control agreements, all in form and substance reasonably satisfactory to Lender (including being sufficient to grant Lender a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Lender, upon Lender's request, appropriate certificates and stock powers and financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance reasonably satisfactory to Lender, and (c) provide to Lender all other documentation in form and substance satisfactory to Lender that in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above.

**Section 6.12.  Use of Proceeds**. Borrower shall use the proceeds of the Loan solely for the Permitted Uses.

**Section 6.13.  Additional Collateral**. With respect to any property acquired after the Closing Date by Borrower that is intended to be subject to a Lien created by any Transaction Document, other than any property subject to a Permitted Lien, as to which the Lender does not have a perfected Lien, Borrower shall promptly, and in any event within 30 days of acquiring such property: (i) execute and deliver to the Lender such supplements or amendments to this Agreement or such other documents as the Lender deems necessary or advisable to grant to the Lender a security interest in such property; and (ii) subject to Section 3.03, take all actions necessary or advisable to grant to Lender a perfected first priority security interest in such property, including the filing of UCC-1 financing statements in such jurisdictions as may be required by this Agreement or by Requirements of Law or as may be requested by the Lender.

**Section 6.14.  Maintenance of Books and Records; Inspection**. Borrower shall keep proper books of records and accounts, in which full, true and correct in all material respects entries in conformity with GAAP and all

*Loan and Security Agreement – Page 16*

Requirements of Law shall be made of all dealings and transactions and assets in relation to its business and activities. Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrower's usual business hours, but in no event on more than two occasions during any fiscal year (absent the occurrence of an Event of Default), to inspect Borrower's books and records and to make copies thereof and to inspect, test, and appraise the Collateral in order to verify Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral, and such inspection shall be at Lender's expense unless there is, at that time, an Event of Default.

**Section 6.15. Further Assurances**. Promptly upon the request of the Lender, Borrower shall:

(a) Correct any material defect or error that may be discovered in any Transaction Document or in the execution, acknowledgement, filing or recordation thereof; and

(b) Do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, conveyances, pledge agreements, assignments, financing statements and continuations thereof, termination statements, notices of assignments, transfers, certificates, assurances and other instruments as the Lender, may reasonably require from time to time in order to: (i) carry out more effectively the purposes of the Transaction Documents; (ii) to the fullest extent permitted by Governmental Rules, subject Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by the security interest in this Agreement and the other Transactions Documents; (iii) perfect and maintain the validity, effectiveness and priority of the Liens intended to be created by the security interest under this Agreement and the other Transaction Documents; and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively to the Lender, the rights granted or now or hereafter intended to be granted to the Lender under any Transaction Document or under any other instruments executed in connection with any Transaction Document to which Borrower is or is to be a party.

**Section 6.16. Deposit Account Control Agreements**. Within thirty days from the Closing Date, Borrower, Lender and each bank in which Lender maintains a deposit account, other than those banks identified on Exhibit F, attached hereto and incorporated herein, shall have entered into a control agreement sufficient to perfect a security interest in each of Borrower's deposit accounts, in a form reasonably acceptable to Lender. Each control agreement shall provide, among other things, that such bank agrees, from and after the receipt of a notice from Lender (which notice may be given by Lender at any time after the occurrence of an Event of Default) to forward immediately all amounts in such account to Lender and to commence the process of daily sweeps from such account to Lender.

## Article 7.   NEGATIVE COVENANTS.

While any Obligations remain outstanding:

**Section 7.01. Liens**. Borrower shall not (i) in any way create or permit to exist any Lien with respect to any of its property, except for Permitted Liens or those liens described in Section 3.03; (ii) enter into or permit to exist any agreement that restricts the ability of Borrower to grant a Lien to Lender in any of Borrower's property (other than (A) restrictions that would be unenforceable or ineffective pursuant to Section 9-408 of the Code or the Uniform Commercial Code as adopted in any other applicable jurisdiction and (B) restrictions in agreements governing property subject to a Lien that is otherwise permitted pursuant to clause (v) or clause (vi) of the definition of Permitted Lien).

**Section 7.02. Transfers**. Borrower shall not sell, transfer, assign, pledge, collaterally assign, exchange, or otherwise dispose of (collectively, a "*Transfer*") all or any part of its business or property, other than Transfers: (i) of inventory in the ordinary course of business, (ii) of non-exclusive licenses and similar arrangements for the use of the property of Borrower in the ordinary course of business, (iii) of worn-out, unneeded or obsolete equipment or inventory in the ordinary course of business; (iv) other Transfers of property in any fiscal year of the Borrower, so long as such property, together with all other property Transferred during such fiscal year, shall have a fair market value not exceeding $100,000; or (v) assignment of delinquent accounts receivable for collection purposes.

**Section 7.03.  Change of Control.**  Without the prior written consent of the Lender, there shall not occur (a) any transaction or series of related transactions, whether by merger, consolidation, sale of stock or otherwise, pursuant to which the holders of Borrower's voting Equity Securities prior to the transaction or series of related transactions do not hold at least 50% of the voting power of Borrower or any resulting Person after such transaction or transactions, or (b) any transaction or series of related transactions which results in the sale of all or substantially all of its assets of the Borrower, unless (i) the Obligations are assumed or unconditionally guaranteed in a manner satisfactory to the Lender by a Person which is the ultimate parent entity (the "*Acquirer*") of the acquiring Person and (ii) the Acquirer is a creditworthy entity (as determined by Borrower in its sole discretion); provided, however, that neither the terms and conditions of this Section 7.03 nor any other term or provision of this Agreement or any Transaction Document shall prohibit any sale, amalgamation, merger, conversion, consolidation or other combination, the terms of which provide for the contemporaneous or prior payment of all Obligations.

**Section 7.04.  Distributions.**  Without the prior written consent of the Lender, Borrower shall not (i) pay any dividends or make any distributions on its Equity Securities; (ii) purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Securities (other than (A) repurchases pursuant to the terms of employee stock purchase plans, employee restricted stock agreements or similar arrangements either (1) by the cancellation of Indebtedness or (2) in an aggregate amount not to exceed $50,000 or (B) redemptions of the Company's Series B Preferred Stock pursuant to the terms of the stock purchase agreements by which such Series B Preferred Stock was acquired which are triggered in connection with the Reg A+ Financing); (iii) return any capital to any holder of its Equity Securities; (iv) make any distribution of assets, Equity Securities, obligations or securities to any holder of its Equity Securities; or (v) set apart any sum for any such purpose; provided, however, Borrower may declare dividends payable solely in Equity Securities and make cash payments in lieu of the issuance of fractional shares upon the conversion of convertible securities. If Borrower is permitted to form any Subsidiaries under this Agreement, Borrower shall not suffer or permit any Subsidiary to be a party to, or be bound by, an agreement that restricts such Subsidiary from paying dividends or otherwise distributing property to Borrower.

**Section 7.05.  Indebtedness.**  Borrower shall not create, incur, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness.

**Section 7.06.  Investments.**  Borrower shall not, directly or indirectly acquire or own, or make any Investment in or to, any Person other than Permitted Investments.

**Section 7.07.  Transactions with Affiliates.**  Borrower shall not, directly or indirectly, enter into or permit to exist any material transaction with any Affiliate, except for transactions that are in the ordinary course of such Person's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arms' length transaction with a nonaffiliated Person; provided that the foregoing restriction shall not apply to (i) reasonable and customary fees paid to members of the board of directors of Borrower; (ii) compensation arrangements and benefit plans for officers and other employees of Borrower entered into or maintained in the ordinary course of business; and (iii) expense reimbursements for employees and independent contractors. Lender hereby approves that certain Real Estate Lease, dated June 1, 2001, by and between Borrower and ThreeSquare, LLC, an entity affiliated with David Levine.

**Section 7.08.  Indebtedness Payments.**  Borrower shall not prepay, redeem, purchase, defease or otherwise satisfy in any manner prior to the scheduled repayment thereof any Permitted Indebtedness (other than amounts due or permitted to be prepaid under this Agreement).

**Section 7.09.  Accounts.**  Borrower shall not maintain any deposit accounts or securities accounts except accounts with respect to which Lender has obtained a control agreement with the bank or other financial institution sufficient to perfect a security interest in such deposit accounts or securities accounts except for those accounts described on **Exhibit F**, attached hereto and incorporated herein.

**Section 7.10.  Line of Business.**  Borrower shall not engage in any line of business other than the lines of business of Borrower existing on the date hereof, together with lines of business reasonably related or ancillary thereto.

**Section 7.11. Limitation on Amendments of Material Contracts.** Borrow shall not amend, supplement or otherwise modify (pursuant to a waiver or otherwise): (a) its articles of incorporation, certificate of designation, bylaws or other ·organizational document; or (b) the terms and conditions of any material Contractual Obligations, in each case, in any respect materially adverse to the interests of the Lender, without the Lender's prior written consent.

**Section 7.12. Financial Covenants.**

(a) Borrower shall not exceed the identified amount for "Total Expenses" set forth on the Budget attached hereto as **Exhibit G** by more than 10% in any given month., without the prior written consent of the Lender, provided that if Borrower does exceed such amount by more than 10% then it shall be entitled to compensate for such over expenditure by spending below the budged "Total Expenses" the following month by an amount equal to or greater than the amount spent the previous month that exceeded the 10% limit, and the failure to comply with this covenant shall not be considered an Event of Default under section 9.01(b) until the second month has passed and the Borrower shall not be entitled to any additional cure periods under Section 9.01(b);

(b) Borrower shall not allow its cash reserves to fall below $100,000 taking into consideration all bank accounts, CDs, and cash, provided that if its cash reserves do fall below such amount then Borrower shall replenish such cash reserves on or before the twentieth (20th) day after the end of such month, and a failure to maintain such cash reserve required hereunder shall not be considered a default until the 20th day has passed; provided, further, if Lender shall not have made Additional Loan(s) to Borrower under this Agreement of at least $3,000,000 by December 31, 2016, this Section 7.12(b) shall terminate.

## Article 8. PRESERVATION OF COLLATERAL.

Upon the occurrence and during the continuance of an Event of Default, at Lender's sole and absolute discretion but without any obligation to do so, Lender may make, perform, observe, take or do the same in such manner and to such extent as Lender may deem necessary to protect its security interest in or the value of the Collateral without releasing Borrower from any obligation, covenant or condition in any Transaction Document. The foregoing rights shall include the right: (i) to perform (but Lender shall not be obligated to and shall incur no liability to Borrower or any third party for failure to perform) any act which Borrower is obligated by this Agreement to perform, (ii) to ask, demand, collect, receive, receipt for, sue for any and all rents, issues, profits, avails, distributions, income, payment draws and other sums in which a security interest is granted under Section 3.01 with full power to settle, adjust or compromise any claim thereunder as fully as if Lender were Borrower itself, (iii) to receive payment of and to endorse the name of Borrower to any items of Collateral (including checks, drafts and other orders for the payment of money) that come into Lender's possession or under Lender's control, (iv) to make all demands, consents and waivers, or take any other action with respect to, the Collateral, (v) in Lender's discretion, to file any claim or take any other action or institute proceedings, either in its own name or in the name of Borrower or otherwise, which Lender may reasonably deem necessary or appropriate to protect and preserve the right, title and interest of Lender in and to the Collateral, and (vi) to otherwise act with respect thereto as though Lender were the outright owner of the Collateral. To the extent necessary to take any of the foregoing actions, Borrower does hereby irrevocable appoint Lender (which appointment is coupled with an interest) as the true and lawful attorney-in-fact of Borrower with full power of substitution for it and its name; *provided, however*, that the power of attorney herein granted shall be exercisable only upon the occurrence and during the continuation of an Event of Default. Borrower agrees to reimburse Lender upon demand for all reasonable costs and expenses, including attorneys' fees and expenses, which Lender may incur under this Article 8, all of which costs and expenses are included within the Obligations. Upon the occurrence and during the continuance of an Event of Default, Lender may appoint a third-party administrator to administer the payments of the Obligations and otherwise act with respect to protection and preservation of the Collateral, and upon notice of such appointment, Borrower shall cooperate with such third-party administrator and shall reimburse Lender for the reasonable costs of such administrator.

