**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

In re:

GEOSTELLAR, INC.

          Debtor.

_____

MARTIN P. SHEEHAN, Trustee of the
Bankruptcy Estate of Geostellar, Inc.

          Plaintiff,

v.

DAVID A. LEVINE and INDECO UNION, a
Delaware Corporation

          Defendants.

Case No.: 3:18-BK-0045

# MOTION OF PHILADELPHIA INDEMNITY INSURANCE COMPANY TO ALLOW PAYMENT OF DEFENSE COSTS <u>FOR DEFENDANT, DAVID A. LEVINE</u>

       Philadelphia Indemnity Insurance Company ("PIIC") brings this Motion to allow it to pay reasonable and necessary Defense Costs for the Defendant, David Levine ("Levine"), in the captioned litigation.   PIIC seeks authority from this Court to allow advancement of Levine's Defense Costs under Private Company Protection Plus Policy No. PHSD1249816 (the "Policy") issued by for PIIC to the Debtor in this case, Geostellar, Inc.,[1] which PIIC has agreed to pay subject to a reservation of all of its rights, remedies and defenses, whether at law, in equity or under the Policy, and approval by this Court.  PIIC is seeking this Court's approval for such an advancement

---

[1] On April 26, 2018, the United States Bankruptcy Court for the Northern District of West Virginia entered an order converting the bankruptcy case of Geostellar, Inc. from a case under Chapter 11 to a case under Chapter 7.

because the Limit of Liability is eroded by defense payments, and the Policy also insures Debtor Geostellar, Inc.

As is detailed in the Memorandum of Points and Authorities filed with this motion: (1) courts have granted relief from an automatic stay to the extent necessary to allow for advancement of defense costs where the harms weigh more heavily against the directors or officers than the debtor; in this case Levine faces a risk of serious, immediate and irreparable harm in defending against certain actions noted below, while Debtor Geostellar, Inc. faces no risk of immediate or irreparable harm; (2) Levine bargained for and relied upon the protections afforded to him under the Policy, which includes a provision for priority of payment favoring directors and officers such as Levine over the Debtor Geostellar, Inc.; and (3) it would be unjust to deprive Levine of the protections afforded to him as a former director and officer of Debtor Geostellar, Inc. under the Policy, including the advancement of his reasonable and necessary Defense Costs.

A proposed *Order Authorizing Philadelphia Indemnity Insurance Company to Advance Defense Costs for Defendant, David Levine* is attached hereto.

Respectfully submitted the 8th day of December, 2020.

**PHILADELPHIA INDEMNITY
INSURANCE COMPANY,
By Counsel**:

*/s/ Debra Tedeschi Varner*

Debra Tedeschi Varner (WV State Bar #6501)

Varner & Van Volkenburg, PLLC
360 Washington Avenue
Clarksburg, WV 26301
Telephone: (304) 918-2840
Facsimile: (304) 566-1161

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

In re:

GEOSTELLAR, INC.

          Debtor.

_____

MARTIN P. SHEEHAN, Trustee of the
Bankruptcy Estate of Geostellar, Inc.

          Plaintiff,

v.

DAVID A. LEVINE and INDECO UNION, a
Delaware Corporation

          Defendants.

Case No.: 3:18-BK-0045

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ALLOW PAYMENT OF DEFENSE COSTS FOR DEFENDANT, DAVID A. LEVINE

## I.    JURISDICTION

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. §157(b)(2).  Venue in this Court is proper under 28 U.S.C. §§1408 and 1409.

## II.    BACKGROUND

1.    On the Petition Date of January 29, 2018, Geostellar, Inc. ("Debtor") filed a voluntary Chapter 11 bankruptcy petition in the above-entitled action.  ECF No. 1.

2.    On April 26, 2018, the United States Bankruptcy Court for the Northern District of West Virginia entered an order converting the bankruptcy case of Geostellar, Inc. from a case under Chapter 11 to a case under Chapter 7.  ECF No. 78.

3.      Prior to the Petition Date, Philadelphia Indemnity Insurance Company ("PIIC") issued Private Company Protection Plus Policy No. PHSD1249816 (the "Policy") to Geostellar, Inc. for a Policy Period of May 31, 2017 to May 31, 2018.  A true and correct copy of the Policy with an Extended Reporting Period Endorsement, which has been numbered in the bottom right corner consecutively for ease of reference, is attached to the Exhibit 1, the Declaration of Dirk E. Ehlers ("Ehlers Dec."), as Exhibit 1.1, and is referenced herein as "Ex. 1.1".

4.      A twelve (12) month Extended Reporting Period Endorsement (PI-PRD-17 (04/02)) was added to the Policy effective May 31, 2018.  The Extended Reporting Period expired on May 31, 2019. Ex. 1.1, pp. 1-2; Ehlers Dec. ¶ 5.

5.      On or about May 20, 2019, Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc., filed an adversary proceeding against David Levine and Indeco Union, in connection with Levine's alleged conduct, in part, as a director and officer of Debtor Geostellar, Inc.  The litigation is captioned *Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc., Plaintiff, v. David A. Levine and Indeco Union, a Delaware Corporation, Defendants,* in the United States Bankruptcy Court for the Northern District of West Virginia, Adversary Number 3:19-AP-00024, was filed in this Court (the "Adversary Litigation").  Ehlers Dec. Ex. 1.2 (a copy of the Complaint filed in the Adversary Litigation); Ehlers Dec. ¶ 6.

6.      Levine is seeking payment of Defense Costs he has incurred in connection with the Adversary Litigation under the Policy.  Ehlers Dec. at ¶ 7.

7.      PIIC initially agreed to provide advancement of reasonable and necessary Defense Costs for Levine's defense provided by the law firm Dunlap Bennett & Ludwig PLLC., which is permitted under the Policy under Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsections A. and B. (Ex. 1.1, pp. 54-55) subject to a

reservation of all its rights, remedies and defenses, whether at law, in equity or under the Policy, and subject to approval by this Court.  Ehlers Dec. at ¶ 8.

8.      Levine subsequently elected to tender his defense in the Adversary Litigation to PIIC, as is permitted under the Policy Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsections A. and B. (Ex. 1.1, pp. 54-55), and PIIC has appointed George Zimmer Kunz PLLC for Levine's defense, for which payment under the Policy is likewise subject to approval by this Court.  Ehlers Dec at ¶ 9.

9.      The Policy provides a Limit of Liability for all Claims during the Policy Period under Part 1, the D&O Liability Insurance, of $3 million (Ex. 1.1, p. 5), with payment of Defense Costs eroding the Limit of Liability pursuant to Part 6, COMMON POLICY CONDITIONS, SECTION I., LIMITS OF LIABILITY, Subsection D. (Ex. 1.1, p. 54).  Ehlers Dec at ¶ 10.

10.      The Policy defines "Insured" under Part 4., COMMON POLICY DEFINITIONS, Section H. to mean "the Private Company and Individual Insured."  Ex. 1.1, p. 49; Ehlers Dec at ¶ 11.

11.      The Policy defines "Individual Insured" under Part 4, COMMON POLICY DEFINITIONS, Section G. to mean, in pertinent part: "any individual who has been, now is or shall become a director, officer, governor, trustee, Employee, volunteer, management committee member, or member of the Board of Managers of the Private Company . . . ." Ex. 1.1, p. 49; Ehlers Dec. ¶ 12.

12.      The Policy defines "Private Company" under Part 4., COMMON POLICY DEFINITIONS, Section L. as follows, in pertinent part:

L.      Private Company means:

1.      the Named Corporation

2.      any Subsidiary

      3.      any entity or person as a debtor in possession within the meaning of the Unite States Bankruptcy Code or similar legal status under foreign law [.]

                                    \*      \*      \*

Ex. 1.1, p. 50; Ehlers Dec. ¶ 13.

13.     "The Policy defines "Named Corporation" under Part 4., COMMON POLICY DEFINITIONS, Section K. to mean "the first entity named in Item 1 of the Declarations Page." (Ex. 1.1, p. 50; Ehlers Dec. ¶ 14) and Item 1 of the Declarations Page of the Policy lists Debtor, "Geostellar, Inc." as the Named Corporation.  Ex 1.1, pp. 5, 27; Ehlers Dec. ¶ 14.

14.     Levine is named in the Adversary Proceeding as a defendant in part for conduct as a former director and officer of Debtor Geostellar, Inc., and is therefore potentially liable in part as an "Individual Insured" under the Policy.  Ehlers Dec., Ex. 1.2, ¶ 16; Ehlers Dec. at ¶ 15.

15.     The Limit of Liability provided by the Policy is shared by the Individual Insureds, including Levine, and the Private Company, including Debtor Geostellar, Inc.  *See* DECLARATIONS, Item 3, listing the Limits of Liability, Ex. 1.1, pp. 5, 27; Part 6, COMMON POLICY CONDITIONS, Section I., LIMITS OF LIABILITY, Ex. 1.1, p. 54; Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection H., ORDER OF PAYMENTS, pp. 55-56; Ehlers Dec. at ¶ 16.

16.     Subject to the other terms and conditions of the Policy, the Insuring Agreements under Part 1, the D&O Liability Insurance, Section I., Subsections A., B. and C. are as follows:

A.     INDIVIDUAL LIABILITY COVERAGE

The Underwriter shall pay on behalf of the Individual Insured, Loss from Claims made against the Individual Insureds during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&O Wrongful Acts, except to the extent the Private Company has indemnified the Individual Insureds for such Loss.

B.      PRIVATE COMPANY INDEMNITY COVERAGE

The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against Individual Insureds, during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act.

C.      PRIVATE COMPANY LIABILITY COVERAGE

The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against the Private Company during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act.

Ex. 1.1, p. 42; Ehlers Dec. at ¶ 17.

17.      Under Part 4, COMMON POLICY DEFINITIONS, Section J., the Policy defines "Loss" to include, in pertinent part, "Defense Costs." Ex. 1.1, p. 50; Ehlers Dec. at ¶ 18.

18.      Under Part 4, COMMON POLICY DEFINITIONS, Section D. of the Policy, the definition of "Defense Costs" includes "reasonable and necessary legal fees and expenses incurred in the defense of a Claim whether by the Insured with PIIC's consent or directly by PIIC, in the investigation, adjustment, defense and appeal of a Claim." Ex. 1.1, p. 48-49; Ehlers Dec. ¶ 19.

19.      Under Part 6, COMMON POLICY CONDITIONS, Section II., RETENTION CLAUSE, the Policy provides:

The Underwriter shall only be liable for that portion of Loss arising from each Claim which is in excess of the respective Retention stated in Item 4. of the Declarations Page. Such Retention shall be borne by the Insured, uninsured and at their own risk, provided no Retention shall be incurred by Individual Insureds for which the Private Company is not permitted or required to indemnify the Individual Insured or is financially unable to do so. A single Retention shall apply to Loss arising from all Claims alleging Interrelated Wrongful Acts.

Ex. 1.1, p. 54; Ehlers Dec. ¶ 20.

20.     In addition, under Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection H., ORDER OF PAYMENTS, the Policy states as follows:

H.     ORDER OF PAYMENTS

In the event of Loss arising from one or more Claims for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which Loss in the aggregate exceeds the remaining available Limit of Liability for Part 1 (Directors and Officers Liability Insurance), the Underwriter shall:

1.     first, pay such Loss for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2.     with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such Loss for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

Ex. 1.1, p. 55-56; Ehlers Dec. ¶ 21.

21.     Debtor has not paid any Retention amount for Levine for any of his "Defense Costs" in the Adversary Litigation.  Levine is himself not required to pay a Retention pursuant to Part 6, COMMON POLICY CONDITIONS, Section II., RETENTION CLAUSE, which states, in pertinent part, that "no Retention shall be incurred by Individual Insureds for which the Private Company is not permitted or required to indemnify the Individual Insured or is financially unable to do so," Levine is not required to provide payment of a Retention.  Ex. 1.1, p. 54, as quoted above in ¶ 19; Ehlers Dec. ¶ 22.

22.     Likewise, any covered "Loss" incurred by Levine, as an Individual Insured, including "Defense Costs" (*see* Ex. 1.1, p. 50, definition of "Loss," as quoted above in ¶ 17) for which he is not indemnified by Debtor Geostellar, Inc., would be covered under the Policy by the insuring agreement provision under Part 1, the D&O Insurance, Section I., INSURING

6

AGREEMENTS, Subsection A., INDIVIDUAL LIABILITY COVERAGE (Ex. 1.1, p. 42, as quoted above in ¶ 16), for which the Policy does not include a Retention under DECLARATIONS, Item 4., which provides for a $50,000 Retention for Claims under Part 1, the D&O Liability Insurance, but only for "Claims under Insuring Agreement B & C." Ex. 1.1, pp. 5, 27; Ehlers Dec. ¶ 23.

23.     Subject to the other terms and conditions of the Policy, if Levine opts to retain control of his own defense in the Adversary Litigation, as he is permitted under Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection A. (Ex. 1.1, pp. 54; Ehlers Dec. at ¶ 24), then pursuant to Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection B. of the Policy, PIIC is required to advance his Defense Costs "prior to the final disposition of a Claim." Ex. 1.1, p. 55; Ehlers Dec. at ¶ 24.

24.     Subject to the other terms and conditions of the Policy, if Levine opts to retain control of his own defense in the Adversary Litigation, as he is permitted under Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection A. (Ex. 1.1, pp. 54), then pursuant to Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection B. of the Policy, PIIC is required to advance his Defense Costs "prior to the final disposition of a Claim." Ex. 1.1, p. 55; Ehlers Dec. ¶ 24.

25.     Alternatively, Levine may elect to tender his defense to PIIC pursuant to Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection A.  Ex. 1.1, pp. 54; Ehlers Dec. ¶25.

26.     Levine has requested that PIIC provide payment of "Defense Costs" that he has incurred in connection with the Adversary Litigation pursuant to the advancement provision under COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection

B. (Ex. 1.1, p. 55) and pursuant to his option to tender the defense to PIIC under COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection A.  Ex. 1.1, p. 54; Ehlers Dec. ¶ 26.

27.     In accordance with the "Order of Payments" provision under Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection H. (Ex. 1.1, pp. 55-56, as quoted above in ¶ 21), in the event Loss arising from one or more Claims under Part 1, the D&O Liability Insurance, exceeds the remaining available Limit of Liability for Part 1, the Policy requires that PIIC first pay such Loss under Insuring Agreement A, the INDIVIDUAL LIABILITY COVERAGE, such as the Defense Costs that Levine would incur in the Adversary Litigation, and only then would coverage be available for any Claim under Part 1, for Claims under Insuring Agreements B. or C., for which coverage is provided under Part 1 for Debtor Geostellar, Inc. as the "Private Company."  *See* Ex. 1-1, p. 42, as quoted above in ¶ 16; Ehlers Dec. ¶¶ 21, 27.

### III.     RELIEF REQUESTED

PIIC respectfully requests that this Court issue an order authorizing PIIC to advance reasonable and necessary Defense Costs in connection with the Adversary Litigation, including, if necessary, relief from the automatic stay to allow for such advancement.

### IV.     BASIS FOR RELIEF

### A.     Cause Exists for Relief From the Automatic Stay

In light of the "Order of Payments" provision under Part 6, Section III., Subsection H. of the Policy, if a party asserts a claim against the Debtor Geostellar Inc. that could result in insured "Loss" under the Policy, but there are not sufficient Limits of Liability to provide payment of the such claimed Loss and any Loss under Part 1, the D&O Liability Insurance, Section I., INSURING AGREEMENTS, Section A., INDIVIDUAL LIABILITY COVERAGE, which would provide

coverage for an Individual Insured, such as Levine, then such Individual Insured is entitled to obtain payment of his or her Loss before the Debtor Geostellar would be entitled to any payment under Part 1.  Therefore, although the Limit of Liability under the Policy is shared by the Debtor Geostellar Inc. with its former directors and officers, such as Levine, a reduction of the available Limit of Liability under the Policy as the result of the advancement of Defense Costs for Levine would not impact the Debtor Geostellar Inc.'s rights under Part 1 of the Policy.  Accordingly, assuming that the aggregate Limit of Liability under the Policy should be treated as an asset of the estate because of the potential interest of the Debtor in such Limit of Liability, cause exists under Section 362(d) of the Code for this Court to grant relief from the automatic stay to permit PIIC to advance reasonable and necessary Defense Costs incurred by Levine for his defense in the Adversary Proceeding.

Under 11 U.S.C. §362(d) the Bankruptcy Code provides in relevant part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay…for cause…."

Under Section 362(d)(1), the term "for cause" has been construed quite broadly by courts reviewing a bankruptcy court's decision to lift the automatic stay.  *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).  Cause for lifting the stay "has no clear definition and is determined on a case-by-case basis*." In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990); *In re Beguelin*, 220 B.R. 94, 97-98 (9th Cir. BAP 1998) (citations omitted).

A number of courts have allowed relief from the automatic stay in order to pay the defense costs for individual directors and officers in similar circumstances.  *See, e.g., In re MILA, Inc.,* 423 B.R. 537 (9th Cir. BAP 2010); *In re Beach First National Bankshares, Inc.*, 451 B.R. 406 (D. S.C. 2011);  *In re Allied Digital Techs. Corp.,* 306 B.R. 505 (Bankr. D. Del. 2004);  *In re CHS Elecs.,*

*Inc.*, 261 B.R. 538 (Bankr.S.D.Fla. 2001); and *In re Enron Corp*. 2002 WL 1008240 (Bankr. S.D.N.Y. May 17, 2002). The standard often employed by courts in determining whether to lift an automatic stay in this situation is whether the individual directors and officers "would 'suffer substantial and irreparable harm if prevented from exercising their rights to defense payments.'" *In re Allied*, 306 B.R. at 513 (quoting *In re Cybermedica, Inc.*, 280 B.R. 12, 18 (Bankr. D. Mass. 2002)). Courts have granted relief from an automatic stay to advance defense costs where "the harms weigh more heavily against the directors or officers than the debtor." *In re MILA, Inc.* 423 B.R. at 544.

Here, Levine faces a risk of serious, immediate and irreparable harm. He needs advancement of his Defense Costs to ensure that he is able to maintain an adequate defense in connection with this Adversary Litigation and its resolution. Without such payment, Levine would be deprived of his contractual rights under the Policy and would have to pay for defense counsel from his own funds or risk the hazard of a default judgment being entered against him in connection with the Adversary Litigation. On the other hand, the Debtor Geostellar faces no such risk of immediate, irreparable harm. In fact, under the provisions of the Policy at issue, if the Debtor Geostellar would incur Loss under Part 1 which, when combined with Levine's Loss would exceed the aggregate limit of liability available for Loss under Part 1 of the Policy, the Order of Payments provision under the Policy would entitle Levine to be paid first. Accordingly, allowing PIIC's payment of Defense Costs under the Policy to Levine would not operate to create any actual disadvantage for Debtor Geostellar, Inc. The "Order of Payments" provision of the Policy is part of an enforceable contract and should be upheld for the benefit of the Defendants as written. *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. April 11, 2002) (holding that priority of payment provision was an enforceable contractual right.) As an officer and director of Debtor

10

Geostellar, Inc., Levine had bargained for and relied upon the protections afforded him by the Policy and it would be unjust to deprive them of that benefit.

## V.    <u>CONCLUSION</u>

In light of the foregoing, because the potential "substantial and irreparable harm" to Levine as an director and officer in being unable to pay his Defense Costs greatly outweighs any potential harm to the Debtor Geostellar, Inc., relief from the automatic stay should be provided, if necessary, to allow for such advancement, subject to the terms and conditions of the Policy and PIIC's continuing reservation of rights.  Accordingly, PIIC requests that this Court enter an order in the form attached hereto, providing relief from the automatic stay to the extent it is necessary, and authorizing it to advance Defense Costs to Levine in accordance with the terms of the Policy.

Respectfully submitted the 8th day of December, 2020.

**PHILADELPHIA INDEMNITY INSURANCE COMPANY, By Counsel**:

*/s/ Debra Tedeschi Varner*

Debra Tedeschi Varner (WV State Bar #6501)

Varner & Van Volkenburg, PLLC
360 Washington Avenue
Clarksburg, WV 26301
Telephone: (304) 918-2840
Facsimile: (304) 566-1161

11

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

In re:

GEOSTELLAR, INC.

          Debtor.

Case No.: 3:18-BK-0045

_____

MARTIN P. SHEEHAN, Trustee of the
Bankruptcy Estate of Geostellar, Inc.

          Plaintiff,

v.

DAVID A. LEVINE and INDECO UNION, a
Delaware Corporation

          Defendants.

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that on the 8th day of December, 2020, the undersigned counsel served the foregoing (1) "***MOTION OF PHILADELPHIA INDEMNITY INSURANCE COMPANY TO ALLOW PAYMENT OF DEFENSE COSTS FOR DEFENDANT, DAVID A. LEVINE***" and (2) "***MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ALLOW PAYMENT OF DEFENSE COSTS FOR DEFENDANT, DAVID A. LEVINE***" upon counsel of record via the Court's CM/ECF system, which will send notification of such filing to the following participants:

| | |
|---|---|
| Martin P. Sheehan, Trustee<br>1 Community Street, Suite 200<br>Wheeling, WV 26003<br>sheehanparalegal@wvdsl.net<br>sheehanbankruptcy@wvdsl.net<br>***Chapter 7 Trustee*** | Patrick S Cassidy, Esquire<br>Timothy F. Cogan, Esquire<br>Cassidy, Cogan, Shapell & Voegelin, L.C.<br>1413 Eoff Street<br>Wheeling, WV 26003<br>pcassidy@walslaw.com<br>tfc@walslaw.com<br>***Counsel for Chapter 7 Trustee*** |
| Charles I. Jones, Jr., Esquire<br>Campbell Woods, PLLC<br>P. O. Box Box 1835<br>Huntington, WV 25719-1835<br>cjones@campbellwoods.com<br>***Counsel for Allied Building Products Corp.*** | Michael Joshua Lichtenstein, Esquire<br>Shulman Rogers Gandal Pordy & Ecker P.A.<br>12505 Park Potomac Avenue, 6th Floor<br>Potomac, MD 20854<br>mjl@shulmanrogers.com<br>***Counsel for Matador Solar Partners, LLC,***<br>***as administrative agent for Matador;***<br>***Geostellar Capital Fund II, LLC;***<br>***and Novus Capital Group, LLC*** |

12

Salene Rae Mazur Kraemer, Esquire
Arthur W. Zamosky, Esquire
Bernstein-Burkley, P.C.
707 Grant Street, Suite 2200
Pittsburgh, PA 15219
skraemer@bernsteinlaw.com
azamosky@bernsteinlaw.com
***Counsel for Debtor, Geostellar, Inc.***

Keith J. Pappas, Esquire
176 Fayette Street
Morgantown, WV 26505
kpappaslaw@labs.net
***Counsel for United Bank***

Debra A. Wertman, Esquire
U.S. Trustee's Office
300 Virginia Street, East, Room 2025
Charleston, WV 25301
debra.a.wertman@usdoj.gov
***United States Trustee***

Michael L. Scales, Esquire
Michael L. Scales, PLLC
314 West John Street
Martinsburg, WV 25401
mlscales@frontier.com
***Counsel for Matador Solar Partners, LLC, as administrative agent for Matador***

Christopher Schueller, Esquire
Buchanan Ingersoll & Rooney PC
501 Grant Street, Suite 200
Pittsburgh, PA 15219
christopher.schueller@bipc.com
***Counsel for Applied Philosophy Lab, P.B.C.; and Indeco, LLC***

Aaron C. Amore, Esquire
Amore Law, PLLC
206 West Liberty Street
P. O. Box 386
Charles Town, WV 25414
aaron@amorelaw.com
***Counsel for Threesquare, LLC; and David A. Levine***

*/s/ Debra Tedeschi Varner*

13

# Exhibit 1

# Ehlers Declaration

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

In re:

GEOSTELLAR, INC.