## Article 9.   EVENTS OF DEFAULT.

**Section 9.01.   Events of Default.** The occurrence of any of the following shall constitute an *"Event of Default"* under the Transaction Documents:

(a)  Failure to Pay.  Borrower fails to pay any principal or interest under any Loan when due or fails to pay any fees, charges or other amounts payable by Borrower (provided it has received written notice of such fee, charge or other amount) hereunder or under any other Transaction Document when due and such failure remains unremedied for a period of ten (10) days; provided, however, that Lender shall not be required to provide written notice of non-payment of principal or interest more than two (2) times in any twelve-month period in order for such non-payment to be an Event of Default; or

(b)  Breaches of Covenants.  Borrower or any of its Subsidiaries shall fail to perform or observe (i) any of the covenants or agreements contained in Article 6 or Article 7 hereof or (ii) any other covenant, or agreement contained in any Transaction Document (other than the other Events of Default specified in this Article 9) and such failure remains unremedied for fifteen (15) Business Days from the date on which the Lender has given the Borrower written notice of such failure, except that if such default is subject to cure and cannot reasonably be cured within such time then so long as Borrower is diligently pursuing such remedy the time period for such cure shall be extended by an additional thirty (30) Business Days; or

(c)  Representations and Warranties.  Any representation, warranty, certificate, or final financial statement made or furnished by or on behalf of Borrower to Lender in writing in connection with this Agreement or any of the other Transaction Documents, or as an inducement to Lender to enter into the Transaction Documents, shall be false or misleading in any material respect when made or furnished; or

(d)  Other Payment Obligations.  An event of default under and as defined in any agreements relating to Indebtedness of Borrower shall have occurred and be continuing (provided that any applicable cure period has passed), and as a result such default or event of default, the Borrower becomes obligated to pay, or other lender accelerates, $100,000 or more of such Indebtedness prior to its stated maturity date; or

(e)  Insolvency.  Borrower is unable to pay its debts generally (including trade debts) as they become due or otherwise becomes insolvent; or

(f)  Voluntary Bankruptcy or Insolvency Proceedings.  Borrower shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its obligations generally as they come due or otherwise become insolvent, (iii) make a general assignment for the benefit of its creditors, (iv) be dissolved or liquidated or, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar Governmental Rule now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of affecting any of the foregoing; or

(g)  Involuntary Bankruptcy or Insolvency Proceedings.  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of Borrower or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to Borrower or the debts thereof under any bankruptcy, insolvency or other similar Governmental Rule now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within sixty (60) days of commencement; or

(h)  Judgments.  A final judgment or order for the payment of money in excess of One Hundred Thousand Dollars ($100,000) (that is not covered by insurance) shall be rendered against Borrower and the same shall remain undischarged for a period of thirty (30) days during which execution shall not be effectively stayed, or any judgment, writ, assessment, warrant of attachment, or execution or similar process shall be issued or

levied against a substantial part of the property of Borrower and such judgment, writ, or similar process shall not be released, stayed, vacated or otherwise dismissed within thirty (30) days after issue or levy; or

(i) Transaction Documents. Any Transaction Document or any material term thereof shall cease to be, or be asserted by Borrower not to be, a legal, valid and binding obligation of Borrower enforceable in accordance with its terms or if, after Lender has properly filed financing statements, and all appropriate documents with the United States Patent and Trademark Office and the United States Copyright Office and obtained control agreements, the Liens of Lender in the Collateral shall cease to be or shall not be valid, perfected Liens, except when such failure is due to Lender's failure to take any action necessary to properly perfect such Lien, subject only to Permitted Liens. For avoidance of doubt, the delay in obtaining deposit account control agreements which Borrower has requested to be delivered after the Closing Date as permitted by this Agreement shall not be deemed to be Lender's failure to take necessary action to property perfect its Lien.

(j) Default Under Certain Agreements. An event of default under and as defined in the Novus Loan Agreement, any agreements relating to a Qualified Commercial Bank Financing, any agreements related to a Qualified Line of Credit, and any agreements relating to the Reg A+ Financing shall have occurred and be continuing (provided that any applicable cure period has passed).

## Article 10.   LENDER'S RIGHTS AND REMEDIES

**Section 10.01. Rights of Lender upon Default.** Upon the occurrence and during the existence of any Event of Default (other than an Event of Default referred to in Sections 9.01(f) and 9.01(g)) and at any time thereafter during the continuance of such Event of Default, the Lender may, by written notice to Borrower, declare all outstanding Obligations, including, without limitation, the obligation to make each payment scheduled to be made under Section 2.02, payable by Borrower hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the Notes to the contrary notwithstanding. Upon the occurrence or existence of any Event of Default described in Sections 9.01(f) and 9.01(g), immediately and without notice, all outstanding Obligations, including, without limitation, the non-cancelable obligation to make each payment scheduled to be made under Section 2.02, payable by Borrower hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the Notes to the contrary notwithstanding.

**Section 10.02. Rights Regarding Collateral.** Borrower agrees that when any Event of Default has occurred and is continuing, Lender shall have the rights, options, duties and remedies of a secured party as permitted by Governmental Rules and, in addition to and without limiting the foregoing, Lender may exercise any one or more or all, and in any order, of the remedies herein set forth, including the following: (i) Lender, personally or by agents or attorneys, shall have the right (subject to compliance with any applicable mandatory Requirements of Law) to require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender or to take immediate possession of the Collateral, or any portion thereof, and for that purpose may pursue the same wherever it may be found, and may enter any premises of Borrower, with or without notice, demand, process of law or legal procedure, to the extent permitted by applicable Governmental Rule, and search for, take possession of, remove, keep and store the same, or use and operate or lease the same until sold; (ii) Lender may, if at the time such action may be lawful and always subject to compliance with any mandatory Requirements of Law, either with or without taking possession and either before or after taking possession, without instituting any legal proceedings whatsoever, having first given notice of such sale by registered or certified mail to Borrower once at least ten (10) days prior to the date of such sale, and having first given any other notice which may be required by Governmental Rules, sell and dispose of the Collateral, or any part thereof, at a private sale or at public auction, to the highest bidder, in one lot as an entirety or in separate lots, and either for cash or on credit and on such terms as Lender may determine, and at any place (whether or not it be the location of the Collateral or any part thereof) designated in the notice referred to above; and (iii) Lender may proceed to protect and enforce this Agreement and the other Transaction Documents by suit or suits or proceedings in equity, at law or in bankruptcy, and whether for the specific performance of any covenant or agreement herein contained or in execution or aid of any power herein granted; or for foreclosure hereunder, or for the appointment of a receiver or receivers for any real property security or any part thereof, or for the

*Loan and Security Agreement – Page 21*

recovery of judgment for the Obligations or for the enforcement of any other proper, legal or equitable remedy available under applicable Governmental Rules. Lender and its agents and any purchasers at or after foreclosure are hereby granted a non-exclusive, irrevocable, perpetual, fully paid, royalty-free license or other right, solely pursuant to the provisions of this Section 10.02, to use, without charge, Borrower's Intellectual Property that remains embedded or contained in the Collateral, including without limitation, labels, Patents, Copyrights, rights of use of any Trademarks, and advertising matter, or any property of a similar nature, now or at any time hereafter owned or acquired by Borrower or in which Borrower now or at any time hereafter has any rights; provided, however, such license shall only be exercisable in connection with the disposition of Collateral upon Lender's exercise of its remedies hereunder. To the extent permitted by applicable Governmental Rules, any such sale or sales may be adjourned from time to time by announcement at the time and place appointed for such sale or sales, or for any such adjourned sale or sales, without further published notice, and Borrower, Lender or the holder or holders of the Note, or of any interest therein, may bid and become the purchaser at any such sale. With respect to any of Borrower's owned premises, Borrower hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, for up to one hundred twenty (120) days in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise.

**Section 10.03. Lender's Liability for Collateral.** So long as the Lender complies with its obligations, if any, under the Code, except for any loss or damage resulting from Lender's gross negligence or willful misconduct, Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral; (ii) any loss or damage thereto occurring or arising in any manner of fashion from any cause other than Lender's gross negligence or willful misconduct; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person whomsoever. All risk of loss, damage or destruction of the Collateral shall be borne by Borrower.

**Section 10.04. Application of Collateral Proceeds.** The proceeds of the Collateral, or any part thereof, resulting from Lender's exercise of remedies hereunder (as well as any other amounts of any kind held by Lender at the time of, or received by Lender after, the occurrence of an Event of Default hereunder) shall be paid to and applied as follows: (i) First, to the payment of reasonable costs and expenses, including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made hereunder by Lender; (ii) Second, to the payment to Lender of the amounts then owing or unpaid on the Notes, including each payment scheduled to be made under Sections 2.02(b) and 2.02(c) of this Agreement; (iii) Third, to the payment of other amounts then payable to Lender under any of the Transaction Documents; and (iv) Fourth, to the payment of the surplus, if any, to Borrower, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

**Section 10.05. Reinstatement of Rights.** If Lender shall have proceeded to enforce any right under this Agreement or any other Transaction Document by foreclosure, sale, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely, then and in every such case (unless otherwise ordered by a court of competent jurisdiction), Lender shall be restored to its former position and its rights hereunder with respect to the property subject to the security interest created under this Agreement shall be reinstated.

**Section 10.06. Waiver by Borrower.** Borrower hereby waives presentment, demand, protest or any notice, except as expressly provided in this Article 10 (to the extent permitted by applicable Governmental Rule) of any kind in connection with this Agreement or any Collateral. To the extent permitted by the Code or other applicable Governmental Rules, Borrower waives any rights now or hereafter conferred by statute or otherwise which limit or modify any of Lender's rights or remedies under this Agreement.

## Article 11.   MISCELLANEOUS.

**Section 11.01. Modifications, Amendments or Waivers.** The provisions of any Transaction Document may be modified, amended or waived only by a written instrument signed by Borrower and Lender. Lender may correct patent errors and fill in any blanks in the Transaction Documents consistent with the agreement of the parties.

**Section 11.02. No Implied Waivers; Cumulative Remedies; Writing Required.** No delay or failure of Lender in exercising any right, power or remedy hereunder shall affect or operate as a waiver thereof; nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power or remedy preclude any further exercise thereof or of any other right, power or remedy. The rights and remedies hereunder of the Lender are cumulative and not exclusive of any rights or remedies which it would otherwise have under the Code, by law or equity. Any waiver, permit, consent or approval of any kind or character on the part of Lender of any breach, Default or Event of Default under this Agreement or any such waiver of any provision or condition of this Agreement must be in writing and shall be effective only in the specified instance and to the extent specifically set forth in such writing.

**Section 11.03. Reimbursement.** Borrower shall reimburse Lender for all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and disbursements expended or incurred in any arbitration, mediation, judicial reference, legal action or otherwise in connection with (i) the amendment of the Transaction Documents and enforcement of the Transaction Documents following the occurrence and continuance of an Event of Default, including without limitation, any workout, attempted workout and/or in connection with the rendering of legal advice as to Lender's rights, remedies and obligations under the Transaction Documents, (ii) enforcing the Transaction Documents or collecting any sum which becomes due Lender under any Transaction Document, (iii) while an Event of Default has occurred and is continuing any proceeding for declaratory relief, any counterclaim to any proceeding, or any appeal, unless Borrower is wholly successful in any such proceeding, or (iv) the protection, preservation or enforcement of any rights of Lender unless Borrower is wholly successful in any such proceeding. For the purpose of this section, attorneys' fees shall include, without limitation, fees incurred in connection with the following: (1) contempt proceedings; (2) discovery, (3) any motion, proceeding or other activity of any kind in connection with an insolvency proceeding; (4) garnishment, levy, and debtor and third party examinations; and (5) post-judgment motions and proceedings of any kind, including without limitation, any activity taken to collect or enforce any judgment. All of the foregoing costs and expenses shall be payable by Borrower upon demand by Lender, and if not paid within thirty (30) days of presentation of invoices shall bear interest at the Default Rate.

**Section 11.04. Indemnification.** Borrower shall indemnify, reimburse and hold the Lender and its permitted assigns, each of Lender's or its permitted assign's members, and each of their respective successors, assigns, agents, officers, directors, managers, shareholders, members, servants, agents and employees harmless from and against all liabilities, losses, damages, actions, suits, demands, claims of any kind and nature (including claims relating to environmental discharge, cleanup or compliance), all costs and expenses whatsoever to the extent they may be incurred or suffered by such indemnified party in connection therewith (including reasonable attorneys' fees and expenses), fines, penalties (and other charges of applicable governmental authorities), licensing fees relating to any item of Collateral, damage to or loss of use of property (including consequential or special damages to third parties or damages to Borrower's property), or bodily injury to or death of any person (including any agent or employee of Borrower) (each, a "*Claim*"), directly or indirectly relating to or arising out of the use of the proceeds of the Loan, including the falsity of any representation or warranty of Borrower or Borrower's failure to comply with the terms of this Agreement or any other Transaction Document; provided, however, that Borrower shall not indemnify Lender (or any other indemnified party hereunder) for any liability incurred by Lender (or any other indemnified party hereunder) as a result of that Lender's (or any other indemnified party hereunder) gross negligence or willful misconduct. Such indemnities shall continue in full force and effect, notwithstanding the expiration or termination of this Agreement. Upon Lender's written demand, Borrower shall assume and diligently conduct, at its sole cost and expense, the entire defense of Lender and its permitted assigns, each of Lender's or its permitted assign's members, and each of their respective successors, assigns, agents, officers, directors, managers, shareholders, members, servants, agents and employees against any indemnified Claim described in this Section 11.04. Borrower shall not settle or compromise any Claim against or involving Lender without first obtaining Lender's written consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that nothing in this Section 11.04 shall prohibit Borrower from settling or compromising any Claim against or involving Lender (or any other indemnified party hereunder) if such settlement does not lead to liability or the creation of a financial or other obligation on the part of the Lender and provides for the unconditional release of each indemnified Person from all liabilities and obligations in connection with such Claim. The obligations in this Section 11.04 shall survive payment of all other Obligations until all applicable statute of limitation periods with respect to actions that may

be brought against Lender have run. All amounts owing under this Section 11.04 shall be paid within thirty (30) days after written demand.

**Section 11.05. Limitation on Damages.** NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LOAN AGREEMENT OR ANYWHERE ELSE, LENDER AND BORROWER AGREE THAT NEITHER PARTY SHALL SEEK FROM THE OTHER UNDER ANY THEORY OF LIABILITY (INCLUDING ANY THEORY IN TORTS), ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES.