          Debtor.

Case No.: 3:18-BK-0045

---

MARTIN P. SHEEHAN, Trustee of the
Bankruptcy Estate of Geostellar, Inc.

          Plaintiff,

v.

DAVID A. LEVINE and INDECO UNION, a
Delaware Corporation

          Defendants.

## <u>DECLARATION OF DIRK E. EHLERS</u>

I, Dirk E. Ehlers, declare as follows:

I make this Declaration pursuant to 28 U.S.C. §1746 and state as follows:

1.      I am over the age of twenty-one (21) years and a citizen and resident of the State of

Illinois.  I am competent to make this Declaration and I have personal knowledge of the matters

set forth herein, and if called as a witness to testify I could and would testify competently to those

matters.  I make this Declaration in support of the motion of Philadelphia Indemnity Insurance

Company ("PIIC") entitled "Motion of Philadelphia Indemnity Insurance Company to Allow

Payment of Defense Costs for Defendant, David A. Levine."

### <u>The Policy</u>

2.      Exhibit 1.1 to this Declaration is a true and correct copy of Private Company

Protection Plus Policy No. PHSD1249816 (the "Policy") issued by PIIC to Debtor, Geostellar, Inc.

for a Policy Period of May 31, 2017 to May 31, 2018, including an additional Extended Reporting Period Endorsement, as to which consecutive page numbers 1 through 76 have been added in the lower right corner for ease of reference.

### The Adversary Litigation

3.      On January 29, 2018, (the "Petition Date") the Debtor, Geostellar, Inc. filed a voluntary Chapter 11 bankruptcy petition in the above entitled action.  ECF No. 1.

4.      On April 26, 2018, the United States Bankruptcy Court for the Northern District of West Virginia entered an order converting the bankruptcy proceeding of Debtor Geostellar, Inc. from a proceeding under Chapter 11 to a proceeding under Chapter 7.  ECF No. 78.

5.      Prior to the Petition Date, effective on May 31, 2017, PIIC issued the Policy to Debtor Geostellar, Inc., to which two additional endorsements were subsequently added, which were:  (a) a revised Common Policy Declarations page, effective January 23, 2018, changing the address for Geostellar, Inc. (*see* Ex. 1.1, pp. 3-5) and an Extended Reporting Period Endorsement, effective May 31, 2018 through May 31, 2019.  *See* Ex. 1.1, pp. 1-2.

6.      On or about May 20, 2019, Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc. filed an adversary proceeding against David A. Levine and Indeco Union, in part, in connection with Levine's alleged conduct as a director and officer of the Debtor, Geostellar, Inc.  The litigation is captioned *Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc., Plaintiff, v. David A. Levine and Indeco Union, a Delaware Corporation, Defendants,* in the United States Bankruptcy Court for the Northern District of West Virginia, Adversary Number 3:19-AP-00024, was filed in this Court (the "Adversary Litigation").  A true and correct copy of the Complaint filed in the Adversary Litigation is attached to this Declaration as Exhibit 1.2.

7.     Defendant Levine is seeking payment of Defense Costs he incurs in connection with the Adversary Litigation under the Policy.

8.     PIIC initially agreed to provide advancement of reasonable and necessary Defense Costs for Levine's defense provided by the law firm Dunlap Bennett & Ludwig PLLC., which is permitted under the Policy under Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsections A. and B. (Ex. 1.1, pp. 54-55) subject to a reservation of all its rights, remedies and defenses, whether at law, in equity or under the Policy, and subject to approval by this Court.

9.     Levine subsequently elected to tender his defense in the Adversary Litigation to PIIC, as is permitted under the Policy Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsections A. and B. (Ex. 1.1, pp. 54-55), and PIIC has appointed George Zimmer of the law firm Kunz PLLC for Levine's defense, for which payment under the Policy is likewise subject to approval by this Court.

10.    The Policy provides a Limit of Liability for all Claims during the Policy Period under Part 1, the D&O Liability Insurance, of $3 million (Ex. 1.1, p. 5), with payment of Defense Costs eroding the Limit of Liability pursuant to Part 6, COMMON POLICY CONDITIONS, SECTION I., LIMITS OF LIABILITY, Subsection D.  Ex. 1.1, p. 54.

11.    The Policy defines "Insured" under Part 4., COMMON POLICY DEFINITIONS, Section H. to mean "the Private Company and Individual Insured."  Ex. 1.1, p. 49.

12.    The Policy defines "Individual Insured" under Part 4., COMMON POLICY DEFINITIONS, Section G. to mean, in pertinent part: "any individual who has been, now is or shall become a director, officer, governor, trustee, Employee, volunteer, management committee member, or member of the Board of Managers of the Private Company . . . ." Ex. 1.1, p. 49.

13.     The Policy defines "Private Company" under Part 4., COMMON POLICY DEFINITIONS, Section L. as follows, in pertinent part:

L.     Private Company means:

1.     the Named Corporation

2.     any Subsidiary

3.     any entity or person as a debtor in possession within the meaning of the Unite States Bankruptcy Code or similar legal status under foreign law [.]

*     *     *

Ex. 1.1, p. 50.

14.     The Policy defines "Named Corporation" under Part 4., COMMON POLICY DEFINITIONS, Section K. to mean "the first entity named in Item 1 of the Declarations Page." Ex. 1.1, p. 50, and Item 1 of the Declarations Page of the Policy lists Debtor, "Geostellar, Inc.," as the "Named Corporation."  Ex 1.1, pp. 5, 27.

15.     Levine is named in the Adversary Proceeding as a defendant in part for conduct as a former director and officer of Debtor Geostellar, Inc., and is therefore potentially liable in part as an "Individual Insured" under the Policy.  Ex. 1.2, ¶16.

16.     The Limit of Liability provided by the Policy is shared by the Individual Insureds, including Levine, and the Private Company, Debtor Geostellar, Inc.  *See* DECLARATIONS, Item 3, listing the Limits of Liability, Ex. 1.1, pp. 5, 27; Part 6, COMMON POLICY CONDITIONS, Section I., LIMITS OF LIABILITY, Ex. 1.1, p. 54; and Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection H., ORDER OF PAYMENTS, pp. 55-56.

17.     Subject to the other terms and conditions of the Policy, the under Part 1, the DIRECTORS AND OFFICERS LIABILITY INSURANCE, Section I., INSURING AGREEMENTS, Subsections A., B. and C., the Policy provides as follows:

A.     INDIVIDUAL LIABILITY COVERAGE

The Underwriter shall pay on behalf of the Individual Insured, Loss from Claims made against the Individual Insureds during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&O Wrongful Acts, except to the extent the Private Company has indemnified the Individual Insureds for such Loss.

B.     PRIVATE COMPANY INDEMNITY COVERAGE

The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against Individual Insureds, during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act.

C.     PRIVATE COMPANY LIABILITY COVERAGE

The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against the Private Company during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act.

Ex. 1.1, p. 42.

18.     Under Part 4, COMMON POLICY DEFINITIONS, Section J., the Policy defines "Loss" to include, in pertinent part, "Defense Costs."  Ex. 1.1, p. 50.

19.     Under Part 4, COMMON POLICY DEFINITIONS, Section D., Paragraph 1. of the Policy, "Defense Costs" is defined to include "any reasonable and necessary legal fees and expenses incurred in the defense of a Claim whether by the Insured with PIIC's consent or directly by PIIC, in the investigation, adjustment, defense and appeal of a Claim."  Ex. 1.1, pp. 48-49.

20.     Under Part 6, COMMON POLICY CONDITIONS, Section II., RETENTION CLAUSE, the Policy provides:

The Underwriter shall only be liable for that portion of Loss arising from each

Claim which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the Insured, uninsured and at their own risk, provided no Retention shall be incurred by Individual Insureds for which the Private Company is not permitted or required to indemnify the Individual Insured or is financially unable to do so.  A single Retention shall apply to Loss arising from all Claims alleging Interrelated Wrongful Acts.

Ex. 1.1, p. 54.

21.     In addition, under Part 6, COMMON POLICY CONDITIONS, Section III.,

DEFENSE AND SETTLEMENT, Subsection H., ORDER OF PAYMENTS, the Policy states as

follows:

H.      ORDER OF PAYMENTS

In the event of Loss arising from one or more Claims for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which Loss in the aggregate exceeds the remaining available Limit of Liability for Part 1 (Directors and Officers Liability Insurance), the Underwriter shall:

1.     first, pay such Loss for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2.     with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such Loss for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

Ex. 1.1, pp. 55-56.

22.     Debtor Geostellar, Inc. has not paid any Retention amount for Levine for any of his

"Defense Costs" in the Adversary Litigation, and has not otherwise agreed to indemnify Levine

for his defense in the Adversary Litigation.  Levine is himself not required to pay a Retention

pursuant to Part 6, COMMON POLICY CONDITIONS, Section II., RETENTION CLAUSE,

which states, in pertinent part, that "no Retention shall be incurred by Individual Insureds for which

the Private Company is not permitted or required to indemnify the Individual Insured or is

financially unable to do so."  Ex. 1.1, p. 54, as quoted above in ¶ 20.

23.     Likewise, any covered "Loss" incurred by Levine, as an Individual Insured,

including "Defense Costs" (*see* Ex. 1.1, p. 50, definition of "Loss," as quoted above in ¶ 18) for which he is not indemnified by Debtor Geostellar, Inc., would be covered under the Policy by the insuring agreement provision under Part 1, the D&O Insurance, Section I., INSURING AGREEMENTS, Subsection A., INDIVIDUAL LIABILITY COVERAGE (Ex. 1.1, p. 42, as quoted above in ¶ 17), for which the Policy does not include a Retention under DECLARATIONS, Item 4., which provides for a $50,000 Retention for Claims under Part 1, the D&O Liability Insurance, but only for "Claims under Insuring Agreement B & C."  Ex. 1.1, pp. 5, 27.

24.     Subject to the other terms and conditions of the Policy, if Levine opts to retain control of his own defense in the Adversary Litigation, as he is permitted under Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection A. (Ex. 1.1, pp. 54), then pursuant to Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection B. of the Policy, PIIC is required to advance his Defense Costs "prior to the final disposition of a Claim."  Ex. 1.1, p. 55.

25.     Alternatively, Levine may elect to tender his defense to PIIC pursuant to Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection A.; Ex. 1.1, pp. 54.

26.     Levine has requested that PIIC provide payment of "Defense Costs" that he has incurred in connection with the Adversary Litigation pursuant to the provisions for advancement of Defense Costs under COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection B., (Ex. 1.1, p. 55) and pursuant to his option to tender the defense to PIIC under COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection A.  Ex. 1.1, p. 54.

27.     In accordance with the "Order of Payments" provision under Part 6, COMMON POLICY CONDITIONS, Section III., DEFENSE AND SETTLEMENT, Subsection H. (Ex. 1.1, pp. 55-56, as quoted above in ¶ 21), in the event Loss arising from one or more Claims under Part 1, the D&O Liability Insurance, exceeds the remaining available Limit of Liability for Part 1, the Policy requires that PIIC first pay such Loss under Insuring Agreement A, the INDIVIDUAL LIABILITY COVERAGE, such as the Defense Costs that Levine would incur in the Adversary Litigation, and only then would coverage be available for any Claim under Part 1, for Claims under Insuring Agreements B. or C., for which coverage is provided under Part 1 for Debtor Geostellar, Inc. as the "Private Company."  *See* Ex. 1-1, p. 42, as quoted above in ¶ 17.

I declare under penalty of perjury under the laws of the United States of America and the State of Illinois that the foregoing is true and correct.

Dated this the 3rd day of December 2020.

_____
**Dirk E. Ehlers**

# Exhibit 1.1

# Private Company Protection Plus
# Policy No. PHSD1249816

# POLICY CHANGE DOCUMENT

**POLICY NO.:** PHSD1249816

| Philadelphia Indemnity Insurance Company | 952 | MAURY DONNELLY & PARR, INC. |

NAMED INSURED    Geostellar, Inc.

MAILING ADDRESS    2426 Steamboat Run Rd
Shepherdstown, WV 25443-4115

POLICY PERIOD:    FROM    05/31/2017    TO    05/31/2018    at
12:01 A.M. Standard Time at your mailing address shown above.

CHANGE EFFECTIVE   05/31/2018             CHANGE # 2           REVISION # 2

DESCRIPTION

In consideration of the premium reflected, the policy is amended as indicated below:

12 Month Extended Reporting Period Endorsement is added.  Premium for
endorsement is fully earned.

Path ID 11739555

Total Annual
Additional/Return Premium $              15,801.43
                                         ADDITIONAL

Total Prorate
Additional/Return Premium $              15,801.43
                                         ADDITIONAL

COUNTERSIGNED                            BY

            (Date)                            (Authorized Representative)

05/29/2018
Issue Date

PI-PRD-17 (04/02)

## **THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXTENDED REPORTING PERIOD

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Pursuant to PART 6 COMMON POLICY CONDITIONS, section VIII., and in return for additional premium of $ 14,842.00 , it is agreed and understood that an Extension Period is granted, effective 05/31/2018, and:

      ☒ Expiring on 05/31/2019

      ☐ with no expiration.

All other terms of the policy are unchanged.

2

## POLICY CHANGE DOCUMENT

**POLICY NO.:** PHSD1249816

| Philadelphia Indemnity Insurance Company | 952 | MAURY DONNELLY & PARR, INC. |
|---|---|---|

NAMED INSURED       Geostellar, Inc.

MAILING ADDRESS     2426 Steamboat Run Rd
                    Shepherdstown, WV 25443-4115

POLICY PERIOD:      FROM    05/31/2017    TO    05/31/2018       at
                    12:01 A.M. Standard Time at your mailing address shown above.

CHANGE EFFECTIVE   01/22/2018            CHANGE #  1        REVISION #  1

DESCRIPTION
In consideration of the premium reflected, the policy is amended as indicated below:

The mailing address is amended to read:

2426 Steamboat Run Rd
Shepherdstown, WV 25443

Path ID 11389091

| Total Annual Additional/Return Premium $ | 0.00 NO CHANGE | Total Prorate Additional/Return Premium $ | 0.00 NO CHANGE |
|---|---|---|---|

COUNTERSIGNED                              BY

              (Date)                                    (Authorized Representative)

01/23/2018
Issue Date                        Insurance Policy              Page 1 of 1     3



**PHILADELPHIA INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

## COMMON POLICY DECLARATIONS

**Policy Number:** PHSD1249816

**Named Insured and Mailing Address:**
Geostellar, Inc.
2426 Steamboat Run Rd
Shepherdstown, WV 25443-4115

**Producer:** 952
MAURY DONNELLY & PARR, INC.
24 Commerce Street
BALTIMORE, MD 21202

(410)685-4625

**Policy Period From:** 05/31/2017  **To:** 05/31/2018

at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | 29,847.26 |
| Crime Protection Plus | 1,754.60 |

|  | **Total** | **$ 31,601.86** |
|---|---|---|
| Total Includes Fees and Surcharges (See Schedule Attached) | | **172.86** |

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
<u>Refer To Forms Schedule</u>

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (06/14)

Secretary

President and CEO

4



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

## Philadelphia Indemnity Insurance Company

Policy Number:  PHSD1249816

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND R REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FO DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item     1.          Private Company Name and Address:
                        Geostellar, Inc.
                        2426 Steamboat Run Rd
                        Shepherdstown, WV 25443-4115


                        Internet Address: www.  geostellar.com

Item     2.          Policy Period:          From:  05/31/2017          To:  05/31/2018
                                                      (12:01 A.M. local time at the address shown in Item 1.)


Item     3.          Limits of Liability:
            (A)       Part 1, D&O Liability:           $          3,000,000 each Policy Period.
            (B)       Part 2, Employment Practices:    $          1,000,000 each Policy Period.
            (C)       Part 3, Fiduciary Liability:     $          1,000,000 each Policy Period.
            (D)       Aggregate, All Parts:            $          5,000,000 each Policy Period.


Item     4.          Retention:
            (A)       Part 1, D&O Liability:       $          50,000  for each Claim under Insuring Agreement B & C.
                          Private Offering: $          50,000  for each Claim under Insuring Agreement B & C.
            (B)       Part 2, Employment Practices:  $          25,000  for each Claim.
            (C)       Part 3, Fiduciary Liability:   $               0  for each Claim.


Item     5.          Prior and Pending Date: Part 1     05/16/2013    Part 2     05/06/2013  Part 3     05/16/2013


Item     6.          Premium:          Part 1 $   23,270.00     Part 2 $   5,709.00     Part 3 $     705.00

                                          *Total Premium*:  $     29,847.26

Item     7.          Endorsements:  SEE SCHEDULE

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

Authorized Representative                Countersignature                Countersignature Date

6

Change Date: 01/22/2018                                                      PI-CRP-01 (06/05)



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

## *CRIME PROTECTION PLUS DECLARATIONS*

Policy Number:  PHSD1249816

In return for the payment of the premium, and subject to all the terms of this Policy, we agree with you to provide the insurance stated in this Policy.

DECLARATIONS

ITEM

1.  Named Insured:  Geostellar, Inc.
    2426 Steamboat Run Rd
2.  Mailing Address:  Shepherdstown, WV 25443-4115

3.  Policy Period: from  05/31/2017  to  05/31/2018
    (12:01 A.M. Standard Time at Your Mailing Address)

4.  Coverages, Limits of Insurance and Deductibles:

    ☐   Loss Sustained Option   ☒   Discovery Option
    (If no box is checked, the Loss Sustained Option shall apply)

    Insuring Agreements, Limit of Insurance and Deductible Amounts shown below are subject to all of the terms of this policy that apply.

| Insuring Agreements Forming Part of This Policy | Limit of Insurance | Deductible Amount |
|---|---|---|
| A1. EMPLOYEE THEFT AND CLIENT COVERAGE | $    1,000,000 | $    10,000 |
| A2. ERISA FIDELITY | $    1,000,000 | $    NIL |
| B.  FORGERY OR ALTERATION, including Credit, Debit, or Charge Card Extension ($25,000 limit) | $ _____ | $ _____ |
| C.  INSIDE THE PREMISES | $ _____ | $ _____ |
| D.  OUTSIDE THE PREMISES | $ _____ | $ _____ |
| E.  MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY | $ _____ | $ _____ |
| F.  COMPUTER FRAUD AND FUNDS TRANSFER FRAUD | $ _____ | $ _____ |

5.  Form Numbers of Endorsements Forming Part of This Policy When Issued: SEE SCHEDULE
6.  Cancellation of Prior Insurance: By acceptance of this Policy, you give us notice canceling prior policies or bonds numbered: _____
    _____ the cancellations to be effective at the time this policy becomes effective.

This Policy has been signed by the Company's President and Secretary.

Includes copyright material of the Insurance Services Office Inc., used with its permission.

7



PHILADELPHIA
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, PA 19004

### RENEWAL APPLICATION FOR:

**PRIVATE COMPANY PROTECTION PLUS**
**DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY INSURANCE**
**EMPLOYMENT PRACTICES LIABILITY INSURANCE**
**FIDUCIARY LIABILITY INSURANCE**

**NOTICE: THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE UNDERWRITER PURSUANT TO THE TERMS HEREIN. THIS POLICY PROVIDES A LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS THAT SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS. FURTHER NOTE THAT DEFENSE COSTS PAID SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

### Instructions

- Whenever used in this Application the term **Applicant** shall mean the Named Corporation and its wholly-owned/controlled Subsidiaries and their respective Directors, Officers, Trustees or Governors.
- The **Applicant** is required to complete Application Sections 1 and 5.
- The **Applicant** should complete the other applicable Section(s) for which coverage is desired. (See chart below)

| Check Coverage Desired | Application Section | Requested Limit | Requested Retention | Requested Effective Date |
|---|---|---|---|---|
| General Information | 1 | N/A | N/A | N/A |
| ✓ Directors & Officers | 2 | $3,000,000 | $50,000 | 5/26/2017 |
| ✓ Employment Practices | 3 | $1,000,000 | $25,000 | 5/26/2017 |
| ✓ Fiduciary Liability | 4 | $1,000,000 | $0 | 5/26/2017 |
| General Summary | 5 | N/A | N/A | N/A |

### SECTION 1 – GENERAL INFORMATION

1. Name of **Applicant**: Geostellar, Inc.

2. Change in Address: ✓ None or _____

3. Change in website address: ✓ None or www. _____

4. Have there been any changes in the **Applicant's** operations?: ☐ Yes ✓ No **If yes, please provide details.**

5. The Officer of the **Applicant** designated to receive any and all notices from the Underwriter or their authorized representative concerning this insurance is:  Name: David Levine

### Section 2 - DIRECTORS & OFFICERS INFORMATION
(Complete this section **only** if Directors & Officers Liability coverage is desired.)