**Section 11.06. Notices.** All notices and other communications given to or made upon any party hereto in connection with this Agreement shall be in writing and shall be delivered by certified mail, postage prepaid, return receipt requested, by a nationally recognized overnight courier, by facsimile, by electronic mail or other means of electronic communication or personally delivered to the respective parties, as follows:

Borrower:

**GEOSTELLAR, INC.**
Attn: David Levine
224 W. King Street
Martinsburg, West Virginia 25401
Fax: 240-465-1069
Email: david.levine@geostellar.com

Lender:

**MATADOR SOLAR PARTNERS, LLC**
Attn: John Greer
8750 North Central Expressway
Suite 750
Dallas, Texas 75231
Fax: 214-369-5710
Email: jgreer@matadorcapital.com

with a copy to (which shall not constitute notice):

with a copy to (which shall not constitute notice):

**CARRINGTON COLEMAN**
Attn: David Black
901 Main Street
Suite 5500
Dallas, TX 75202
Fax: 214.758.3722
Email: dblack@ccsb.com

**LIDJI DOREY & HOOPER**
Attn: Kyle C. Hooper
500 N. Akard Street
Suite 3500
Dallas, Texas 75201
Fax: 214.774.1212
Email: khooper@LDHlaw.com

or in accordance with any subsequent written direction from either party to the other. All such notices and other communications shall be effective, (i) in the case of delivery by messenger or overnight delivery service, when left at the appropriate address; (ii) in the case of facsimile transmission, upon the sender's receipt of electronic confirmation of receipt; (iii) in the case of electronic mail, upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (iv) in all other cases, upon actual receipt however evidenced.

**Section 11.07. Severability.** If any term or provision of any Transaction Document is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision thereof or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify the applicable Transaction Document so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 11.08. Reliance by Lender.** All covenants, agreements, representations and warranties made herein by Borrower shall be deemed to be material to and have been relied upon by the Lender, notwithstanding investigation by Lender.

**Section 11.09. No Set-Offs by Borrower.** All sums of principal and interest payable by Borrower pursuant to this Agreement or any of the other Transaction Documents shall be payable without notice or demand and shall be payable without set-off or deduction in any manner whatsoever.

**Section 11.10. Survival.** All covenants, agreements, representations and warranties made by the Borrower in the Transaction Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Transaction Document shall survive the execution and delivery of the Transaction Documents and the making of any Loans, regardless of any investigation made by Lender and notwithstanding that the Lender may have notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as any Obligation under this Agreement is outstanding and unpaid.

**Section 11.11. Confidentiality.** Lender agrees to hold non-public information received in confidence and shall not disclose such information to third parties except to their employees, members, partners or the partners of its

*Loan and Security Agreement – Page 25*

affiliated investment funds, their lenders, and professional advisors to the foregoing, including attorneys and accountants, and others under a similar duty of confidentiality (provided such parties sign a non-disclosure agreement in favor of Borrower), and as Lender may deem necessary in its reasonable judgment to satisfy its legal obligations or to enforce its rights under any Transaction Document. Borrower acknowledges that Lender may issue press releases, advertisements, and other promotional materials, either in print or on Lender's website(s), describing any successful outcome of services provided on Borrower's behalf (provided Borrower has approved all such publications in advance). Borrower agrees that Lender shall have the right to identify Borrower by name and use Borrower's corporate logo in those materials, solely for marketing purposes. Borrower agrees that, without Lender's prior written consent, it shall not, and shall cause its Affiliates not to, issue any press release, advertisement, promotional material or other public statement, in any form, which identifies the Lender or otherwise makes reference to the transactions contemplated hereby.

**Section 11.12. Choice of Law and Venue; Jury Trial Waiver.**

(a) This Agreement and the other Transaction Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Transaction Document (except, as to any other Transaction Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to conflicts of laws principles.

(b) Each of Borrower and Lender irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against the other party in any way relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, in any forum other than the courts of the State of Delaware, and of the United States District Court of the Delaware, and each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any such Delaware State court or, to the fullest extent permitted by applicable Governmental Rules, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Governmental Rule.

(c) Each of Borrower and Lender irrevocably and unconditionally waives, to the fullest extent permitted by applicable Governmental Rules, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Transaction Document in any such court referred to in subsection (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Governmental Rules, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Each of Borrower and Lender irrevocably consents to the service of process in the manner provided for notices in Section 11.06 and agrees that nothing herein will affect the right of any party hereto to serve process in any other manner permitted by applicable Governmental Rules.

(e) EACH OF BORROWER AND LENDER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE GOVERNMENTAL RULES, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY. EACH PARTY HERETO (A) CERTIFIES THAT NO AGENT, ATTORNEY, REPRESENTATIVE OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 11.13. Successors and Assigns**.  This Agreement and the other Transaction Documents shall be binding upon and inure to the benefit of the Lender, all future holders of the Notes, Borrower and their respective successors and permitted assigns, except that Borrower may not assign or transfer its rights hereunder or thereunder or any interest herein or therein without the prior written consent of Lender.  Lender may grant a security interest or assign all or any portion of its rights hereunder and under one or more of the Notes, without the consent of or notice to Borrower, to any of its Affiliates (an "*Assignee*").  Lender may disclose the Transaction Documents and any other financial or other information relating to Borrower to any potential Assignee, provided that such Assignee agrees to protect the confidentiality of such documents and information using the same measures that it uses to protect its own confidential information and otherwise conform to the requirements of Section 11.11. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, or as contemplated by Section 11.04) any legal or equitable right, remedy or claim under or by reason of this Agreement.

**Section 11.14. Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original, but all such counterparts shall together constitute one and the same instrument. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 11.15. Entire Agreement**.  This Agreement and each of the other Transaction Documents, taken together, constitute and contain the entire agreement of Borrower and the Lender and supersedes any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

**Section 11.16. Termination of Security Interest**.  Upon the payment in full of all Obligations (other than inchoate indemnity obligations) and the termination of any commitment to make the Loans, the security interest granted herein shall terminate and all rights to the Collateral shall revert to Borrower.  Upon Lender's written verification to Borrower of receipt of such payment, Lender hereby authorizes Borrower to file any UCC termination statements necessary to effect such termination and Lender will return any Collateral in its possession to Borrower and will execute and deliver to Borrower any additional documents or instruments as Borrower shall reasonably request to evidence such termination.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**LENDER:**

**MATADOR SOLAR PARTNERS, LLC,**
a Texas limited liability company

By: _____

Name: John M. Greer

Title: President and Manager

**BORROWER:**

**GEOSTELLAR, INC.,**
a Delaware corporation

By: _____

Name: David Levine

Title: Chief Executive Officer

Signature Page to Loan and Security Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

LENDER:

**MATADOR SOLAR PARTNERS, LLC,**
a Texas limited liability company

By: _____

Name: John M. Greer

Title:  President and Manager

BORROWER:

**GEOSTELLAR, INC.,**
a Delaware corporation

By: _____

Name: David Levine

Title: Chief Executive Officer

# EXHIBIT 8



SHULMAN
ROGERS

GANDAL
PORDY
ECKER

**BENJAMIN P. SMITH**   ATTORNEY
℘ 301.230.5241  ℓ. bsmith@shulmanrogers.com

December 14, 2017

## SENT VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED

**To:**   Geostellar, Inc.                                               *Notice also provided by email*
224 West King Street
Martinsburg, WV 25401
Attention: David Levine
david.levine@geostellar.com

Greenberg Traurig, LLP                                    *Notice also provided by email*
Attn: David Black
2200 Ross Ave.
Suite 5200
Dallas, TX 75201
blackda@gtlaw.com

Geostellar, Inc.
c/o Corporation Service Company, R/A
251 Little Falls Drive
Wilmington, DE 19808

## Re:   NOTICE TO GEOSTELLAR, INC. OF INVENTORY AND PICK-UP OF COLLATERAL

To Whom It May Concern:

This firm represents Matador Solar Partners, LLC, Geostellar Capital Fund II, LLC and Novus Capital Group, LLC (collectively the "Lenders"). Reference is made to those certain Loan and Security Agreements by and between Geostellar, Inc. (the "Borrower") and the Lenders dated as of February 26, 2016, October 7, 2016, and June 7, 2017, as the same may be amended (the "Loan Agreements").

A Notice of Event of Default and Demand for Payment (the "Novus Notice") was issued to the Borrower by Novus Capital Group, LLC on October 5, 2017. Subsequently, a Forbearance Agreement was executed by Novus Capital Group, LLC and Borrower on October 6, 2017 (the "Novus Forbearance"). A Notice of Event of Default was issued by Matador Solar Partners, LLC to the Borrower on December 12, 2017 (the "Matador Notice") (the Novus Notice, Novus Forbearance and Matador Notice are collectively referred to herein as the "Notices"). To date each Event of Default, each as separately described or referenced in the Notices or as defined under the separate Loan Agreements has not been cured. Therefore, Lenders hereby notify you of their intent to inventory and pick up the Collateral secured pursuant to the terms of the Loan Agreements.

SHULMAN
ROGERS

GANDAL
PORDY
ECKER

The Collateral is described as follows:

All personal property of Borrower of every kind, whether existing prior to or created or acquired after the execution of any of the Loan Agreements, and wherever located, including, but not limited to: accounts receivable, notes receivable, contract rights, drafts, instruments and chattel paper, whether tangible or electronic, equipment, machinery, furniture, fixtures, tools and supplies, inventory, general intangibles, deposit accounts, investment property, securities, financial assets, customer lists, and the proceeds thereof.    Collateral shall also include copyrights, patents, trademarks, both registered and unregistered, or goodwill associated with trademarks of Borrower.  In addition, the Collateral includes the Borrower's software platform and all modifications made thereto, and all registered and unregistered intellectual property, data, software and information related in any way to the development of Borrower's software platform around a cryptocurrency or other digital currency/token model. Collateral also includes any proceeds arising from the disposition of any interest in the foregoing (the "Collateral").

To the extent any Collateral has been transferred to Applied Philosophy Lab, P.B.C., Indeco, LLC, or any other entity or individual, you are hereby directed to notify such entity or individual that the transfer was made subject to Lenders' liens and identify the specific transferred Collateral for the Lenders at the time, date and location identified in this notice.  You are further directed to return or arrange to have returned any transferred Collateral to Borrower for Lenders to inventory and pick up at the date, time and location indicated in this notice.

The Borrower is hereby directed to arrange, preserve and retain the Collateral for the Lender to inventory and pick up at the address of **224 W. King Street, Martinsburg, WV 25401**.  The Borrower shall not conceal, sell or transfer the Collateral to any third-party. Lenders intend to inventory and pick up the Collateral on **December 22, 2017 at 10:00 a.m.** Please contact the undersigned immediately in the event you have any questions.

Very truly yours,

Benjamin P. Smith, Esq.

CC:

Robert Tobin
Chief Investment Officer
Persimmon Capital Partners
robert.tobin@persimmoncap.com

Geostellar Capital Fund I LLC
c/o Valentis Solar Equity Fund I, LLC
7921 Jones Branch Drive
Suite 222
McLean, VA 22102
Attn: Mehmet Ogden

SHULMAN
ROGERS

GANDAL
PORDY
ECKER

Geostellar Capital Fund I, LLC
c/o The Corporation Trust Company, R/A
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

Geostellar Capital Fund II, LLC
c/o Registered Agent Solutions, Inc., R/A
9 E. Loockerman Street
Suite 311
Dover, DE 19901

Geostellar Capital Fund II, LLC
Attn: Todd Cimano-Johnson
224 W. King Street
Martinsburg, WV 25401
solarventuredebtfund@gmail.com

Edinger Associates PLLC
1875 I Street, NW
Suite 500
Washington, D.C. 20006
Attn: Brook Edinger
bedinger@edingerlaw.net

# EXHIBIT 9



SHULMAN
ROGERS

GANDAL
PORDY
ECKER

**MICHAEL J. LICHTENSTEIN** SHAREHOLDER
T 301.230.5231 E MLichtenstein@shulmanrogers.com

January 5, 2018

## SENT VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED

**To:** Geostellar, Inc.                         -    *Notice also provided by email*
224 West King Street
Martinsburg, WV 25401
Attention: David Levine
david.levine@geostellar.com

Greenberg Traurig, LLP                -    *Notice also provided by email*
Attn: David Black
2200 Ross Ave.
Suite 5200
Dallas, TX 75201
blackda@gtlaw.com

Arch W. Riley, Jr., Esq.                  -    *Notice also provided by email*
48 14th Street
Suite 301
Hare Building
Wheeling, WV 26003
ariley@bernsteinlaw.com
*Counsel for Geostellar, Inc.*

David Levine                                -    *Notice also provided by email*
224 West King Street
Martinsburg, WV 25401
david.levine@geostellar.com

Geostellar, Inc.
c/o Corporation Service Company, R/A
251 Little Falls Drive
Wilmington, DE 19808

## Re:    DEMAND FOR IMMEDIATE TURNOVER OF COLLATERAL

To Whom It May Concern:

As you are aware from the prior correspondence dated December 14, 2017 and December 19, 2017 (the "Demands"), this firm represents Matador Solar Partners, LLC and Novus Capital Group, LLC (collectively the "Lenders"). Despite the issuance of the Demands, Geostellar, Inc. (the "Borrower") has failed to arrange Lenders' Collateral (as defined below) for the Lenders to inventory and pick-up.