6. **Ownership Information:**

a) Number of common shares outstanding: 5,104,892          If LLC, number of membership shares: _____

PI-PRD-Renewal App (06/11)

Page 1 of 8

© 2011 Philadelphia Insurance Companies

8

**Directors & Officers information cont'd**

b) Number of common shareholders: 46 _____    Number of active members: _____

c) Total number of shares owned directly or beneficially by Directors & Officers or Board of Managers: Attached _____

d) Does any shareholder(s) or group of affiliated shareholders (including an employee stock ownership plan) own more than five (5)% of the voting shares directly or beneficially? ☑ Yes ☐ No  **If yes, please provide details.**

See attached cap table

_____

e) Are there any changes in ownership from the prior year? ☑ Yes ☐ No **If yes, please provide details.**

See attached cap table

_____

7. Provide a list of all direct and indirect subsidiaries.

Name: NONE _____    Type of Business: _____

Percent Owned by the **Applicant**: _____ %    Date Created / Acquired: _____

Name: _____    Type of Business: _____

Percent Owned by the **Applicant**: _____ %    Date Created / Acquired: _____

Name: _____    Type of Business: _____

Percent Owned by the **Applicant**: _____ %    Date Created / Acquired: _____

**If additional space is needed, please attach a separate page or use the additional information page provided at the end of the application.**

8. In the next twelve (12) months, does the **Applicant** anticipate being involved in any of the following: **If yes, provide details by attachment.**

| | |
|---|---|
| Merger, acquisition or consolidation with another entity? | ☐ Yes ☑ No |
| Sales, distribution or divestiture of any assets other than in the ordinary course of business? | ☐ Yes ☑ No |
| Changes in the board of directors or senior management (other than death or retirement)? | ☐ Yes ☑ No |
| Change in the **Applicant's** independent auditors? | ☐ Yes ☑ No |

9. **Offering of Securities Information**

a) Within the next twelve (12) months is the **Applicant** contemplating any private offering of debt or equity of securities? ☑ Yes ☐ No **If yes, please attach the offering memorandum or prospectus describing the essential terms of each transaction, including the effective date, the professionals used, the amount of the offering and the current status of each such transaction.**

10. **Financial Information**

a) Within the next twelve (12) months, is the **Applicant** contemplating any bankruptcy, reorganization or arrangement with creditors under federal or state law? ☐ Yes ☑ No

b) Is the **Applicant** in violation of any of its debts or loan convenants? ☐ Yes ☑ No

c) In the past twelve (12) months, did an Independent CPA render a "going concern" opinion? ☑ Yes ☐ No

PI-PRD-Renewal App (06/11)

© 2011 Philadelphia Insurance Companies

9

**Note: If the Applicant answered yes to 10 (a), (b), or (c) please attach details including the most recent financial audit, review or compilation with the auditors notes.**

11. **Outside Directorship**

Does the **Applicant** direct or request any individual to serve as director, officer, governor or trustee of any other entity? ☐ Yes ☑ No  **If yes, please complete questions a – g below.**

a) Name of individual director, officer, governor or trustee: _____ Position held: _____
b) Name of outside entity: _____
c) Nature of entity's business: _____
d) Percentage of ownership by **Applicant**: _____ % Domestic or Foreign: _____
e) Does the outside entity provide indemnification to its Directors and Officers? ☐ Yes ☐ No
f) Complete the following information regarding the Directors and Officers Liability Insurance carried by the outside entity: Insurer: _____ Limit of Liability _____ Policy Period: _____
g) Has the outside entity or its Directors and Officers been involved in any Directors and Officers Liability litigation? ☐ Yes ☐ No

<u>Section 3 - EMPLOYMENT PRACTICES INFORMATION</u>
(Complete this section <u>only</u> if Employment Practices Liability coverage is desired.)

12. Please provide the following employee count information:

|  | Currently | One Year Ago | Two Years Ago |
|---|---|---|---|
| U.S. based employees: |  |  |  |
| Total Full Time: | 30 | 29 | 15 |
| Total Part Time: | 0 | 0 | 0 |
| Volunteers: | 0 | 0 | 0 |
| Temporary: | 0 | 0 | 0 |
| Leased: | 0 | 0 | 0 |
| Total Non U.S. based employees: | 0 | 0 | 0 |
| **TOTAL SUM OF ABOVE:** | 30 | 29 | 15 |

Number of employees per the following states:

|  | Currently | One Year Ago | Two Years Ago |
|---|---|---|---|
| CA: | 3 | 2 | 2 |
| FL: | 0 | 0 | 0 |
| NJ: | 0 | 0 | 0 |
| NY: | 0 | 0 | 0 |
| TX: | 0 | 0 | 0 |

13. Total number of current employees with annual compensation greater than $100,000: _____ 9 _____

14. How many employees have been terminated or demoted in the past twelve (12) months?

Voluntary: 7 _____   Involuntary: 9 _____   Laid Off: 6 _____

15. Is any reduction of employees or change of status anticipated or being contemplated in the next year?
☐ Yes ☑ No  **If yes, number estimated**: _____

16. Does the **Applicant** anticipate any plant, facility, branch, office, or department closing, consolidation, reorganization or layoff in the next twelve (12) months? ☐ Yes ☑ No **If yes, provide details.**

17. Does the **Applicant** have a human resources department? ☑ Yes ☐ No  **If no, describe how this function is handled.**

**Employment Practices Liability (continued)**

18. **Human Resource Policies and Procedures**

Has the **Applicant** implemented any new employment policies or procedures over the past twelve (12) months?
☐ Yes  ☑ No  **If yes, please provide details**.

---

## Section 4 - FIDUCIARY LIABILITY COVERAGE
(Complete this section **only** if Fiduciary Liability coverage is desired.)

19. List all plans for which coverage is requested (use attachment if necessary):

| Plan Name | Year Established | Assets / Contributions | Type* | Participants | Administrator |
|---|---|---|---|---|---|
| Example: | | | | | |
| The ABC Manufacturing Corp 401K Plan | 2000 | $1,000,000 | 3 | 75 | self |
| a) Geostellar, Inc. Employee Plan | 2014 | 121,587.51 | 2 | 2 | PEO-TriNet |
| b) | | | | | |
| c) | | | | | |
| d) | | | | | |

* **1** = Employee Welfare Benefit Plan (as defined by ERISA), **2** = Defined Contribution Plan (as defined by ERISA), **3** = Defined Benefit Plan (as defined by ERISA), **4** = Other. **If "Type" is an ESOP a Fiduciary Liability - ESOP Supplement must be completed.**

**If additional space is needed, please attach a separate page or use the additional information page provided at the end of the application.**

20. Have there been any changes to any plan listed above? ☐ Yes ☑ No **If yes, provide details by attachment.**

21. Has any plan requested or contemplated filing a request for termination? ☐ Yes ☑ No **If yes, provide details by attachment.**

22. Has any plan been spun-off (sold), transferred or terminated? ☐ Yes ☑ No **If yes, provide details by attachment.**

**Please attach the most recent tax form 5500 for each plan listed above.**

## SECTION 5 - GENERAL SUMMARY
(The Applicant must complete this section.)

23. Please provide details on the following insurance coverage currently in place:

| COVERAGES | Insurance Company | Limit of Liability | Deductible | Policy Effective Dates |
|---|---|---|---|---|
| General Liability | Hartford | $ 2,000,000 | $ 500 | 4/12/2017 - 4/11/2018 |
| Professional Liability | | $ | $ | |

24. Has the **Applicant** been the subject or involved in any litigation in the past twelve (12) months? ☐ Yes ☑ No **If yes, provide details by attachment.**

25. In the next twelve (12) months, does the **Applicant** anticipate any substantial change or reorganization of operations? ☐ Yes ☑ No **If yes, provide details by attachment.**

PI-PRD-Renewal App (06/11)

© 2011 Philadelphia Insurance Companies

**Material Change**

If there is any material change to the answers of this Applications questions prior to the policy inception date, the Applicant must notify the Underwriter in writing. Any outstanding quotation may be modified or withdrawn.

### FRAUD NOTICE STATEMENTS

**NOTICE TO APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF ALASKA APPLICANTS:** "A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE AN INSURANCE COMPANY FILES A CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION MAY BE PROSECUTED UNDER STATE LAW."

**RESIDENTS OF ARKANSAS APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**RESIDENTS OF ARIZONA APPLICANTS:** "FOR YOUR PROTECTION ARIZONA LAW REQUIRES THE FOLLOWING STATEMENT TO APPEAR ON THIS FORM. ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF COLORADO APPLICANTS:** "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES."

**RESIDENTS OF DISTRICT OF COLUMBIA APPLICANTS:** "WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

**RESIDENTS OF FLORIDA RESIDENTS APPLICANTS:** "ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE."

**RESIDENTS OF KANSAS APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO, OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF KENTUCKY APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY "MATERIALLY" FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME."

**RESIDENTS OF LOUISIANA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**RESIDENTS OF MAINE APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

© 2011 Philadelphia Insurance Companies

**RESIDENTS OF MARYLAND APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WILLFULLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY AND WILLFULLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**RESIDENTS OF MINNESOTA APPLICANTS:** "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST ANY INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**RESIDENTS OF NEW JERSEY APPLICANTS:** "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF NEW MEXICO APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES."

**RESIDENTS OF NEW YORK APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

**RESIDENTS OF OHIO APPLICANTS:** "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST ANY INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**RESIDENTS OF OKLAHOMA APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY."

**RESIDENTS OF OREGON APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD AN INSURER: (1) BY SUBMITTING AN APPLICATION, OR (2) BY FILING A CLAIM CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT, MAY BE VIOLATING STATE LAW."

**RESIDENTS OF PENNSYLVANIA APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**RESIDENTS OF TENNESSEE APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

**RESIDENTS OF TEXAS APPLICANTS:** IF A LIFE, HEALTH AND ACCIDENT INSURER PROVIDES A CLAIM FORM FOR A PERSON TO USE TO MAKE A CLAIM, THAT FORM MUST CONTAIN THE FOLLOWING STATEMENT OR A SUBSTANTIALLY SIMILAR STATEMENT: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR THE PAYMENT OF A LOSS IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN STATE PRISON."

**RESIDENTS OF VERMONT APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE STATEMENT IN AN APPLICTION FOR INSURANCE MAY BE GUILTY OF A CRIMINAL OFFENSE AND SUBJECT TO PENALTIES UNDER STATE LAW."

**RESIDENTS OF VIRGINIA APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

**RESIDENTS OF WASHINGTON APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSES OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES, AND DENIAL OF INSURANCE BENEFITS."

© 2011 Philadelphia Insurance Companies

13

**RESIDENTS OF WEST VIRGINIA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

| Mike Rhodes | CFO |
|---|---|
| Name (Please Print/Type) | Title **(MUST BE SIGNED BY THE PRESIDENT, CHAIRMAN OR CEO)** |
| | 5/26/2017 |
| Signature | Date |

The above signed warrants that he/she is authorized and has the power to complete and execute this Application, including the Warranty Statement on behalf of the **Applicant** and their respective Directors, Officers or other insured persons.

**Produced By: (Section to be completed by Producer/Broker)**

| Producer | Agency |
|---|---|
| Producer License Number | Agency Taxpayer ID or SS Number |

Address (Street, City, State, Zip)

As part of this Application, please submit the following documents:
a) **Applicant's latest fiscal year end financial statement (CPA prepared) and latest interim financial statement**
b) List of the **Applicant's** current Directors & Officers
c) Copies of the most recently filed Form(s) 5500 (and attachments) for all ERISA plans for which coverage requested (If Fiduciary Liability coverage is being requested)

PI-PRD-Renewal App (06/11)

© 2011 Philadelphia Insurance Companies

14

## ADDITIONAL INFORMATION

This page may be used to provide additional information to any question on this application. Please identify the question number to which you are referring.

_____
Signature

5/26/2017
_____
Date

PI-PRD-Renewal App (06/11)

Page 8 of 8
© 2011 Philadelphia Insurance Companies

15



A Member of the Tokio Marine Group

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900 • Fax 610.617.7940 • PHLY.com

06/07/2017

Geostellar, Inc.
224 W King St
Martinsburg, WV 25401-3212

**Re:  PHSD1249816**

Dear Valued Customer:

Thank you very much for choosing Philadelphia Indemnity Insurance Company for your insurance needs.  Our first class customer service, national presence and A++ (Superior) A. M. Best financial strength rating have made us the selection by over 550,000 policyholders nationwide.  I realize you have a choice in insurance companies and truly appreciate your business.

I wish you much success this year and look forward to building a mutually beneficial business partnership which will prosper for years to come.  Welcome to PHLY and please visit PHLY.com to learn more about our Company!

Sincerely,

Robert D. O'Leary Jr.
President & CEO
Philadelphia Insurance Companies

RDO/sm

Philadelphia Consolidated Holding Corp. • Philadelphia Indemnity Insurance Company • Tokio Marine Specialty Insurance Co • Maguire Insurance Agency, Inc.

- Receive Invoices Electronically
- Pay Your Bills Online
- Set Up Recurring Payments
- Available 24/7
- Safe and Secure
- NO FEE!
- Environmentally Friendly

# Enroll Today!

## Pay Your Bill Online

To pay your bills online you will need a User ID and Password to access our website. If you don't have a User ID please create one by visiting **https://www.PHLY.com/myphly/newuser.aspx**.

If you have a User ID, please login and click on *"Online Bill Pay"* and enter the necessary information to pay your bills.
Philadelphia Insurance Companies accepts electronic checks (a debit from your checking or savings account) as a method of payment. Please allow 2 to 3 business days for your payment to post to your account. This service is offered free of charge. Please note that credit card payments cannot be made online.

## Recurring Payment

Customers that receive their bill directly (and not from their agent) can sign up for recurring payment via automatic withdrawals from a checking, savings, or money market account for direct bill policies.

If you do not already have an account on **PHLY.com** you will need to create one by visiting **https://www.PHLY.com/myphly/newuser.aspx**. Once logged in please refer to *"Links for You"* and click the *"Recurring Payment Instructions"* to learn how to enroll.  You can also click the *"Online Bill Pay"* tab on the left hand side to enroll in Recurring Payment.

### How to Create an Account on PHLY.com

1. Go to **https://www.PHLY.com/myphly/newuser.aspx**
2. Select the applicable BUTTON (insured or producer).
3. Complete the information on the page:
   - You will CREATE your own USER NAME and PASSWORD.
   - The password must be at least 7 characters and contain one number, one lower case letter, and one capital letter.
4. Click CONTINUE when done.
5. On the next page, complete the PASSWORD RESET QUESTION. If you ever forget your password, we will ask you this security question and you will enter the answer you have selected.
6. Once you have received the page that states: "CONTINUE TO MY PHLY," then you have successfully created the account.





**PHILADELPHIA**
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

Focus on the Things that Matter, We'll Handle the Risk!®



**PHILADELPHIA**
INSURANCE COMPANIES

A Member of the Tokio Marine Group

# Making Things Easier for You!

## PHLY CUSTOMER SERVICE

### Did you know…
- The Loss Assistance Hotline provides Management & Professional Liability policyholders with two FREE HOURS of legal consultation with knowledgeable attorneys on any matter that could potentially result in a claim under a PHLY policy
- You can review billing and payment history online
  *For example: Payment verifications go to MyPHLY on PHLY.com*
- You can pull up and print your invoices and policy documents online
- You can update your profile online
  *For example: Billing address or contact information changes*
- We offer live help within seconds: No complicated phone systems
- 94.4% of our policyholders would refer us to prospective customers*
- We provide 48 hour turnaround time on small business quotes and policy issuance in less than 10 days
- We provide interest free installments for accounts that generate at least $2,000 in premium

### Frequently Asked Questions
*How can I get information about my insurance?*
There are 5 different ways to contact Customer Service
- Customer Service 877.438.7459
- Customer Service Fax 866.847.4046
- Customer Service E-mail: custserv@phly.com
- Customer Service online chat
- PHLY.com – "Contact Us"

*When can I contact Customer Service?*
Customer Service is available Monday - Friday from 8:30 a.m. - 8:00 p.m. EST

*What forms of payment does PHLY accept?*
PHLY accepts 3 forms of payment:
- Check sent to the lock box
- Check by phone payments through our IVR (877.438.7459 – Option 1), website, or contact center representatives
- Credit card payments through our live contact center representatives (Visa, MasterCard, and American Express)

### Claims
- Average policyholder first party automobile losses settled in 10 days or less
- Same or next business day acknowledgements of newly reported and opened claims
- Claims representation nationally with Commercial Liability Claims Examiner Niche expertise
- 24/7 claims service. Staff efficiencies with paperless and industry leading systems
- Staff of Subrogation and Recovery Examiners exclusively dedicated to recovery efforts for policyholder paid losses
- Experienced, consistent staff and department structure

### Risk Management Services
- National network of in-house risk management professionals providing direct support to policyholders
- Product specific web-based risk management solutions through PHLY.com
- Interactive Driver Training online courses and examination at no additional charge
- Regular e-flyer communications on relevant risk management issues
- Strategic partnerships with best-in-class vendors for discounted MVR checks, abuse training, GPS, and many more

### Automatically included on most accounts
PHLY Bell Endorsement - Includes $50,000 limits each for Business Travel Accident Benefit, Donation Assurance, Emergency Real Estate Consulting Fee, Identity Theft Expense, Image Restoration and Counseling, Key Individual Replacement Expenses, Kidnap Expense, Terrorism Travel Reimbursement, Workplace Violence Counseling. $25,000 limits for each Conference Cancellation, Fundraising Event Blackout, Political Unrest ($5,000 per employee), Temporary Meeting Space Reimbursement, and $1,500 Travel Delay Reimbursement.

### Honors, Awards, and Ratings
- America's Top 150 Workplaces
- Best Places to Work in Insurance (4th consecutive year)
- Stevie Awards
- ACE Awards
- Top Workplaces in Philadelphia
- Ward's Top 50 (13th consecutive year)
- National Underwriter Top 100 Insurance Groups (Tokio Marine) #29
- National Underwriter Top 100 Insurance Companies #41

*A Passion for Service!*

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Coverage(s) described may not be available in all states and are subject to Underwriting and certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. © 2014 Philadelphia Consolidated Holding Corp., All Rights Reserved.
*All statistics contained herein were generated via an internal company survey of active policy holders.







TOKIO MARINE GROUP

Ed. 101514



# Risk Management Services

## PHLY RISK MANAGEMENT SERVICES

Welcome to PHLY Risk Management Services Services, PHLY is familiar with the unique Risk Management Services programming needs of you organization and has achieved superior results in this area. We are committed to delivering quality and timely loss prevention services and risk control products to your organization. Customer satisfaction through the delivery of these professional products to achieve measurable risk improvement results is our goal. We know the fulfillment of our Risk Management Services commitment is not complete until we deliver upon our promises.

**OUR MISSION:** We welcome the opportunity to demonstrate how we can tailor a risk management program suitable to our customer's needs. We are committed to providing our customers with improved communications, quicker implementation of loss control servicing initiatives, and specific benchmarking goals that help us quantify the true value of our services.

**OUR MOTTO:** "Innovative Services Producing Optimum Results:" This mantra reflects our commitment to utilize innovative products and solutions to help our customers achieve measurable results. Customer satisfaction through the delivery of these quality professional products is our goal. We know the fulfillment of our Risk Management Services commitment is not complete until we deliver upon our promises.

In order to gain full access to these resources and others, please take a moment to register on our website. If you already have an id to PHLY.com, please login to access Risk Management Services resources.

Risk Management Resources
- IntelliCorp Records, Inc.
- Accountants Resources
- WEMED Loss Assistance Hotline
- in2vate: Web-enabled EPLI (employment practices liability insurance) Risk Management Services

Proprietary Risk Management Services
- PHLY Risk Management Services E-flyers
- Responding to Risk Management Services Recommendations

Contact
- For more information please contact: Customer Service

# 800.873.4552

IMPORTANT NOTICE - The information and suggestions presented by Philadelphia Indemnity Insurance Company in this e-brochure is for your consideration in your loss prevention efforts. They are not intended to be complete or definitive in identifying all hazards associated with your business, preventing workplace accidents, or complying with any safety related, or other, laws or regulations. You are encouraged to alter them to fit the specific hazards of your business and to have your legal counsel review all of your plans and company policies.

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Consolidated Holding Corp., All Rights Reserved.







One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

# Philadelphia Indemnity Insurance Company

# Commercial Lines Policy

THIS POLICY CONSISTS OF:

– DECLARATIONS
– COMMON POLICY CONDITIONS
– ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
• ONE OR MORE COVERAGE FORMS
• APPLICABLE FORMS AND ENDORSEMENTS

BJP-190-1 (12-98)

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless signed by our authorized representative.

President & CEO

Secretary

BJP-190-1 (12-98)



# Risk Management Services

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

As a free service benefit to its policyholders, PHLY has partnered with nationally recognized law firm Wilson, Elser, Moskowitz, Edelman & Dicker LLP (WEMED), to offer a toll-free Loss Assistance Hotline. The telephone number is 877.742.2201or you can contact a WEMED attorney online at: apps.wilsonelser.com/pic/. This hotline provides you with 2 free hours of legal consultation with a knowledgeable attorney on any matter that you feel could result in a Claim under your professional or management liability policy. The Loss Assistance Hotline is NOT a Claim reporting service. To report a Claim, follow the Claim reporting instructions in your policy and also notify your insurance agent. If you have any questions concerning the Loss Assistance Hotline, please contact us at 800.759.4961 x2967.



800.873.4552

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Insurance Companies, All Rights Reserved.



PHLY.com



Ed.081513

PP 20 15 (06/15)

## PHILADELPHIA INSURANCE COMPANIES PRIVACY POLICY NOTICE

### Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies value your privacy and we are committed to protecting personal information that we collect during the course of our business relationship with you. The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information that we collect and how it may be used or disclosed. This does not reflect a change in the way we do business or handle your information.

**Information We Collect:**

We collect personal information about you from the following sources:
- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

**Information We Disclose:**

We will only disclose the information described above to our affiliates and non-affiliated third parties, as permitted by law, and when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:
- Your agent or broker (producer);
- Parties who perform a business, professional or insurance functions for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, attorneys, other insurers or medical care providers who need information to investigate, defend or settle a claim involving you;
- Regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having a legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes. We do not disclose the personal information of persons who have ceased to be our customers.

**Protection of Information:**

The Philadelphia Insurance Companies maintain physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information.  We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

**Use of Cookies and Opt-Out:**

We may place electronic "cookies" in the browser files of your computer when you access our website. Cookies are text files placed on your computer to enable our systems to recognize your browser and so that we may tailor information on our website to your interests.  We or our third party service providers or business partners may place cookies on your computer's hard drive to enable us to match personal information that we maintain about you so that we are able to pre-populate on-line forms with your information.  We also use cookies to help us analyze traffic on our website to better understand your interests.   Although we do not use your non-public personal information for this purpose, you may opt-out of cookies and advertising features through one of the available options including but not limited to Ads Settings in Google.com or the Network Advertising Initiative (NAI) Consumer Opt-out.  Opting out does not mean you will no longer receive online advertising.  It does mean that companies from which you opted out will no longer customize ads based on your interests and web usage patterns using cookies.

**How to Contact Us:**  Philadelphia Insurance Companies, One Bala Plaza, Suite 100, Bala Cynwyd, PA  19004
Attention:   Chief Privacy Officer



**PHILADELPHIA INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

### Philadelphia Indemnity Insurance Company

# COMMON POLICY DECLARATIONS

**Policy Number:** PHSD1249816

**Named Insured and Mailing Address:**
Geostellar, Inc.
224 W King St
Martinsburg, WV 25401-3212

**Producer:** 952
MAURY DONNELLY & PARR, INC.
24 Commerce Street
BALTIMORE, MD 21202

(410)685-4625

**Policy Period From:** 05/31/2017 **To:** 05/31/2018

at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | 29,847.26 |
| Crime Protection Plus | 1,754.60 |
| **Total** | **$ 31,601.86** |

Total Includes Fees and Surcharges (See Schedule Attached)   172.86

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (06/14)

Secretary

President and CEO

24

Philadelphia Indemnity Insurance Company

Form Schedule – Policy

**Policy Number:** PHSD1249816

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| Recurring Payment Flyer | 1212 | Recurring Payment Flyer |
| CSNotice-1 | 1014 | Making Things Easier |
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 0813 | Policyholder Notice (Loss Assistance Hotline) |
| PP2015 | 0615 | Privacy Policy Notice |
| CPD-PIIC | 0614 | Common Policy Declarations |
| Fees and Surcharge Schedule | 0110 | Fees and Surcharge Schedule |

Philadelphia Indemnity Insurance Company

Fees and Surcharge Schedule

Policy Number: **PHSD1249816**

Policy Term Effective Date:  **05/31/2017**
Policy Term Expiration Date: **05/31/2018**

**West Virginia Insurance Premium Surcharge                      $      172.86**



**PHILADELPHIA INSURANCE COMPANIES**
A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

## Philadelphia Indemnity Insurance Company

Policy Number:  PHSD1249816

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND R REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FO DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item  1.  Private Company Name and Address:
Geostellar, Inc.
2426 Steamboat Run Rd
Shepherdstown, WV 25443-4115

Internet Address: www. geostellar.com

Item  2.  Policy Period:  From:  05/31/2017  To:  05/31/2018
(12:01 A.M. local time at the address shown in Item 1.)