SHULMAN
ROGERS

GANDAL
PORDY
ECKER

The Collateral is described as follows:

All personal property of Borrower of every kind and wherever located including, but not limited to: accounts receivable, notes receivable, contract rights, drafts, instruments and chattel paper, whether tangible or electronic, equipment, machinery, furniture, fixtures, tools and supplies, inventory, general intangibles, deposit accounts, investment property, securities, financial assets, customer lists, and the proceeds thereof. Collateral shall also include copyrights, patents, trademarks, both registered and unregistered, or goodwill associated with trademarks of Borrower. In addition, the Collateral includes the Borrower's software platform and all modifications made thereto, and all registered and unregistered intellectual property, data, software and information related in any way to the development of Borrower's software platform around a cryptocurrency or other digital currency/token model. The Collateral also includes the new cryptocurrency token developed with Indeco, LLC, any intellectual property, personal property, business opportunities and any other property of any kind transferred by the Borrower to Indeco, LLC and/or Applied Philosophy Lab, P.B.C. Collateral shall also include any proceeds arising from the disposition of any interest in the foregoing (the "Collateral").

As a result of Borrower's failure to comply with the Demands, Lenders hereby provide notice that if all Collateral is not turned over to the Lenders, or if a concrete and detailed proposal, acceptable to Lenders in their sole discretion, identifying how and when Lenders will be repaid is not received by this office by Wednesday, January 10, 2018, at 5:00 p.m. EST, the Lenders will file an involuntary chapter 7 bankruptcy petition against the Borrower. The Lenders will also sue Indeco, LLC and Applied Philosophy Lab, P.B.C. for, *inter alia*, fraudulent conveyances, tortious interference, and theft of business opportunity.

Please contact the undersigned immediately to confirm you will comply with the demands made in this correspondence. A failure to comply will result in immediate legal action.

Very truly yours,

Michael J. Lichtenstein

Michael J. Lichtenstein

Copies to:

Robert Tobin
Chief Investment Officer
Persimmon Capital Partners
robert.tobin@persimmoncap.com

Geostellar Capital Fund I LLC
c/o Valentis Solar Equity Fund I, LLC
7921 Jones Branch Drive
Suite 222
McLean, VA 22102
Attn: Mehmet Ogden

SHULMAN
ROGERS

GANDAL
PORDY
ECKER

Geostellar Capital Fund I, LLC
c/o The Corporation Trust Company, R/A
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

Geostellar Capital Fund II, LLC
Attn: Todd Cimano-Johnson
224 W. King Street
Martinsburg, WV 25401
solarventuredebtfund@gmail.com

Geostellar Capital Fund II, LLC
c/o Registered Agent Solutions, Inc., R/A
9 E. Loockerman Street
Suite 311
Dover, DE 19901

Edinger Associates PLLC
1875 I Street, NW
Suite 500
Washington, D.C. 20006
Attn: Brook Edinger
bedinger@edingerlaw.net

# EXHIBIT 10



SHULMAN
ROGERS

GANDAL
PORDY
ECKER

**MICHAEL J. LICHTENSTEIN**   SHAREHOLDER
ı 301.230.5231  ı  MLichtenstein@shulmanrogers.com

January 12, 2018

<u>**SENT VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**</u>

**To:**

Geostellar, Inc.
224 West King Street
Martinsburg, WV  25401
Attention:  David Levine
Notice also provided by email:
david.levine@geostellar.com

Greenberg Traurig, LLP
Attn: David Black
2200 Ross Ave.
Suite 5200
Dallas, TX  75201
Notice also provided by email:
blackda@gtlaw.com

Arch W. Riley, Jr., Esq.
48 14th Street
Suite 301
Hare Building
Wheeling, WV  26003
Notice also provided by email:
ariley@bernsteinlaw.com
*Counsel for Geostellar, Inc.*

David Levine
224 West King Street
Martinsburg, WV  25401
Notice also provided by email:
david.levine@geostellar.com

Applied Philosophy Lab, P.B.C.
Northwest Registered Agent
 Service, Inc.
8 The Green, Suite B
Dover, DE  19901

Indeco, LLC
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801

Joseph Tutela
11911 Freedom Dr.
8th floor
Reston, VA 20190

Russell Bruemmer
11911 Freedom Dr.
8th floor
Reston, VA 20190

Denise Denson
11911 Freedom Dr.
8th floor
Reston, VA 20190

Paul Feldman
11911 Freedom Dr.
8th floor
Reston, VA 20190

Jeff Hembrock
11911 Freedom Dr.
8th floor
Reston, VA 20190

David Heyman
11911 Freedom Dr.
8th floor
Reston, VA 20190

January 12, 2018
Page 2

SHULMAN | GANDAL
ROGERS | PORDY
         | ECKER

Daniel M. Casto, Esq.                    Geostellar, Inc.
7050 Hi Tech Dr., STE 101                c/o Corporation Service Company, R/A
Hanover, MD 21076                        251 Little Falls Drive
Notice also provided by email:           Wilmington, DE 19808
dcasto@vor-tech.com

Daniel M. Casto, Esq.
11911 Freedom Dr.
8th floor
Reston, VA 20190

### Re:   **DEMAND FOR IMMEDIATE TURNOVER OF COLLATERAL**

To Whom It May Concern:

This firm represents Matador Solar Partners, LLC, and Novus Capital Group, LLC, (collectively the "Lenders"). Despite this issuance of numerous prior notices to Geostellar, Inc. and related persons, Lenders' Collateral has not been turned over to the Lenders and, upon information and belief, has been transferred to other entities listed below. As such, recipients of this Demand are hereby notified that Lenders will seek to have any person or entity that has aided or abetted in the transfer of, or failure to return, Lenders' Collateral liable to the fullest extent permitted by law. Lenders further notify the recipients of this Demand that Lenders will seek to hold any person or entity liable to the fullest extent permitted by law for any improper use, receipt, possession or transfer of any funds provided by Lender.

The Collateral is described as follows:

All personal property of Borrower of every kind and wherever located including, but not limited to: accounts receivable, notes receivable, contract rights, drafts, instruments and chattel paper, whether tangible or electronic, equipment, machinery, furniture, fixtures, tools and supplies, inventory, general intangibles, deposit accounts, investment property, securities, financial assets, customer lists, and the proceeds thereof. Collateral shall also include copyrights, patents, trademarks, both registered and unregistered, or goodwill associated with trademarks of Borrower. In addition, the Collateral includes the Borrower's software platform and all modifications made thereto, and all registered and unregistered intellectual property, data, software and information related in any way to the development of Borrower's software platform around a cryptocurrency or other digital currency/token model. The Collateral also includes the new cryptocurrency token developed with Indeco, LLC, any intellectual property, personal property, business opportunities and any other property of any kind transferred by the Borrower to Indeco, LLC and/or Applied Philosophy Lab, P.B.C. Indeco, LLC and Applied Philosophy Lab, P.B.C. are deemed to be Collateral as well. Collateral shall also include any proceeds arising from the disposition of any interest in the foregoing (the "Collateral").



SHULMAN
ROGERS

GANDAL
PORDY
ECKER

January 12, 2018
Page 3

Please be advised that the Lenders will exercise their remedies under contract and at law to the fullest extent. Those remedies will include a demand for a judgment to recover all funds collected or raised in conjunction with the theft and use of the Collateral.

Very truly yours,

Michael J. Lichtenstein /Tu

Michael J. Lichtenstein

F: 130376.00002
41620078_2

Copies to:

Robert Tobin
Chief Investment Officer
Persimmon Capital Partners
robert.tobin@persimmoncap.com

Paul Feldman
paulfeldman@gmail.com

Geostellar Capital Fund I LLC
c/o Valentis Solar Equity Fund I, LLC
7921 Jones Branch Drive
Suite 222
McLean, VA 22102
Attn: Mehmet Ogden

Geostellar Capital Fund I, LLC
c/o The Corporation Trust Company, R/A
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

Geostellar Capital Fund II, LLC
Attn: Todd Cimano-Johnson
224 W. King Street
Martinsburg, WV 25401
solarventuredebtfund@gmail.com

Geostellar Capital Fund II, LLC
c/o Registered Agent Solutions, Inc., R/A
9 E. Loockerman Street
Suite 311
Dover, DE 19901

Edinger Associates PLLC
1875 I Street, NW
Suite 500
Washington, D.C. 20006
Attn: Brook Edinger
bedinger@edingerlaw.net

# EXHIBIT 11

## EXHIBIT A

### Promissory Note Number 01

### Hereby made a part of Loan and Security Agreement Number 1055

AMOUNT:     $500,000.00

DEBTOR:     Geostellar, Inc., a Delaware corporation ("Debtor")
LENDER:     NOVUS CAPITAL GROUP, LLC, a Delaware limited liability company ("Lender")

FOR VALUE RECEIVED, Debtor promises to pay to the order of Lender, at such address as Lender may designate by notice to Debtor, in lawful money of the United States, the principal sum of Five Hundred Thousand Dollars and 00/100 ($500,000.00) together with interest, calculated at 13.75% per annum, in Thirty-Six (36) consecutive monthly installments (principal and interest) of not less than Seventeen Thousand Twenty-Eight Dollars and 17/100 ($17,028.17) each. Assuming a Disbursement Date on or prior to March 10, 2016, the Commencement Date shall be March 10, 2016 and the Payment Due Date of the first payment scheduled under the Loan shall be April 10, 2016 and shall continue on the same day of each month thereafter through and including March 10, 2019 at which time all principal and all accrued interest shall be due and payable in full. The Final Payment Fee of Fifty Thousand Dollars and 00/100 ($50,000.00) ("Final Payment Fee") shall be due in full on April 10, 2019. Interim Interest will be charged for the period of time between the Disbursement Date and the Commencement Date and shall be due concurrent with the first scheduled payment due April 10, 2016.

Upon execution of this Note, Debtor will prepay the documentation fee of 1% ($5,000.00) and this amount will be deducted from the proceeds of the Loan.

This Note is one of the Notes referred to in the Loan and Security Agreement Number 1055 between Debtor and Lender (as the same may from time to time be amended, supplemented or otherwise modified, the "Agreement"), is secured as provided in the Agreement, and is subject to the terms and provisions thereof. Capitalized terms used herein shall have the respective meanings given them in the Agreement unless otherwise defined herein or unless the context otherwise requires.

If a payment is more than ten (10) days late, Debtor will be assessed a late fee and charged five percent (5%) of such payment.

Upon the occurrence and continuance of any one or more of the Events of Default specified in the Agreement, the amounts then remaining unpaid on this Note, together with any interest accrued, may be declared to be (or, with respect to certain Events of Default, automatically shall become) immediately due and payable in the sum of all existing delinquent and accrued interest, late fees and charges plus the remaining unpaid principal due under the Note. Interest shall accrue on the accelerated balance at the lesser of eighteen percent (18%) per annum or the highest rate allowed under applicable law.

In the event that Lender or any holder of this Note shall institute any action for the enforcement or the collection of this Note, there shall be immediately due and payable, in addition to the unpaid balance hereof, all costs and expenses of such action, including reasonable attorneys' fees and costs, whether incurred at trial, on appeal or in any bankruptcy proceeding.

Loan and Security Agreement

Confidential

Page 14 of 17

_____ (initials)

Debtor and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, protest and notice of dishonor.  Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew, or extend (repeatedly and for any length of time) this loan, or release any party or guarantor or collateral; fail to realize upon or perfect Lender's security interest in the collateral; or take any other action deemed reasonably necessary by Lender without the consent of or notice to anyone.  If Debtor consists of more than one person or entity, all obligations of Debtor herein shall be joint and several.

This Promissory Note is dated this 26 day of  February  , 2016.

LENDER:                                                    DEBTOR:

**NOVUS CAPITAL GROUP, LLC,**                             **GEOSTELLAR, INC.,**
a Delaware limited liability company                      a Delaware corporation

By:                                                       By:

Name:   John Saefke                                       Name:   David Levine

Title:   Chief Executive Officer                          Title:   Chief Executive Officer

Date:    2-26-16                                          Date:    2/25/16

## EXHIBIT B

### Supplement Number 1

### Hereby made a part of Loan and Security Agreement Number 1055

### and Promissory Note Number 01

**DEBTOR:**     Geostellar, Inc., a Delaware corporation ("Debtor")

**LENDER:**     NOVUS CAPITAL GROUP, LLC, a Delaware limited liability company ("Lender")

This Supplement is executed and delivered by Debtor pursuant to the terms of a Loan and Security Agreement Number 1055 between Debtor and Lender, as the same may from time to time be amended, supplemented or otherwise modified (the "Agreement"). Capitalized terms used herein shall have the respective meanings given them in the Agreement unless otherwise defined herein or unless the context otherwise requires.

1.     Debtor hereby affirms that (i) the representations and warranties set forth in Section 4 of the Agreement are true and correct in all material respects as of the date hereof; and (ii) no Default or Event of Default has occurred and is continuing.

2.     Upon the funding thereof, Debtor hereby affirms that Lender will have made a Loan to it, which Loan is evidenced by a Note, in the principal amount of Five Hundred Thousand Dollars and 00/100 ($500,000.00).