Item  3.  Limits of Liability:
(A)  Part 1, D&O Liability:  $  3,000,000 each Policy Period.
(B)  Part 2, Employment Practices:  $  1,000,000 each Policy Period.
(C)  Part 3, Fiduciary Liability:  $  1,000,000 each Policy Period.
(D)  Aggregate, All Parts:  $  5,000,000 each Policy Period.

Item  4.  Retention:
(A)  Part 1, D&O Liability:  $  50,000  for each Claim under Insuring Agreement B & C.
     Private Offering:  $  50,000  for each Claim under Insuring Agreement B & C.
(B)  Part 2, Employment Practices:  $  25,000  for each Claim.
(C)  Part 3, Fiduciary Liability:  $  0  for each Claim.

Item  5.  Prior and Pending Date: Part 1  05/16/2013  Part 2  05/06/2013  Part 3  05/16/2013

Item  6.  Premium:  Part 1 $ 23,270.00  Part 2 $ 5,709.00  Part 3 $  705.00

*Total Premium*: $  29,847.26

Item  7.  Endorsements:  SEE SCHEDULE

PAGE 1 OF 2

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

Authorized Representative                    Countersignature                              Countersignature Date

Philadelphia Indemnity Insurance Company

Form Schedule – Private Company Protection Plan

**Policy Number:** PHSD1249816

# Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-PRD-1 | 0902 | Private Company Protection Plus Declarations |
| PI-BELL-1 | 1109 | Bell Endorsement |
| PI-CME-1 | 1009 | Crisis Management Enhancement Endorsement |
| PI-PRD-2 | 0902 | Private Company Protection Plus Policy |
| PI-PRD-5 | 0902 | Professional Services Exclusion |
| PI-PRD-70 | 0803 | Health Insurance Portability and Accountability Act |
| PI-PRD-73 | 0506 | Corporate Advantage Pro-Pak Elite Coverage |
| PI-PRD-75 | 1203 | Amendment of Exclusions |
| PI-PRD-77 | 0104 | Amendment of Cancellation Provision |
| PI-PRD-112 | 0115 | Breach Of Contract Exclusion |
| PI-MANU-1 | 0100 | SIDE-A NON-RESCINDABLE COVERAGE |
| PI-MANU-1 | 0100 | DEFENSE ONLY WAGE & HOUR CARVEBACK |
| PI-PRD-WV-1 | 0303 | West Virginia Amendatory Endorsement |
| PI-SLD-001 | 0115 | Cap On Losses From Certified Acts Of Terrorism |

PI-CRP-01 (06/05)



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

## *CRIME PROTECTION PLUS DECLARATIONS*

Policy Number:  PHSD1249816

In return for the payment of the premium, and subject to all the terms of this Policy, we agree with you to provide the insurance stated in this Policy.

DECLARATIONS

ITEM
1.  Named Insured:  Geostellar, Inc.
      224 W King St
2.  Mailing Address:  Martinsburg, WV 25401-3212

3.  Policy Period**:** from  05/31/2017  to  05/31/2018
      (12:01 A.M. Standard Time at Your Mailing Address)

4.  Coverages, Limits of Insurance and Deductibles**:**

☐   Loss Sustained Option     ☒   Discovery Option
(If no box is checked, the Loss Sustained Option shall apply)

Insuring Agreements, Limit of Insurance and Deductible Amounts shown below are subject to all of the terms of this policy that apply.

| Insuring Agreements Forming Part of This Policy | Limit of Insurance | Deductible Amount |
|---|---|---|
| A1. EMPLOYEE THEFT AND CLIENT COVERAGE | $         1,000,000 | $         10,000 |
| A2. ERISA FIDELITY | $         1,000,000 | $         NIL |
| B.  FORGERY OR ALTERATION, including Credit, Debit, or Charge Card Extension ($25,000 limit) | $ | $ |
| C.  INSIDE THE PREMISES | $ | $ |
| D.  OUTSIDE THE PREMISES | $ | $ |
| E.  MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY | $ | $ |
| F.  COMPUTER FRAUD AND FUNDS TRANSFER FRAUD | $ | $ |

5.  Form Numbers of Endorsements Forming Part of This Policy When Issued: SEE SCHEDULE
6.  Cancellation of Prior Insurance**:**  By acceptance of this Policy, you give us notice canceling prior policies or bonds numbered: _____
      _____ the cancellations to be effective at the time this policy becomes effective.

This Policy has been signed by the Company's President and Secretary.

Includes copyright material of the Insurance Services Office Inc., used with its permission.

30

Philadelphia Indemnity Insurance Company

## Form Schedule – Crime Protection Plus

**Policy Number:** PHSD1249816

## Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-CRP-01 | 0605 | Crime Protection Plus Declarations |
| PI-BELL-1 | 1109 | Bell Endorsement |
| PI-CME-1 | 1009 | Crisis Management Enhancement Endorsement |
| PI-CRP-02 | 0605 | Crime Protection Plus Policy |
| PI-CRP-13 | 0605 | Policy Bridge - Discovery Replacing Loss Sustained |
| PI-CRP-WV-1 | 0605 | West Virginia Changes |

PI-BELL-1 (11/09)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## BELL ENDORSEMENT



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

**I.    SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Liability or Limits of Insurance and/or additional coverages provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| Business Travel Accident Benefit | $50,000 |
| Conference Cancellation | $25,000 |
| Donation Assurance | $50,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Fundraising Event Blackout | $25,000 |
| Identity Theft Expense | $50,000 |
| Image Restoration and Counseling | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Kidnap Expense | $50,000 |
| Political Unrest | $5,000 per employee: $25,000 policy limit |
| Temporary Meeting Space Reimbursement | $25,000 |
| Terrorism Travel Reimbursement | $50,000 |
| Travel Delay Reimbursement | $1,500 |
| Workplace Violence Counseling | $50,000 |

© 2009 Philadelphia Insurance Companies

PI-BELL-1 (11/09)

## II.  CONDITIONS

### A.  Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

### B.  Limits of Liability or Limits of Insurance

1.  When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limits of liability or limits of insurance will apply.  In no instance will multiple limits apply to coverages which may be duplicated within this policy.  Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum limits of liability or limits of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limits of liability or limits of insurance under any one coverage part or policy.

2.  Limits of liability or limits of insurance identified in Section **I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS** above are not excess of, but are in addition to the applicable Limits of Liability or Limits of Insurance stated in the Declarations.

### C.  Claim Expenses

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

## III.  ADDITIONAL COVERAGES

### A.  Business Travel Accident Benefit

We will pay a Business Travel Accident Benefit to the insured if a director or officer suffers injury or death while traveling on a common carrier for your business during the policy period.

For the purpose of Business Travel Accident Benefit coverage, injury means:

1.  Physical damage to the body caused by violence, fracture, or an accident that results in loss of life not later than one hundred eighty (180) days after the policy expiration, the date of cancellation or the date of non-renewal;

2.  Accidental loss of limbs or multiple fingers;

3.  Total loss of sight, speech or hearing.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

The Business Travel Accident Benefit shall not be payable if the cause of the injury was:

1.  An intentional act by the insured;

2.  An act of suicide or attempted suicide;

3.  An act of war; or

4.  A disease process.

© 2009 Philadelphia Insurance Companies

33

**B.  Conference Cancellation**

We will reimburse the insured for any business-related conference expenses, paid by the insured and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend.  The cancellation must be due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference.

With respect to a conference cancellation claim, it is further agreed as follows:

**1.**  The insured employee must have registered for the conference at least thirty (30) days prior to the cancellation; and

**2.**  The cancellation must be ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.

The limit of insurance for this coverage is $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

**C.  Donation Assurance**

If the insured is a 501(c)(3) status non-profit organization as defined in the United States Internal Revenue Code, we will reimburse the insured for "failed donation claim(s)."

With respect to any "failed donation claim," it is further agreed as follows:

**1.**  The donor must not have been in bankruptcy, nor have filed for bankruptcy or reorganization in the past seven (7) years prior to the time said pledge was made to the insured;

**2.**  For non-cash donations, our payment of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

**3.**  In the case of unemployment or incapacitation of a natural person donor and as a condition of payment of the "failed donation claim":

    **a.**  Neither the natural person donor nor the insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date; and

    **b.**  The donor shall be unemployed for at least sixty (60) days prior to a claim being submitted by the insured;

**4.**  No coverage shall be afforded for a written pledge of funds or other measurable, tangible property to the insured dated prior to the policy period; and

**5.**  A donation amount which is to be collected by the insured over more than a twelve (12) month period shall be deemed a single donation.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**D.  Emergency Real Estate Consulting Fee**

We will reimburse the insured any realtor's fee or real estate consultant's fee necessitated by the insured's need to relocate due to the "unforeseeable destruction" of the insured's "principal location" listed in the Declarations during the policy period.  The limit of insurance for this

PI-BELL-1 (11/09)

coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**E.  Fundraising Event Blackout**

We will reimburse the insured for "fundraising expenses" that are incurred due to the cancellation of a fundraising event caused by the lack of electric supply resulting in a power outage, provided the fundraising event is not re-scheduled.  The fundraising event must have been planned at least thirty (30) days prior to the power outage.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**F.  Identity Theft Expense**

We will reimburse any present director or officer of the named insured for "identity theft expenses" incurred as the direct result of any "identity theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the insured's first policy with us.  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**G.  Image Restoration and Counseling**

We will reimburse the insured for expenses incurred for image restoration and counseling arising out of "improper acts" by any natural person.

Covered expenses are limited to:

**1.**  The costs of rehabilitation and counseling for the accused natural person insured, provided the natural person insured is not ultimately found guilty of criminal conduct; this reimbursement to occur after acquittal of the natural person insured;

**2.**  The costs charged by a recruiter or expended on advertising, for replacing an officer as a result of "improper acts"; and

**3.**  The costs of restoring the named insured's reputation and consumer confidence through image consulting.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**H.  Key Individual Replacement Expenses**

We will pay "key individual replacement expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the policy period which results in the loss of life during the policy period.  The limit of insurance for this coverage is the lesser of $50,000 or ten (10) times the annual premium paid for this policy.  No deductible applies to this coverage.

**I.  Kidnap Expense**

We will pay on behalf of any director or officer of the insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner," parent or child during the policy period.  Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

1. Fees and costs of independent negotiators;

2. Interest costs for any loan from a financial institution taken by you to pay a ransom demand or extortion threat;

3. Travel costs and accommodations incurred by the named insured;

4. Reward money paid to an informant which leads to the arrest and conviction of parties responsible for loss covered under this insurance; and

5. Salary, commissions and other financial benefits paid by you to a director or officer.  Such compensation applies at the level in effect on the date of the kidnap and ends upon the earliest of:

    a. Up to thirty (30) days after their release, if the director or officer has not yet returned to work;

    b. Discovery of their death;

    c. One hundred twenty (120) days after the last credible evidence following abduction that they are still alive; or

    d. Twelve (12) months after the date of the kidnapping.

The limit of insurance for this coverage is $50,000 each policy period for all insureds combined.  No deductible applies to this coverage.

**J.   Political Unrest Coverage**

We will reimburse any present director, officer, employee or volunteer of the named insured while traveling outside the United States of America for "emergency evacuation expenses" that are incurred as a result of an incident of "political unrest."  This "political unrest" must occur during the policy period.  No coverage is granted for travel to countries in a state of "political unrest" at the time of departure of the travel.  The limit of insurance for this coverage is $5,000 per covered person, subject to a maximum of $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**K.   Temporary Meeting Space Reimbursement**

We will reimburse the insured for rental of meeting space which is necessitated by the temporary unavailability of the insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period.  Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**L.   Terrorism Travel Reimbursement**

We will reimburse any present director or officer of the named insured in the event of a "certified act of terrorism" during the policy period which necessitates that he/she incurs "emergency travel expenses."  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

© 2009 Philadelphia Insurance Companies

**M.  Travel Delay Reimbursement**

We will reimburse any present director or officer of the named insured for any "non-reimbursable expenses" they incur as a result of the cancellation of any regularly scheduled business travel on a common carrier.  The limit of insurance for this coverage is $1,500 per policy period for all insureds combined.  A seventy-two (72) hour waiting period deductible applies to this coverage.

**N.  Workplace Violence Counseling**

We will reimburse the insured for emotional counseling expenses incurred directly as a result of a "workplace violence" incident at any of the insured's premises during the policy period.  The emotional counseling expenses incurred must have been for:

**1.**  Your employees who were victims of, or witnesses to the "workplace violence";

**2.**  The spouse, "domestic partner," parents or children of your employees who were victims of, or witnesses to the "workplace violence"; and

**3.**  Any other person or persons who directly witnessed the "workplace violence" incident.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

## IV.  DEFINITIONS

For the purpose of this endorsement, the following definitions apply:

**A.**  "Certified act of terrorism" means any act so defined under the Terrorism Risk Insurance Act, and its amendments or extensions.

**B.**  "Communicable disease" means an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact, or contact with human fluids, waste, or similar agent, such as, but not limited to Meningitis, Measles or Legionnaire's Disease.

**C.**  "Domestic partner" means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the named insured.

**D.**  "Emergency evacuation expenses" mean:

**1.**  Additional lodging expenses;

**2.**  Additional transportation costs;

**3.**  The cost of obtaining replacements of lost or stolen travel documents necessary for evacuation from the area of "political unrest"; and

**4.**  Translation services, message transmittals and other communication expenses.

provided that these expenses are not otherwise reimbursable.

**E.**  "Emergency travel expenses" mean:

© 2009 Philadelphia Insurance Companies

1. Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of a "certified act of terrorism"; and

2. The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "certified act of terrorism";

provided that these expenses are not otherwise reimbursable.

F.  "Failed donation claim" means written notice to the insured during the policy period of:

1. The bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable, tangible property to the insured; or

2. The unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable, tangible property to the insured.

G.  "Fundraising expenses" mean deposits forfeited and other charges paid by you for catering services, property and equipment rentals and related transport, venue rentals, accommodations (including travel), and entertainment expenses less any deposits or other fees refunded or refundable to you.

H.  "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of any director or officer (or spouse or "domestic partner" thereof) of the named insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

I.  "Identity theft expenses" mean:

1. Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

2. Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors; and

3. Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

J.  "Improper acts" means any actual or alleged act of:

1. Sexual abuse;

2. Sexual intimacy;

3. Sexual molestation; or

4. Sexual assault;

committed by an insured against any natural person who is not an insured.  Such "improper acts" must have been committed by the insured while in his or her capacity as an insured.

K.  "Injury" whenever used in this endorsement, other than in Section **III. A. Business Travel**,

© 2009 Philadelphia Insurance Companies

means any physical damage to the body caused by violence, fracture or an accident.

**L.** "Key individual replacement expenses" mean the following necessary expenses:

    **1.** Costs of advertising the employment position opening;

    **2.** Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

    **3.** Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up an employment contract.

**M.** "Natural catastrophe" means hurricane, tornado, earthquake or flood.

**N.** "Non-reimbursable expenses" means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, and for which your director or officer produces a receipt:

    **1.** Meals and lodging;

    **2.** Alternative transportation;

    **3.** Clothing and necessary toiletries; and

    **4.** Emergency prescription and non-prescription drug expenses.

**O.** "Political unrest" means:

    **1.** A short-term condition of disturbance, turmoil or agitation within a foreign country that poses imminent risks to the security of citizens of the United States;

    **2.** A long-term condition of disturbance, turmoil or agitation that makes a foreign country dangerous or unstable for citizens of the United States; or

    **3.** A condition of disturbance, turmoil or agitation in a foreign country that constrains the United States Government's ability to assist citizens of the United States, due to the closure or inaccessibility of an embassy or consulate or because of a reduction of its staff

for which either an alert or travel warning has been issued by the United States Department of State.

**P.** "Principal location" means the headquarters, home office or main location where most business is substantially conducted.

**Q.** "Unforeseeable destruction" means damage resulting from a "certified act of terrorism," fire, collision or collapse which renders all of the insured's "principal locations" completely unusable.

**R.** "Workplace violence" means any intentional use of or threat to use deadly force by any person with intent to cause harm and that results in bodily "injury" or death of any person while on the insured's premises.

© 2009 Philadelphia Insurance Companies

PI-CME-1 (10/09)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CRISIS MANAGEMENT ENHANCEMENT ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

Solely for the purpose of this endorsement:  1) The words  "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  2) The words "we," "us" and "our" refer to the company providing this insurance.

**I.    SCHEDULE OF ADDITIONAL COVERAGE AND LIMITS**

The following is the Limit of Liability provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

Crisis Management Expense                                                              $25,000

**II.   CONDITIONS**

**A.  Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.  All other terms and conditions of the policy or coverage part to which this endorsement is attached remain unchanged.

**B.  Limits of Liability or Limits of Insurance**

When coverage is provided by this endorsement and any other coverage form or endorsement attached to this policy, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Liability or Limit of Insurance.

**C.  Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.  ADDITIONAL COVERAGES**

**A.**  We will reimburse you for "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies.  The amount of such reimbursement is limited as described in Section **II. CONDITIONS, B. Limits of Liability or Limits of Insurance**.  No other obligation or liability to pay sums or perform acts or services is covered.

**B.**  We will reimburse only those "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six (6) months of the date the "crisis" was initiated.

## IV.   DEFINITIONS

**A.**   "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

**B.**   "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm."   However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

**C.**   "Crisis management firm" means any service provider you hire that is acceptable to us.   Our consent will not be unreasonably withheld.

**D.**   "Incident" means an accident or other event, including the accidental discharge of pollutants, resulting in death or serious bodily injury to three or more persons.

**E.**   "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

PI-PRD-2 (09/02)

# PRIVATE COMPANY PROTECTION PLUS

Directors and Officers & Private Company Liability Insurance
Employment Practices Liability Insurance
Fiduciary Liability Insurance

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

### PART 1
### DIRECTORS & OFFICERS LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.      INSURING AGREEMENTS

A.      INDIVIDUAL LIABILITY COVERAGE

The **Underwriter** shall pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Private Company** has indemnified the **Individual Insured** for such **Loss**.

B.      PRIVATE COMPANY INDEMNITY COVERAGE

The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Private Company** has indemnified such **Individual Insureds** for such **Loss**.

C.      PRIVATE COMPANY LIABILITY COVERAGE

The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against the **Private Company** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II.     DEFINITIONS

A.      **D&O Wrongful Act** means any actual or alleged:

1.  act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or

2.  act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the **Private Company**; or

3.  act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity**, but only:

    a.  if such service is at the written request or direction of the **Private Company**; and

    b.  if, at the time such service began, the **Individual Insured** did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a **Claim** under this Policy.

B.  **Outside Entity** means:

    1.  any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

    2.  any other entity listed as an **Outside Entity** in an endorsement to this Policy.

III.    EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against the **Private Company** under Insuring Agreement C:

A.  arising out of, based upon or attributable to any actual or alleged plagiarism, infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan, piracy or misappropriation of ideas or trade secrets;

B.  arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair competition, or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, the Hart-Scott-Rodino Anti-Trust Improvement Act or any other similar federal, state, or local statutory provision or common law anywhere in the world;

C.  for any actual or alleged liability under any written or oral contract or agreement; however, this exclusion does not apply to any of the following:

    1.  liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

    2.  **Defense Costs**.

D.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

E.  for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law;

F.  for any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

G.  arising out of, based upon or attributable to an **Employment Practices Act** or a **Fiduciary Liability Act**.

## IV. PRESUMPTIVE INDEMNIFICATION

If the **Private Company** is permitted or required by common or statutory law, but fails to indemnify the **Individual Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Private Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

### PART 2
### EMPLOYMENT PRACTICES LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

## I. INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act**.

## II. DEFINITIONS

A. **Employment Practice Act** means any actual or alleged:

1. wrongful dismissal, discharge or termination of employment;

2. breach of a written or oral employment contract or implied employment contract;

3. employment related misrepresentation;

4. wrongful failure to promote;

5. violation of employment discrimination laws (including harassment);

6. wrongful deprivation of a career opportunity;

7. employment related wrongful discipline;

8. negligent employee evaluation;

9. employment related invasion of privacy;

10. employment related defamation (including libel and slander);

11. sexual or workplace harassment of any kind;

12. constructive discharge of employment;

13. employment related **Retaliation**;

14. employment related humiliation;

15. wrongful demotion;

16. negligent reassignment;

17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practice Act** means any actual or alleged wrongful failure to employ, discrimination, sexual

harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

B. **Retaliation** means retaliatory treatment against an **Individual Insured** on account of such individual:

    1. exercising his or her rights under law, including but not limited to rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

    2. refusing to violate any law;

    3. having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured**;

    4. disclosing in writing to a superior or to any governmental agency any alleged violations of law;

    5. filing any claim against the **Insured** under the Federal False Claims Act or any other similar "whistle blower" federal, state, or local law.

C. **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Private Company**.

## III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

B. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

C. arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements; provided that this exclusion will not apply to any **Claim** for **Retaliation**;

D. arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

    1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

    2.     **Defense Costs**;

E.  to the extent such **Loss**, other than **Defense Costs**, constitutes employment-related benefits, stock options, perquisites, deferred compensation, payment of insurance, or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay;

F.  arising out of, based upon or attributable to a **D&O Wrongful Act** or a **Fiduciary Liability Act**.

## PART 3
## FIDUCIARY LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.  INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II.  DEFINITIONS

A.  **Administration** means:  (i) giving counsel to **Employees**, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of **Employees** or participants under any **Benefit Plan**.

B.  **Benefit Plan** means:

    1.  any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

    2.  any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

    3.  any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

    4.  any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date

of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

C. **Fiduciary Liability Act** means any actual or alleged:

1. breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

2. negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA.**

III.   EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C. arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D. arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

E. arising out of, based upon or attributable to any failure to comply with any law concerning workers   compensation, unemployment insurance, social security, disability benefits or any similar laws;

F. arising out of, based upon or attributable to an **Employment Practices Act** or a **D&O Wrongful Act**.

PI-PRD-2 (09/02)

## PART 4
## COMMON POLICY DEFINITIONS

A. **Application** means:

    1. the **Application** for this Policy, including any material submitted therewith; and

    2. the **Application**(s), including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means:

    1. a written demand for monetary or non-monetary relief;

    2. a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

    3. a criminal proceeding commenced by a return of an indictment;

    4. a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

    5. an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Underwriter's** written consent, such consent not to be unreasonably withheld;

    6. solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

    against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

    7. a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential **Claim** as described above.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

A c**laim** shall be considered made when an **Insured** first receives notice of the **Claim**.