LENDER:

DEBTOR:

**NOVUS CAPITAL GROUP, LLC,**
a Delaware limited liability company

**GEOSTELLAR, INC.,**
a Delaware corporation

By: _____

By: _____

Name:   John Saefke

Name:   David Levine

Title:   Chief Executive Officer

Title:   Chief Executive Officer

Date:   2-26-16

Date:   2/25/16

Loan and Security Agreement

Confidential

Page 16 of 17

____ (initials)

# EXHIBIT 12

## SECURED PROMISSORY NOTE

$3,000,000.00                                                                      Dated: October 7, 2016

FOR VALUE RECEIVED, the undersigned, GEOSTELLAR, INC., ("*Borrower*"), a Delaware corporation, HEREBY PROMISES TO PAY to the order of MATADOR SOLAR PARTNERS, LLC, a Texas limited liability company ("*Lender*"), at such address as Lender may designate by notice to Borrower, in lawful money of the United States, (1) interest calculated at 15% per annum, in twelve (12) consecutive monthly interest payments, and (2) thereafter Forty-eight (48) consecutive monthly installments of principal and interest of not less than $71,369.79 each. Assuming a Funding Date of October 7, 2016, the Payment Date of the first payment scheduled under the Loan shall be November 1, 2016 and shall continue on the Payment Date of each month thereafter through and including October 1, 2021 at which time all principal and all accrued interest shall be due and payable in full.

This Note is one of the Notes referred to in that certain Loan and Security Agreement, dated as of October 7, 2016 (as amended, restated or otherwise modified from time to time, the "*Loan Agreement*"), by and between Lender and Borrower and is subject to the terms and provisions thereof including but not limited to any right to cure or to prepay this Note contained therein. Capitalized terms used herein and not otherwise defined have the respective meanings set forth in the Loan Agreement.

This Note and the obligation of Borrower to repay the unpaid principal amount of the Note, interest on the Note, premium, if any, and all other amounts due Lender under the Loan Agreement is secured as provided under the Loan Agreement.

Upon the occurrence and continuance of any one or more of the Events of Default specified in the Loan Agreement, the amounts then remaining unpaid on this Note, together with any interest accrued, may be declared to be (or with respect to certain Events of Default, automatically shall become) immediately due and payable in the sum of all existing delinquent and accrued interest, late fees and charges plus the remaining unpaid principal due under the Note. Interest shall accrue on the accelerated balance at the Default Rate..

The Borrower hereby waives diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind. No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Borrower shall pay all reasonable fees and expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by Lender in the enforcement or attempt to enforce any of Borrower's obligations hereunder not performed when due. This Note shall be governed by, and construed and interpreted in accordance with, the laws of the State of Delaware.

[Signature on Next Page]

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed by one of its officers thereunto duly authorized on the date hereof.

**GEOSTELLAR, INC.**
a Delaware corporation

By: _____

Name: David Levine

Title: Chief Executive Officer

# EXHIBIT B

### SECURED PROMISSORY NOTE

$450,000.00                                                    Dated:  January 30, 2017

FOR VALUE RECEIVED, the undersigned, GEOSTELLAR, INC., ("*Borrower*"), a Delaware corporation, HEREBY PROMISES TO PAY to the order of MATADOR SOLAR PARTNERS, LLC, a Texas limited liability company ("*Lender*") the principal amount of Four Hundred Fifty Thousand Dollars ($450,000), at such address as Lender may designate by notice to Borrower, in lawful money of the United States, as follows: (1) interest calculated at 15% per annum, in twelve (12) consecutive monthly interest payments, and (2) thereafter forty-eight (48) consecutive monthly installments of principal and interest of not less than $10,705.47 each.  Assuming a Funding Date of January 31, 2016, the Payment Date of the first payment scheduled under the Loan shall be March 1, 2017 and shall continue on the Payment Date of each month thereafter through and including February 1, 2022 at which time all principal and all accrued interest shall be due and payable in full.

This Note is one of the Notes referred to in that certain Loan and Security Agreement, dated as of October 7, 2016 (as amended, restated or otherwise modified from time to time, the "*Loan Agreement*"), by and between Lender and Borrower and is subject to the terms and provisions thereof including but not limited to any right to cure or to prepay this Note contained therein.  Capitalized terms used herein and not otherwise defined have the respective meanings set forth in the Loan Agreement.

This Note and the obligation of Borrower to repay the unpaid principal amount of the Note, interest on the Note, premium, if any, and all other amounts due Lender under the Loan Agreement is secured as provided under the Loan Agreement.

Upon the occurrence and continuance of any one or more of the Events of Default specified in the Loan Agreement, the amounts then remaining unpaid on this Note, together with any interest accrued, may be declared to be (or with respect to certain Events of Default, automatically shall become) immediately due and payable in the sum of all existing delinquent and accrued interest, late fees and charges plus the remaining unpaid principal due under the Note.  Interest shall accrue on the accelerated balance at the Default Rate.

The Borrower hereby waives diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind. No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Borrower shall pay all reasonable fees and expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by Lender in the enforcement or attempt to enforce any of Borrower's obligations hereunder not performed when due.  This Note shall be governed by, and construed and interpreted in accordance with, the laws of the State of Delaware.

[Signature on Next Page]

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed by one of its officers thereunto duly authorized on the date hereof.

GEOSTELLAR, INC.,
a Delaware corporation

By: _____

Name: David Levine

Title: Chief Executive Officer

EXHIBIT 13

THIS INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THIS INSTRUMENT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR UPON RECEIPT BY GEOSTELLAR OF AN OPINION OF COUNSEL SATISFACTORY TO GEOSTELLAR THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT.

### UNSECURED PROMISSORY NOTE

**$100,000.00** **September 18, 2017**
Martinsburg, WV

For value received, **GEOSTELLAR, INC.**, a Delaware corporation with a primary address of 224 W King Street, Martinsburg, WV 25401, Attn: David A. Levine (david.levine@geostellar.com) (*"Geostellar"*) hereby unconditionally promises to pay to the order of **MATADOR SOLAR PARTNERS, LLC,** a Texas limited liability company, with a primary address of 8750 North Central Expressway, Suite 750, Dallas, Texas 75231, Attn: John M. Greer (jgreer@matadorcaptial.com) or its successors or assigns (collectively, *"Lender"*) the principal sum of **ONE HUNDRED THOUSAND AND NO/100 U.S. Dollars (USD $100,000.00)** (the *"Principal Amount"*) at Lender's office, or at such other place as Lender may from time to time designate in writing as provided in this Promissory Note (this *"Note"*), and all other amounts due and payable under this Note, as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms. This Note is an unsecured obligation of Geostellar.

**1.** **Interest.** Except as otherwise provided in this Note, the outstanding Principal Amount will not bear interest. If any amount payable under this Note is not paid when due (without regard to any applicable grace periods), whether at the stated maturity, by acceleration, or otherwise, the outstanding Principal Amount of this Note will bear interest at an annual rate equal to 18% from the date payment was due until such delinquent payment is paid in full. This provision will not imply that Geostellar may cure any default or Event of Default or reinstate the loan evidenced by this Note after an Event of Default other than as expressly permitted under the terms of this Note, nor will this provision imply that Geostellar has a right to delay or extend the dates upon which payments are due under this Note. All computations of interest will be made on the basis of the actual number of days elapsed in a year of 365 (or 366, as the case may be) days. The agreements made by Geostellar with respect to this Note are expressly limited so that in no event will the amount of interest received, charged, or contracted for by Lender exceed the highest lawful amount of interest permissible under the laws applicable to the Note. If at any time performance of any provision of this Note results in the highest lawful rate of interest permissible under applicable laws being exceeded, then the amount of interest received, charged, or contracted for by Lender will automatically and without further action by any party be deemed to have been reduced to the highest lawful amount of interest then permissible under applicable laws. If Lender ever receives, charges, or contracts for, as interest, an amount which is unlawful, at Lender's election, the amount of unlawful interest will be refunded to Geostellar (if actually paid) or applied to reduce the then unpaid Principal Amount.

**2.** **Purpose of Note and Permitted Uses of Principal Amount.** The loan evidenced by this Note is being extended to Geostellar with the understanding that Geostellar will continue to use commercially reasonable efforts to successfully close the sale of the Crowdfunding Simple Agreement for Future Equity (*"Crowd SAFE"*), pursuant to Regulation CF of the Securities and Exchange Commission, being offered on the Republic funding portal as of September 18, 2017 (the *"Crowd SAFE Financing"*). Geostellar makes no representations regarding the likelihood of success offering the Crowd SAFE's. Upon

request by Lender, Geostellar promptly will provide Lender with updates on the progress of the Crowd SAFE Financing and provide reasonable documentation to Lender to evidence the status of the Crowd SAFE Financing.

**3.** **Payments.** All payments of interest (if any), principal and any other amounts owing under this Note will be in immediately available funds of lawful money of the United States of America no later than 2:00 p.m. Central Time on the date on which such payment is due by cashier's check, certified check or by wire transfer of immediately available funds to Lender's account at a bank specified by Lender in writing to Geostellar from time to time. All payments will be applied first to accrued and unpaid fees, then accrued and unpaid interest (if any), and then to the Principal Amount. Notwithstanding the foregoing, after an Event of Default, all payments made hereunder may be applied by Lender in such order, priority, and in such proportion as Lender will elect in its sole discretion. If at any time any payment made by Geostellar under this Note must be restored or returned upon the insolvency, bankruptcy or reorganization of Geostellar, Geostellar's obligation to make such payment will be reinstated as though such payment had not been made.

**4.** **Maturity Date; Deferred Loan Origination Fee.** The entire outstanding Principal Amount, all unpaid fees and all accrued but unpaid interest (if any) will become immediately due and payable on October 31, 2017 (or such later date as Lender in its sole and absolute discretion may consent, "*Maturity Date*"). In addition, on the Maturity Date, Geostellar shall pay Lender a loan origination fee equal 15% of the original Principal Amount (the "*Deferred Loan Origination Fee*").

**5.** **Collection Costs.** In the event of any default under this Note, Geostellar will pay all costs of collection, including reasonable attorneys' fees and court costs, incurred by Lender in enforcing and collecting this Note.

**6.** **Prepayment.**

(a) Optional Prepayment. Geostellar may prepay this Note (inclusive of all unpaid fees and accrued but unpaid interest (if any), including the Deferred Loan Origination Fee) prior to the Maturity Date at any time without penalty.

(b) **Mandatory Prepayment. Immediately after the closing of the Crowd SAFE Financing and the release of the escrowed funds from such Crowd SAFE Financing by Republic to Geostellar (but in no event more than 24 hours thereafter), the entire outstanding Principal Amount, all unpaid fees (including the Deferred Loan Origination Fee) and all accrued but unpaid interest under this Note (if any) shall be payable in full by Geostellar to Lender without demand or notice (the "*Mandatory Prepayment*") to the extent permitted by applicable law. This Mandatory Prepayment shall not be altered, waived, rescinded or otherwise terminated by Geostellar, its officers or its Board of Directors without the express written consent of the Lender. By execution of this Note by Geostellar, Geostellar hereby authorizes and directs its Chief Financial Officer or any other officer with authority to make payments on behalf of the Company to immediately transfer the entire outstanding Principal Amount, all unpaid fees (including the Deferred Loan Origination Fee) and all accrued but unpaid interest under this Note (if any) to Lender upon receipt by Geostellar of the funds from the Crowd SAFE Financing that are released by Republic to Geostellar without any additional approvals or authorizations from the Board of Directors or officers of Geostellar to the extent permitted by applicable law. Geostellar agrees and acknowledges that this Mandatory Prepayment is superior to any other claim against the funds being held by Republic in connection with the Crowd SAFE Financing.**

*Geostellar, Inc. Unsecured Promissory Note ($100,000) – Page 2*

**7.**     **Representations and Warranties**. Geostellar hereby represents and warrants to Lender on the date hereof as follows:

(a)     Existence; Compliance with Laws. Geostellar is (a) a corporation which has been duly formed, validly existing and in good standing under the laws of the state of Delaware and has the requisite power and authority, and the legal right, to own, lease and operate its properties and assets and to conduct its business as it is now being conducted and (b) in compliance with all laws except to the extent that the failure to comply therewith would not, reasonably be expected to have a material adverse effect on Geostellar.

(b)     Power and Authority. Geostellar has the power and authority, and the legal right, to execute and deliver this Note and to perform its obligations hereunder.

(c)     Authorization; Execution and Delivery. The execution and delivery of this Note by Geostellar and the performance of its obligations hereunder have been duly authorized by all necessary corporation action in accordance with all applicable laws of the state of its jurisdiction of formation. Geostellar has duly executed and delivered this Note. Geostellar's Board of Directors has approved the terms of this Note, has duly authorized Geostellar's officers to execute this Note, and consents to the restrictions and requirements contained herein.

(d)     No Approvals. No consent or authorization of, filing with, notice to or other act by, or in respect of, any governmental authority or any other person is required in order for Geostellar to execute, deliver, or perform any of its obligations under this Note.

(e)     No Violations. The execution and delivery of this Note and the consummation by Geostellar of the transactions contemplated hereby do not and will not (a) violate any provision of Geostellar's organizational documents; (b) violate any law or order applicable to Geostellar or by which any of its properties or assets may be bound; or (c) constitute a default under any material agreement or contract by which Geostellar may be bound.