C. **Damages** means any monetary judgment (including any pre- and post- judgment Interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage).

D. **Defense Cost**s means:

1.  any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim,** whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim,** except that **Defense Costs** shall not include:

    a.  any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

    b.  salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

    c.  salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**; and

2.  a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E.  **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employees as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall not include any independent contractors, unless specifically scheduled by endorsement.

F.  **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

G.  **Individual Insured** means:

    1.  any individual who has been, now is or shall become a director, officer, governor, trustee,  **Employee**, volunteer, management committee member, or member of the Board of Managers of the **Private Company** or, solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or  **Employee** of any **Benefit Plan**;

    2.  the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person;

    3.  the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in G. (1) or (4) which, in the absence of such death or incompetence, would have been covered by this Policy;

    4.  with respect to a **Private Company** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Private Company** that is equivalent to any position described in (1) above.

H.  **Insured** means the **Private Company** and **Individual Insured**.

I.  **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

J.  **Loss** means:

     1.     **Damages**;

     2.     **Defense Costs**;

     but **Loss** does not include:

     1.     criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or

     2.     taxes; or

     3.     matters deemed uninsurable under the law to which this Policy shall be construed; or

     4.     any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

     5.     any costs other than **Defense Costs** associated with any accommodation required pursuant to the American With Disabilities Act (removed Civil Rights Act of 1964) and the rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

K.  **Named Corporation** means the first entity named in Item 1 of the Declarations Page.

L.  **Private Company** means:

     1. the **Named Corporation**, and

     2. any **Subsidiary**, and

     3. any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, and

     4. solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

M.  **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

N.  **Private Offering** means securities offered or issued by the **Private Company** which are exempt from  registration with the United States Securities and Exchange Commission pursuant to Section 3 (b) of the Securities Act of 1933.

O.  **Public Offering** means securities issued by the **Private Company** for initial public offering, public sale, public solicitation or public distribution to the general public and which is subject to full registration with the United States Securities & Exchange Commission (SEC).  **Public Offering** does not include a **Private Offering**.

P.  **Run-Off Policy** means a new policy of insurance offered by the **Underwriter** at the request of the **Named Corporation** in the event of a **Transaction**. The **Run-Off Policy** shall apply to

**Claims** made and reported to the **Underwriter** during the term of the **Run-Off Policy**, but only for **Wrongful Acts** occurring prior to the effective date of said **Transaction**.

Q. **Subsidiary** means:

    1.  a corporation of which the **Named Corporation** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its **Subsidiaries** or the right to elect, appoint or designate more than 50% of such entity's **board** of directors, trustees, or managers and which is set forth in the **Application**;

    2.  a corporation which becomes a **Subsidiary** during the **Policy Period** and whose assets total less than 25% of the total consolidated assets of the **Named Corporation** as of the inception date of this **Policy Period**.  The **Named Corporation** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

    3.  a corporation, which becomes a **Subsidiary** during the **Policy Period** other than a corporation described in paragraph 2. above, but only upon the condition that within 90 days of its becoming a **Subsidiary**, the **Named Corporation** shall have provided the **Underwriter** with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this Policy required by the **Underwriter** relating to such new **Subsidiary**.  Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Underwriter** relating to such new **Subsidiary**.

    A corporation becomes a **Subsidiary** when the **Named Corporation** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**.  A corporation ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**.  Coverage for **Claims** made against any **Subsidiary** or the **Individual Insureds** of any **Subsidiary** shall only apply to **Wrongful Acts** of such **Subsidiary** or the **Individual Insureds** of such **Subsidiary** occurring after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

R. **Transaction** shall mean:

    1  the **Private Company** merging into or consolidating with another entity such that the other entity is the surviving entity; or

    2.  another entity, or person or group of entities and/or persons acting in concert acquiring securities or   voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more     than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Private Company**; or

    3.  **Public Offering**.

S.  **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

T.  **Wrongful Act** means:

PI-PRD-2 (09/02)

1.   with respect to Part 1, any **D&O Wrongful Act**,
2.   with respect to Part 2, any **Employment Practice Act**,
3.   with respect to Part 3, any **Fiduciary Liability Act**.

## PART 5
## COMMON POLICY EXCLUSIONS

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.   arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B.   arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

No **Wrongful Act** of any **Insured** shall be imputed to any other **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C.   arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D.   arising out of, based upon or attributable to any bodily injury or property damage in connection with tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E.   arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F.   arising out of, based upon or attributable to:

2.   any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

2.   any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

3.   any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G.    arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.    to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.    for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.    brought or maintained by or on behalf of, or in the right of, the **Private Company** except a derivative action **Claim**    by any person who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** and who brings or maintains the **Claim** without the solicitation, assistance or participation of such persons; provided, however that this exclusion shall not apply to a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for the **Private Company**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

K.    brought or maintained by any **Individual Insured** except:

    1.    any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by this Policy;

    2.    a **Claim** for an **Employment Practice Act** or a **Fiduciary Liability Act**;

    3.    a **Claim** for a **D&O Wrongful Act** brought or maintained by an **Employee**(s) who is not a past or present  director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** if such **Claim** for a **D&O Wrongful Act** is brought and maintained by such **Employee** without the assistance, participation or solicitation of any such persons.

L.    for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.    for service by the **Individual Insured** in any position or capacity in any entity other than the **Private Company**, a **Benefit Plan** or an **Outside Entity**, even if the **Private Company** directed or requested the **Individual Insured** to serve in such other position or capacity;

N.    arising out of, based upon or attributable to a **Public Offering** or any violation of the Securities and Exchange Act of      1933, Securities and Exchange Act of 1934, Investment Act of 1940, any state "Blue Sky" securities law, or any other federal, state or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the actual sale or purchase of securities; provided, however that this exclusion shall not apply:

    1.    to any **Private Offering**, subject to terms and conditions of Part 6, Section XVII;

PI-PRD-2 (09/02)

2.  to any **Claim** made by any securityholder of the **Private Company** for the failure of the **Insured** to undertake or complete a **Public Offering**.

### PART 6
### COMMON POLICY CONDITIONS

I.  LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A.  With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Loss** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B.  With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C.  The **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations.  The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C),  are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D.  **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations.  The **Underwriter** is not obligated to pay any **Loss** after the applicable Limit of Liability has been exhausted.

E.  The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II.  RETENTION CLAUSE

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

III.  DEFENSE AND SETTLEMENT

A.  The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim.** However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**.  Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE  AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

54

B.      If the **Insured** is defending a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld.  The **Underwriter** shall not be liable for **Loss** admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.  The **Underwriter** reserves the right, but not the duty, at any time to take over control of the defense of any **Claim** and with the consent of the **Insured**, settle any **Claim** as the **Underwriter** deems expedient.

C.      The **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D.      In the event that a **Claim** is made against the **Insured**, the **Insured** shall take reasonable measures to protect their interests.

E.      If more than one **Insured** is involved in a **Claim,** the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds.**

F.      The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G.      If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured.   Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%).  It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer.  If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

H.      ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which **Loss** in the aggregate exceeds the remaining available Limit of Liability for Part 1(Directors and Officers Liability Insurance), the **Underwriter** shall:

1. first pay such **Loss** for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2. with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such **Loss** for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

IV.     NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.  Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.     In the event that a **Claim** is made against the **Insured**, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice to the **Underwriter** as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such **Claim**, but, not later than 60 days after the expiration date of this Policy, Extension Period, or **Run-Off Policy**, if applicable.

B.     If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim,** with full particulars as to the **Wrongful Act,** dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.     All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Loss** on account of a one **Claim**.  Such **Claim** shall be deemed to be first made when the earliest of such **Claims** was first made or first deemed made pursuant to Clause B. hereinabove.

V.     CANCELLATION AND NON-RENEWAL

A.     The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least ten (10) days prior to the effective date of cancellation.

B.     The **Private Company** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Private Company** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C.    The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be mailed to the **Private Company** at least sixty (60) days prior to expiration of the **Policy Period**.

VI.    REPRESENTATIONS AND SEVERABILITY

A.    The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B.    Except for material facts or circumstances known to the **Individual Insured** signing the **Application,** no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII.    SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery.  The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII.    EXTENSION PERIOD

A.    If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension").  This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim.**

Upon expiration of the Automatic Extension, the **Private Company** shall have the right, upon payment of an additional 50%, 100%, 150% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this

Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B.    If the **Private Company** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium the following will apply:

The **Private Company** shall have the right, upon payment of an additional 50%, 100%, or 150% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C.   All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

## IX.   CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

## X.   ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

## XI.   AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Private Company** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Private Company** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Private Company** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Private Company** shall be the agent of any **Insured** to effect changes in this Policy.

## XII.   OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

In event of a **Claim** against the **Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** or an **Employment Practices Act** against or committed by a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.

XIII.   ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XIV.   ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.   No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.   Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XV.   CHANGE IN OWNERSHIP OR CONTROL

A.   If after the inception of the **Policy Period** a **Transaction** occurs then coverage under Parts 1, 2, and 3 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and only if the following conditions are met:

1.   the **Insured** provides written notice of the **Transaction** (other than **Public Offering**) to the **Underwriter** as soon as practicable but no later than 45 days of the effective date of such **Transaction**; and

2.   the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary; and

3.   in the case of a **Public Offering,** the **Insured** provides written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission.  The **Underwriter** shall provide a quotation for the **Public Offering**.

If **Insured** fails to meet conditions 1., 2., & 3. above, coverage under this Policy shall cease as of the effective date of the **Transaction** and the **Underwriter** shall return any unearned premium on a pro-rata basis.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years.  If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** by the **Insured** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

XVI.   TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed anywhere in the world.

PI-PRD-2 (09/02)

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVII.    COVERAGE FOR A PRIVATE OFFERING

The **Insured** shall give the **Underwriter** written notice of a **Private Offering**, together with full details and as soon as practicable, but not later than 60 days after the effective date of such **Private Offering**. However, any **Claim** arising out of, based upon or attributable to a **Private Offering** shall be subject to the Private Offering Retention stated in Item 4. of the Declarations Page. Such Private Offering Retention shall be borne by the **Insureds**, uninsured and at their own risk, except that a Private Offering Retention shall not apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.

XVIII.   TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Private Company** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim**. Notwithstanding the foregoing, if more than one coverage part applies to the same **Wrongful Act** or **Interrelated Wrongful Acts**, then the maximum Limit of Liability under all such coverage parts combined shall not exceed the highest applicable Limit of Liability under any one coverage part. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Private Company** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX.     ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Private Company**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss.  Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

PI-PRD-5 (09/02)

**<u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>**

## PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

It is provided, however, that the foregoing shall not be applicable to any derivative or shareholder class action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

All other terms and conditions of this Policy remain unchanged

PI-PRD-70 (08/03)

<u>**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**</u>.

# HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) EXTENSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

> ***PRIVATE COMPANY PROTECTION PLUS***

Under **PART 3**, **FIDUCIARY LIABILITY INSURANCE**:

The following is added to Section II. DEFINITIONS:

**C. Fiduciary Liability Act** also means:

3.  a.  any actual or alleged breach by an **Insured** of the responsibilities, obligations or duties imposed upon  fiduciaries of any **Benefit Plan** by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) including amendments thereto; or, by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) including amendments thereto; or

   b.  any other actual or alleged violation of HIPAA by the **Insured** due solely to such **Insured's** service as a fiduciary of a **Benefit Plan**; or

   c.  any actual or alleged negligent violation of HIPAA by any **Insured** in the **Administration** of any **Benefit Plan**.

It is further agreed that Section III. EXCLUSIONS is amended as follows:

Paragraph B. is deleted in its entirety and replaced with:

B.  to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable laws, except to the extent that::

   (1)  the benefits are payable by an **Individual Insured** as a personal obligation; and

   (2)  recovery for the benefits is based upon a covered **Fiduciary Liability Act,**

however, this exclusion shall not apply to **Defense Costs.**

Paragraph E. is deleted in its entirety and replaced with:

E.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, disability benefits, unemployment insurance, social security, or any similar laws, except with regard to:

    1.  the Consolidated Omnibus Budget Reconciliation Act of 1985 and any amendments thereto; or

    2.  the Health Insurance Portability and Accountability Act of 1996 and any amendments thereto.

All other terms and conditions of this Policy remain unchanged.

PI-PRD-73 (05/06)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## CORPORATE ADVANTAGE PRO-PAK ELITE COVERAGE

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended as follows:

**1.  OUTSIDE DIRECTORSHIP MODIFICATION**

**PART 1** **DIRECTORS & OFFICERS LIABILITY INSURANCE**, Section II (DEFINITIONS), item A. (**D&O Wrongful Act**), item 3. is replaced by the following:

3.  act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** if such service is at the written request or direction of the **Private Company**.

**2.  AMENDMENT OF PRIOR AND PENDING LITIGATION**

PART 5, (COMMON POLICY EXCLUSIONS), item F. is replaced by the following:

1. any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

2. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other similar policy in which this Policy is a renewal or replacement .

**3.  DELETION OF ~~EXCLUSIONS~~**

~~PART 5, (COMMON POLICY EXCLUSIONS), item G. and H. are hereby omitted in their entirety.~~

**4.  SECURITIES CLAIM CARVE BACK**

**PART 1** (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), Section III (EXCLUSIONS), items A. and F. are amended to include the following:

Exclusions A. and F. shall not apply to any **Claim** brought by any security holder of the **Private Company** (whether directly or derivatively) provided that such security holder is acting totally independently of, and totally without the solicitation, assistance, participation, or intervention of any Director or Officer of the **Private Company**, or any affiliate thereof.

5. **SEVERABILITY AMENDMENT**

PART 6, (COMMON POLICY CONDITIONS), Section VI (REPRESENTATIONS AND SEVERABILITY), items A. and B. are replaced by the following:

(A) In granting coverage to the **Insureds** under this Policy, the **Underwriter** has relied upon the declarations and statements in the written application(s) for this Policy.  Such declarations and statements are the basis of the coverage under this Policy and shall be considered as incorporated in and constituting part of this Policy.

(B) Any written application(s) shall be construed as a separate application(s) for coverage by each **Insured**. With respect to the declarations and statements in such application(s):

(1) no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available; and

(2) only facts pertaining to and knowledge possessed by the Chief Financial Officer, President, general counsel, risk manager, Chief Executive Officer, director of human resources  or Chairperson of any part of the **Private Company** or any other individual signing such application(s) shall be imputed to the **Private Company** for the purpose of determining if coverage is available.

6. **MODIFIED CHANGE IN OWNERSHIP OR CONTROL**

PART 6, (COMMON POLICY CONDITIONS), Section XV (CHANGE IN OWNERSHIP OR CONTROL), is replaced by the following:

If after the inception of the **Policy Period** a **Transaction** occurs then this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and the premium shall immediately be considered fully earned.

However, in the case of a **Public Offering**, the **Insured** shall provide written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission.  The **Underwriter** shall provide a quotation for the **Public Offering**.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years.  If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

7. **FORMER OFFICER I VS. I CARVE BACK**

PART 5, (COMMON POLICY EXCLUSIONS), item K. will not apply to any **Claim**:

1. in which the party bringing the **Claim** has not served as a director, trustee, manager, officer or equivalent executive of the **Private Company** within four (4) years immediately preceding the date the **Claim** is first made;

2. in which the party bringing the **Claim** has not brought the **Claim** in concert or cooperation with, at the suggestion of, or with the participation, active assistance, or intervention of any other **Insured** not described in line 1 above; or

3. based upon, arising from, or attributable to any **Public Offering**.

## 8. INDEPENDENT CONTRACTORS AS EMPLOYEES

PART 4, (COMMON POLICY DEFINITIONS), item E. is deleted and replaced with the following:

E. **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employed persons as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall include **Independent Contractor** as defined below.

**Independent Contractor** means an individual who is contracted to perform services for the **Private Company**; provided that such individual shall be deemed an **Employee** only if and to the extent that the **Private Company** provides indemnification to such individual for services rendered as if they were rendered by an actual **Employee** of the **Private Company**, and provided further that such individual(s) have been identified by the **Private Company** to the **Underwriter**. This Policy does not cover any **Loss** which any **Insured** is obligated to pay an **Independent Contractor** for overtime pay, vacation pay, employee benefit, or any compensation for services rendered.

## 9. AGGREGATE RETENTION

Part 6 (COMMON POLICY CONDITIONS), section II (RETENTION CLAUSE), is replaced by:

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

The Aggregate Retentions, which must be borne by the **Insured**, for all **Claims** made during the **Policy Period**, will be triple the amount of the per claim Retentions stated in Item 4. of the Declarations Page.

## 10. MODIFICATION OF SETTLEMENT CONDITION

Part 6 (COMMON POLICY CONDITIONS), section III (DEFENSE AND SETTLEMENT), item G is replaced by:

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 75% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 25% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by twenty-five percent (25%).  It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer.  If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

## 11. MODIFICATION OF SPOUSAL EXTENSION

PART 4, (COMMON POLICY DEFINITIONS), item G. paragraph 2, is deleted and replaced with the following:

2.  the lawful spouse or **Domestic Partner** of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person.  Domestic Partner means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the **Private Company**;

## 12. MODIFICATION OF PART 3 (FIDUCIARY LIABILITY INSURANCE)

**This section only applies if a Limit of Liability is noted for Fiduciary Liability on the Declarations Page.**

Part 3, Section I( Insuring Agreement), is deleted in its entirety and is replaced by the following:

A.  The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.  This coverage shall not apply any claims arising out of any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated under such law concerning privacy of health information or arising out of **Managed Care** liability.

In the event of the Insured enters into a voluntary settlement program with the Internal Revenue Service (or any similar state or federal agency), the **Company,** following prior notice provided by the **Company** to the **Underwriter,** during the **Policy Period** (or any applicable Extended Reporting Period), of the **Company's** intent to enter into said settlement program, shall pay on behalf of the **Insureds** any fees, penalties or sanctions imposed by law under said settlement program for which Inured is legally liable as a result of a **Fiduciary Liability Act** in an amount not to exceed $50,000. Such amount shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.  In no case, however, shall the Underwriter pay for any costs of corrections.

B.  The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** arising from any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated

under such law concerning privacy of health information.   Coverage under this paragraph is subject to a sublimit of liability of $25,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

C. The **Underwriter** shall pay on behalf of the **Insured**, **Defense Costs** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** in connection with **Managed Care** liability solely as regards any **Managed Care** plans sponsored solely by the **Private Company** and insured and administered by an outside insurance carrier. Coverage under this paragraph is subject to a sublimit of liability of $100,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

For the purposes of this endorsement **Managed Care** shall mean any  plan providing comprehensive medical care to plan members on the basis of a prepaid contract and which by virtue thereof limits the choices of medical care and service providers available to plan members.

Part 3, Section II, Definitions, Paragraph B is deleted in its entirety and is replaced by the following:

B. **Benefit Plan** means:

1. any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2. any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3. any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion.  The 90-day notice requirement shall not apply, however, if the total assets of the acquired or formed **Pension Benefit Plan**, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the Insured Organization, or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period; and

4. any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan or any employee stock ownership plan unless said plan is added by specific written endorsement to this policy.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

PI-PRD-73 (05/06)

**13. AMEND DEFINITION OF THIRD PARTY**

Part 2, Section II Definitions, Paragraph C is deleted in its entirety and replaced with the following:

C.   **Third Party** means any natural person who is not an **Employee** of the **Private Company**.

PI-PRD-75 (12/03)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), section III (EXCLUSIONS), item E. is replaced by:

E.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 4 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

PI-PRD-77 (01/04)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMENDMENT OF CANCELLATION PROVISION

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 6 Common Policy Conditions, section V. Cancellation and Non-Renewal, item B. is amended to include the following:

If, during the policy period, the **Underwriter's** *A.M. Best* rating is downgraded, and the **Private Company** elects to cancel the policy, then the earned premium will be calculated on a pro-rata basis.

All other terms and conditions of this Policy remain unchanged.

PI-PRD-112 (01/15)

**<u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>**

# BREACH OF CONTRACT EXCLUSION

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended as follows:

I.  <u>PART 1</u>, DIRECTORS & OFFICERS LIABILITY INSURANCE, Section III. EXCLUSIONS, Item C. is hereby deleted in its entirety and replaced with the following:

C. arising out of, based upon or attributable to any actual or alleged liability under any written or oral agreement; however this exclusion does not apply to liability which would have attached even in the absence of such contract or agreement.

All other terms and conditions remain unchanged.

## **THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

### SIDE-A NON-RESCINDABLE COVERAGE

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

SIDE-A NON-RESCINDABLE COVERAGE

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:


The Underwriter shall not be entitled under any circumstances to rescind the coverage granted by PART 1, DIRECTORS & OFFICERS LIABILITY INSURANCE, Section I. INSURING AGREEMENTS paragraph A. INDIVIDUAL LIABILITY COVERAGE.
.

All other terms and conditions of this Policy remain unchanged.

PI-MANU-1 (01/00)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

DEFENSE ONLY WAGE & HOUR CARVEBACK

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


DEFENSE ONLY WAGE & HOUR CARVEBACK

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS


1.    Part 2, EMPLOYMENT PRACTICES LIABILITY INSURANCE, Section III.
EXCLUSIONS, paragraph B. is amended by adding the following sentence to the
end thereof:

Notwithstanding the above, this exclusion shall not apply to Defense Cost
incurred in the defense of any Claim for violation of the Fair Labor
Standards Act (FLSA) or any similar federal, state, local or foreign
statutory law or common law or regulation governing or related to wage and
hour practices, including but not limited to, (i) any unfair business
practices alleged because of the failure to pay Earned Wages, or (ii)
seeking Earned Wages because any Employee(s) status was misclassified or
mislabeled or (iii) any dispute involving the distribution or pooling of tip
monies.  Coverage herewith in is subject to a Wage & Hour Sublimit of
Defense Cost of $100,000.  This Wage & Hour Sublimit of Defense Cost shall
be part of and not in addition to the Limit of Liability shown in Item 3.
(B) of the Declarations.


For the purpose of this endorsement, Earned Wages means wage compensation or
overtime pay for services rendered.


ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

All other terms and conditions of this Policy remain unchanged.