(f)     Enforceability. The Note is a valid, legal and binding obligation of Geostellar, enforceable against Geostellar in accordance with its terms.

(g)     No Litigation. No action, suit, litigation, investigation or proceeding of, or before, any arbitrator or governmental authority is pending or, to the knowledge of Geostellar, threatened by or against Geostellar or any of its property or assets (a) with respect to the Note or any of the transactions contemplated hereby or (b) that would be expected to materially adversely affect Geostellar's financial condition or the ability of Geostellar to perform its obligations under the Note.

(h)     Subsequent Financing; Budget. Geostellar has initiated the Crowd SAFE financing transaction and as of the date hereof there is approximately $249,000.00 being held by Republic in escrow in connection with such financing. The Approved Budget has been duly adopted by Geostellar's Board of Directors and is in effect as of the execution of this Note.

**8.**     Covenants. Until all amounts outstanding under this Note have been paid in full:

(a)     Maintenance of Existence. Geostellar shall: (i) preserve, renew and maintain in full force and effect its corporate existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, where the failure to do so would not reasonably be expected to have a material adverse effect.

*Geostellar, Inc. Unsecured Promissory Note ($100,000) – Page 3*

(b)     Compliance with Laws. Geostellar shall comply with all laws and orders applicable to it and its business, except where the failure to do so would not reasonably be expected to have a material adverse effect.

(c)     Maximum Amount of Loans. Geostellar shall not issue any additional promissory notes to other third parties which are subject to repayment from the funds being raised in the Crowd SAFE Financing if the principal amount of all such promissory notes (including this Note) would exceed 70% of the net amount (after commissions, fees and expenses) of the funds Geostellar will be entitled to receive with respect to the Crowd SAFE Financing that are currently held in escrow by Republic. For clarification, if the amount being held in escrow by Republic in connection with the Crowd SAFE Financing is $250,000 and the net amount payable to Geostellar is $232,500, then Geostellar will only be permitted to issue promissory notes being repaid by such Crowd SAFE Financing funds in the aggregate amount of $162,750 ($232,000 x 70%).

(d)     More Favorable Terms. Until this Note is paid in full, Geostellar shall not issue any additional promissory notes to third parties on terms more favorable to such third party than the terms granted to Lender in this Note, as determined in Lender's reasonable judgment, unless Lender provides consent to such issuance.

(e)     Compliance with Budget. Prior to funding, Geostellar's Board of Directors must approve the budget attached hereto as Exhibit A (the "*Approved Budget*"). Geostellar shall only make expenditures that are in accordance with the Approved Budget, and Geostellar may not modify the Approved Budget without approval by the Lender.

(f)     Further Assurances. Each of the parties hereto shall, and shall cause their respective affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Note.

**9.     Default.** The occurrence of any one or more of the following events will constitute an event of default under this Note ("*Event of Default*"):

(a)     Geostellar fails to pay any of the principal or any other amount due under this Note in immediately available funds of U.S. dollars on the date the same becomes due and payable;

(b)     An event of default hereafter occurs or exists under any debt obligation pursuant to which Geostellar is a borrower, debtor or other obligor, **and** the lender or creditor thereunder commences pursuit of its remedies in connection with such default;

(c)     Any representation or warranty made or deemed made by Geostellar herein or under the terms of any other agreement used as security for this Note, is incorrect in any material respect on the date as of which such representation or warranty was made or deemed made;

(d)     Geostellar fails to observe any covenant, obligation, condition or agreement contained in this Note;

(e)     One or more judgments or decrees have been entered against Geostellar;

(f)     The dissolution of Geostellar or forfeiture of Geostellar's certificate of formation or other authority to operate in the jurisdiction of its formation;

*Geostellar, Inc. Unsecured Promissory Note ($100,000) – Page 4*

(g)     Geostellar files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or later in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(h)     An involuntary petition is filed against Geostellar (unless such petition is dismissed or discharged within sixty (60) days under any bankruptcy statute now or hereafter in effect), or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of Geostellar.

**10.     Remedies Upon Default**.  Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, Lender may at its option, by written notice to Geostellar (a) declare the entire unpaid Principal Amount of this Note, together with all accrued interest thereon (if any) and all other amounts payable hereunder, immediately due and payable; and/or (b) exercise any or all of its rights, powers or remedies under applicable law; *provided, however* that, if an Event of Default described in Section 10(g) or 10(h) occurs, the Principal Amount of this Note, together with all accrued interest thereon (if any) and all other amounts payable hereunder will become immediately due and payable without any notice, declaration or other act on the part of Lender.

**11.     Waiver.     EXCEPT AS OTHERWISE PROVIDED HEREIN, GEOSTELLAR HEREBY WAIVES DEMAND FOR PAYMENT, PRESENTMENT FOR PAYMENT, PROTEST, NOTICE OF PAYMENT, NOTICE OF DISHONOR, NOTICE OF NONPAYMENT, NOTICE OF ACCELERATION OF MATURITY AND DILIGENCE IN TAKING ANY ACTION TO COLLECT SUMS OWING HEREUNDER.**

**12.     Miscellaneous.**

(a)     Amendment and Waiver of Terms.  No term of this Note may be waived, modified or amended except by an instrument in writing signed by each of the parties hereto, which must be authorized by Geostellar's Board of Directors. Any waiver of the terms hereof will be effective only in the specific instance and for the specific purpose given.

(b)     Notices.  All notices, requests or other communications required or permitted to be delivered hereunder will be delivered in writing, in each case to the address specified in the first paragraph of this Note or to such other address as such party may from time to time specify in writing in compliance with this provision. Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service will be deemed to have been given when received; (ii) sent by facsimile during the recipient's normal business hours will be deemed to have been given when sent (and if sent after normal business hours will be deemed to have been given at the opening of the recipient's business on the next business day); and (iii) sent by e-mail will be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment).

(c)     Governing Law.  This Note and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Note and the transactions contemplated hereby will be governed by the laws of the State of Delaware, without giving effect to any choice of law or other conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(d)    Waiver of Jury Trial.  **GEOSTELLAR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, EQUITY, TORT, OR ANY OTHER THEORY.**

(e)    No Waiver by Lender.  No failure or delay on the part of Lender in exercising any right, power or privilege hereunder and no course of dealing between Geostellar and Lender will operate as a waiver thereof; nor will any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein expressly provided are cumulative and not exclusive of any rights, powers or remedies which Lender would otherwise have.  No notice to or demand on Geostellar in any case will entitle Geostellar to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.  The acceptance by Lender of any payment hereunder which is less than payment in full of all amounts due and payable at the time of such payment will not, unless otherwise expressly agreed to by Lender in writing at such time, constitute a waiver of the right to exercise any of Lender's rights, remedies, recourses or powers at that time, or any subsequent time, or nullify any prior exercise of any such right, remedy, recourse or power, except as and to the extent otherwise required by applicable law.

(f)    Severability.  If any term or provision of this Note is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Note so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(g)    Counterparts; Integration; Effectiveness. This Note and any amendments, waivers, consents or supplements hereto may be executed in counterparts, each of which will constitute an original, but all taken together will constitute a single agreement. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic (i.e., "pdf" or "tif") format will be effective as delivery of a manually executed counterpart of this Note. This Note constitutes the entire contract between the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

(h)    Assignment; Sale of Note. This Note may be assigned or transferred, in whole or in part, by Lender to any person or entity at any time without notice to or the consent of Geostellar. Geostellar may not assign or transfer this Note or any of its rights hereunder without the prior written consent of Lender. This Note will inure to the benefit of and be binding upon the parties hereto and their permitted assigns. Lender shall have the absolute and unrestricted right at any time or from time to time, and without notice to or consent by Geostellar, any guarantor, or any other person, to sell or assign all or any portion of this Note and the loan evidenced by this Note, or may grant or sell participation interests therein, to one or more persons. Geostellar shall, and shall cause each guarantor and indemnitor to, execute, acknowledge, and deliver any and all instruments reasonably requested by Lender to satisfy any purchaser or participant that the unpaid obligations evidenced by this Note are outstanding and payable without defense, offset, or counterclaim of any kind on the terms and provisions set out in this Note. Such assignee(s) or participant(s) will have the rights and benefits with respect to this Note as such assignee(s) or participant(s) would have if they were the Lender originally named in this Note.

(i)     Time of the Essence. Time will be of the essence with respect to all of Geostellar's obligations under this Note.

(j)     **Payment at Maturity. For the avoidance of doubt, at maturity (whether by acceleration or otherwise), Geostellar must repay the entire Principal Amount of this Note, unpaid fees and unpaid interest (if any) then due. Lender is under no obligation to refinance the outstanding balance of this Note at any time. Geostellar will, therefore, be required to make payment utilizing other assets or obtain financing from other sources.**

(k)     Interpretation. For purposes of this Note: (a) the words "include," "includes," and "including" will be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Note as a whole. The definitions given for any defined terms in this Note will apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun will include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein: (x) to Schedules, Exhibits, and Sections mean the Schedules, Exhibits, and Sections of this Note; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Note will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

(l)     Headings. The headings of the various sections and subsections herein are for reference only and will not define, modify, expand, or limit any of the terms or provisions hereof.

(m)     Counsel and Expenses. Geostellar will be responsible for all reasonable out-of-pocket fees, costs, and expenses of Lender incurred in connection with negotiating, documenting and consummating this Note (including, without limitation, the cost of Lender's counsel), provided that the costs and expenses of Lender for such costs does not exceed $2,500.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Geostellar has executed and delivered this Note effective as of the 19th day of September, 2017.

GEOSTELLAR, INC.

By: _____
     David A. Levine, President

By its acceptance of this Note, Lender acknowledges and agrees to be bound by the provisions of the Note to the extent applicable to Lender.

MATADOR SOLAR PARTNERS, LLC

By: _____
     Wicky el-Effendi, Manager

Effective as of September 19, 2017.

Date of Note:                    September 19, 2017
Lender:                          Matador Solar Partners, LLC
Original Principal Amount:       $100,000.

EXHIBIT A

<u>APPROVED BUDGET</u>

(attached hereto)

**Geostellar, Inc.**
**Cash Needs Forecast**
**Sources & Uses - Projected Through October 31, 2017**

| PROJECTED SOURCES & USES | | | | |
|---|---|---|---|---|
| **Sources of Funds** | | | **Uses of Funds** | |
| | | | **Financing Expenses** | |
| Cash Balance as of September 13th, 2017 | S | (9,130) | Republic Reg CF (10.10 Close) | 53,500 |
| | | | ST Note Repayment - Feldman (10.10) | 57,500 |
| | | | ST Note Repayment - Matador (10.10) | 115,000 |
| Loan Against Reg CF Balance | | 100,000 | **Operating Expenses** | |
| Reg CF SAFE Maximum Raise (10.10 Close) | | 1,070,000 | Salary & Benefits - Sep 15 payroll | 83,027 |
| Collections from Customers ($15K/wk) | | 80,000 | Salary & Benefits - Sep 30 payroll (+ commissions) | 87,527 |
| | | | Salary & Benefits - Oct 15 payroll | 58,119 |
| | | | Salary & Benefits - Oct 31 payroll (+ commissions) | 62,619 |
| | | | Office Expenses & Utilities | 8,102 |
| | | | Hosting and Software Expenses | 36,500 |
| | | | Expense reports | 10,000 |
| | | | Insurance premiums | 15,355 |
| | | | Fund Administrator Payment | 1,500 |
| | | | ThreeSquare Rent Payments | 47,525 |
| | | | Reg CF SAFE Marketing Costs | 25,000 |
| | | | **Project Fund Expenses** | |
| | | | Equipment Orders for Customers | 160,000 |
| | | | Installer Payments | 50,000 |
| | | | Distributor Payments | 35,000 |
| | | | Channel Partner Commissions | 10,000 |
| | | | **Reg A+ Costs** | |
| | | | Cherry Bekaert 2017 Review Prepayment | 17,000 |
| | | | Cherry Bekaert 2014/5/6 Audit Payment | 183,000 |
| | | | Accounting Consultant - 2017 Review | 25,000 |
| | | | Legal - Offit Kurman | 8,000 |
| **Total Sources of Funds** | S | 1,240,870 | **Total Uses of Funds** | S 1,149,274 |

*Remaining Cash Balance*                                               S    91,596

| | Starting Cash | Operating Expenses | Project Expenses | Loan Repayments | Reg A+ Expenses | Customer Collections | Financing Proceeds | Ending Cash* |
|---|---|---|---|---|---|---|---|---|
| **Period Ending 9/22** | $ (9,130) | 100,657 | 1,500 | | 8,000 | 15,000 | 100,000 | $ (4,287) |
| **Period Ending 9/30** | $ (4,287) | 11,000 | - | - | - | 20,000 | - | $ 4,713 |
| **Period Ending 10/15** | $ 4,713 | 211,472 | 253,500 | 172,500 | 225,000 | 20,000 | 1,016,500 | $ 178,741 |
| **Period Ending 10/31** | $ 178,741 | 112,145 | - | - | - | 25,000 | - | $ 91,596 |
| | (9,130) | 435,274 | 255,000 | 172,500 | 233,000 | 80,000 | 1,116,500 | $ 91,596 |

**Across the Board Payroll Reduction:**     30%     Oct 15th

# EXHIBIT 14

2009 WL 1522047
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
N.D. West Virginia.

In re 210 WEST LIBERTY HOLDINGS, LLC, Debtor.