PI-PRD-WV-1 (03/03)

## <u>THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY</u>.


# WEST VIRGINIA AMENDATORY ENDORSEMENT


Section XIV, paragraph B. is replaced with the following:

Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter,** may be submitted to binding arbitration.  Both parties must mutually agree to arbitration.  The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel.  The panel shall consist of one arbitrator selected by such **Insured,** one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

PI-SLD-001 (01/15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS LIABILITY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions  of the federal Terrorism Risk Insurance Act, to be an act of terrorism subject to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

# Exhibit 1.2

# Complaint Filed in *Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc. v. David A. Levine, and Indeco Union*, Adversary No. 3:19-AP-00024

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE:  GEOSTELLAR, INC.                                      BK. NO. 3:18-BK-0045

MARTIN P. SHEEHAN, Trustee of
the Bankruptcy Estate of Geostellar, Inc.,

      Plaintiff,                                      CASE NO. _____

v.                                                           JUDGE _____

DAVID A. LEVINE, and
INDECO UNION, a Delaware Corporation,

      Defendants.

### COMPLAINT

NOW COMES Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc.,
by and through his counsel, Patrick S. Cassidy and Timothy F. Cogan, and Cassidy, Cogan,
Shapell & Voegelin, L.C., and for his Complaint against David A. Levine and Indeco Union, and
states as follows.

### General Allegations

1.     Geostellar, Inc., is a Delaware corporation.  It had been doing business at 224 W.
King St., Martinsburg, West Virginia. It filed for Chapter 11 Bankruptcy Relief on January 29,
2018.

2.     On April 26, 2018, the United States Bankruptcy Court for the Northern District
of West Virginia entered an order converting the bankruptcy case of Geostellar, Inc., from a case
under Chapter 11 to a case under Chapter 7.

3.     As a consequence of conversion to Chapter 7, Martin P. Sheehan was appointed
as the interim Chapter 7 Trustee.  In that capacity, Martin P. Sheehan is the successor in interest
to all legal and equitable interests of the Corporation at the time of filing of the case, pursuant to

11 U.S.C. § 541(a)(1) and to such additional rights as are contained in 11 U.S.C. § 541(a).

4.     A meeting of creditors was held in the Chapter 7 case on May 24, 2018.  No request for an election of an alternate trustee was made.  When the meeting of creditors concluded, Martin P. Sheehan became the permanent Chapter 7 Trustee of the Bankruptcy Estate of Geostellar, Inc., pursuant to 11 U.S.C. § 704(d).  He remains the successor in interest to all legal and equitable interests of the Corporation at the time of filing of the case, pursuant to 11 U.S.C. § 541(a)(1) and to such additional rights as are contained in 11 U.S.C. § 541(a).

5.     This is an action for civil conspiracy, breach of fiduciary duty, fraud, and breach of contract.

6.     Jurisdiction in this Court exists pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.  Venue is proper pursuant to 28 U.S.C. § 1408.

7.     This is a non-core proceeding.

### The Parties

8.     Plaintiff is Martin P. Sheehan, Trustee of the Bankruptcy Estate of Geostellar, Inc. Mr. Sheehan has a business address of 41 Fifteenth St., Wheeling, WV 26003.

9.     Defendant is David A. Levine.  Mr. Levine resides at 2426 Steamboat Run Road, Sheperdstown, WV 25401.

10.     Defendant, Indeco Union is the current name of what had originally been Applied Philosophy Lab, P.B.C., and Indeco, LLC. As detailed below, these entities were formed by, or at the direction of, Defendant, David A. Levine. These entities became a single entity known as Indeco Union on June 27, 2018. Indeco Union is the successor to all benefits and responsibilities of the entities which now compose that entity.

a.   Applied Philosophy Lab, P.B.C., was incorporated on September 25, 2017 by

2

David A. Levine as a Delaware Public Benefit Company.

b.  Indeco, LLC, was formed as a Delaware Limited Liability Company. It was formed as a wholly owned subsidiary of Applied Philosophy Lab, P.B.C. on November 3, 2017 by Michael Perlowski at the direction of David A. Levine.

c.  On February 14, 2018, the Articles of Incorporation of Indeco, LLC were changed to cause the corporation to be known as Indeco Corporation. That action was taken by the Chief Executive Officer David A. Levine of Applied Philosophy Lab, P.B.C., which entity was the sole member of Indeco, LLC.

d.  On March 22, 2018, the Articles of Incorporation of Indeco Corporation were again changed. What had been Indeco Corporation changed its name to Indeco Financial Syndicate by actions of David A. Levine, the Chief Executive Officer of Applied Philosophy Lab, P.B.C., which entity was the sole member of what had been Indeco Corporation.

e.  Also on March 22, 2018, Applied Philosophy Lab, P.B.C., amended its Certificate of Incorporation to change the name of Applied Philosophy Lab, P.B.C. to Indeco Union. The Amended Certificate of Incorporation was executed by the Chief Executive Officer of what had been Applied Philosophy Lab, P.B.C.

f.  On June 27, 2018, Indeco Financial Syndicate, an entity that had previously been known as Indeco, LLC, and then Indeco Corporation, merged with Indeco Union, an entity that had previously been known as Applied Philosophy Lab, P.B.C.

g.  As a result of the merger, the surviving corporate entity was Indeco Financial Syndicate, formerly Indeco, LLC and Indeco Corporation.

h.  However, the merger documents also reflect that the surviving entity, Indeco

3

Financial Syndicate, formerly Indeco, LLC and Indeco Corporation, again changed its name.

   i.   The name adopted by Indeco Financial Syndicate, formerly Indeco, LLC and Indeco Corporation, was Indeco Union. This was the name of the former subsidiary, that began as Indeco, LLC, and which had become Indeco Union.

11.   The business of Geostellar, Inc., was to provide an efficient solar energy marketplace.

12.   To create an efficient solar market place, Geostellar, Inc., created proprietary software through which it intended to match potential customers, that is persons interested in installing solar power generating capacity with all necessary information to complete a solar installation project, including a list of solar equipment vendors, solar equipment installers, and lending institutions interested in financing solar power projects.

13.   The on going business of Geostellar, Inc., was not generating profits, but had achieved the potential of meeting operational expenses by arranging 30 installations of solar power projects per month.

14.   Geostellar, Inc., had achieved the goal of 30 installations of solar power projects per month a number of times.

15.   Consistently meeting the goal of 30 installations of solar power per month would have permitted Geostellar, Inc. to raise on going capital and other financing to cause the growth and ultimately to the long term profitability of Geostellar, Inc.

16.   At all times material to this Complaint and prior to January 24, 2018, David A. Levine was the Chief Executive Officer of Geostellar, Inc. At all times material to this Complaint, and prior to January 24, 2018, David A. Levine was also a member of the Board of

4

Directors of Geostellar, Inc.  Thereafter, David A. Levine had an official role with Geostellar, Inc., and he testified as the representative of the corporate debtor at meetings of creditors held while the bankruptcy case was in Chapter 11, and after it converted to Chapter 7.

17.    As the Chief Executive Officer and as a member of the Board of Directors of Geostellar, Inc., David A. Levine owed a fiduciary duty to Geostellar, Inc., including the duty of loyalty.

18.    David A. Levine was bound by the terms of an employment contract dated July 28, 2016 with Geostellar, Inc., attached hereto as Exhibit A.

19.    Under the terms of that contract, David A. Levine was obligated, inter alia, to:

    a.  "diligently, conscientiously and exclusively, devote" his "full time and attention" as well as his "best efforts to discharge" his assigned duties;

    b.  be bound by the general employment policies and practices of the Company, including "those relating to protection of confidential information;"

    c.  to "not participate in, directly, or indirectly" "in any other business activity" or to "make or acquire any investment or business or prospects, financial or otherwise in a business adverse or antagonistic to" Geostellar, Inc., or "its prospects, financial or otherwise" without the written approval of the Chairman of the Compensation Committee.

20.    In addition, in the employment contract dated July 28, 2016, David A. Levine agreed inter alia, to pay attorney's fees to the prevailing party in the event of a breach of the contract of employment.

21.    Under the terms of that addendum to the employment contract, attached hereto as Exhibit B,  David A. Levine agreed to:

    a.   recognize and "hold in strictest confidence" all Proprietary Information of the Company; and,

    b.   Not to "directly or indirectly, whether as owner, partner, consultant, agent, coventurer or otherwise" "solicit, induce, or encourage any employee or consultant" of Geostellar, Inc., to "end his relationship with the Company" or "offer any employee or consultant of the Company....employment or engagement elsewhere."

22.    In addition, in the addendum to the employment contract dated July 28, 2016, David A. Levine agreed inter alia, to pay attorney's fees to the prevailing party in the event of a breach of the addendum to the contract of employment.

23.    On October 7, 2016, David A. Levine in his capacity as Chief Executive Officer of Geostellar, Inc., executed a Loan and Security Agreement with Matador Solar Partners, Inc., in which David A. Levine inter alia, pledged assets of Geostellar, Inc., including assets described therein as "Intellectual Property[1]" as collateral for a loan from Matador Solar Partners, Inc.

24.    By pledging such assets, David A. Levine created an expectation that such assets would be preserved for the benefit of Matador Solar Partners, Inc.

25.    The preservation of such assets became a fiduciary obligation of the officers and directors of Geostellar, Inc., including David A. Levine, the Chief Executive Officer.

---

[1]  As specifically provided in those documents, "Intellectual Property" was defined to mean: (i) all inventions designs, know-how, methods, processes, drawings, specifications or other data or information and all memoranda, notes and records with respect to any research and development, and all embodiment or fixations thereof whether in tangible or intangible form, (ii) Copyrights, Trademarks, Patents and Mask Works; (iii) and all trade secrets, and any and all intellectual property rights in computer software and computer software products; (iv) any and all design rights; (v) any and all claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above; (vi) all licenses or other rights to use any of the Copyrights, Patents, Trademarks, Mask Works, or any other property rights described above; (vii) all amendments, renewals and extensions of any of the Copyrights, Trademarks, Patents or Mask Works; and (viii) all proceeds and products of all the foregoing.
    Such a definition included the proprietary software developed by Geostellar, LLC.

26.     In and around, July 2017, David A. Levine changed the focus of Geostellar, Inc, from establishing a solar energy market place as discussed above.

27.     Instead, David A. Levine caused employees of the engineering department of Geostellar, Inc., to curtail work related to development of a solar energy marketplace and instead to cause those employees to begin working on the development of a cryptocurrency.

28.     A cryptocurrency depends on the existence of software and related programming code known as a "blockchain."   Ultimately, the cryptocurrency being developed by the engineering department of Geostellar, Inc., was to be known as Zydeco.

29.     On or about August 11, 2017, David A. Levine caused the filing of a form C, as required by 17 C.F.R. § 227.100, et seq., with the Securities and Exchange Commission in connection with efforts to obtain Crowdfunding for Geostellar, Inc.

30.     As part of that form, it was represented that Geostellar, Inc., was developing a cryptocurrency.

31.     A presentation was made to the Board of Directors of Geostellar, Inc., by David Levine on September 21, 2017 concerning the development of the cryptocurrency to be known as Zydeco.   That presentation described how funds could be generated for the benefit of Geostellar, Inc., through development and distribution of a cryptocurrency.

32.     In that document, some relationship was identified between the cryptocurrency and a watt of solar energy and further that the cryptocurrency being developed by Geostellar, Inc., had some intrinsic value because of this relationship.

33.     In fact, there can be no relationship between a cryptocurrency and a watt of solar energy such as to create an intrinsic value for the cryptocurrency being developed by Geostellar, Inc.

7

34.    The representations made through the Crowdfunding document filed with the Securities and Exchange Commission represented an effort to obtain monies without further exchange of a tangible asset, or any interest in a tangible asset.  The sole consideration for any monies paid to Geostellar, Inc., through the Crowdfunding solicitation was a speculative interest the cryptocurrency.

35.    On September 25, 2017, David A. Levine, in breach of his contractual and other fiduciary duties and intending to defraud Geostellar, Inc., formed a corporation to compete with Geostellar, Inc,, known as Applied Philosophy Lab, P.B.C., as a Delaware Public Benefit Corporation.

36.    On or about, November 3, 2017, David A. Levine, in breach of his contractual and other fiduciary duties and intending to defraud Geostellar, Inc., formed Indeco, LLC, a Delaware Limited Liability Company to be a wholly owned subsidiary of Applied Philosophy Lab, P.B.C. and to compete with Geostellar, Inc.

37.    The formation of Applied Philosophy Lab, P.B.C., as a Delaware Public Benefit Corporation and the formation of Indeco, LLC, as a Delaware Limited Liability company, was a conflict of interest for David A. Levine because the business plan of both entities was to compete with Geostellar, Inc.  Said actions further defrauded Geostellar, Inc.

38.    According to a Regulation Crowdfunding Form C that had been prepared for filing on November 17, 2017, with the Securities and Exchange Commission on behalf of Applied Philosophy Lab, P.B.C., Applied Philosophy Lab, P.B.C. was going to do business as "Zydeco," the name of the cryptocurrency previously identified by David A. Levine as the cryptocurrency to be developed by Geostellar, Inc.

39.    The "Overview" section of that document included an explanation that the

8

Company, that is Applied Philosophy Lab, P.B.C., expected to "leverage the capabilities of Geostellar's solar energy platform through a master license agreement." And further that "as part of an arrangement with Geostellar, the Company anticipate financing solar energy, battery storage, smart home, smart city, energy efficiency and related sustainability issues."

40.     At no time, did Applied Philosophy Lab, P.B.C., have any agreement with Geostellar, Inc., to cause Geostellar, Inc., to supply intellectual property to Applied Philosophy Lab, P.B.C., or to Indeco, LLC.

41.     In fact, when the prospect of such an arrangement was presented to the Board of Directors of Geostellar, Inc., that proposal and all related proposals were rejected by the Board of Directors on or about October 20, 2017.

42.     Any and all further action or statements by David A. Levine and/or Applied Philosophy Lab, P.B.C. based on the existence of some arrangement between Geostellar, Inc., and Applied Philosophy Lab, P.B.C., was in breach of contractual and other fiduciary duties of David A. Levine to Geostellar, Inc., and fraudulent, and in furtherance of a civil conspiracy between David A. Levine and others, including but not limited to Applied Philosophy Lab, P.B.C., now known as Indeco Union.

43.     According to a Regulation Crowdfunding Form including Exhibits A to C thereto that had been prepared for filing on December 5, 2017 with the Securities and Exchange Commission for Indeco, LLC, Indeco LLC was going to offer a cryptocurrency to be known as "Indecoin."

44.     The ideas expressed in this document were appropriated by David A. Levine from the Crowdfunding document prepared earlier for Geostellar, Inc.  More than appropriating the ideas expressed in this document, David A. Levine appropriated the business plan of Geostellar,

Inc., for competing companies which he had created.

45.   Said actions were in breach of the contractual and other fiduciary duties of David A. Levine and defrauded Geostellar, Inc.

46.   David A. Levine did not accept direction from the Board of Directors.

47.   Instead, David A. Levine directed that the proprietary software developed by Geostellar, Inc., and used as part of marketing efforts to raise working capital and otherwise to arrange financing for Geostellar, Inc., and as had been specifically pledged as collateral to Matador Solar Partners, LLC, be converted to "open source" software.

48.   The effect of this transformation of proprietary software to open code software caused the proprietary software of Geostellar, Inc., to be available to anyone, including entities created by David A. Levine to compete with Geostellar, Inc. What had previously available exclusively to Geostellar, Inc., was made non-exclusive. Said actions caused Geostellar, Inc., to be in breach of its contractual obligations.

49.   Furthermore, the effect of the transformation of proprietary software to open code software was to render the value of the proprietary software of Geostellar, Inc., which had been developed at considerable expense, to be made valueless as an exclusive asset of Geostellar, Inc.

50.   Said actions were in violation of contractual and fiduciary duties owed by David A. Levine to Geostellar, Inc. and defrauded Geostellar, Inc.

51.   In addition to appropriating intellectual property from Geostellar, Inc., on November 6, 2017, David A. Levine terminated all employees of Geostellar, Inc.

52.   On November 7, 2017, the former employees of the engineering department of Geostellar, Inc., the employees previously assigned to development of proprietary software for Geostellar, Inc., were hired by Indeco, LLC, a competitor of Geostellar, Inc., founded by David

10

A. Levine, and owned and controlled by him through Applied Philosophy Lab, P.B.C., another entity founded by David A. Levine and owned and controlled by him.

53.    Said actions were in violation of contractual and other fiduciary duties owed by David A. Levine to Geostellar, Inc. and defrauded Geostellar, Inc., and were in furtherance of a conspiracy between David A. Levine and others, including but not limited to Indeco, LLC, now known as Indeco Union.

54.    In November of 2017, David A. Levine traveled to Los Angeles at the expense of Geostellar, Inc., for the ostensible purpose of addressing a conference as the representative of Geostellar, Inc. The purpose of the travel was for David A. Levine to promote the cryptocurrency of Geostellar, Inc., known as Zydeco.

55.    Instead, on November 18, 2017, David A. Levine appeared at the conference and promoted the cryptocurrency known as Indecoin on behalf of Applied Philosophy Lab, G.P.C.

56.    These actions caused a breach of the Loan and Security Agreement in existence with Matador Solar Partners, LLC and exposed Geostellar, Inc., to claims of breach of contract by Matador Solar Partners, Inc.

57.    Said actions were a breach of the contractual and other fiduciary duties owed by David A. Levine to Geostellar, Inc. and defrauded Geostellar, Inc., and were in furtherance of a a civil conspiracy with others, including but not limited to Applied Philosophy Lab, G.P.C., now known as Indeco Union.

58.    Applied Philosophy Lab, P.B.C., was intended to develop "smart contracts, digital tokens, or other digital representations of assets on a distributed blockchain ledger, to finance, track and compensate for the shared ownership of assets, such as solar energy systems, energy storage, smart dwelling sensors and controls, appliances, carpeting real estate, water, soft

11

commodities, vehicles, smart city infrastructure, and other goods and services as well as compensate the suppliers of the assets and collect revenue from those who purchase the assets or subscribe to the goods and services, as well as compensate the suppliers of the asset." Further, Applied Philosophy Lab, P.B.C., was to be responsible for management of Indeco, LLC and to acquire customers, develop distribution channels, contract with suppliers, develop the Blockchain, and otherwise manage Indeco, LLC. Functionally, Applied Philosophy Lab, P.B.C. was created to be a competitor to Geostellar, Inc.

59.     Applied Philosophy Lab, P.B.C., and Indeco, LLC recognized that David A. Levine had a conflict of interest with Geostellar, Inc., through his holdings and representation on the Board of Directors of Geostellar, Inc. Nonetheless, said entities continued to conspire with David A. Levine to defraud Geostellar, Inc.

60.     A website for Geostellar, Inc., was revised to transfer web traffic to a website for Indeco, LLC without the approval of the Board of Directors of Geostellar, Inc., and in violation of the contractual and fiduciary duties of David A. Levine to Geostellar, Inc.

61.     In direct infringement of that contract of employment, David A. Levine breached his fiduciary duty by deceitfully creating a separate entity, which he owned and controlled so that he could take Geostellar's employees, technology, corporate opportunity developed solely for Geostellar, leave creditors and shareholders behind, to pursue crypto on his own, ... ultimately resulting in the demise of Geostellar and a cessation of business thereby damaging Geostellar and its creditors.

WHEREFORE, the Bankruptcy Estate of Geostellar, Inc., demands judgment, jointly and severally against, David A. Levine, and Indeco Union, for its damages including attorney's fees.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE TO A JURY.**

Respectfully submitted,

MARTIN P. SHEEHAN, Trustee of the
Bankruptcy Estate of Geostellar, Inc.,


By: /s/ Patrick S. Cassidy
                Of Counsel

Patrick S. Cassidy, Esq. (WV State Bar No. 671)
Timothy F. Cogan, Esq. (WV State Bar No. 764)
CASSIDY, COGAN,
SHAPELL & VOEGELIN, L. C.
The First State Capitol
1413 Eoff Street
Wheeling, WV 26003
Telephone: (304) 232-8100
Facsimile: (304) 232-8200
pcassidy@walslaw.com
tfc@walslaw.com

13

# EXHIBIT A

### GEOSTELLAR, INC.

### EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("*Agreement*") is entered into as of July 28, 2016, by and between DAVID A. LEVINE ("*Executive*") and GEOSTELLAR, INC., a Delaware corporation (the "*Company*").

### RECITALS

A. The Company and Executive are parties to that certain Key Employee Agreement dated as of March 8, 2010 (the "*Prior Agreement*"), which has been terminated effective January 15, 2014.

B. The Company and Executive desire to amend and restate the Prior Agreement in its entirety as set forth below.

### AGREEMENT

Accordingly, in consideration of the mutual promises and covenants contained herein, the parties hereto, intending to be legally bound, agree to the following:

1.   **EMPLOYMENT BY THE COMPANY.**

     1.1   **Effective Date.** The effective date of this Agreement shall be the date this Agreement is entered as set forth above (the "*Effective Date*").

     1.2   **Position.** Subject to the terms set forth herein, the Company agrees to employ Executive in the position of President and Chief Executive Officer, and Executive hereby accepts such employment under the terms of this Agreement effective as of the Effective Date.

     1.3   **Duties.** Executive shall serve in an executive capacity and shall perform such duties as are customarily associated with each of Executive's positions and any other functions reasonably assigned to the Executive from time to time. Executive will report to the Company's Board of Directors (the "*Board*"). Executive shall diligently, conscientiously and exclusively devote Executive's full time and attention and Executive's best efforts to discharge the duties assigned to the Executive by the Company.

     1.4   **Other Employment Policies.** The employment relationship between the parties shall also be governed by the general employment policies and practices of the Company, including those relating to protection of confidential information and assignment of inventions, except that when the terms of this Agreement differ from or are in conflict with the Company's general employment policies or practices, this Agreement shall control. As an employee of the Company, Executive agrees to comply with the Company policies, procedures and standards of conduct that may be established by the Company from time to time.

1

2.    COMPENSATION.

    2.1    Salary.  As of August 1, 2016, Executive shall receive for Executive's services to be rendered hereunder an annualized base salary of $160,000 (such salary, as may be adjusted pursuant to the immediately following sentences, the "*Base Salary*"), subject to standard federal and state withholding requirements, payable in accordance with Company's standard payroll practices.  At such a time as the Company has raised $1,500,000 in Series BB preferred stock (not including convertible debt), Executive shall receive for Executive's services to be rendered hereunder an annualized base salary of $195,000. The Board or the Compensation Committee of the Board (the "*Compensation Committee*") shall review and may make any adjustments to the Base Salary on at least an annual basis, subject to the covenants contained in that certain Amended and Restated Investors' Rights Agreement dated as of the Effective Date, as amended from time to time.  For the sake of clarity, nothing in this Section 2 alters Executive's at-will employment with the Company or obligates the Company to employ the Executive for any period of time. Executive's position with the Company is an exempt position, which means Executive will be paid a salary and will be expected to work additional hours as required by the nature of your duties and responsibilities and you will not be eligible for overtime pay.