No. 08–677.
|
May 29, 2009.

**Attorneys and Law Firms**

Kathy M. Santa Barbara, Santa Barbara Law Offices, PLLC, Martinsburg, WV, for Debtor.

### *MEMORANDUM OPINION*

PATRICK M. FLATLEY, United States Bankruptcy Judge.

**\*1** Glen R. Poe requests that the **Chapter 11** case of 210 West Liberty Holdings, LLC ("the Debtor") be **dismissed** on the grounds that: (1) the filing of the bankruptcy is not authorized under the Debtor's operating agreement; and (2) even if the filing of the case is authorized, it should be **dismissed** or **converted** for cause under 11 U .S.C. § 1112(b). [1]

For the reasons stated herein, the court concludes that the filing of the bankruptcy case is authorized, but will **convert** this case to one under Chapter 7 pursuant to § 1112(b). [2]

### I. BACKGROUND

In 2006, James P. Campbell was looking for possible restaurant business opportunities in the Eastern Panhandle of West Virginia. At the time, James's brother, Daniel Campbell, had restaurant management experience and was living in South Carolina. James saw the potential of a restaurant venture in the Eastern Panhandle of West Virginia as a way to bring his brother closer to home.

In early 2007, James located historic property in Charles Town, West Virginia, known as the Charles Washington Inn. The property is located at 210 West Liberty Street. According to James, it was built by George Washington's younger brother, Charles, and is the oldest surviving structure in Charles Town. Moreover, the property had been used as a restaurant since 1990. Although the existing restaurant did no advertising, James told potential investors that it had consistent annual revenue of about $300,000 per year. [3] With substantial advertising, and the addition of gambling and catering revenue, James projected that the business could increase revenue to $650,000 in the first twelve months of operation.

To purchase the property, James formed the Debtor and solicited three of his friends and/or business partners, Steven Foster, Michael Briel, and Louis Athey, to be members. According to the Debtor's operating agreement dated April 26, 2007, each of the four members held a 25% interest. Regarding the management of the Debtor, the April 26, 2007 Operating Agreement states:

3.1 *Management and Voting Rights.* Unless otherwise agreed, the members will have equal rights in the management of the LLC business. Except as provided otherwise in this agreement, all decisions will be by majority vote with each member who is admitted as a member having a vote in proportion to his or her membership interest.... The members may elect one or more persons to serve as managers to serve pursuant to the West Virginia Code. The manager, or managers if more than one is serving, will have the right, power and authority to manage the business affairs of the company and will serve until replaced by the members. For so long as a manager is serving in that capacity, no other member will have any authority to manage the business affairs of the company. Until otherwise agreed by the members, the initial managers of this company shall be James P. Campbell, Steven D. Foster, Michael E. Briel and Louis B.Aethy.

**\*2** 3.2 *Certain Issues Requiring Unanimous Vote.* The following action require a unanimous vote:

A. Borrowing on behalf of the LLC or pledging its **assets** in any way;

B. Lending LLC money or other **assets**;

C. **Transferring**, assigning, encumbering or selling any portion of a member's interest in the L.L.C., either directly or indirectly;

D. Distributions of capital;

E. Distributions of income;

F. Admission of a new member;

G. Change of accounting method;

H. Amendment to operating agreement of varying from its terms.

....

7.2 *Amendment and Revocation.* This agreement may be amended, altered or revoked at any time, in whole or in part, by written instrument signed by all the parties. No change, modification or revocation of this agreement will be valid unless it is in writing and signed by all the parties or their duly authorized representatives.

...

(Creditor's Exhibit 4).

The original four members of the Debtor understood—and agreed—that the membership and management of the Debtor would be altered such that a business entity would hold a 25% ownership interest in the Debtor as the managing "Class A" member, and that the remaining 75% ownership interest would be held by as many as 20, non-managerial, "Class B" members. Class B membership interests were to be sold to investors. In exchange for a $10,000 capital contribution, an investor would receive a 3.75% ownership interest in the Debtor. Importantly, the Debtor was only to own the real and personal property, which it would then lease to another entity for the purpose of running the restaurant business. Investors were to be paid out of the monthly rental payments.

James Campbell created Liberty Street Enterprises, LLC, ("LSE") to serve as the Debtor's lessee. In turn, LSE executed a restaurant management agreement with Daniel Campbell and Jonathan Fertal to actually run the day-to-day operations of the restaurant.

Before implementing this business plan, however, the original four members of the Debtor had to purchase the real property, and the personal property associated with the existing restaurant business. The agreed purchase price was $725,000. To finance the purchase, the Debtor borrowed $400,000 from Middleburg Bank, secured by a first deed of trust on the real property, and owner-financed

the remaining $325,000 with CT Liberty Limited Liability Company, who had a second deed of trust on the real property.[4] Each of the Debtor's four original members are personally liable on both notes.

The members of the Debtor all agreed that before the restaurant could open for business, substantial renovations needed to be completed. To obtain the capital needed to complete these renovations, the Debtor began soliciting Class B investors even though the April 26, 2007 Operating Agreement had no provision for the allowance of Class B members. Among the various investors solicited was Glen Poe, who also owned and/or operated other restaurants in the area. In addition to restaurant experience, Mr. Poe has significant construction experience, and, having taken an interest in the project, Mr. Poe began to personally assist in the renovations of the restaurant facility. To secure his promised Class B membership interest, Mr. Poe sent Michael Briel a $10,000 check. That money sat in Mr. Briel's trust account for several weeks before being forwarded to the Debtor's bank account on August 27, 2007.

**\*3** By August 2007, the Debtor had not received enough cash from its purported Class B members to complete the renovation of its restaurant property. At a meeting between James Campbell, Glen Poe, Louis Athey, and Michael Briel, Mr. Poe made a proposal that he would lend the Debtor $100,000 to complete the restaurant renovations under certain conditions. Among those conditions were that James Campbell, Louis Athey, and Michael Briel would guarantee the $100,000 note, and that Steven Foster would terminate his membership. Mr. Poe would then assume the membership interest of Mr. Foster. Also, Mr. Briel would be given control over the Debtor's checking account, which had previously been under the control of Mr. Foster. James Campbell told Mr. Poe that if he would make the loan, Mr. Poe would not only be a "Class A" member of the Debtor, but he would be at the "head of the Class." The parties at the meeting agreed to Mr. Poe's conditions, and a contemporaneous telephone call to Mr. Foster confirmed his approval of the proposal. Mr. Poe's $100,000 loan was wired into the Debtor's bank account on August 30, 2007.

Shortly after agreeing to abandon his membership interest in the Debtor, Mr. Foster met with Mr. Poe to explain that he was reluctant to forego his membership interest in the

Debtor given that he was personally obligated on the first deed of trust owed to Middleburg Bank, the second deed of trust owed to CT Liberty Limited Liability Company, and, in addition, the renovations of the restaurant were being done under his contractor's license. Over drinks, Mr. Poe and Mr. Foster settled their differences, and Mr. Poe agreed to waive the requirement that Mr. Foster dissociate as a member of the Debtor .[5] Meanwhile, Mr. Athey refused to sign the personal guarantee on Mr. Poe's $100,000 note, and he resigned as a putative "Class A" member of the Debtor but wished to retain an interest as a putative "Class B" member. Following Mr. Athey, Mr. Briel also resigned as a managing member of the Debtor and he expressed his desire to only be a putative "Class B" investor.[6]

After making the loan to the Debtor, the relationship between Mr. Poe, James Campbell, and Steven Foster began to deteriorate. Although Mr. Poe loaned the Debtor $100,000, the conditions he placed on the loan were not being met. For example, Mr. Athey refused to guarantee the note, and Mr. Foster—not Mr. Briel—retained control over the Debtor's checking account.

Despite their dispute over whether the conditions of Mr. Poe's $100,000 loan were being met, the restaurant opened for business on October 27, 2007. James Campbell testified that it collected about $60,000 a month in gross revenue. Due to difficulties in establishing and maintaining an accurate restaurant accounting system, however, the net profit and/or loss from the restaurant is unknown. Regardless of the restaurant's financial status, it was not paying LSE enough money to allow it to make its monthly rental obligations to the Debtor. In total, LSE only made one, partial, $6,000 rental payment before the Debtor filed its bankruptcy petition. The precise reasons why LSE was unable to make its rental payments to the Debtor is the subject of collateral litigation between the parties pending in State court.

*4 On April 13, 2008, James Campbell, among others, exercised self-help remedies and took possession of the restaurant premises. As a result, the restaurant closed for a period of time. On April 28, 2008, James Campbell drafted a new operating agreement for the Debtor, which created Class A and Class B membership interests. Class A membership is held by Woodstar Holdings, LLC. Mr. Poe is not listed as either a Class A or a Class B member, and is not listed as a member of Woodstar. The April 28, 2008

Operating Agreement gives Woodstar the sole authority to file a bankruptcy petition on behalf of the Debtor. Pursuant to that power, Woodstar filed the Debtor's **Chapter 11** bankruptcy petition on May 2, 2008.

## II. DISCUSSION

Mr. Poe contends that he is a member of the Debtor, he did not authorize the April 28, 2008 Operating Agreement, and he did not consent to the filing of the bankruptcy petition. Also, Mr. Poe asserts, even if the bankruptcy filing is authorized, it should be **dismissed** or **converted** for cause under 11 U.S.C. § 1112(b).

### A. Authority to File

Mr. Poe argues that the filing of the Debtor's bankruptcy petition is an unauthorized act because the Debtor's April 28, 2008 Operating Agreement is invalid, and he—as a managing member of the Debtor—did not consent to the bankruptcy filing. Therefore, Mr. Poe contends the court must **dismiss** this case. *E.g., Price v. Gurney,* 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945) ("If the ... Court finds that those who purport to act on behalf of a corporation have not been granted authority by local law to institute the [bankruptcy] proceedings, it has no alternative but to **dismiss** the petition."); *Hager v. Gibson,* 108 F.3d 35, 39 (4th Cir.1997) (same).

Even assuming, without deciding, that Mr. Poe is a managing member of the Debtor, and that the April 28, 2008 Operating Agreement is invalid, the filing of this bankruptcy case is still authorized under the April 26, 2007 Operating Agreement.

The determination of who has the authority to file a bankruptcy petition on behalf of a business entity is based on state law because "[t]he Bankruptcy Code does not establish what the internal requisites are for the initiation of a voluntary corporate bankruptcy proceeding." *In re American Globus Corp.,* 195 B.R. 263, 265 (Bankr.S.D.N.Y.1996).

Under West Virginia law, an LLC is a legal entity that has attributes of both a corporation and a partnership. To the extent that the LLC's operating agreement does not provide otherwise, Chapter 31B of the West Virginia Code "governs relations among the members, managers

and company." W. Va. Code § 31B–1–103(a). Chapter 31B does not specifically address the filing of a bankruptcy petition on behalf of an LLC, and the filing of a bankruptcy petition is not listed among the non-waiveable provisions of the Uniform Act. §§ 31B–1–103(b) (stating that an operating agreement may not waive statutory requirements regarding, among other things, the duty of loyalty or the right to expel a member); 31B–2–203(c)(1) ("Articles of organization of a limited liability company may not vary the nonwaivable provisions of section 1–103(b). As to all other matters .... [t]he operating agreement controls as to managers, members and members' transferees....").

**\*5** Under the Debtor's April 26, 2007 Operating Agreement, "all decisions will be by majority vote with each member who is admitted as a member having a vote in proportion to his or her membership interest." Thus, the court must determine who is a member of the Debtor, who has management authority, and whether a majority of the membership interest of those entitled to vote authorized the filing of the bankruptcy petition.

When the Debtor's Operating Agreement of April 26, 2007, was executed, the Debtor only had four members: James Campbell, Steven Foster, Michael Briel, and Louis Athey; each having a 25% membership interest. All four original members are also named as managers, and James Campbell is named as the tie-breaking vote for any deadlock in management decisions.

Before the Debtor filed its May 2, 2008 bankruptcy petition, both Mr. Athey and Mr. Briel resigned as managing members, and, consequently, were dissociated from the Debtor. [7] § 31B–6–602. As such, neither Mr. Aethy nor Mr. Briel could participate in the management of the Debtor. § 31B–6–603(b)(1). Thus, under Mr. Poe's theory, the only managing members of the Debtor were James Campbell, Steven Foster, and Glen Poe. Mr. Poe's negative vote for the authorization of bankruptcy filing would not be sufficient to defeat the majority vote necessary for the filing of the bankruptcy petition. Consequently, because: (1) both James Campbell and Steven Foster authorized the filing, (2) James Campbell and Steven Foster had a minimum of a 50% membership interest in the Debtor, and (3) the April 26, 2007 Operating Agreement designated Mr. Campbell as the tiebreaker vote, the terms of the April 26, 2007 Operating Agreement

were satisfied for authorizing the filing of the bankruptcy petition. [8]

### B. Dismissal Under 11 U.S.C. § 1112(b)
Mr. Poe asserts several items that, in his view, require this court to **dismiss** the Debtor's bankruptcy petition for cause under 11 U.S.C. § 1112(b).