    2.2    **Performance Incentive-Based Bonus**.  Commencing with the year following the first year in which the Company achieves Free Cash Flow of at least $10,000 per month for three consecutive months, Executive shall be eligible for an annual incentive bonus award (an "*Annual Bonus*") in respect of each fiscal year during his term of employment (each such year shall be referred to as the "*Bonus Year*").  Whether or not Executive earns any bonus will be dependent upon (a) the Company's achievement of a higher annual Free Cash Flow in the applicable Bonus Year over that of the immediately preceding year, and (b) Executive's continuous performance of services to the Company through the end of the applicable Bonus Year for which performance is being measured. The amount of the Annual Bonus shall be equal to the product of (a) the applicable Bonus Year's percentage increase in the Company's annual Free Cash Flow from the Company's annual Free Cash Flow in the immediately preceding year, multiplied by (b) the Base Salary.  Any Annual Bonus payable to Executive shall be paid to Executive at the same time as annual bonuses are generally payable to other senior executives of the Company, but in any event not later than the date which is two and one-half (2 ½) months following the end of the calendar year in which such Annual Bonus is earned.  For example, if the Board or Compensation Committee, as applicable, determines on March 1, 2017 that Executive has earned a bonus related to fiscal year 2016, that bonus must be paid at the same time as annual bonuses are generally payable to other senior executives of the Company, but in any event not later than March 15, 2017. Any bonus paid to Executive shall be subject to standard federal and state withholding requirements.

    2.3    **Retention Bonus**. Executive shall be eligible to earn the following retention bonus awards (collectively, the "*Retention Bonus*"): (a) a Retention Bonus in the amount of 20% of Executive's then current Base Salary if Executive remains in the continuous service of the Company through the two-year anniversary of the Effective Date; (b) a Retention Bonus in the amount of 30% of Executive's then current Base Salary if Executive remains in the

2

continuous service of the Company through the three-year anniversary of the Effective Date; (c) a Retention Bonus in the amount of 40% of Executive's then current Base Salary if Executive remains in the continuous service of the Company through the fourth-year anniversary of the Effective Date; and (d) a Retention Bonus in the amount of 50% of Executive's then current Base Salary if Executive remains in the continuous service of the Company through the five-year anniversary of the Effective Date. The Retention Bonus will be paid in the first full payroll cycle after the applicable anniversary date, but in all cases not later than the date which is two and one-half (2 ½) months following such year's anniversary of the Effective Date.

2.4     **Equity Financing Award.** Excluding the proceeds from the Series BB Preferred Share transaction closing in or about July 28, 2016, after the Effective Date, upon the closing of each equity financing in which the Company issues shares of its Preferred Stock (as defined in the Company's Certificate of Incorporation, as amended from time to time (the "*Charter*")) for total proceeds to the Company of not less than $1,000,000 at a price per share of at least 200% of the Series BB Original Issue Price (as defined in the Charter and such financing, a "*Qualified Financing*"), Executive shall be eligible to receive a Stock Award (as defined in the Company's 2011 Equity Incentive Plan, as amended from time to time) of that number of shares equal to the product of (i) 50,000 times (ii) the quotient of the price per share paid by the investors purchasing the equity securities in that Qualified Financing divided by the price per share paid by the investors who purchased equity securities in the Qualified Financing immediately prior to such Qualified Financing, rounded down to the nearest integer, with a maximum total number of shares equal to 1,000,000.

2.5     **Standard Company Benefits; Accrued Vacation.** During the term of his employment, Executive shall be entitled to participate in the standard benefits plans under the terms and conditions of such plans as may be in effect from time to time and provided by the Company to similarly situated employees. The Company may adopt, change or delete plans, policies and provisions in its sole discretion. Executive will be entitled to vacation benefits per the Company's standard vacation policy.

2.6     **Life Insurance.** For so long as the Company maintains a "key man" insurance policy on Executive, at Executive's election, the Company shall at its expense maintain a term life insurance policy with equivalent benefits to the "key man" insurance policy payable to a beneficiary selected by Executive, up to a maximum total expenditure of $5,000 per year by the Company. Executive may increase, supplement or augment the level of coverage beyond such maximum.

2.7     **Long-Term Disability Insurance.** The Company shall reimburse Executive an amount equal to the long-term disability insurance premiums paid by Executive up to a maximum of 2% of Executive's Base Salary. The Company's obligation to reimburse such insurance premiums will expire at such time that the Company provides long-term disability insurance benefits to Executive under a Company benefit plan.

3

    **2.8**   **Expense Reimbursement**.  The Company will reimburse Executive for reasonable business expenses in accordance with the Company's standard expense reimbursement policy.

    **2.9**   **Withholding**.  All payments required to be made by the Company to the Executive pursuant to this Agreement shall be subject to the withholding of such amounts, if any, relating to tax and other payroll deductions as the Company may reasonably determine should be withheld pursuant to any applicable law or regulation, including under Section 409A of the Internal Revenue Code (the "*Code*") and applicable guidance.

    **3.**   **EMPLOYEE PROPRIETARY INFORMATION, INVENTIONS, NON-SOLICITATION AND NON-COMPETITION AGREEMENT**.  The obligations of the Company under this Agreement, including its obligation to pay the compensation provided for in this Agreement, to the extent permitted by applicable law, are contingent upon the Executive's performance of Executive's obligations under the Amended and Restated Employee Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement in the form attached hereto as EXHIBIT A (the "*Assignment of Inventions Agreement*").  The Assignment of Inventions Agreement contains provisions that are intended by the parties to survive and do survive termination or expiration of this Agreement.

    **4.**   **OUTSIDE ACTIVITIES.**

    **4.1**   **Conflicting Interests**.  While employed by the Company, without the written approval of the Chairman of the Compensation Committee of the Board (a) Executive agrees not to participate in, directly or indirectly, any position (whether as an employee, consultant, director, advisor or otherwise) in any other business activity, whether or not such activity is pursued for gain, profit or other pecuniary advantage, or (b) make or acquire any investment or interest in a business adverse or antagonistic to the Company, its business or prospects, financial or otherwise; provided, however, that anything above to the contrary notwithstanding, (i) Executive may own, as a passive investor, securities of any public competitor corporation, so long as Executive's direct holdings in any one such corporation shall not in the aggregate constitute more than 1% of the voting stock of such corporation, and (b) Executive may engage in civic and not for profit activities so long as such activities do not materially interfere with the performance of his or her duties hereunder.

    **5.**   **FORMER EMPLOYMENT.**

    **5.1**   **No Conflict With Existing Obligations**.  Executive represents that Executive's performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement or obligation of any kind made prior to Executive's employment by the Company, including agreements or obligations Executive may have with prior employers or entities for which Executive has provided services.  Executive has not entered into, and agrees Executive will not enter into, any agreement or obligation either written or oral in conflict herewith.

**5.2** **No Disclosure of Confidential Information.** Executive will not intentionally disclose to the Company or use on behalf of the Company any confidential information belonging to any of Executive's former employers (except in accordance with agreements between the Company and any such former employer); but during Executive's employment by the Company Executive will use in the performance of Executive's duties all information which is generally known and used by persons with training and experience comparable to Executive's own and all information which is common knowledge in the industry or otherwise legally in the public domain.

**6.** **TERMINATION OF EMPLOYMENT.** Subject to the terms and requirements below, the parties acknowledge that Executive's employment with the Company is at-will. Either Executive or the Company may terminate the employment relationship at any time, for any reason, with or without Cause (as defined below). The provisions of *Sections 6.1* through *6.5* govern the amount of compensation, if any, to be provided to Executive upon termination of employment.

**6.1** **Termination by the Company Without Cause.**

(a) If and only if sixty percent (60%) or more of the Directors on the Company's Board of Directors vote to authorize Executive's termination without Cause, the Company shall have the right to terminate Executive's employment with the Company without Cause by giving notice as described in *Section 6.6* of this Agreement.

(b) In the event Executive's employment is terminated without Cause, the Company shall, subject to Section 6.1(d), provide to Executive the following "*Severance Benefits*" (i) continue to pay Executive as severance Executive's then-effective Base Salary for a period of time (the "*Severance Period*") equal to the Severance Length (as defined below) beginning on the date the Release (as defined below) becomes effective and may no longer be revoked by the Executive, less applicable withholding and deductions, on the Company's regular payroll dates and (ii) if Executive is participating in the Company's group health insurance plans on the effective date of termination, and Executive timely elects and remains eligible for continued coverage under COBRA, or, if applicable, state insurance laws, the Company shall pay, up to a maximum aggregate amount of $5,000.00, that portion of Executive's insurance premiums that the Company was paying prior to the effective date of termination for the Severance Period or for the continuation period for which Executive is eligible, whichever is shorter (the "*COBRA Payment Period*"). Notwithstanding the foregoing, if the Company determines, in its sole discretion, that the payment of the COBRA premiums would result in a violation of the nondiscrimination rules of Section 105(h)(2) of the Code or any statute or regulation of similar effect (including but not limited to the 2010 Patient Protection and Affordable Care Act, as amended by the 2010 Health Care and Education Reconciliation Act), then in lieu of providing the COBRA premiums, the Company, in its sole discretion, may elect to instead pay Executive on the first day of each month of the COBRA Payment Period, for the remainder of the COBRA Payment Period, a fully taxable cash payment equal to the COBRA premiums for that month, subject to applicable tax withholdings (such amount, the "Special Severance Payment"). Executive may, but is not obligated to, use such Special Severance

5

Payment toward the cost of COBRA premiums. The Company's insurance premium payment obligation will end immediately if the Executive obtains health care insurance from any other source during the Severance Period.

(c)     The "*Severance Length*" means eighteen (18) months.

(d)     Notwithstanding anything herein to the contrary, Executive shall not receive the severance payments set forth in Section 6.1(b) above or Section 6.5 below, as applicable, unless and until Executive executes a general release in substantially the form attached to this Agreement as EXHIBIT B, as updated to reflect changes in the law (the "*Release*"), on or before the forty-five (45) day period following his termination of employment and allows the Release to become effective on the eighth day after Executive signs the Release. If the period during which the Executive has discretion to execute or revoke the Release straddles two taxable years of the Executive, then the Company in its sole discretion shall make the severance payments starting in the second of such taxable years, regardless of which taxable year the Executive actually delivers the executed general release of claims to the Company. In addition, notwithstanding anything herein to the contrary, Executive shall forfeit his right to receive the severance payments set forth in Section 6.1(b) above and Section 6.5 below, if Executive fails to (i) return to the Company of all Company property, (ii) comply with the provisions of the Release, including without limitation any non-disparagement and confidentiality provisions contained therein, or (iii) comply with the terms of this Agreement, including, without limitation, the Assignment of Inventions Agreement.

### 6.2     Termination by the Company for Cause.

(a)     The Company shall have the right to terminate Executive's employment with the Company at any time for Cause by giving notice as described in *Section 6.6* of this Agreement.

(b)     "*Cause*" for termination shall mean sixty percent (60%) or more of the Directors on the Company's Board of Directors vote that reasonable cause exists to justify termination for Cause based on one or more of the following factors (as specifically identified prior to the Board vote): (i) conviction of, or plea of *nolo contendere* to, any felony or of any other crime involving dishonesty, moral turpitude or illegal drugs; (ii) Executive's breach of any material provision of this Agreement or of Executive's Assignment of Inventions Agreement; (iii) any act constituting dishonesty, fraud, immoral or disreputable conduct which is materially harmful to the Company or its reputation; (iv) any act of misconduct which is materially injurious to the Company; (v) refusal to follow or implement a clear and reasonable directive of the Board; (vi) gross negligence in the performance of Executive's duties; or (vii) breach of fiduciary duty. Prior to any termination for Cause pursuant to each such event listed in (v) or (vi) above, to the extent such event(s) is capable of being cured by Executive as determined in good faith by the Company, (A) the Company shall give the Executive notice of such event(s), which notice shall specify in reasonable detail the circumstances constituting Cause, and (B) there shall be no Cause with respect to any such event(s) if a majority of the Board determines in

6

160295 v5/DC

good faith that such events have been cured by Executive within thirty (30) days after the delivery of such notice.

(c)     In the event Executive's employment is terminated at any time with Cause, Executive will not receive severance pay or any other such compensation, except that, pursuant to Company's standard payroll policies, the Company shall pay to Executive through the date of termination, together with all compensation and benefits payable to Executive based on his participation in any compensation or benefit plan, program or arrangement the accrued but unpaid salary of Executive through the date of termination.

### 6.3     Voluntary Termination by Executive without Good Reason.

Executive may voluntarily terminate Executive's employment with the Company without Good Reason (as defined below) at any time by giving notice as described in Section 6.6. In the event Executive voluntarily terminates Executive's employment without Good Reason, Executive will not receive severance pay or any other such compensation, except that, pursuant to Company's standard payroll policies, the Company shall pay to Executive through the date of termination, together with all compensation and benefits payable to Executive based on his participation in any compensation or benefit plan, program or arrangement the accrued but unpaid salary of Executive through the date of termination.

### 6.4     Termination by the Company for Inability to Regularly Perform Duties or Due to Discontinuance of the Business.

(a)     Company may terminate Executive's employment in the event (i) of Executive's death, (ii) of any illness, disability or other incapacity of Executive in such a manner that Executive is physically rendered unable regularly to perform Executive's duties hereunder for a period in excess of one hundred twenty (120) consecutive days or more than one hundred eighty (180) days in any consecutive twelve (12) month period ("*Disability*"), unless otherwise prohibited by any applicable federal, state, or local law or ordinance, or (iii) the Company's business is discontinued because rendered impracticable by substantial financial losses, lack of funding, legal decisions, administrative rulings, declaration of war, dissolution, national or local economic depression or crisis or any reasons beyond the control of the Company (the "*Discontinuance of the Business*").

(b)     In the event of Executive's death or Disability or the Discontinuance of the Business, Executive will not receive severance pay or any other such compensation, except that, pursuant to Company's standard payroll policies, the Company shall pay to Executive the accrued but unpaid salary of Executive through the date of termination, together with all compensation and benefits payable to Executive based on his participation in any compensation or benefit plan, program or arrangement through the date of termination.

(c)     The determination regarding whether Executive is physically unable regularly to perform Executive's duties under (a) above shall be made by the Board based on written certification by a licensed physician. Executive's inability to be physically present on

7

160295 v5/DC

the Company's premises shall not constitute a presumption that Executive is unable to perform such duties.

      6.5    **Resignation by the Executive for Good Reason**. The Executive may resign Executive's employment for Good Reason within thirty (30) days after the occurrence of one of the events specified in Section 6.5(a) below, by giving notice as described in *Section 6.6* of this Agreement.

      (a)    *"Good Reason"* is limited to the following, without Executive's prior written consent: (i) forced relocation of the Executive by the Company to a location that is outside of a one hundred (100) mile radius of the Washington, D.C.-metropolitan area that increases the one-way driving commute of Executive by more than fifty miles; (ii) willful failure by the Company to provide the Executive the Base Salary in accordance with the terms of this Agreement, except for any reduction which is part of a general reduction or other concessionary arrangement affecting a majority of employees or affecting a majority of senior executive officers, (iii) material diminution in the Executive's job title, reporting structure or material duties prior to a Corporate Transaction; provided, that there will be no "Good Reason" if Executive remains the Chief Executive Officer of the Company, or (iv) material diminution of Executive's material duties on or after a Corporate Transaction unless Executive is performing duties and responsibilities for the Company or its successor that are similar to those Executive was performing for the Company immediately prior to such transaction (for example, if the Company becomes a division or unit of a larger entity and Executive is performing duties for such division or unit that are similar to those Executive was performing prior to such transaction but under a different title as Executive had prior to such transaction, there will be no "Good Reason" for Executive to terminate Executive's employment pursuant to this clause (iv)). However, prior to any termination for Good Reason pursuant to clauses (i), (ii), (iii) or (iv) of this Section 6.5(a), (A) the Executive shall first provide the Board with reasonable written notice, setting forth in reasonable detail the circumstances that the Executive believes exist that give rise to Good Reason for resignation within 90 days after the first occurrence of such circumstance, and (B) there shall be no Good Reason for resignation with respect to any such circumstances cured by the Company within thirty (30) days after the delivery of such notice, and if such circumstance is not reasonably cured within such period, the Executive's resignation from all positions the Executive then holds with the Company is effective not later than 30 days after the expiration of the cure period. Notwithstanding the foregoing, any actions taken by the Company to accommodate a disability of the Executive or pursuant to the Family and Medical Leave Act shall not be a Good Reason for purposes of this Agreement.

      (b)    In the event of Executive's resignation with Good Reason, the Executive shall be entitled to receive the same severance payments as Executive would receive under Section 6.1(b) above had Executive been terminated by the Company without Cause, subject to the provisions of Section 6.1(d) above.

      (c)    If the Executive terminates employment for any reason other than those listed in items (i), (ii), (iii) and (iv) of Section 6.5(a), the termination will not be for Good Reason and the Executive will not be entitled to severance pay or other benefits, except that,

8

160295 v5/DC

pursuant to Company's standard payroll policies, Company shall pay to Executive the accrued but unpaid salary of Executive through the date of termination, together with all compensation and benefits payable to Executive based on his participation in any compensation or benefit plan, program or arrangement through the date of termination.

(d)    "*Corporate Transaction*" means (i) any consolidation, stock exchange or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, stock exchange, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, stock exchange, merger or reorganization continue to hold at least a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, stock exchange, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of fifty percent (50%) of the Company's voting power is transferred; or (iii) a sale of all or substantially all of the assets of the Company; provided, that a Corporate Transaction shall not include (x) any consolidation or merger effected exclusively to change the domicile of the Company, or (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof.

6.6    Notice; Effective Date of Termination.

(a)    Termination of Executive's employment pursuant to this Agreement shall be effective on the earliest of:

(i)    immediately after the Company gives written notice to Executive of Executive's termination without Cause, unless the Company specifies a later date, in which case, termination shall be effective as of such later date;

(ii)    immediately after the Company gives written notice to Executive of Executive's termination for Cause, *provided, that* the Company has complied with the procedures set forth in the last sentence of Section 6.2(b) above, as applicable;

(iii)    immediately upon the Executive's death or the Discontinuance of the Business;

(iv)    immediately after the Company gives written notice to Executive of Executive's termination on account of Executive's Disability, unless the Company specifies a later date, in which case, termination shall be effective as of such later date, *provided,* that Executive has not returned to the full time performance of Executive's duties prior to such date;

(v)    immediately after the Executive gives written notice to the Company of Executive's resignation without Good Reason; or

9

(vi)    immediately following the date that Executive gives written notice to the Company of Executive's resignation for Good Reason; *provided*, that Executive has complied with the procedures set forth in the second to last sentence of Section 6.5(a) above, as applicable, and the reasons establishing Good Reason have not been cured by the Company during the thirty (30) day period as provided in Section 6.5(a) above.

(b)    Executive will receive compensation through any required notice period in the event of termination for any reason. However, subject to any right of Executive to cure during any cure period, the Company reserves the right to require that the Executive not perform any services or report to work during any required notice period.

7.    **GENERAL PROVISIONS.**

7.1    **Notices.**  Any notices provided hereunder must be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by electronic mail, telex or confirmed facsimile if sent during normal business hours of the recipient, and if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery.  All communications shall be sent to the Company at its primary office location and to Executive at Executive's address as listed on the Company payroll, or at such other address as the Company or the Executive may designate by ten (10) days advance written notice to the other.

7.2    **Amendment of Agreement.**  This Agreement may not be modified or amended except by an instrument in writing signed by the parties hereto; provided, however, that Executive agrees to execute any and all amendments to this Agreement as may be necessary to ensure compliance with the distribution provisions of Section 409A of the Code or as otherwise needed to ensure that this Agreement complies with Section 409A of the Code and all related rules and regulations as determined in the sole and absolute discretion of the Company.

7.3    **Severability.**  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provisions had never been contained herein.

7.4    **Waiver.**  If either party should waive any breach of any provisions of this Agreement, such party shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

7.5    **Complete Agreement.**  This Agreement and Executive's Assignment of Inventions Agreement constitute the entire agreement between Executive and the Company with regard to the subject matter hereof.  This Agreement is the complete, final, and exclusive embodiment of their agreement with regard to this subject matter and supersedes any prior oral

10

160295 v5/DC

discussions or written communications and agreements, including the Prior Agreement. This Agreement is entered into without reliance on any promise or representation other than those expressly contained herein, and it cannot be modified or amended except in writing signed by Executive and an authorized officer of the Company. The parties have entered into a separate Assignment of Inventions Agreement and may have entered into other agreement related to equity grants, which governs other aspects of the relationship between the parties, have or may have provisions that survive termination of Executive's employment under this Agreement, may be amended or superseded by the parties without regard to this Agreement and is enforceable according to its terms without regard to the enforcement provision of this Agreement.

7.6    **Counterparts.** This Agreement may be executed in separate counterparts, any one of which need not contain signatures of more than one party, but all of which taken together will constitute one and the same Agreement.

7.7    **Headings.**    The headings of the sections hereof are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof.

7.8    **Successors and Assigns.** This Agreement is intended to bind and inure to the benefit of and be enforceable by Executive and the Company, and their respective successors, assigns, heirs, executors and administrators, except that Executive may not assign any of Executive's duties hereunder without the written consent of the Company.

7.9    **Survival.** Executive's obligations under the Assignment of Inventions Agreement shall survive termination of Executive's employment with the Company, as provided therein.

7.10    **Choice of Law.** All questions concerning the construction, validity and interpretation of this Agreement will be governed by the law of the State of West Virginia. Time is of the essence hereunder.

7.11    **Arbitration.** To ensure the rapid and economical resolution of disputes that may arise in connection with the Executive's employment with the Company, the Executive and the Company agree that any and all disputes, claims, or causes of action, in law or equity, arising from or relating to the enforcement, breach, performance, or interpretation of this Agreement, the Executive's employment, or the termination of the Executive's employment, shall be resolved, to the fullest extent permitted by law, by final, binding and confidential arbitration in Martinsburg, West Virginia, conducted by the Judicial Arbitration and Mediation Services, Inc. ("*JAMS*") or its successor, under the then applicable rules of JAMS. The Executive and the Company acknowledge that by agreeing to this arbitration procedure, each party waives the right to resolve any dispute through a trial by jury or judge or administrative proceeding. The Arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (b) issue a written arbitration decision including the arbitrator's essential findings and conclusions and a statement of the award. The arbitrator shall be authorized to award any or all remedies that the Executive or the Company would be entitled to seek in a court of law. Nothing

11

in this Agreement is intended to prevent either the Executive or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. Notwithstanding anything herein to the contrary, the provisions of this Section 7.11 shall not apply to any issue or dispute arising under the Assignment of Inventions Agreement. The parties shall split the costs of the arbitration.

7.12    **Attorneys' Fees.**   In the event that any arbitration, suit or action is instituted to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all reasonable fees, costs and expenses of appeals.

7.13    **Advice of Counsel.**   Executive acknowledges that this Agreement has been prepared on behalf of the Company by Carrington, Coleman, Sloman & Blumenthal, LLP ("CCSB"), counsel to the Company, and that CCSB does not represent, and is not acting on behalf of, Executive. Executive has been provided with an opportunity to consult with Executive's own counsel with respect to this Agreement. This Agreement shall not be construed against any party by reason of the drafting or preparation hereof.