Section 1112(b) of the Bankruptcy Code allows a court, in the exercise of its discretion, to **convert** or **dismiss** a **Chapter 11** case for cause, whichever is in the best interest of creditors and the estate. "Cause" is not specifically defined in the Bankruptcy Code, but § 1112(b) lists several, nonexclusive examples of what may constitute cause. Among the enumerated causes for either **converting** or **dismissing** a case are gross mismanagement of the estate and failure to timely satisfy reporting requirements. §§ 1112(b)(4)(B),(F).

### 1. Findings of "Cause" to Convert or Dismiss Under § 1112(b)

#### a. § 1112(b)(4)(B)
Section 1112(b)(4)(B) provides that "cause" is present to **convert** or **dismiss** a case where there has been "gross mismanagement" of the estate. This subsection focuses on the conduct of the estate's affairs (not the debtor's) and requires that the mismanagement be "gross" in character, meaning that the mismanagement is "glaringly noticeable usu[ally] because of inexcusable badness or objectionableness." *Webster's Ninth New Collegiate Dictionary* 538 (1991).

**\*6** Mr. Poe has demonstrated three examples of mismanagement of the estate by the Debtor, which, individually or in combination, constitute gross mismanagement of the estate within the meaning of 11 U.S.C. § 1112(b)(4)(B).

First, the Debtor's schedule of personal property lists an $81,830 rent obligation owing to it by the operator of the restaurant, LSE. No effort has been undertaken to collect that receivable from LSE, and no investigation has been done to ascertain if the principals of that entity can be held personally liable on the obligation. One of the Debtor's principals, Steven Foster, testified that he would not sue LSE or its principals because the principals of that entity were friends of his. This receivable was not included as an

asset of the Debtor in its disclosure statement and is not subject to liquidation under the Debtor's proposed plan. The Debtor's refusal to pursue collection of an asset of the estate (or to provide a compelling reason why such an asset is not being pursued) constitutes gross mismanagement of the estate.

Second, because the Debtor has not received any income of a substantial nature during the course of this bankruptcy case, third parties have been advancing money to pay for the Debtor's expenses. No court approval was sought to authorize the receipt of the benefit of these post-petition transactions. Although the Debtor's operating reports from August 2008 through April 2009 indicate that the Debtor was borrowing money on a monthly basis, the August 2008 through January 2009 operating reports were not filed until February 5, 2009. In a supplemental report dated February 9, 2009, the Debtor states that the sums "borrowed" are "contributions from equity interest" and are mostly "contributed" by James Campbell. At this time, it is unclear whether the sums advanced are gifts, capital contributions to the Debtor, loans made with the expectation of repayment, or payments by guarantors/sureties that give rise to claims of indemnity and/or contribution against the Debtor. The point here is only that these sums of money are being transferred by third parties to the Debtor without full, timely disclosure to the court and parties in interest, or, if required, approval by the court for engaging in some form of post-petition financing.

### Operating Report Period

December 2008

November 2008

October 2008

September 2008

August 2008

In fact, the Debtor filed its delinquent operating reports only after Mr. Poe's motion to dismiss was filed on January 16, 2009, and only six days before the original hearing on the motion, which was held on February 11, 2009. Moreover, given the circumstances of the Debtor's past performance, it is doubtful that the operating report for January 2009 would have been filed on time but for Mr. Poe's motion to dismiss.

Third, the Debtor's restaurant premises is in violation of the local fire code. Some of the fire code violations have existed for over a year, and the restaurant is in danger of losing its occupancy permit. As James Campbell stated, the value of the Debtor is in having its property being used as a restaurant operation. If the property loses its occupancy permit and the restaurant is forced to close its doors, then substantial value to the estate may be lost.

In this court's view, the above three examples of mismanagement are objectionable, individually or in combination, and are sufficiently gross to constitute cause to convert or dismiss this case under 11 U.S.C. § 1112(b)(4)(B).

#### b. § 1112(b)(4)(F)

*7 Under § 1112(b)(4)(F), the "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter," constitutes cause to dismiss or convert a Chapter 11 case. This ground is established in this case.

An operating report is due not later than the 15th day of the month following the month covered by the operating report. Here, the Debtor has been late in filing its operating reports. For example:

### Operating Report Filed

February 5, 2009

February 5, 2009

February 5, 2009

February 5, 2009

February 5, 2009

Operating reports and the financial disclosures accompanying them are the life-blood of the Chapter 11 process. They are the means by which creditors can monitor a debtor's post-petition operations, and, as such, are an important obligation of a debtor in possession. The failure to timely file operating reports in itself constitutes cause to dismiss or convert a case, and habitual noncompliance calls into question a debtor's ability to

effectively reorganize. *E.g., Ronald Kern & Sons v. United States Tr.,* No. 01–CV–0717E, 2002 U.S. Dist. LEXIS 13884 at *5 (W.D.N.Y. June 11, 2002) ("Debtor's deficient and untimely financial statements provided sufficient cause to **dismiss** Debtor's **Chapter 11** proceeding.").

### 2. Unusual Circumstances and Reasonable Justification: §§ 1112(b)(1) and (2)

Having determined that cause exists to **dismiss** or **convert** this case pursuant to § 1112(b)(4)(B) and (F), § 1112(b)(1) directs that "the court shall" **dismiss** or covert this case unless there are "unusual circumstances specifically identified by the court that establish that the requested conversion or **dismissal** is not in the best interest of the estate." Given the basis on which the court has found cause to **convert** or **dismiss** this case, the court knows of no such "unusual circumstances" that would warrant a deviation from the mandate of § 1112(b)(1) to either **dismiss** or **convert** the Debtor's case.

Nevertheless, under § 1112(b)(2), in the absence of such "unusual circumstances," the court may still exercise its discretion not to **convert** or **dismiss** this case for cause based on the Debtor's objection to **dismissal**, so long as the Debtor can establish, among other things, that "the grounds for granting such relief include an act or admission of the debtor ... (i) for which there exists a reasonable justification ... and (ii) that will be cured within a reasonable period of time ...." § 1112(b)(2)(B).

**\*8** To reiterate, the following are the bases for the court's finding of cause to either **convert** or **dismiss** this bankruptcy case, and to forestall either conversion or **dismissal**, the Debtor must demonstrate both that its actions were reasonably justified and that the cause to **dismiss** or **convert** the case can be cured within a reasonable period of time:

1. The failure of the Debtor to pursue an $81,830 rent obligation owing to it by Liberty Street Enterprises, LLC. The Debtor has also failed to include this receivable as an **asset** in its disclosure statement, or its liquidation in the proposed plan.

2. The receipt of monies and/or benefits from third parties during the course of this bankruptcy case that were received outside the Debtor's ordinary course of business and which may give rise to post-petition liabilities against the estate.

3. The Debtor's real property is in violation of the existing fire code and is in danger of losing its occupancy permit. Some of the fire code violations are over a year old and still have not been remedied by the Debtor.

4. The Debtor has failed to timely file operating reports.

The Debtor has failed to demonstrate a "reasonable justification" to excuse these "cause" findings. [9]

First, Steven Foster testified that the Debtor's failure to pursue the $81,830 rent obligation owing to it by LSE was because the principals of LSE were friends of his. In fact, James Campbell was the architect for the creation of LSE, which he created solely for the purpose of operating the restaurant and paying rent to the Debtor. The Debtor made no showing to the court that an action against LSE for unpaid rent would be fruitless and has otherwise failed to articulate any "reasonable justification" as to why its failure to pursue this **asset** of the estate is justified.

Second, while in bankruptcy, the Debtor has not received steady rental income. Monthly operating reports from August 2008 through April 2009 reflect that the Debtor was borrowing money. In providing supplemental information, the Debtor attempted to clarify that the additional income was from "contributions from equity interest," and primarily came from James Campbell. No cogent explanation exists as to the exact nature of these "contributions," but the court strongly doubts that such sums (totaling $25,118.43 through April 2009) were gifts to the Debtor. Although James Campbell attempted to explain that such sums were paid by persons who had guaranteed certain of the Debtor's obligations, that was not always the case. For example, J. Michael Cassell assisted in "contributing" $3,000 in November 2008, and he was not listed as a guarantor on any note signed by the Debtor. Likewise, entities known as Market Street Holdings, LLC and 201 North George Street, LLC made a payment to Middleburg bank on behalf of the Debtor when they were not obligated on the Debtor's note. Moreover, the Debtor's ledger listed the amounts "contributed" by James Campbell in August and September 2008 as loans, and the first pages of the Debtor's monthly operating reports indicate that it was "borrowing" money. On the whole, it appears to the court, at this time, that James Campbell and others, have been financing the Debtor's post-petition operations without

seeking court approval, in violation of 11 U.S.C. § 364(b). No reasonable justification has been advanced to explain this failure.

**\*9** Third, the Debtor's failure to remedy fire code violations jeopardizes the Debtor's entire plan of reorganization. Without an occupancy permit, the Debtor cannot continue to lease its real property as a restaurant business. As James Campbell testified, the value of the Debtor's real and personal property is increased if it can be leased or sold as a going concern. Also, as the property's current "tenant," Azmi Zarou, stated, if the restaurant shut down even for a short time, he would be reluctant to continue to operate a restaurant in that location. If the building loses its occupancy permit, no restaurant business may operate, and whatever additional value may be garnered from the sale or lease of the Debtor's real property as a going concern will be lost. The Debtor has known about these fire code violations for about a year, and has not advanced any justifiable reason for failing to remedy the violations.

Fourth, the Debtor's failure to timely file operating reports is evident on the record. To receive the benefits of being a debtor-in-possession in a **Chapter 11** case, a debtor must comply with reporting requirements to allow the court, parties in interest, and the United States trustee transparent access to the debtor's financial affairs. The filing of operating reports months behind schedule, especially for a business that has very little monthly business activity and which is effectively controlled by a member who is himself a bankruptcy attorney, is simply inexcusable.

### 3. Conversion or Dismissal

Because the court has found cause to **dismiss** or **convert** the Debtor's case under 11 U.S.C. § 1112(b) of the Bankruptcy Code, and has found that no reasonable justification exists for the cause findings identified by the court, the court is required to either **dismiss** or **convert** this case under § 1112(b)(1).

As between conversion and **dismissal**, the court believes that the estate may benefit from administration by a Chapter 7 trustee, who can make a thorough determination as to whether there is any value to be extracted from the estate after considering the claims of the secured creditors. There are back rent accruals that may have value and potential claims against insiders to consider. In addition, a Chapter 7 trustee may be able to effect a sale of the restaurant premises to Azmi Zarou, who expressed an interest to the court in assuming the Debtor's secured liabilities and in making a lump sum payment to the estate of $150,000. Thus, the court will **convert** this case to one under Chapter 7 of the Bankruptcy Code.

### III. CONCLUSION

The court will enter a separate order pursuant to Fed. R. Bankr.P. 9021 that **converts** this case to one under Chapter 7.

### All Citations

Not Reported in B.R., 2009 WL 1522047

### Footnotes

1   Also before the court are Mr. Poe's argument that: (1) this case should be **dismissed** because it was filed in bad faith; and (2) failing **dismissal** or conversion, Mr. Poe seeks relief from the automatic stay to foreclose on his deed of trust; (3) to prohibit the use of his cash collateral; and/or (4) the appointment of a **Chapter 7** trustee. Given the court's decision in this case, these arguments are either moot, or will be continued to allow the Chapter 7 trustee time to review the motions.

2   This court's opinion is rendered in accordance with the dictates of § 1112(b)(3). The motion to **dismiss** was taken under advisement after closing arguments were heard on May 13, 2009. To the extent that the court has exceeded the time within which its decision must be rendered (i.e., one day), the court notes that the press of its schedule prevented it from providing its opinion any earlier.

3   In his direct testimony, James stated that the previous operators actually made between $200,000 and $275,000 per year.

4   Mr. Poe eventually purchased the second deed of trust from CT Liberty Company.

5   Both James Campbell and Steven Foster testified that this agreement was reached before Mr. Poe made the $100,000 loan. Mr. Poe stated that he could not remember the timing sequence.

6    The exact date of Mr. Briel's resignation is disputed between Mr. Briel and James Campbell. Both parties agree, however, that the resignation took place before the Debtor's May 2, 2008 bankruptcy petition.

7    Both Mr. Athey and Mr. Briel agreed to become "Class B" members; however, under the terms of the April 26, 2007 Operating Agreement, there was no such thing as a "Class B" member. Even if there were, the parties stated that this putative membership class had no management rights.

8    The Debtor's bankruptcy petition was actually filed by Woodstar Holdings, LLC, an entity chosen by James Campbell and Steven Foster to be a manager of the Debtor and to hold the Class A membership under the purported April 28, 2008 Operating Agreement. Even assuming that the April 28, 2008 Operating Agreement is invalid, both James Campbell and Steven Foster have indicated their assent to the filing of the bankruptcy petition. The court does not find any defect in the filing of the bankruptcy petition sufficient to warrant the **dismissal** of this case.

9    Because the Debtor has failed to demonstrate a reasonable justification to excuse the cause findings identified by the court, the court need not address whether the cause findings may be cured within a reasonable period of time under § 1112(b)(2)(B)(ii).

---

**End of Document**                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.