7.14    **Section 409A.**   It is intended that all of the severance benefits and other payments payable under this Agreement satisfy, to the greatest extent possible, the exemptions from the application of Section 409A of the Code and the regulations and other guidance thereunder and any state law of similar effect (collectively, "*Section 409A*") provided under Treasury Regulations Sections 1.409A-1(b)(4), 1.409A-1(b)(5) and 1.409A-1(b)(9), and this Agreement will be construed in a manner that complies with Section 409A. The provisions of this Agreement shall be interpreted and construed in favor of satisfying any applicable requirements of Section 409A. However, the Company does not guarantee any particular tax effect for income provided to Executive pursuant to this Agreement. Notwithstanding anything in this Agreement to the contrary, to the extent that any severance payments or benefits paid or provided to Executive, if any, under this Agreement are considered deferred compensation subject to Section 409A (such payments, the "*Deferred Payments*"), then to the extent required by Section 409A, no Deferred Payments will be payable unless Executive's termination of employment also constitutes a "separation from service," as defined in Treasury Regulations Section 1.409A-1(h) (without regard to any alternative definition thereunder) (a "*Separation from Service*"). Similarly, no Deferred Payments payable to Executive, if any, under this Agreement that otherwise would be exempt from Section 409A pursuant to Treasury Regulations Section 1.409A-1(b)(9) will be payable until Executive has a Separation from Service. For clarity, if Executive terminates employment with the Company in a manner entitling Executive to severance payments and benefits under Section 6.1(b), but does not incur a separation from service within the meaning of Section 409A, then any severance payments or benefits that are Deferred Payments and that are not immediately payable under this Section 7.14 will instead be paid to Executive when Executive incurs a Separation from Service, notwithstanding that Executive may no longer be employed under this Agreement. For purposes of Section 409A (including, without limitation, for purposes of Treasury Regulations Section 1.409A-2(b)(2)(iii)),

12

160295 v5/DC

Executive's right to receive any installment payments under this Agreement (whether severance payments, reimbursements or otherwise) shall be treated as a right to receive a series of separate payments and, accordingly, each installment payment hereunder shall at all times be considered a separate and distinct payment. Anything in this Agreement to the contrary notwithstanding, if, at the time of Executive's Separation from Service, the Company determines that Executive is a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code and that delayed commencement of any portion of the Deferred Payments is required to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code (any such delayed commencement, a "*Payment Delay*"), such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (i) six months and one day after the Executive's separation from service, (ii) the Executive's death, or (iii) such earlier date as is permitted under Section 409A. If any such delayed cash payment is otherwise payable on an installment basis, the first payment shall include a catch-up payment covering amounts that would otherwise have been paid during the six-month period but for the application of this provision, and the balance of the installments shall be payable in accordance with their original schedule. All in-kind benefits provided and expenses eligible for reimbursement under this Agreement shall be provided by the Company or incurred by the Executive during the time periods set forth in this Agreement. All reimbursements shall be paid as soon as administratively practicable, but in no event shall any reimbursement be paid after the last day of the taxable year following the taxable year in which the expense was incurred. The amount of in-kind benefits provided or reimbursable expenses incurred in one taxable year shall not affect the in-kind benefits to be provided or the expenses eligible for reimbursement in any other taxable year. Such right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit. For purposes of Section 409A, the right to a series of installment payments under this Agreement shall be treated as a right to a series of separate payments.

[SIGNATURE PAGE FOLLOWS]

13

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Employment Agreement on the day and year first written above.

GEOSTELLAR, INC.

By: _____

Tracy McKibben
Chairman of the Board

_____
DAVID A. LEVINE

14

160295 v5/HC

# EXHIBIT B

## EXHIBIT A

### GEOSTELLAR, INC.

### EMPLOYEE PROPRIETARY INFORMATION, INVENTIONS, NON-SOLICITATION AND NON-COMPETITION AGREEMENT

I am entering an Amended and Restated Employment Agreement ("Employment Agreement") with GEOSTELLAR, INC. (the "Company" or "Geostellar") contemporaneously with the execution and delivery of this Employee Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement ("Agreement"), which is attached as Exhibit A to my new Employment Agreement. Pursuant to the Employment Agreement, I will continue to serve as an executive of the Company and will receive a material increase in my base salary and become eligible for certain incentive bonuses, retention bonuses, equity awards, and benefits to which I am not already entitled. In consideration of my continued employment by the Company and the changes in the terms and conditions of my continued employment with the Company pursuant to my new Employment Agreement, I hereby agree as follows:

**1.    NONDISCLOSURE.**

1.1     Recognition of Company's Rights; Nondisclosure. At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at Company and/or incorporates any Proprietary Information. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns. I have been informed and acknowledge that the unauthorized taking of the Company's trade secrets may subject me to civil and/or criminal penalties.

1.2     Proprietary Information. The term "Proprietary Information" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company. By way of illustration but not limitation, "Proprietary Information" includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (collectively, "Inventions"), and (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers and (c) information regarding the skills and compensation of other employees of the Company. Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information which is generally known in the trade or industry, which is not gained as result of a breach of this Agreement, and my own, skill knowledge, know-how and experience to whatever extent and in whichever way I wish.

1.3     Third Party Information. I understand, in addition that the Company has received and in the future will receive from third parties confidential or proprietary information ("Third Party Information") subject to duties on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

1.4     No Improper Use of Information of Prior Employers and Others. During my employment by the Company I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer, or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person. I will use in the performance of my duties only information which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided, owned or developed by the Company.

**2.    ASSIGNMENT OF INVENTIONS.**

2.1     Proprietary Rights. The term "Proprietary Rights" shall mean all trade secrets, patents, copyright, mask work and other intellectual property rights or "moral rights" throughout the world. "Moral rights" refers to any rights to claim authorship of an invention or to object to or prevent the modification of any invention, or to withdraw from circulation or cause the publication or distribution of any Invention, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

2.2     Prior Inventions. Inventions, if any, patented or unpatented, which I made prior to the commencement of my employment with the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on Exhibit A (Previous Inventions) attached hereto a complete list of all Inventions that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively, "Prior Inventions"). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in Exhibit A but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such Inventions has not been made for that reason. A space is provided on Exhibit A for such purpose. If no such disclosure is attached, I represent that there are no Prior Inventions. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent.

2.3     Assignment of Inventions. Subject to Sections 2.4 and 2.6 I hereby assign and agree to assign in the future (when they are developed) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment with the Company. Inventions assigned to the Company, or to a third party as directed by the Company pursuant to this Section 2, are referred to as "Company Inventions."

2.4     I assigned Inventions. I recognize that this Agreement will not be deemed to require assignment of any invention that was developed entirely on my own time without using the Company's equipment, supplies, facilities, or trade secrets and neither related to the Company's actual or anticipated business, research or development, nor resulted from work performed by me for the Company.

2.5     Obligation to Keep Company Informed. During the period of my employment and for six (6) months after termination of my employment with the Company, I will promptly disclose to the Company fully and in writing all Inventions authored, conceived or reduced to practice by me, either alone or jointly with others. In addition, I will promptly disclose to the Company all patent applications filed by me or on my behalf within a year after termination of employment. The Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to the Company pursuant to this Agreement.

2.6     Government or Third Party. I also agree to assign all my right, title and interest in and to any particular Company Invention to a third party, including without limitation the United States as directed by the Company.

2.7     Works for Hire. I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C. Section 101).

2.8     Enforcement of Proprietary Rights. I will assist the Company in every proper way to obtain and from time to time enforce, United States and foreign Proprietary Rights relating to Company Inventions in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Proprietary Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee. My obligation to assist the Company with respect to Proprietary Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of my employment, but

1.

By:
519015 v5/RI

the Company shall compensate me at a reasonable rate after my termination for the time actually spent by me at the Company's request on such assistance

In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and in my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company

**3.** RECORDS. I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all Proprietary Information developed by me and all inventions made by me during the period of my employment at the Company, which records shall be available to and remain the sole property of the Company at all times

**4.** DUTY OF LOYALTY DURING EMPLOYMENT. I understand that my employment with the Company requires my full attention and effort. I agree that during the period of my employment by the Company I will not, without the Company's express written consent, engage in any employment or business activity other than for the Company, including but not limited to employment in business activity which is competitive with, or would otherwise conflict with, my employment by the Company

**5.** NO SOLICITATION OF EMPLOYEES, CONSULTANTS, SUPPLIERS, CONTRACTORS OR CUSTOMERS. I agree that for the period of my employment by the Company and for two (2) years after the date my employment by the Company ends for any reason, including but not limited to voluntary termination by me or involuntary termination by the Company, I will not, either directly or through others, (i) solicit, induce or encourage any employee or consultant of the Company to end his or her relationship with the Company; (ii) offer any employment or consultant of the Company (or anyone who was an employee or consultant of the Company within the six (6) months period prior thereto) employment or engagement elsewhere (iii) hire any employee or consultant of the Company (or anyone who was an employee or consultant of the Company within the six (6) month period prior thereto) to work elsewhere; or (iv) solicit or contact any supplier, contractor or customer of the Company, with whom I had contact or whose identity I learned as a result of my employment with the Company, for the purpose or effect of competing or interfering with any part of the Company's Business

The parties agree that for purposes of this Agreement, a customer is any person or entity to which the Company has provided goods or services at any time during the period commencing six (6) months prior to my employment with the Company and ending on the date my employment with the Company ends

**6.** NON-COMPETE PROVISION. I agree that for the period of my employment with the Company, and for the period of eighteen (18) months after the later of (1) the date my employment ends for any reason, including but not limited to voluntary termination by me or involuntary termination by the Company, or (2) the date a court of competent jurisdiction enters an order enforcing this provision in the event the Company enforces this Agreement through a court order, I will not, directly or indirectly (whether as owner, partner, consultant, agent, employee or otherwise, compete with the Company in its affiliates in the Company's Business in West Virginia, Virginia, Maryland, the District of Columbia, and any other state, province, or similar political unit in which the Company has employees, consultants, suppliers, contractors, or customers. The parties agree that the geographic scope of this non-competition provision is fair and reasonable in light of the geographically broad scope of the Company's business and the nature of its products and/or services. As a senior member of the Company's management team I acknowledge that I will be involved with, and have knowledge about, all aspects of the Company's business in all locations

The parties agree that for purposes of this Agreement, "Company's Business" means the business of the Company and its affiliates with respect to any product, service or process or the research and development of (a) software that uses large scale Genomics data to compute high resolution, integrated models from multiple data sources, (b) software that serves as a renewable energy value-chain integration platform, marketplace or exchange based on modeling and predicting resource and production risks, or (c) any other products, services or processes that has been or is being researched, designed, developed, manufactured, marketed, or sold by the Company during my employment

**7.** NO CONFLICTING AGREEMENT OR OBLIGATION. I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement or obligation of any kind made prior to my employment by the Company, including agreements or obligations I may have with prior employers or entities for which I have provided services. I have not entered into, and I agree I will not enter into, any agreement or obligation either written or oral in conflict herewith

**8.** RETURN OF COMPANY DOCUMENTS. When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all tangible and electronic copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company. I further agree that any property located at the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement

2.

Bo,
519015 v5/RH

**9.** LEGAL AND EQUITABLE REMEDIES. I recognize that in the course of employment with the Company, I will have access to Proprietary Information, to Third Party Information, and to employees, consultants, suppliers, contractors, and customers of the Company. I also recognize that the services I will be employed to provide are personal and unique. I understand that because of this the Company may sustain irreparable injury if I violate this Agreement. In order to limit or prevent such irreparable injury, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement

**10.** NOTICES. Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing

**11.** NOTIFICATION OF NEW EMPLOYER. In the event that I leave the employ of the Company, I authorize the Company to provide notice of my rights and obligations under this Agreement to my subsequent employer and to any other entity or person to whom I provide services

**12.** GENERAL PROVISIONS.

**12.1** Governing Law; Consent to Personal Jurisdiction. This Agreement will be governed by and construed according to the laws of the State of Delaware. Any action to enforce or construe this Agreement shall be exclusively instituted in any federal or state court of competent jurisdiction in Wilmington, Delaware and the parties consent to the personal jurisdiction of these courts

**12.2** Attorneys' Fees. I agree to indemnify the Company for its reasonable attorneys' fees and costs incurred in enforcing the terms of this Agreement should I violate any of its terms

**12.3** Severability. In case any one or more of the provisions, subsections, or sentences contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Moreover, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear

**12.4** Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns

**12.5** Survival. The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee

**12.6** Waiver. No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement

**12.7** Entire Agreement. The obligations pursuant to Sections 1 and 2 of this Agreement shall apply to any Item during which I was previously employed, or am in the future employed, by the Company as a consultant if no other agreement governs such disclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions or agreements between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement

This Agreement shall be effective as of the first day of our employment with the Company, namely _____ 201

No. 3:19-ap-00024   Doc 1-2   Filed 05/20/19   Entered 05/20/19 16:43:39   Page 4 of 9

I HAVE READ THIS AGREEMENT CAREFULLY AND
UNDERSTAND ITS TERMS.  I HAVE COMPLETELY FILLED
OUT EXHIBIT A TO THIS AGREEMENT.

Dated: 7/28/16

_____
(Signature)

_____
(Printed Name)

ACCEPTED AND AGREED TO:

GEOSTELLAR, INC.

By: _____

Title: CEO — Chairman

224 W. King Street
Martinsburg, WV 25401

Dated: July 28, 2016

3.

BLx
519015 v5/RT

## EXHIBIT A

### PREVIOUS INVENTIONS

TO:       Geostellar, Inc.

FROM:     _____

DATE:     _____

SUBJECT:  Previous Inventions

1.        Except as listed in Section 2 below, the following is a complete list of all inventions or improvements relevant to the subject matter of my employment by Geostellar, Inc. (the "*Company*") that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company;

☐    No inventions or improvements.

☐    See below:

_____

_____

_____

☐    Additional sheets attached.

2.        Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

☐    Additional sheets attached.

160295 v5/DC

## Exhibit B

### Form Of Release Agreement

A blank copy of this Release Agreement was attached to the Amended and Restated Employment Agreement as Exhibit A (the "*Employment Agreement*").

I understand that my position with GEOSTELLAR, INC. (the "*Company*") terminated effective _____, _____ (the "*Separation Date*"). The Company and I have agreed that if I choose to sign and return this Release, allow it to be effective, and comply with its terms, then following the Release Date (as defined below) the Company will provide severance benefits to me as follows: [described benefits and payment schedule]

I understand that I am not entitled to such severance benefits unless I sign this Release and otherwise comply with the surviving terms of the Agreement. I understand that, regardless of whether I sign this Release, the Company will pay me all of my accrued Base Salary through the Separation Date and any other benefits to which I am entitled by law.

In consideration for the severance benefits I am receiving under the Agreement, I hereby release, acquit and forever discharge the Company, its parents and subsidiaries, and their officers, directors, agents, servants, employees, attorneys, stockholders, successors, assigns and affiliates, of and from any and all claims, liabilities, demands, causes of action, costs, expenses, attorneys fees, damages, indemnities and obligations of every kind and nature, in law, equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed (collectively, "*Claims*"), arising out of or in any way related to agreements, events, acts or conduct at any time prior to and including the execution date of this Agreement, including but not limited to: all such Claims directly or indirectly arising out of or in any way connected with my employment with the Company or the termination of that employment; Claims related to salary, bonuses, commissions, stock, stock options, or any other ownership interests in the Company, vacation pay, fringe benefits, expense reimbursements, severance pay, or any other form of compensation; Claims pursuant to any federal, state or local law, statute, or cause of action including, but not limited to, the federal Civil Rights Act of 1964, as amended; the federal Americans with Disabilities Act of 1990; the federal Age Discrimination in Employment Act of 1967, as amended (the "*ADEA*"); 42 U.S.C. §1981, as amended, the Equal Pay Act, the Family Medical Leave Act, the Employee Retirement Income Security Act, Section 510; the West Virginia Human Rights Act; tort law; contract law; wrongful discharge; discrimination; harassment; fraud; defamation; emotional distress; breach of the implied covenant of good faith and fair dealing; and any and all other federal, state and local statutes, cases, authorities or laws (including common law) providing a cause of action that can be the subject of a release under applicable law. THIS IS A GENERAL RELEASE.

I expressly acknowledge that this Agreement is intended to include and does include in its effect, without limitation, all claims, including those which, as of the time I execute this Agreement, I do not know or suspect to exist I may have against the Company, and that this Agreement

160295 v5/DC

Case 3:22-cv-00050-GMG Document 7-7 Filed 04/19/22 Page 137 of 141 PageID #: 1197

contemplates the extinguishment of any such claim or claims except as expressly provided herein.

Notwithstanding the foregoing, nothing in the above Release shall cover any of my (i) rights under this Release; (ii) rights under any written agreement executed by the Company after the Separation Date; (iii) rights of indemnification; or my rights under any directors and officers insurance policy with regard to my service with the Company; or (iv) any claims that cannot be waived as a matter of law. The parties agree that this Release does not eliminate my right to file a charge with a government agency or to participate in a government agency investigation. I am waiving, however, my right to any monetary recovery should any governmental agency or entity, such as the EEOC or the DOL, pursue any charge or claims on my behalf.

I further acknowledge that the benefits provided to me pursuant to the Agreement based on my execution of this Release represent full and complete satisfaction of any and all monetary and non-monetary claims I have or might have against the Company, and that, except as expressly provided herein, no other amounts remain due and owing to me.

Within ten (10) days of the effective date of the Separation Date, I agree to return to the Company all Company documents (and all copies thereof) and other Company property then in existence that you have had in your possession at any time, including, but not limited to, Company files, notes, drawings, records, business plans and forecasts, financial information, specifications, computer-recorded information, tangible property (including, but not limited to, computers), credit cards, entry cards, identification badges and keys; and, any materials of any kind that contain or embody any proprietary or confidential information of the Company (and all reproductions thereof). **Receipt of the severance payments and benefits describe above in this Release expressly conditioned upon return of all such Company Property.**

I acknowledge and agree that this Release does not affect or supersede any agreements I have signed with the Company concerning confidentiality and non-disclosure, non-competition, non-solicitation, and assignment of inventions or other intellectual property developments, which agreements will remain in full force and effect.

I agree to keep the Agreement and its contents confidential and I will not disclose the Agreement or its contents to any person, other than my spouse, and my legal or tax advisor, unless compelled by legal process. I will refrain from taking action or making statements, written or oral, that disparage or defame the goodwill or reputation of the Company, its directors, officers, stockholders, agents and employees, as applicable. However, I understand nothing in the Agreement prevents me from providing accurate information to a government agency or participating in an agency investigation.

If I am forty (40) years of age or older as of the Separation Date, I acknowledge that I am knowingly and voluntarily waiving and releasing any rights I may have under the ADEA. I also acknowledge that the consideration given for the waiver in the above paragraph is in addition to anything of value to which I was already entitled. I have been advised by this writing, as required by the ADEA that: (a) my waiver and release do not apply to any claims that may arise

160295 v5/IX

after my signing of this Release; (b) I should consult with an attorney prior to executing this Release; (c) I have twenty-one (21) days within which to consider this Release (although I may choose to voluntarily execute this Release earlier); (d) I have seven (7) days following the execution of this release to revoke the Release; and (e) this Release will not be effective until the eighth day after this Release has been signed both by me and by the Company (the "*Release Date*").

I and the Company, acting through its executive officers, agree not to disparage the other party, and in addition with respect to the Company, I agree not to disparage the Company's officers, directors, employees, shareholders and agents, in each case in any manner likely to be harmful to them or their business, business reputation or personal reputation; provided that both the Company and I will respond accurately and fully to any question, inquiry or request for information when required by legal process.

This Release does not constitute an admission by the Company of any wrongful action or violation of any federal, state, or local statute, or common law rights, including those relating to the provisions of any law or statute concerning employment actions, or of any other possible or claimed violation of law or rights.

This Release constitutes the complete, final and exclusive embodiment of the entire agreement between you and the Company with regard to this subject matter. It is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties or representations. This Release may not be modified or amended except in a writing signed by both you and a duly authorized officer of the Company. This Release will bind the heirs, personal representatives, successors and assigns of both you and the Company, and inure to the benefit of both you and the Company, their heirs, successors and assigns. If any provision of this Release is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement and the provision in question will be modified by the court so as to be rendered enforceable. This Release will be deemed to have been entered into and will be construed and enforced in accordance with the laws of the State of West Virginia as applied to contracts made and performed entirely within West Virginia.

**I HAVE READ THE FOREGOING OFFER AND I FULLY UNDERSTAND ITS TERMS. I AM SIGNING THIS AGREEMENT FREELY AND VOLUNTARILY, HAVING BEEN GIVEN A FULL AND FAIR OPPORTUNITY TO CONSIDER IT AND CONSULT WITH ADVISORS OF MY CHOICE.**

**AGREED AND ACCEPTED:**

160295 v5/1JC

David A. Levine                              Date

160295 v5/DC

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

GEOSTELLAR, INC.

        Debtor.

Case No.: 3:18-BK-0045

_____

MARTIN P. SHEEHAN, Trustee of the
Bankruptcy Estate of Geostellar, Inc.

        Plaintiff,

v.

DAVID A. LEVINE and INDECO UNION, a
Delaware Corporation

        Defendants.

## ORDER AUTHORIZING PHILADELPHIA INDEMNITY INSURANCE COMPANY TO ADVANCE DEFENSE COSTS FOR DEFENDANT, DAVID LEVINE

Due notice of the *Motion of Philadelphia Indemnity Insurance Company to Allow Payment of Defense Costs for Defendant, David Levine* having been given; it further appearing that no other or further notice is necessary with respect to the motion; a hearing having been conducted to consider the relief sought in the motion; it appearing that there is good and sufficient cause for the relief sought in the motion; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334; it is hereby ORDERED that: (1) the relief requested in the *Motion of Philadelphia Indemnity Insurance Company to Allow Payment of Defense Costs for Defendant, David Levine* is granted in its entirety, pursuant to Section 362(d) of the Bankruptcy Code and Bankruptcy Rule 400l (a); (2) to the extent necessary, the automatic stay is hereby lifted or modified to permit the advancement of Defense Costs to Defendant Levine pursuant to Private Company Protection Plus Policy No. PHSD1249816 ("the Policy") issued to Geostellar, Inc.; and

(3) nothing in this Order shall constitute a waiver, modification or limitation of Philadelphia Indemnity Insurance Company's reservation of its rights, remedies, and defenses, under the Policy, at law or in equity or constitute a finding in regard to coverage under the Policy.

**IT IS SO ORDERED.**

ENTER:_____

_____
Honorable B. McKay Mignault

PREPARED BY:

*/s/ Debra Tedeschi Varner*
_____
Debra Tedeschi Varner (WV State Bar #6501)
Varner & Van Volkenburg, PLLC
360 Washington Avenue
Clarksburg, WV 26301
Telephone: (304) 918-2840
Facsimile: (304) 566-1161
***Counsel for Philadelphia Indemnity***
***Insurance Company***